# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE AUTOHOP LITIGATION | MASTER FILE<br>12 Civ. 4155 (LTS)(KNF) |
| | **REDACTED PUBLIC FILING**<br>**ORIGINAL FILED UNDER SEAL** |
| This Document Relates To:<br><br>Dish Network L.L.C. v. American Broadcasting Companies, Inc., et al., Civil Action No. 12-cv-4155 (LTS)(KNF) | |

## MEMORANDUM IN SUPPORT OF THE MOTION OF
## ABC, INC., AMERICAN BROADCASTING COMPANIES, INC., AND
## <u>DISNEY ENTERPRISES, INC. FOR A PRELIMINARY INJUNCTION</u>

Kevin T. Baine
Thomas G. Hentoff (admitted *pro hac vice*)
Hannah M. Stott-Bumsted
Stephen J. Fuzesi
Julia H. Pudlin (admitted *pro hac vice*)

WILLIAMS & CONNOLLY LLP
 725 Twelfth Street, N.W.
 Washington, DC 20005
 Telephone: (202) 434-5000
 Facsimile: (202) 434-5029

*Attorneys for ABC, Inc., American Broadcasting Companies, Inc., and Disney Enterprises, Inc.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

FACTS ................................................................................................................................................3

    A.    ABC's Production and Distribution of Primetime Programming............................3

    B.    ABC's Limited Grant of Rights to DISH ...................................................................6

    C.    No Video-on-Demand Rights .......................................................................................6

    D.    DISH's PrimeTime Anytime/AutoHop Service .........................................................7

        1.    DISH Introduces and Advertises PrimeTime Anytime and AutoHop...........................................................................................................7

        2.    How DISH's Service Works ............................................................................8

            a.    PrimeTime Anytime.................................................................................8

            b.    AutoHop.................................................................................................10

        3.    DISH's Service Targets ABC's Advertising and Competes with Its Authorized Distribution Channels ............................................................12

ARGUMENT ...................................................................................................................................14

I.    ABC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS .........................15

    A.    ABC Is Likely To Succeed on the Merits of Its Breach of Contract Claim .........15

    B.    ABC Is Likely To Succeed on Its Direct Copyright Infringement Claim .............17

        1.    DISH Directly Infringes ABC's Copyrights by Making Copies for Its Subscribers' Viewing............................................................................17

            a.    DISH's Copying Violates ABC's Exclusive Right To Reproduce Its Copyrighted Works.................................................17

            b.    DISH's Copying Is Not a Fair Use ..............................................21

                1)    The Purpose and Character of Use....................................22

                2)    The Nature of the Copyrighted Work ...............................23

                3)    Amount or Substantiality of Portion Used........................23

                4)    Threat to Existing and Potential Markets and Value of Copyrights ...............................................................23

        2.    DISH's Internal Copies Directly Infringe ABC's Copyrights..................26

    C.    ABC Is Likely To Succeed on Its Claim of Vicarious Infringement....................27

        1.    DISH Controls and Profits from the Copying............................................27

        2.    The Copying that DISH Controls Infringes ABC's Copyrights...............28

II.     ABC WILL BE IRREPARABLY HARMED IN THE ABSENCE OF A
        PRELIMINARY INJUNCTION ...................................................................33

        A.      Harm to ABC's Right to Exclusive Control .........................................34

        B.      Harm to ABC's Relationships and Negotiations with Authorized
                Licensees..............................................................................................35

        C.      Harm to ABC's Advertising Revenues.................................................36

        D.      Harm to ABC's Ability To Promote Its Own Programming .................38

        E.      Harm to ABC's Goodwill ....................................................................38

III.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN ABC'S FAVOR.................38

IV.     A PRELIMINARY INJUNCTION WOULD NOT HARM THE PUBLIC
        INTEREST.........................................................................................................39

CONCLUSION.............................................................................................................40

## TABLE OF AUTHORITIES

### CASES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)..............................29

*Agee v. Paramount Comm'cns, Inc.*, 59 F.3d 317 (2d Cir. 1995)..........................26, 33

*In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003)........................................33

*Am. Broad. Cos., Inc. v. Aereo, Inc.*, 2012 WL 2848158 (S.D.N.Y. July 11, 2012)...............36, 37

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994)................................21, 22, 26

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ........................................17

*Arista Records LLC v. Lime Grp.*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ............................27, 28

*BMG Music v. Gonzalez*, 430 F.3d 888 (7th Cir. 2005) ...............................................33

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ........................................21-24, 26

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 2003 WL 21056809 (S.D.N.Y. 2003)...........16

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ........................2, 17-21

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998).....................21

*CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004)....................................18

*eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058 (N.D. Cal. 2000) ...........................38

*eBay, Inc. v. MercExch., LLC*, 547 U.S. 388 (2006) ................................................15

*Eldred v. Ashcroft*, 537 U.S. 186 (2003)..........................................................39

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)................................28

*Fox Broadcasting Co. v. Dish Network L.L.C.*, No. CV 12-04529 (C.D. Cal. Nov. 7, 2012)..............................................................................3

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159 (2d Cir. 1971) ............27

*Harper & Row, Publ'rs, Inc. v. Nation Enters., Inc.*, 471 U.S. 539 (1985) ..........17, 22, 24, 29, 39

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) ..............................21, 22, 23

*Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693 (2d Cir. 1998) ...................................28

*MCA, Inc. v. Wilson*, 677 F.2d 180 (2d Cir. 1981) ...................................................................23

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788 (9th Cir. 2007) ...........................................27

*Princeton Univ. Press v. Mich. Doc. Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996).........................22

*RCA Records v. All-Fast Sys., Inc.*, 594 F. Supp 335 (S.D.N.Y. 1984)............................................16

*Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238 (S.D.N.Y. 2000).........................................35

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004)....................................14, 33, 34, 36

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ...............................................................14, 15, 33

*Satellite Broad. Commc'ns Ass'n v. FCC*, 275 F.3d 337 (4th Cir. 2001).......................................39

*Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182 (2d Cir. 2012)..........................17

*Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) ...............................27

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ..............22-24, 29-31, 33

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510 (S.D.N.Y. 2009)......................16

*Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256 (S.D.N.Y. 2008) ............................................28

*Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513 (S.D.N.Y. 2008) ........................21

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011) .34-35, 37-39

*WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011),
    *aff'd*, 691 F.3d 275 (2d Cir. 2012)........................................................................................37

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012)..........................................2, 14, 33-37, 39

## STATUTES AND RULES

17 U.S.C. § 106.............................................................................................................................26

17 U.S.C. § 107....................................................................................................................22, 23, 24

17 U.S.C. § 410.............................................................................................................................17

47 U.S.C. § 325...............................................................................................................................6

## OTHER AUTHORITIES

4-13 *Nimmer on Copyright* § 13.05 (MB 2012) ....................................................................21, 23

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 42 (5th ed. 1984)..................21

## PRELIMINARY STATEMENT

DISH Network L.L.C. ("DISH"), the third largest distributor of cable or satellite television programming in the United States, has unilaterally and without authorization undertaken to record all of the primetime programs of the four major television networks every night—and to make those programs available for playback without the commercials.  DISH promotes its service, which it calls "PrimeTime Anytime" and "AutoHop," as providing an "on-demand" "library of the latest primetime shows" and "commercial-free television."

DISH describes its service as "innovative," but there is nothing new about on-demand and commercial-free programming:  ABC offers nearly every on-demand and commercial-free option that modern technology permits—through authorized providers who negotiate the terms upon which those options are made available.[1]  What is new about DISH's service is that DISH offers it without authorization from ABC and without regard to the contract provisions to which licensed providers of similar services have agreed.

Copyright law exists to protect the copyright holder's exclusive right to control the reproduction and distribution of its works.  In addition, the contract at issue here expressly prohibits DISH from making or authorizing others to make copies of ABC's programming.  By creating for its subscribers—or by authorizing and encouraging them to create—an "on-demand library" of ABC's most valuable programming for commercial-free viewing, DISH has infringed the copyrights on all of this programming and breached the agreement that defines its right to distribute ABC programming.  The very purpose and undeniable effect of DISH's service is to

---

[1] For ease of reference, this brief collectively refers to counterclaim plaintiffs ABC, Inc., American Broadcasting Companies, Inc., and Disney Enterprises, Inc. as "ABC," except when discussed individually.

act as a substitute for ABC's authorized offerings for on-demand and commercial-free viewing of the very same primetime programs.

Application of two Second Circuit decisions calls for entry of a preliminary injunction in this case. Under *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"), ABC is likely to succeed in establishing DISH's liability for direct copyright infringement. The unauthorized reproductions made by DISH's service are the direct result of comprehensive, affirmative, and "volitional" conduct on DISH's part. DISH selects the programs that are available for PrimeTime Anytime recording—those that appear in primetime on the four major networks; a subscriber cannot add any programs. DISH decides when each recording starts and stops; a subscriber cannot change this and is even prevented from stopping a recording that is in progress or about to begin. And every week, employees acting on DISH's behalf review an electronic program guide to decide which specific programs to record. This conduct renders DISH liable for direct copyright infringement as well as breach of contract and vicarious copyright infringement.

Under *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), the ongoing and threatened harm to ABC in this case is the type of irreparable harm that requires a preliminary injunction. As in *ivi*, DISH's actions "dilute [ABC's] . . . control over [its] product," "weaken [ABC's] negotiating position with advertisers and reduce the value of its . . . advertisements," and "disrupt [ABC's] broadcast distribution models" and "[t]he strength of [ABC's] negotiating" position with authorized distributors that feel pressure to imitate DISH's service. *Id.* at 285-87. DISH is also undermining ABC's ability to attract new audiences via the promotional spots for its own programming that ABC airs during commercial breaks.

The longer DISH is allowed to offer and grow its unauthorized service, the more it will interfere with ABC's advertising, the more it will disrupt ABC's relationship with providers of authorized on-demand and commercial-free services, and the more it will undermine ABC's goodwill with the increasing numbers of viewers who become accustomed to DISH's unlawful service.[2]  A preliminary injunction is therefore warranted.

## FACTS

### A.    ABC's Production and Distribution of Primetime Programming

With some variation by time zone, the hours from 8:00 p.m. to 11:00 p.m. Monday through Saturday, and 7:00 p.m. to 11:00 p.m. Sunday, are known in television as primetime. This is when most viewers watch television and when the four major broadcast networks—ABC, CBS, NBC, and FOX—air the programs on which they rely for the lion's share of their advertising revenue.  *See* Declaration of Justin Connolly ("Connolly Decl.") ¶ 7; Declaration of Patrick McGovern ("McGovern Decl.") ¶ 3.

ABC invests significant sums of money to develop, produce, and acquire the premium-quality, creative programming that airs during primetime (the "ABC programs" or "ABC programming").  Connolly Decl. ¶ 6.  ABC owns the copyrights in many of these programs and acquires the rights to air the rest.  *Id.* ¶ 5.

ABC's programs are primarily distributed through the ABC Television Network (the "Network"), which provides broadcast programming to eight stations owned by ABC-related

---

[2] In *Fox Broadcasting Co. v. Dish Network L.L.C.*, No. CV 12-04529 (DMG) (C.D. Cal.), with which this Court is familiar, Judge Gee of the Central District of California recently denied a preliminary injunction against DISH's PrimeTime Anytime/AutoHop service.  *See Fox*, Slip op. (C.D. Cal. Nov. 7, 2012) ("*Fox* Op.") (attached as Exhibit 1 to the Declaration of Thomas G. Hentoff).  But that case involved a different contract, and the court's copyright analysis overlooked important facts and misapplied the law, as we will explain in this Memorandum.  Fox appealed the decision two days after it was issued, and the appeal will be fully briefed by the end of January 2013.  *See* Order, *Fox*, No. 12-5708 (9th. Cir. Nov. 15, 2012), ECF No. 6.

entities and more than 200 affiliated stations owned by third parties. *Id.* ¶¶ 3, 5. ABC programming is broadcast free of charge to 54 million Americans who watch television via over-the-air antennas. *Id.* ¶ 9. It is also distributed via cable, satellite, and similar services by providers such as Comcast, Time Warner Cable, DirecTV and DISH, who charge a fee to their subscribers. *Id.* ¶¶ 9, 24.

ABC's primetime programming would not be possible without the revenue derived from advertising. ████████████████████████████████████████████████

**REDACTED-FILED UNDER SEAL**

████████████████████████████████████████

Advertisers pay for commercial time based on the size of the audience—principally as measured by The Nielsen Media Research Company's "C3" rating. The Nielsen C3 rating measures the audience not of a program itself, but of the advertisements that air during the program's commercial breaks. Specifically, the C3 rating measures the average audience size during the commercial minutes while the program is broadcast live and over the next three days when it is played back at normal speed on a DVR or viewed via a cable or satellite video-on-demand service. McGovern Decl. ¶ 4-5; Connolly ¶ 12. ████████████████████████████

**REDACTED-FILED UNDER SEAL**

████████████ Declaration of Mark Loughney ("Loughney Decl.") ¶ 20. When viewers watch programs using regular DVR playback, they have the option of manually fast-forwarding (by use of a fast-forward or 30-second skip button) through commercials. ████████████████████████

**REDACTED-FILED UNDER SEAL**

████████████████████ *Id.* ¶ 15.

In addition to its live broadcasts, ABC makes its programming available through a number of distribution platforms, which give consumers a range of viewing options, including:

**Video-on-demand:** ABC has entered into dozens of video-on-demand ("VOD") agreements with cable and satellite providers, enabling their subscribers to access programs (usually the day after initial broadcast) via on-demand menus on their TV screens.  To protect ABC's advertising revenue, these agreements expressly prohibit fast-forwarding. ████████

████████████████████████████████████████████████████

REDACTED-FILED UNDER SEAL

███████████████████████████████ Connolly Decl. ¶ 12.

**Internet streaming:** ABC provides digital versions of its programs, with commercials that cannot be skipped, for Internet streaming, typically the day after initial broadcast.  These programs are available on ABC.com and on authorized third-party websites, including hulu.com. *Id.* ¶¶ 16, 17.

**Digital distribution:** ABC makes commercial-free versions of its primetime programs available for paid downloading, typically starting the day after initial broadcast, from online services such as Apple (iTunes) and Amazon.  These versions can be viewed on consumers' computers and mobile devices.  Connolly Decl. ¶ 18.

**DVD and Blu-ray discs:**  ABC distributes for sale DVD and Blu-ray discs containing commercial-free versions of its primetime programs, typically after the end of the broadcast season.  *Id.* ¶ 19.

**"Subscription" video-on-demand:**  ABC also makes commercial-free versions of its primetime programs available at online subscription video sites like Netflix and Amazon Prime.

Paid subscribers of these services are able to view online streams of ABC programs, typically starting after the broadcast season ends.  Connolly Decl. ¶ 20.

**B.**     **ABC's Limited Grant of Rights to DISH**

Under federal communications law, satellite television providers like DISH must obtain consent from a broadcast television station to retransmit its signal to subscribers in local markets. 47 U.S.C. § 325(b)(1)(A) & (b)(3)(C).  ABC, Inc. on September 15, 2005 entered into a Retransmission Consent Agreement ("2005 Agreement") with DISH's predecessor, EchoStar Satellite L.L.C.  The 2005 Agreement grants DISH the limited right to "simultaneously receive and retransmit" the digital broadcast signal of eight stations owned by ABC-related entities (the "Digital Signal") to DISH's satellite television subscribers.  *Id.* ¶ 22, Ex. 4 (§ 1), 23. ███████

███████████ REDACTED-FILED UNDER SEAL ███████████

The Retransmission Consent Agreement expressly prohibits DISH from copying, or authorizing the copying of, the Digital Signal:

> EchoStar **shall not**, for pay or otherwise, **record, copy, duplicate**, retransmit, **and/or authorize** the **recording, copying, duplication** or retransmission **of any portion of the Digital Signal** without the prior written consent of Broadcaster [ABC, Inc.].  The foregoing shall not preclude EchoStar's practice of connecting subscribers' home recording devices such as VCRs or DVRs . . . .

*Id.* ¶¶ 22, Ex. 4 (§ 12) (emphasis added), 23, 24.

ABC, Inc. did not charge DISH any license fee for the right to retransmit the Digital Signal.  Connolly Decl. ¶ 24.  The critical benefit that ABC receives from the distribution of its programming by DISH is the advertising revenue that it receives as a result.  *Id.*

**C.**     **No Video-on-Demand Rights**

████████████████████████████████████████████

████████████ REDACTED-FILED UNDER SEAL ████████████

███████ **REDACTED-FILED UNDER SEAL**

█████ DISH is the only one of the top ten cable or satellite TV providers that has not entered into a VOD agreement with ABC. *Id.* ¶ 26.

### D. DISH's PrimeTime Anytime/AutoHop Service

#### 1. DISH Introduces and Advertises PrimeTime Anytime and AutoHop

Like other cable and satellite providers, DISH furnishes subscribers with combination tuner/DVR set-top boxes that receive incoming signals and can make digital recordings of programs. In March 2012, in connection with the introduction of a new set-top box called the Hopper, DISH launched a new service called PrimeTime Anytime, which records by default **every** primetime program broadcast by **all four** major television networks and stores them for up to eight days. DISH explained at the time that PrimeTime Anytime "creates an on-demand library of approximately 100 hours of primetime TV" every week, Declaration of Thomas G. Hentoff ("Hentoff Decl."), Ex. 20, at 602, which DISH also described as "a library of the latest primetime shows," Ex. 42, at 787.[3]

DISH widely promoted PrimeTime Anytime as providing "On Demand" access to the networks' primetime programming. *See, e.g.*, Ex. 8, at 305-07; Ex. 9, at 316, 318; Ex. 14, at 453. It filed a trademark application describing PrimeTime Anytime as a "video-on-demand service," Ex. 19, at 583, █████████ **REDACTED-FILED UNDER SEAL**

████████████████████████████████████

In May 2012, DISH added to PrimeTime Anytime a service called AutoHop, which allows subscribers "to skip all commercials for most recorded primetime HD programs shown on ABC, CBS, FOX, and NBC when viewed the day after airing." Ex. 21, at 605. Calling its new

---

[3] References to "Ex. __, at __" are to the consecutively paginated exhibits attached to the Hentoff Declaration. References to "__ Decl., Ex. __" are to exhibits attached to other declarations.

service "a revolutionary development that no other company offers," *id.*, DISH distinguished

AutoHop from "manual fast forwarding," which the patent application for the service derided as

"an inconvenience for the user" that "often leads to inaccurate results."  Ex. 36, at 756.  With

AutoHop, DISH announced, "DISH [has] created commercial-free TV."  Ex. 8, at 301.

As part of the largest advertising campaign in its history, DISH has spent millions of

dollars advertising the PrimeTime Anytime/AutoHop service as providing "instant On Demand

access to your favorite primetime shows" and allowing consumers to "Watch Commercial-Free

TV."  Ex. 8, at 305; Ex. 9, at 324, 325.

REDACTED-FILED UNDER SEAL

### 2. How DISH's Service Works

#### a. PrimeTime Anytime

To receive PrimeTime Anytime, a DISH subscriber need only activate it by pressing

"Enable" in response to a prompt from DISH on an on-screen Hopper menu.  A subscriber is

presented with the default PrimeTime Anytime setting that records all four major networks, all

seven days of the week, and stores the recordings for eight days.[4]  By then pressing "Done," the

subscriber is signed up to receive the PrimeTime Anytime service for good.  Ex. 2, at 189-91,

---

[4] Subscribers are given the option of deselecting any of the networks or days of the week, or
reducing to two the number of days stored.  Ex. 2, at 189-92 (Minnick Dep.); *see also* Ex. 10, at
357.  REDACTED-FILED UNDER SEAL

201 (Minnick Dep.); *see also* Ex.15, at 530; Ex. 10, at 357.

Once PrimeTime Anytime is activated in this manner, DISH takes over and does everything else.  From that time forward, DISH causes every ABC, NBC, CBS, and FOX primetime program to be recorded on the subscriber's hard drive.  The programs are instantly available for on-demand viewing and remain available for eight days, when they are replaced by newer selections.  Ex. 2, at 112, 201-02; Ex. 8, at 302; Ex. 33, at 720-21.  As emphasized in DISH promotional materials, "[t]he magic of PrimeTime Anytime is that it allows DISH subscribers to catch up on all primetime shows, including episodes recorded over the past week and recommended by friends, family, and co-workers after they've already been broadcast."  Ex. 21, at 605.  According to DISH, although "[y]ou used to have to spend time finding your shows [and] setting recordings," now the Hopper "does the work for you."  Ex. 33, at 720.  In one DISH advertisement, a subscriber says: "I'm recording all prime time TV right now without doing anything . . . . I'm not doing a thing."  *Id.* at 717.

Behind the scenes, employees of EchoStar Technologies L.L.C. ("EchoStar"), an agent of DISH and a counterclaim defendant, decide each week which programs to include in PrimeTime Anytime.  "EchoStar receives electronic programming information nine days in advance . . . and uses that information to designate which shows are within . . . 'primetime.'"  Ex. 4, at 262 (Minnick Decl. (*Fox*) ¶ 31).  That designation provides the instructions to PrimeTime Anytime as to what to record.  *Id.* at 261-62 (¶¶ 30-31); Ex. 2, at 184-89 (Minnick Dep.).

In addition to designating all programs that begin and end within normal primetime hours, EchoStar employees make decisions about recording programs that fall outside these hours.  If more than half of a program occurs within normal primetime hours, EchoStar employees mark the entire program for recording: "the rule is, when they look at the guide, . . . if

9

they see an event that at least 50 percent of it . . . falls within prime time . . . they'll mark the entire event." *Id.* at 186.  For example, when an ABC college football game starts at 7:00 p.m., or an ABC NASCAR race ends at 11:30 p.m., an EchoStar employee decides when to start or stop the PrimeTime Anytime recording outside of normal primetime hours.  Ex. 12, at 381, 380. During the Olympics, DISH expanded recording periods by one or two hours beyond primetime each night.  Ex. 2, at 187-88 (Minnick Dep.); Ex. 13, at 386.

DISH subscribers, by contrast, have no "ability to adjust when . . . PrimeTime Anytime starts recording" because "that's a DISH . . . function," and subscribers are not even able to stop a recording that is in progress.  Ex. 2, at 186, 163, 174-75, 194-95 (Minnick Dep).

## b.    AutoHop

If a subscriber has activated PrimeTime Anytime, the AutoHop service is available automatically.  Ex. 4, at 269, 271 (Minnick Decl. ¶¶ 53, 59).  After 3:00 a.m. the next morning, DISH's agent EchoStar transmits instructions to subscribers' Hopper set-top boxes that enable the boxes to identify and skip over all of the commercial breaks in PrimeTime Anytime recordings.  Ex. 3, at 230-31 (Khemka Dep.); Ex.2, at 109-110 (Minnick Dep.);

From the subscriber's perspective, as soon as AutoHop playback is available for a recording, a red kangaroo icon appears next to it in an on-screen folder.  If the subscriber chooses to play back the recording, she is greeted by a pop-up window that says, "You can automatically hop over this event's commercial breaks.  Would you like to enable AutoHop for this event?"  To play back the program, the subscriber must select either "Yes" or "No Thanks." *Id.* at  45-46, 79-80; Ex. 10, at 347; Ex. 3, at 230-31 (Khemka Dep.).  If the subscriber selects "Yes," then on playback all the commercials are skipped.  Ex. 16, at 545; *see also* Ex. 17, at 547. As the AutoHop Quick Start Guide explains, "[o]nce you have chosen AutoHop for your show, you can put the remote control down; you've enabled AutoHop's patented technology to skip the

commercials during your show automatically."  Ex. 16, at 545; *see also* Ex. 9, at 326.

AutoHop is available only to subscribers who have activated PrimeTime Anytime; its instructions act upon the PrimeTime Anytime recordings.  Ex. 2, at 92-93, 199, 206 (Minnick Dep.); Ex. 4, at 271, 275-76 (Minnick Decl. ¶ 61); Ex. 11, at 368 ("it works on my PrimeTime Anytime recordings"); *see also* Ex. 3, at 246-48 (Khemka Dep.).  The recordings that DISH makes via PrimeTime Anytime thus serve two separate but related purposes.  First, they are used to create an on-demand library of the networks' latest primetime programming.  Second, they are used to receive the AutoHop instructions that enable commercial-free viewing on playback.

REDACTED-FILED UNDER SEAL

DISH also engages in what it calls a quality assurance, or "QA," process that, until just days ago, required it to make at least three additional sets of unauthorized copies of every network primetime program each night "to make sure that the commercial-skipping instructions work properly before they are sent to subscribers' Hoppers."  *Id.* at 274-75 (¶¶ 73-76).

REDACTED-FILED UNDER SEAL

██████████████████████████████████

████████████REDACTED-FILED UNDER SEAL██████████

██████████████████████████████ [5]

### 3.   DISH's Service Targets ABC's Advertising and Competes with Its Authorized Distribution Channels

DISH acknowledges that the purpose and effect of its service is to thwart broadcasters' commercial messages and to compete with authorized channels of distribution.  According to a DISH employee's promotional post: "I have been using the AutoHop feature" and "I have so much free time without commercials that I have started writing my novel again."  Ex. 11, at 371; Ex. 3, at 246-48 (Khemka Dep.); *see also* Ex. 11, at 362-63, 368, 376.  In an understatement, DISH Network Corporation chairman Charlie Ergen admitted in an interview that "[i]f the ad is skipped, . . . it's not necessarily good for the broadcaster."  Ex. 24, at 615.

Critically, the commercials that AutoHop skips over include the promotional spots on which ABC itself depends to attract viewers.  The biggest advertiser on ABC is ABC, which forgoes millions of dollars in advertising revenue each week in order to promote its own upcoming shows during commercial breaks.  More viewers learn about new ABC shows from these promotional spots than from any other source.  McGovern Decl. ¶¶ 13-15.

████████████████████████████████████

████████████REDACTED-FILED UNDER SEAL██████████

---

[5] On November 7, the *Fox* court ruled that these so-called "QA" copies were likely infringing. *Fox* Op. at 24-25 (Ex. 1). ████████████████████

████████████REDACTED-FILED UNDER SEAL██████████

████████████████████████████████████

REDACTED-FILED UNDER SEAL

REDACTED-FILED UNDER SEAL

REDACTED-FILED UNDER SEAL

   In its public promotional efforts, DISH has claimed that "the PrimeTime Anytime feature is an excellent alternative" to cable's "PrimeTime On Demand shows," Ex. 11, at 363, and that PrimeTime Anytime's "instant access" to network primetime content "beats the competition," Ex. 9, at 315; *see also* Ex. 3, at 246-48 (Khemka Dep.).  And in interviews, DISH has touted the advantages that its service has over digital streaming services like ABC.com and Hulu.  A DISH

executive promoted the fact that "while other pay TV providers like Hulu give you access to some of your content after a delay, with the Hopper, customers get instant access to all the prime time shows the same day they air," Ex. 34, at 735. The executive even predicted that "I don't think you'd ever need Hulu Plus or Hulu after this." Ex. 35, at 743.

## ARGUMENT

DISH's PrimeTime Anytime/AutoHop service breaches the Retransmission Consent Agreement between the parties and violates ABC's exclusive rights under Section 106 of the Copyright Act. It does so by making unauthorized copies of all of ABC's primetime programming for viewing without the commercials that provide the revenue necessary for ABC to create the programming in the first place. DISH's actions strike at the heart of the advertising model that has supported free television since its beginnings. And they interfere with the authorized on-demand and commercial-free platforms modern technology has made possible.[6]

According to the well-established test in the Second Circuit, a preliminary injunction should issue if the plaintiff shows: "(1) a likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) a balance of the hardships tipping in their favor; and (4) non-disservice of the public interest by issuance of a preliminary injunction." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 278 (2d Cir. 2012) (citing *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)); *see also id.*; *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). As the Second Circuit noted in *Salinger*, although irreparable harm must be shown in every case, the historical tendency has been to grant preliminary injunctions in copyright cases on a showing of likelihood

---

[6] ABC brings this motion based on three of its claims: express breach of contract (Counterclaim Count I), direct copyright infringement (Count III), and vicarious copyright infringement (Count V). ABC reserves and continues to advance in this litigation its remaining claims for breach of the covenant of good faith and fair dealing, inducement of copyright infringement, and contributory copyright infringement.

of success on the merits, given "'the difficulty of protecting a right to **exclude** through monetary remedies.'"  607 F.3d at 82 (quoting *eBay, Inc. v. MercExch., LLC*, 547 U.S. 388, 395 (2006) (Roberts, C.J., concurring) (emphasis in original)).

## I.   ABC IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### A.   <u>ABC Is Likely To Succeed on the Merits of Its Breach of Contract Claim</u>

Section 12 of the Retransmission Consent Agreement prohibits DISH from "record[ing], copy[ing], duplicat[ing], retransmit[ing] and/or authoriz[ing] the recording, copying, duplication, or retransmission of any portion of any Digital Signal without the prior written consent of Broadcaster."  Connolly Decl. ¶ 22, Ex. 4 (2005 Agreement § 12), 23.  DISH has violated this provision by engaging in two distinct types of unauthorized copying every night.

First, DISH copies all of ABC's most valuable primetime programming for all of its PrimeTime Anytime users.  *See* Ex. 21, at 605; Ex. 42, at 787.  This copying constitutes a breach regardless of whether DISH is doing the copying itself or "authoriz[ing]" its subscribers to do the copying.  Connolly Decl. ¶ 22, Ex. 4 (§ 12), 23.  As discussed below, in connection with ABC's copyright claims, DISH contends that its subscribers, not it, are doing the copying.  *See* pp. 27- 33, *infra*.  But this attempted deflection is no defense to ABC's contract claim.  DISH agreed not to "copy" or "**authorize** . . . the copying" by others of ABC's programming.  Connolly Decl. ¶ 22, Ex. 4 (§ 12) (emphasis added), 23.  The express purpose of PrimeTime Anytime is to copy ABC's entire primetime lineup every night.  This is a clear breach of Section 12 of the 2005 Agreement no matter who is doing the copying.

Second, until just days ago DISH (via its agent EchoStar) made additional nightly copies of ABC's entire lineup of primetime programming for internal use at the Cheyenne uplink facility for the purpose of operating DISH's AutoHop service.  █████████████████████

█████████████████████ REDACTED-FILED UNDER SEAL █████████████████████

REDACTED-FILED UNDER SEAL This internal copying has been an important part of the procedure followed by EchoStar each night to ensure the proper functioning of AutoHop's commercial-skipping instructions.  Ex. 4, at 274-76 (Minnick Decl. ¶¶ 73-77); Ex. 2, at 63-72, 77-78, 183-84 (Minnick Dep.).  DISH's breach of contract here is clear: It promised not to "copy."  Yet every night, for months, it made multiple copies of ABC's entire primetime line-up as an important step in the operation of a heavily advertised commercial-skipping service that unmistakably harms ABC.[7]

Both types of copying violate Section 12 of the 2005 Agreement.  The sole exception to Section 12's prohibition against copying is that DISH technicians may engage in the "practice of connecting subscribers' home recording devices such as VCRs or DVRs."  Connolly Decl. ¶ 22, Ex. 4 (§ 12), 23.  In operating PrimeTime Anytime, DISH engages in the nightly copying of **all** of ABC's primetime programming to help populate an unauthorized video on-demand service and to enable a commercial-skipping service.  This conduct goes far beyond merely "connecting" subscribers' DVRs.  And when employees make internal copies on special Hoppers at an EchoStar facility in Cheyenne, they are thousands of miles away from many "subscribers' home[s]."

REDACTED-FILED UNDER SEAL

---

[7] If DISH agrees to ABC's currently pending request to agree not to resume this internal copying until after an adjudication on the merits of its legality, then ABC will not continue to pursue a preliminary injunction as to this copying.  *See Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 524 (S.D.N.Y. 2009).  Without such an agreement, a preliminary injunction remains necessary to prevent DISH from later "revers[ing] course and resum[ing] its challenged activities."  *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 2003 WL 21056809, at *6 (S.D.N.Y. 2003) (quotation omitted); *see also RCA Records v. All-Fast Sys., Inc.*, 594 F. Supp. 335, 338 (S.D.N.Y. 1984) (preliminary injunction necessary so that defendant would not later "pick up where it left off").

In short, there is no question that the widespread copying of all of ABC's primetime programming is a breach of Section 12.

**B.     ABC Is Likely To Succeed on Its Direct Copyright Infringement Claim**

Section 106(1) of the Copyright Act grants the copyright owner the exclusive right "to reproduce the copyrighted work in copies" and to authorize others to reproduce the copyrighted work. By granting this exclusive right, and thus establishing a "marketable right to the use of one's expression," the Copyright Act "supplies the economic incentive to create and disseminate ideas." *Harper & Row, Publ'rs, Inc. v. Nation Enters., Inc.*, 471 U.S. 539, 558 (1985). To establish infringement under the Copyright Act, a plaintiff must show: (1) ownership of a valid copyright and (2) unauthorized, unprivileged copying of constituent elements of the work that are original. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010); *Harper & Row*, 471 U.S. at 547.[8] As set forth below, ABC is likely to succeed in establishing its claim for direct infringement against DISH.

**1.     DISH Directly Infringes ABC's Copyrights by Making Copies for Its Subscribers' Viewing**

**a.     DISH's Copying Violates ABC's Exclusive Right To Reproduce Its Copyrighted Works**

Through its operation of PrimeTime Anytime, DISH is making unauthorized copies of ABC's copyrighted works in excess of the limited rights granted by ABC and in violation of ABC's exclusive reproduction right. In *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2008) ("*Cablevision*"), the Second Circuit held that direct liability for copyright

---

[8] ABC's ownership of valid copyrights in its copyrighted works may be presumed from the certificates of copyright registration for those works (attached as Exhibit 1 to the Declaration of Marsha Reed). *See Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182 (2d Cir. 2012); *see also* 17 U.S.C. § 410(c).

infringement requires "volitional conduct" that "causes" the infringement. *Id.* at 131. In this case, DISH is engaged in "volitional conduct" in every sense—from its control of the overall copying process to its involvement in daily execution, and at every step of the way—from the initial targeting of network primetime programming to the final selection and marking of individual programs for copying.

"'[T]o establish direct liability,'" the *Cablevision* court explained, "'something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner.'" *Id.* at 130 (emphasis omitted) (quoting *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004)).

At issue in *Cablevision* was Cablevision's remote storage DVR, which made a "single unique" copy of a copyrighted work as an automated response to a user's request "to produce a copy of a specific program." 536 F.3d at 124, 130-33, 139. According to the court, the remote DVR in that case differed from a typical in-home DVR only in that it was located at Cablevision. Its function and operation were otherwise the same. The court held that "a customer's conduct in ordering th[e] system to produce a copy of a specific program" was no more infringing than the use of a typical DVR, because the copies were made by the viewers who decided which program to copy. *Id.* at 131. Cablevision's relevant conduct, the court stated, was limited to "designing, housing, and maintaining a system that exists only to produce a copy," whereas its subscribers provided "the necessary element of volition" by "actually press[ing] the button to make the recording." *Id.* The court concluded that Cablevision's conduct was not "sufficiently proximate

to" any "instance" of unauthorized copying at the direction of a subscriber to hold Cablevision liable for direct infringement. *Id.* at 131, 132.

Here, by contrast, DISH engages in a series of acts that are indeed the proximate cause of each and every instance of unauthorized copying. It is DISH, not the subscriber, that makes and carries out virtually every decision in the PrimeTime Anytime copying process. In fact, a central premise of DISH's marketing is just how **little** the user does. As DISH reassures its subscribers, once DISH activates PrimeTime Anytime, DISH will copy the four major networks' primetime programming without the user "doing a thing." Ex. 33, at 717. "So we don't have to do anything?" asks one character in a DISH commercial. "No, not a thing." *Id.* at 716. DISH, by its own admission, "does the work for you." *Id.* at 720.

As an initial matter, DISH has decided to limit the television programs available for copying to the primetime programming of ABC and the other three major networks; nothing else is available for copying by the subscriber. In this respect, DISH is like the provider of a VOD service that "actively selects and makes available beforehand the individual programs available for viewing"—a fact that *Cablevision* described as indicative of direct copying. 536 F.3d at 132.

In *Cablevision*, the customer had to select in advance a particular program to be recorded. *Id.* at 125. The customer makes no such selection with PrimeTime Anytime. In the words of a senior DISH executive, "I just don't have to think about what to watch. . . . I always have something from last night sitting right there waiting for me." Ex. 35, at 749. A DISH subscriber need only decide once to activate PrimeTime Anytime, after which DISH then performs every other step to make copies of each show in each night's primetime line-up—and will continue to do so in perpetuity, without any further action by the subscriber. *See* pp. 8-10, *supra*.

19

The *Cablevision* court explained that "a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct." 536 F.3d at 131-32. Here, DISH does not "automatically obey[]" subscriber commands, *id.* at 131; to the contrary, the start and stop times of every recording every day is something that DISH considers to be an exclusively "DISH . . . function." Ex. 2, at 186 (Minnick Dep.). DISH even prevents subscribers from stopping a PrimeTime Anytime recording that is about to begin or is in progress, based on DISH's own view of the optimal customer experience. *Id.* at 163, 174-75, 194-95. And DISH makes no attempt to limit its copying to the programs that the subscriber in fact intends to watch. PrimeTime Anytime records up to 100 hours of primetime programming a week, and "doesn't take into consideration a user's intent to watch something." *Id.* at 126-27.

DISH's "volitional conduct" continues long after the subscriber makes her one-time decision to enable PrimeTime Anytime and extends to the final actions that result in the actual copies being made. Discovery has revealed that at the final stage DISH takes actions that closely approximate what the *Cablevision* court gave as a paradigmatic example of volitional conduct: a "human employee" of a copy shop who directly operates a machine to make a copy. 536 F.3d at 131. Each week EchoStar, acting for DISH, consults an electronic program guide, decides which programs fall within primetime, and designates which programs should be recorded. When judgment is needed, an EchoStar employee exercises it. When a program, such as ABC Saturday night college football, starts or ends outside of normal primetime hours, he will still mark it for recording if more than half the show falls within primetime. *See* pp. 9-10, *supra*; Ex. 12, at 381; Ex. 2, at 186 (Minnick Dep.). This marking of the program guide provides the direct instruction

as to what to record. *See id.* at 184-89; Ex. 4, at 261-62 (Minnick Decl. ¶¶ 30-31). In short, this "human employee . . . volitionally operates the copying system to make [a] copy." *Cablevision*, 536 F.3d at 131.

For all of these reasons, DISH's actions constitute direct infringement.[9]

### b.   DISH's Copying Is Not a Fair Use

Fair use is an affirmative defense as to which DISH carries the burden of proof. *See Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994); *see also Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 552 (S.D.N.Y. 2008) (party asserting fair use defense has the burden of proof on a preliminary injunction motion). DISH cannot meet that burden.

It is well established that an unauthorized use of a copyrighted work is not a fair use if it substitutes for a market that a "copyright owner . . . 'would in general develop or license others to develop.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 (2d Cir. 1998) (quoting *Campbell*, 510 U.S. at 592). Here, DISH's copying of all of ABC's primetime programming every night plainly is not a fair use. Rather, DISH is offering a "substitute for the

---

[9] In the *Fox* case, the district court found that DISH's conduct was "closer to the [direct infringement] line than its predecessors in *Cablevision* and *Loopnet*," but that it was still not enough to qualify as volitional. *See Fox* Op., at 18-19 (Ex. 1). In reaching this conclusion, the court applied a legal standard that is not the law in the Second Circuit, holding that the defendant's conduct must be the "**most** significant and important cause of the copying." *Id.* at 19 (emphasis added). The court cited the Prosser tort treatise in support of the rule, but the cited passage provides no such support, stating only that proximate causation is "sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be held legally responsible," W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 42, at 273 (5th ed. 1984), a standard that DISH's conduct here easily meets.

The *Fox* court also acknowledged that DISH has the "authority" to modify the times when primetime recordings start and end each night. *Fox* Op., at 18 (Ex. 1) (citing Minnick Decl. ¶ 31). But the court failed to address the evidence that DISH exercises that authority every week by designating which programs will be recorded before or after normal primetime hours.

original," "usurp[s] . . . market[s] that properly belong[] to the copyright-holder" and harms "the value of the copyrighted work[s]." *Infinity Broad. Corp.*, 150 F.3d at 110; 4-13 *Nimmer on Copyright* § 13.05 (MB 2012); *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 923, 926-27 (2d Cir. 1994).

Section 107 of the Copyright Act "notes four nonexclusive factors to be considered," *Harper & Row*, 471 U.S. at 549, in conducting a fair use analysis:  (1) the "purpose and character of the use, including whether such use is of a commercial nature; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used"; and (4) "the effect of the use on the potential market for or value of the copyrighted work."  17 U.S.C. § 107; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447-51 (1984).  Each of these fair use factors weighs heavily against a finding of fair use in this case; together they do so decisively.

### 1)       The Purpose and Character of Use

The first fair use factor takes into account both the purpose of the use, commercial or non-profit, and the nature of the use—whether it transforms or merely duplicates the original. The "central purpose of this investigation is to see . . . whether the new work merely 'supersede[s] the objects' of the original . . . or instead adds something new . . . altering the first with new expression, meaning or message."  *Campbell*, 510 U.S. at 579-80 (citation omitted).

By operating its PrimeTime Anytime service, DISH makes copies for the purely commercial purpose of profiting from those copies, and the copies are exact duplicates of ABC's original works.[10]  In such a case, where the "use involves merely an untransformed duplication,

---

[10] For the purpose of judging DISH's copying, whether or not copying by a subscriber would be a fair use is irrelevant.  *See Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (where defendant's "own retransmission of . . . broadcasts, not the acts of his end-users . . . is at issue," defendant cannot assert users' fair use defense); *Princeton Univ. Press v. Mich. Doc. Servs., Inc.*, 99 F.3d 1381, 1389 (6th Cir. 1996) ("commercial enterprise[s]" may not "stand in the shoes of their customers").

22

the value generated . . . is little or nothing more than the value that inheres in original." *Am.*

*Geophysical Union*, 60 F.3d at 923. As the Supreme Court explained in *Campbell*, the less

transformative a use is, the less it "further[s]" "the goal of copyright" that the fair use doctrine is

intended to protect. 510 U.S. at 579.

### 2)   The Nature of the Copyrighted Work

The nature of ABC's copyrighted works weighs against fair use, as the works are original

creative comedies and dramas at "the core of the copyright's protective purposes." *Id.* at 586.

### 3)   Amount or Substantiality of Portion Used

"The third factor . . . recognizes that the more of a copyrighted work that is taken, the

less likely the use is to be fair." *Infinity Broad. Corp.*, 150 F.3d at 109. DISH copies every ABC

primetime program in its entirety.

### 4)   Threat to Existing and Potential Markets and Value of Copyrights

The fourth fair use factor considers harm to the "potential market for or value of the

copyrighted work." 17 U.S.C. § 107. Where, as here, "a commercial use amounts to mere

duplication of the entirety of [the] original," thus "clearly supersed[ing] the objects of the

original," it is "likely that cognizable market harm to the original will occur." *Campbell*, 510

U.S. at 591 (quotation omitted); *see also Sony*, 464 U.S. at 451. In this case, DISH's copies act

as "substitute[s]" that "usurp" the market for the on-demand and commercial-free versions of

primetime programs that ABC or its licensees distribute via a variety of distribution channels.

*Infinity Broad. Corp.*, 150 F.3d at 110; Connolly Decl. ¶¶ 8, 11-21, 32-33. DISH's copying also

harms the value of ABC's copyrighted works by undermining the principal means by which

ABC monetizes the works. McGovern Decl. ¶¶ 8-12; *see MCA, Inc. v. Wilson*, 677 F.2d 180,

183 (2d Cir. 1981); 4-13 *Nimmer on Copyright* § 13.05.

The analysis under the fourth factor is not limited to the current harm caused by DISH's copying, the harm that will occur before trial, or even the harm that DISH alone ultimately may cause.  Rather, a copyright owner "need only show that if the challenged use 'should become widespread, it would adversely affect the potential market for'" or value of the copyrighted work.  *Harper & Row*, 471 U.S. at 568 (emphasis omitted) (quoting *Sony*, 464 U.S. at 451); 17 U.S.C. § 107.  This factor thus considers "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for [or value of] the original."  *Campbell*, 510 U.S. at 590 (ellipsis in original; quotation omitted).

DISH's copying via its PrimeTime Anytime/AutoHop service far exceeds this threshold, harming the actual and potential value of ABC's copyrighted works in a number of ways:

First, copying to create an instantly available on-demand library of all of ABC's primetime programs diminishes existing and potential on-demand markets for those programs.  *See* Connolly Decl. ¶¶ 11-17, 32-33; pp. 5-6, 12-14, *supra*. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

REDACTED-FILED UNDER SEAL

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A DISH executive even predicted that when PrimeTime Anytime recordings are viewed online or on a mobile device, "I don't think you'd ever need Hulu Plus or Hulu after this."  Ex. 35, at 743. ▮

REDACTED-FILED UNDER SEAL

24

Second, AutoHop harms licensed markets for commercial-free versions of ABC's works—such as Apple's iTunes and Amazon's Instant Video services.  *See* Connolly Decl. ¶¶ 11, 18-21, 32-33.  In fact, DISH has admitted that its "frustration" with competition from services like iTunes was a reason it decided to launch AutoHop.  Ex. 22, at 608.

Third, the copies that DISH makes for commercial-free viewing threaten to undermine ABC's ability to earn advertising revenue through its principal channel of distribution—its broadcasts.  McGovern Decl. ¶¶ 8-12.  Under the Nielsen C3 rating system, ABC gets credit, and advertisers pay for, commercials that are shown live and played back at normal speed within three days of the initial broadcast.  *Id.* ¶ 4.  DISH makes AutoHop's commercial-free playback available early in the morning on the day after the live broadcast. ███████████████

███████████ REDACTED-FILED UNDER SEAL ███████████

███████████  Those viewers who enable AutoHop will play back none of the commercials. Loughney Decl. ¶¶ 17-20.

████████████████████████████████████████

████████████████████████████████████████

███████████ REDACTED-FILED UNDER SEAL ███████████

████████████████████████████████████████

████████████████████████  The harm will only be compounded if DISH's competitors respond to competitive pressures by providing similar services.  *Id.* ¶¶ 10-12; Connolly Decl. ¶¶ 27-32.  DirecTV, a DISH competitor, has stated that it already "has access to technology that could allow [its] millions of subscribers to automatically skip TV commercials."  *Id.* ¶ 27, Ex. 6.  The decrease in Nielsen ratings and the corresponding reduction in advertising revenues caused by such "unrestricted and widespread conduct of the

[same] sort" weigh decisively against any fair use defense here.  *See Campbell*, 510 U.S. at 590 (quotation omitted).

### 2.      DISH's Internal Copies Directly Infringe ABC's Copyrights

The unauthorized copying in which DISH has engaged as part of its so-called "QA" process violates ABC's exclusive right under 17 U.S.C. § 106(1) to reproduce its copyrighted works.  It is undisputed that DISH has been making these copies, without authorization.  And there can be no serious contention that they are a fair use.  Once again, they are complete copies of creative works.  They are wholly commercial and non-transformative in nature.  And they are made for the very purpose of skipping the commercials that enable ABC to generate value from its copyrighted works.  *See Fox* Op. at 24-25 (Ex. 1) (DISH "QA" copies likely not a fair use); *Agee v. Paramount Comm'cns, Inc.*, 59 F.3d 317, 323 (2d Cir. 1995) (defendant's internal copying of plaintiff's sound recording was not a fair use because defendant "derived independent commercial value" from copying that "enhanced the [defendant's] performance by ensuring that there would be no mistakes in the synchronized program broadcast to viewers").

Until days ago, DISH's agent EchoStar made three sets of unauthorized copies of ABC's primetime programs every night to ensure that AutoHop effectively skips all of the commercials. Ex. 4, at 274-75 (Minnick Decl. ¶¶ 73-76). ████████████████████████

████████████████████REDACTED-FILED UNDER SEAL████████████████████

████████████████████████████████████████████████

████████████████████████████ If this "QA" process was unsuccessful, AutoHop was not available for that program. Ex. 2, at 81 (Minnick Dep.).  In short, these internal copies have been an important part of the commercial-skipping service that competes with authorized commercial-free offerings and threatens to deprive ABC of advertising revenue.

They therefore do not qualify as a fair use.  *See Am. Geophys.*, 60 F.3d 913 at 921, 931

("intermediate" copying of journal articles for research was not a fair use).

### C.     ABC Is Likely To Succeed on Its Claim of Vicarious Infringement

Even if DISH could successfully avoid liability for **direct** infringement on the grounds

that its subscribers did the actual copying, DISH would remain liable for **vicarious** infringement

by virtue of its oversight of the process and the profits it reaps as a result.

### 1.     DISH Controls and Profits from the Copying

To establish liability for vicarious copyright infringement, a plaintiff must show that the

defendant "'[1] had the right and ability to supervise the infringing activity and . . . [2] has a

direct financial interest in such activities.'"  *Arista Records LLC v. Lime Grp.*, 784 F. Supp. 2d

398, 434-35 (S.D.N.Y. 2011) (citing *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,

443 F.2d 1159, 1162 (2d Cir. 1971)).  Vicarious liability is imposed when "the right and ability

to supervise coalesce with an obvious and direct financial interest in the exploitation of

copyrighted materials."  *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir.

1963); *Gershwin*, 443 F.2d at 1162.  There is no question that both elements are present here.

As already shown, DISH's involvement in the copying is pervasive—from start to finish.

It targets the Network's primetime programs for copying and makes the weekly selections of

exactly which programs to copy—deciding by itself, for example, whether to copy programs that

begin or end outside of primetime.  DISH designates the programs to be recorded and then locks

the subscriber out of the process altogether fifteen minutes before the recording process begins

and while it continues.  *See* pp. 8-10, *supra*; Ex. 4, at 263-64 (Minnick Decl. ¶ 36).  This level of

control far exceeds what is required to establish DISH's right and ability to control its

subscribers' infringing activity.  DISH does not simply have the "power to police" the copying,

*Shapiro, Bernstein & Co*, 316 F.2d at 208, or the "practical ability" to stop it. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 818 (9th Cir. 2007). It controls the entire process.

DISH derives a direct financial benefit from the copying, as acknowledged in the August 2012 report of Michael Dugan, CEO of EchoStar Corporation, that "PrimeTime Anytime and AutoHop" "have been driving new customer acquisitions for DISH over the quarter." Ex. 32, at 706. Financial benefit exists where the availability of infringing material "'act[s] as a 'draw' for customers.'" *Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256, 261 n.3 (S.D.N.Y. 2008) (quoting *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996) (financial benefit may be shown where "infringing performances enhance the attractiveness of the venue to potential customers" and act as "a 'draw' for customers")). DISH's own advertising and marketing strategies confirm that its infringing service "acts as a 'draw' for customers." A DISH executive testified that DISH has spent ████REDACTED-FILED UNDER SEAL████ to bring the Hopper and its PrimeTime Anytime and AutoHop features to the consumer," Ex. 7, at 296 (Khemka Decl. (*Fox*) ¶ 11), and the "AutoHop feature gives us a marketing claim . . . designed to get customers in the door." Ex. 3, at 249 (Khemka Dep.). ████████████████████████████

██████████ REDACTED-FILED UNDER SEAL ██████████

████████████████████████████

### 2.   The Copying that DISH Controls Infringes ABC's Copyrights

Secondary liability requires proof of "direct infringement by the relevant third party." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 423 (S.D.N.Y. 2011); *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998). Here, there is no question that the wholesale copying of **all** of ABC's primetime programming is unauthorized. ABC did not authorize the creation of on-demand "librar[ies] of the latest primetime shows," Ex. 42, at 787, in competition with licensed VOD and other on-demand services. Nor did ABC authorize

copying to make all of its primetime programs available for commercial-free viewing, in competition with authorized commercial-free services and to the detriment of its own advertising revenues. Thus, even if one assumes that the subscribers, not DISH, make the copies, the copying still violates ABC's exclusive right of reproduction.

The copying here is not a fair use regardless of who is deemed to be doing it. The re-creation of the entire lineup of ABC's primetime programming for commercial-free viewing is equally non-transformative (the principal consideration under the first factor) and has precisely the same harmful effect on the market for and value of that programming (the fourth factor), no matter who is doing the copying. The nature of the copyrighted work (the second factor) and the amount copied (the third) are also unaffected. DISH may argue that the subscriber's copying is not commercial (an element of the first factor). But that argument is unavailing for two reasons:

First, subscriber copying here **would be** commercial in nature. The Supreme Court has instructed that the "crux" of the question is "whether the user stands to profit from [the] exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562; *see also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) (consumer copying "to save the expense of purchasing authorized copies" is commercial in character). The PrimeTime Anytime/AutoHop service offers a substitute for a number of services that charge for on-demand and commercial-free viewing. In other words, it enables subscribers to access a library of commercial-free programming on demand "without paying the customary price." DISH itself has claimed in an advertisement that "77 % of Americans would pay to skip commercials" but that with "the Hopp[er] it comes included." Ex. 8, at 304.

In *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), the Sony Betamax case, the Supreme Court accepted the district court's findings, based on a record that

closed in 1979, that "time-shifting for private home use" had a noncommercial character as it did

not displace products or services that consumers might otherwise buy. *Id.* at 449 & n.33.  DISH

acknowledges in its own advertisements that it intends the opposite result here:  DISH wants

subscribers to drop these other services in favor of its own.  *See* pp. 13-14, *supra.*

Second, subscriber copying with PrimeTime Anytime/AutoHop would not be a fair use

even if the Court were to conclude that it is a noncommercial use.  As the Supreme Court noted

in *Sony*, the fair use doctrine does not protect a "noncommercial use" when the plaintiff shows

"either that the particular use is harmful, or that if it should become widespread, it would

adversely affect the potential market for the copyrighted work."  464 U.S. at 451.  There is no

denying that that is the case here.

The copying in this case interferes with existing and growing markets for the distribution

of ABC's programming.  Connolly Decl. ¶¶ 8, 11-21, 32-33.  Creating an eight-day, on-demand

library of all major-network primetime programming—including all of ABC's primetime

shows—undermines authorized on-demand services. *Id.* ¶¶ 8, 11-17, 32-33.  Copying that

programming for commercial-free playback undercuts authorized commercial-free platforms. *Id.*

¶¶ 8, 18-21, 32-33.  And eliminating viewers' exposure to a program's advertisements

altogether—as opposed to manual fast-forwarding—deprives ABC of the opportunity to interest

viewers in its commercial messages and derive advertising revenue should viewers be

sufficiently interested to play them back at normal speed.  Loughney Decl. ¶¶ 15-19.

In all of these respects, the copying here is fundamentally different from the time-shifting

of individual programs that was approved as a fair use based on the record before the Court in

*Sony*.[11]  *Sony* did not involve the wholesale recording of the entire primetime lineup of all four networks for on-demand commercial-free viewing in competition with authorized on-demand and commercial-free services.  In fact, markets for such services did not even exist in 1984, leading the *Sony* Court to conclude that "respondents failed to demonstrate that time-shifting would cause **any** likelihood of nonminimal harm to the potential market for, or the value of, their copyrighted works."  464 U.S. at 456 (emphasis added).  The copying here would "adversely affect the potential market" for on-demand and commercial-free programming in ways that were not remotely contemplated in *Sony*.  *Id*.

The commercial skipping here also "is harmful" to advertising revenue—or at a minimum will be if "it should become widespread"—in ways that are fundamentally different from the fast-forwarding involved in *Sony*.  *Id*. at 451.  Notably, in a section of the opinion explaining why other copyright holders did not object to the Betamax, the Court emphasized the critical importance to copyright owners of the ability to earn revenue from advertising:  "The traditional method by which copyright owners capitalize upon the television medium— commercially sponsored free public broadcast over the public airwaves—is predicated upon the assumption that compensation for the value of displaying the works will be received in the form of advertising revenues."  464 U.S. at 446 n.28.

In the Court's view, use of the Betamax did not thwart advertising precisely because it was not easy to fast-forward through commercials.  Quoting the district court's findings, the Court observed that fast-forwarding with a Betamax "may be too tedious" for "most recordings" to cause any meaningful harm.  464 U.S. at 452 n.36 (quotation omitted).  "To avoid

---

[11] The Supreme Court emphasized in *Sony* that its ruling was based on the factual "record and findings of the District Court" in that case and, in particular, the failure of respondents to meet the factual burden of showing "**some** meaningful likelihood of future harm exists."  464 U.S. at 451, 456 (emphasis in original).

commercials during playback," the Court explained, viewers would have to "fast-forward and, for the most part, guess as to when the commercial has passed." *Id.* (quotation omitted).[12]  With AutoHop, by contrast, no guess work is involved since DISH skips over not only the **entire** commercial, but the entirety of **all** commercials in a given program.  Indeed, DISH admits that its service is "not like fast-forwarding," Ex. 16, at 545, and the patent application for the AutoHop service specifically distinguished fast-forwarding as "an inconvenience" and "inaccurate."  Ex. 36, at 756.

These are not mere differences in degree; they are differences in kind.  What advertisers seek is **exposure** to their commercials.  Loughney Decl. ¶ 12.  All that an advertiser can hope to do is attract a viewer's attention to its commercial; no one can guarantee that a viewer will actually watch.  *Id.*  During live television, the viewer may leave the room or pick up a newspaper during a commercial break—but she may be interested enough in the commercial to watch.  *Id.*  Likewise, with a fast-forward button, a viewer may be interested enough to watch a particular commercial rather than manually fast-forward through it: the initial exposure before she hits the fast-forward button may be enough to capture her attention, or something she sees while she is fast-forwarding may prompt her to hit the play or rewind buttons and watch.  *Id.* ¶¶ 16, 19.  The viewer is exposed, if only for a moment or fleetingly, to the commercial, and the advertiser has the opportunity to attract her attention and prompt her to watch.  *Id.*  That is what the PrimeTime Anytime/AutoHop commercial-free playback destroys—and in doing so it destroys the value of that commercial to ABC.  *Id.* ¶ 19.  There is nothing "fair" about that use of ABC's programs.

---

[12] While fast-forwarding with a Betamax at the time, the screen went black during fast-forward or rewind.

In the *Fox* case, the court held that copying with PrimeTime Anytime and AutoHop was no different from the time-shifting approved as a fair use in *Sony*. *Fox* Op., at 11-12 (Ex. 1). But the court's two-paragraph discussion failed to acknowledge any of these critical differences between DISH's service and the Sony Betamax. Other courts applying *Sony* have concluded that unauthorized copying that substitutes for licensed copies or harms the value of copyrights in ways that time-shifting did not are not privileged as fair uses. *See Agee v. Paramount Comm'ns, Inc.*, 59 F.3d 317, 323 (2d Cir. 1995) (rejecting fair use defense based on *Sony* where defendant's unlicensed uses of plaintiff's works provided value to defendants "apart from time-shifting"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 647-48 (7th Cir. 2003) (using copies for commercial skipping is "unquestionably infringing": "a commercial-free copy . . . would reduce the copyright owner's income from his original program"); *BMG Music v. Gonzalez*, 430 F.3d 888, 890 (7th Cir. 2005).

In sum, the effect of DISH's service on the value of, and markets for, ABC's programming is precisely the same, regardless of who is deemed to be doing the actual copying. For this reason, the "use" of those copies is not "fair" regardless of who makes them.

## II.   ABC WILL BE IRREPARABLY HARMED IN THE ABSENCE OF A PRELIMINARY INJUNCTION

The Second Circuit has held that harm may be "irremediable, or irreparable," and thus sufficient to justify a preliminary injunction, "for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (copyright case); *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012) (copyright case); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (contract case).

In *ivi*, a copyright infringement case, the Second Circuit found irreparable harm from a startup company's unauthorized retransmission of television programs (including ABC's) for live Internet streaming. The irreparable harm included ongoing and threatened harm to the copyright holders' control over the distribution of their programming, their relationships with licensees, and their advertising revenues. *See* 691 F.3d at 285-87.

As a result of DISH's infringing service, ABC will not only suffer the same types of harm as in *ivi*, but also irreparable harm to its goodwill and ability to promote its own programming during commercial breaks. *See also Register.com*, 356 F.3d at 404 (affirming preliminary injunction in contract case where district court "found it impossible to estimate with any precision the amount of the monetary loss which has resulted and which would result in the future" from defendant's breach) (quotation omitted).

### A.    Harm to ABC's Right to Exclusive Control

ABC's control over "when, where, to whom, and for how much they will authorize transmission of" its copyrighted works is fundamental to its ability to maximize consumer choice, exposure, and total revenue. *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1012 (C.D. Cal. 2011); *ivi*, 691 F.3d at 285.  ABC exercises this control by releasing its primetime programming in different "windows," on different platforms and in different formats. Connolly Decl. ¶¶ 8-21; *see* pp. 3-6, *supra*. Each licensed distribution channel contributes to ABC's ability to recoup the substantial investment it has made in producing these programs, making it possible for ABC to continue to produce the high-quality programming that consumers demand. *Id.* ¶ 33.

By making unauthorized copies of ABC's prime time programming available on-demand and without commercials, DISH interferes with ABC's exclusive right to control the time and manner in which its programs are distributed. *See* pp. 3-6, 12-14, *supra*; Connolly Decl. ¶¶ 8,

34

11-21, 32-33; Ex. 38, at 773-74.  That loss of control is itself irreparable harm, because there is

no way to measure it.  *See ivi*, 691 F.3d at 285 (ivi's unauthorized retransmissions of plaintiffs'

programming "would dilute plaintiffs' programming and their control over their product," thus

causing irreparable harm); *WTV Sys.*, 824 F. Supp. 2d at 1006, 1012-13 (harm to plaintiffs'

"overall ability to control the use and transmission of their Copyrighted Works" through their

independent "strateg[ies] for structuring their respective distribution windows," each of which

represented a separate, licensed "source of revenue," "caus[ed] irreparable injury to

[p]laintiffs."); *see also Register.com, Inc. v. Verio, Inc.*, 126 F. Supp. 2d 238, 248 (S.D.N.Y.

2000) (irreparable harm from breach of contract resulting in "lost opportunities to sell competing

services" to customers), *aff'd*, 356 F.3d 393 (2d Cir. 2004).

> The likelihood that DISH's competitors may offer similar technology if DISH's service is

not enjoined, *see* Connolly Decl. ¶¶ 27-32, makes this threat of irreparable harm even greater.

*See ivi*, 691 F.3d at 286 (noting, in considering irreparable harm, that "[t]he absence of a

preliminary injunction would encourage current and prospective retransmission rights holders,

[and] other Internet services, to follow ivi's lead in retransmitting plaintiffs' copyrighted

programming without their consent.").

### B.    Harm to ABC's Relationships and Negotiations with Authorized Licensees

> DISH's conduct also disrupts ABC's relationships with the licensed distributors of its

content that bargained for the right to distribute its programming through authorized channels.

Connolly Decl. ¶¶ 31-32, 34. ██████████████████████████████████

███████████████ REDACTED-FILED UNDER SEAL ███████████████

████████████████████████████████████████████████

████████████████████████████████   Authorized distributors of ad-supported on-

demand programming, which have agreed to disable fast-forwarding, have seen DISH offer an

ad-free service that threatens to render their service less attractive.  And authorized distributors of commercial-free versions, which charge a fee to their customers, have seen DISH offer a comparable service without a fee. ██████████████████████████

██████████ REDACTED-FILED UNDER SEAL ██████████

██████████ Ex. 38, at 773-74. ██████████

██████████ REDACTED-FILED UNDER SEAL ██████████ Connolly Decl. ¶¶ 30-32, 34.

Because this kind of harm is difficult to measure, courts find it to be irreparable.  *See ivi*, 691 F.3d at 285-86 (irreparable harm that cannot be measured when "ivi's retransmissions of plaintiffs' copyrighted programming without their consent . . . would . . . undermin[e] existing and prospective retransmission fees, negotiations and agreements"); *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 2012 WL 2848158, at *23 (S.D.N.Y.  July 11, 2012) ("Because these harms go to Plaintiffs' negotiating position . . . , they are difficult to measure."); *Register.com*, 356 F.3d at 404 (affirming finding of irreparable harm from breach of contract based on inability to quantify or measure harm resulting from damage to business relationships).[13]

C.     **Harm to ABC's Advertising Revenues**

████████████████████████████████████

██████████ REDACTED-FILED UNDER SEAL ██████████

██████████████████████████████████ AutoHop

threatens that advertising revenue by eliminating commercial playback altogether.  *See* pp. 10-

---

[13] The *Fox* court was also mistaken in concluding that "[t]he fact that Fox has licensing agreements with other companies shows that copies of the Fox Programs have a market value" such that harm from the "QA" copies "is calculable in money damages." *Fox* Op., at 32 (Ex. 1) (emphasis omitted).  To the contrary, the difficulty of measuring the harm caused by "undermining existing and prospective . . . negotiations and agreements" with licensees of these works is in fact one of the reasons that the harm irreparable.  *ivi*, 691 F.3d at 285-86.

12, 25-26, *supra*; McGovern ¶¶ 8-12; Loughney Decl. ¶¶ 17-20.  What advertisers pay for, and have always paid for, is the opportunity to capture the viewer's attention.  Loughney Decl. ¶ 12.  With regular DVR playback, that opportunity remains; with AutoHop, it is gone.  *Id.* ¶¶ 17-20.

The harm to ABC's advertising revenues is difficult to measure since, among other things, it is not possible to know how many Nielsen viewers are users of the PrimeTime Anytime/AutoHop service.  McGovern Decl. ¶ 9.  In similar cases, harm to advertising revenues has been "accepted as irreparable based, at least in part, on the difficulty of proving or quantifying such damages," *Aereo*, 2012 WL 2848158, at *22 (S.D.N.Y.  July 11, 2012), which are "notoriously difficult to prove," *WPIX, Inc. et al. v. ivi, Inc.*, 765 F. Supp. 2d 594, 621 (S.D.N.Y. 2011), *aff'd*, 691 F.3d 275 (2d Cir. 2012) (quotation omitted).

The magnitude of this harm, of course, will grow as ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████REDACTED-FILED UNDER SEAL████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

As the Second Circuit held in *ivi*, the incalculable harm that arises from services that "weaken plaintiff's negotiating position with advertisers and reduce the value of its . . . advertisements" is irreparable.  *See ivi*, 691 F.3d at 286.

### D.    Harm to ABC's Ability To Promote Its Own Programming

The largest advertiser on ABC is ABC itself.  McGovern Decl. ¶ 13.  ABC typically runs multiple promotional spots in every primetime program, forgoing millions of dollars in potential advertising revenue every week.  *Id.*  It does so because the most effective way for ABC to promote its new programs is to advertise on its own network.  *Id.* ¶ 15.  All of that promotional advertising is skipped with AutoHop.  *Id.* ¶ 16.  It would be difficult to accurately measure this harm to the value of ABC's television programming.  *Id.* ¶ 17.  Nor can ABC ever recoup the value it would have gained from promotions that AutoHop users never see.  *Id.* ███████

REDACTED-FILED UNDER SEAL

### E.    Harm to ABC's Goodwill

DISH's unauthorized service threatens to create "incorrect but lasting impressions" with consumers about what constitutes lawful exploitation of ABC's copyrighted works.  *WTV Sys.*, 824 F. Supp. 2d at 1013; Loughney Decl. ¶¶ 21-22.  The longer DISH is permitted to continue offering its illegal service, the more likely large numbers of viewers will grow accustomed to having free access to on-demand, commercial-free programming.  *Id.*  The resulting injury to ABC's goodwill with these viewers that will result when DISH is prevented from offering its illegal service is "neither easily calculable, nor easily compensable."  *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000); Loughney Decl. ¶ 22.

## III.    THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN ABC'S FAVOR

The balance of hardships weighs heavily in favor of granting a preliminary injunction.

████████████████████████████████████████████

REDACTED-FILED UNDER SEAL

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████ REDACTED-FILED UNDER SEAL ████████████

███████████████████████████████

The irreparable harm ABC is likely to suffer in the absence of an injunction is far greater than any harm to DISH. It is "axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product." *ivi*, at 287 (quotation omitted); *see also WTV Sys.*, 824 F. Supp. 2d at 1014-15 (balance of hardships "sharply" favors plaintiffs; defendants "cannot complain of the harm that will befall [them] when properly forced to desist from [their] infringing activities" (alterations in original) (quotation omitted)). Here, DISH faces no cognizable harm if an injunction is granted to stop its infringing conduct.

## IV.   A PRELIMINARY INJUNCTION WOULD NOT HARM THE PUBLIC INTEREST

Upholding copyright protection is in the public interest as a general matter. *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003); *Harper & Row*, 471 U.S. at 558. "[E]ncouraging the production of creative work [will] . . . ultimately serve[] the public's interest in promoting the accessibility of such works." *ivi*, 691 F.3d at 287. In this case, there is a particularly strong public interest to be upheld—in the ad-supported model of free television. *See Satellite Broad. Commc'ns Ass'n v. FCC*, 275 F.3d 337, 343 (4th Cir. 2001). By interfering with ABC's distribution channels, DISH threatens to undermine ABC's ability to produce the creative television programming that the public has come to expect. *ivi*, 691 F.3d at 288; *see* Connolly Decl. ¶ 33. Further, because all of the programming DISH's service infringes will remain available to consumers on a variety of distribution platforms (including free, over-the-air broadcast television), enjoining DISH will cause no harm to consumers. Finally, enjoining the PrimeTime Anytime/AutoHop service would not harm DISH subscribers: they will continue to

39

have access to ABC programming and the other features of their satellite service and their DVRs. *See* Ex. 2, at 137-39, 199-200 (Minnick Dep.).

DISH asserts that it is offering its service to benefit consumers, but its actions are in fact designed to secure for itself an unfair advantage over competitors that play by the rules and honor their contractual obligations.  The production, licensing, and distribution of high-quality television programming is enormously expensive, and the ability of ABC to derive revenue from the sale of commercial air-time to potential advertisers is critical to its ability to continue to produce and offer high-quality television programming in the future.  For these reasons, allowing DISH to continue to offer its service is contrary to the public interest.

## CONCLUSION

For the foregoing reasons, the motion for a preliminary injunction should be granted.

Dated: November 23, 2012                             Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By: _____

Kevin T. Baine
Thomas G. Hentoff (admitted *pro hac vice*)
Hannah M. Stott-Bumsted
Stephen J. Fuzesi
Julia H. Pudlin (admitted *pro hac vice*)

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-Mail: kbaine@wc.com

*Attorneys for ABC, Inc., American Broadcasting Companies, Inc. and Disney Enterprises, Inc.*