**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AUTOHOP LITIGATION | ) MASTER FILE<br>) 12 Civ. 4155 (LTS)(KNF)<br>)<br>)<br>) |
| | ) |
| This Document Relates To: | )<br>) |
| DISH Network L.L.C. v. American<br>Broadcasting Companies, Inc., et al., Civil<br>Action No 12-cv-4155(LTS)(KNF) | )<br>)<br>)<br>) |

**BRIEF OF AMICUS CURIAE PUBLIC KNOWLEDGE IN OPPOSITION TO THE MOTION OF ABC, INC., AMERICAN BROADCASTING COMPANIES, INC., AND DISNEY ENTERPRISES, INC. FOR A PRELIMINARY INJUNCTION**

John Bergmayer (*Pro Hac Vice* pending)
*Attorney for Public Knowledge*
Eric Null
*Law Clerk*
PUBLIC KNOWLEDGE
1818 N Street NW, Suite 410
Washington, DC 20036
Tel: (202) 861-0020
Email: john@publicknowledge.org

Dated: December 21, 2012

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTEREST OF AMICUS CURIAE .................................................................................... v

INTRODUCTION ................................................................................................................ 1

ARGUMENT ........................................................................................................................ 2

   I.   ABC Has Not Met Its Burden to Be Granted a Preliminary Injunction ..................... 2

   II.   ABC is Likely to Lose on the Merits ........................................................................... 3

      A.   DISH Cannot Become a Direct Infringer By Virtue of Its Customers' Acts ................. 3

      B.   ABC's Viewers Do Not Infringe Copyright When They Skip Commercials ................. 6

          1.   Skipping Commercials Does Not, By Itself, Implicate Copyright ............................. 7

          2.   Recording a Show with the Intention of Later Viewing It Without Commercials Is a Fair Use ........................................................................................................ 8

   III.   ABC Will Not Suffer Irreparable Harm When Its Viewers Record Its Programs 12

   IV.   DISH, Not ABC, Would Suffer Hardship if a Preliminary Injunction Is Granted 13

   V.   The Public Benefits from Balanced Copyright and Technological Innovation, Not the Enforcement of a Non-Existent "Right" to Prevent Ad-Skipping ..................... 14

CONCLUSION .................................................................................................................... 15

CERTIFICATE OF SERVICE ........................................................................................... 16

## TABLE OF AUTHORITIES

**CASES**

*A.V. ex rel. Vanderhye v. iparadigms, LLC*, 562 F. 3d 630 (4th Cir. 2009). ............................... 12

*A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ...................................................... 6

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ..................................... 3

*Am. Geophysical Union v. Texaco, Inc.,* 60 F. 3d 913 (2d Cir. 1994) ......................................... 11

*American Broadcasting Companies, Inc. v. Aereo, Inc.*, 2012 U.S. Dist. LEXIS 96309 (S.D.N.Y. July 11, 2012) ................................................................................................................... 2

*Authors Guild, Inc. v. Hathitrust,* 2012 U.S. Dist. LEXIS 146169 (S.D.N.Y. Oct. 10, 2012) ..... 11

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ......................................................... 10

*Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ........................ 2, 3, 12

*Cartoon Network, L.P. v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ................................ 3

*CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004) ..................................... 4, 5, 6

*Disney Enters. v. Hotfile Corp.*, 798 F. Supp. 2d 1303 (S.D. Fla. 2011) ...................................... 5

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004) ........ 2

*eBay v. MercExchange*, 547 U.S. 388 (2006) ...................................................................... 2, 3, 14

*Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989 (9th Cir. 2011) ...... 2, 3, 12, 14

*Fox Film Corp. v. Doyal*, 286 U.S. 123 (1932) ......................................................................... 14

*Humanscale Corp. v. CompX Int'l Inc.*, 2010 U.S. Dist. LEXIS 42083 (E.D. Va. 2011) ............ 12

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F. 2d 965 (9th Cir. 1992) ........................ 8

*Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197 (9th Cir. 1980) ..................................................................................................................... 2

*Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152 (2d Cir. 2010) ........................... 3

*Perfect 10 v. Amazon*, 508 F.3d 1146 (9th Cir. 2007) .................................................................. 6

*Recording Industry Ass'n of Am. v. Diamond Multimedia Systems, Inc.*, 180 F. 3d 1072 (9th Cir. 1999) ......................................................................................................................... 9

*Religious Tech. Ctr. v. Netcom Online Comms. Servs.*, 907 F. Supp. 1361 (N.D. Cal. 1995) 3, 4, 6

*Salinger v. Colting*, 607 F. 3d 68 (2nd Cir. 2010) ............................................................ 3, 12, 14

*SCFC ILC, Inc. v. VISA USA, Inc.*, 936 F.2d 1096 (10th Cir. 1991) ............................................... 2

*Sega Enters. Ltd. v. Sabella*, 1996 U.S. Dist. LEXIS 20470 (N.D. Cal. 1996) ......................... 4, 5

*Sony Pictures, Inc. v. Universal Studios, Inc.*, 464 U.S. 417 (1984) .................................... passim

*UMG Recordings, Inc. v. Shelter Capital Partners, L.L.C.*, 667 F.3d 1022 (9th Cir. 2011) .......... 4

*Universal City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 429 (C.D. Cal 1979) ................. 9

*Winter v. National Resources Defense Council*, 555 U.S. 7 (2008) ........................................ 2, 14

## STATUTES

17 U.S.C. § 106 .................................................................................................................. 7

17 U.S.C. § 107 .................................................................................................................. 8

## OTHER AUTHORITIES

Cyrus Farivar, *Fox, NBCUniversal sue Dish over ad-skipping DVR service*, Ars Technica (May 24, 2012), http://arstechnica.com/tech-policy/2012/05/fox-nbcuniversal-sue-dish-over-ad-skipping-dvr-service ........................................................................................................ 7

Michael A. Carrier, Copyright and Innovation: The Untold Story, 2012 Wisc. L. Rev. (forthcoming), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2099876 ..... 15

U.S. Const. art. I, § 8, cl. 8 ............................................................................................. 7, 14

## INTEREST OF AMICUS CURIAE

Public Knowledge (PK) files this brief to protect the fair use rights of television users,[1] and to argue for legal principles that allow new business models to succeed, and new technologies to reach the market. PK is a non-profit public interest 501(c)(3) corporation, and its primary mission is to promote technological innovation, protect the legal rights of all users of copyrighted works, and ensure that emerging copyright and telecommunications policies serve the public interest.

Applying its years of expertise in these areas, PK frequently files amicus briefs at the district and appellate level in cases that raise novel issues at the intersection of media, copyright, and telecommunications law. *See, e.g.*, *Kirtsaeng v. John Wiley & Sons, Inc.*, 132 S. Ct. 1905 (2012); *Costco Wholesale Corp. v. Omega S.A.*, 131 S. Ct. 565 (2010); *Golan v. Holder*, 132 S. Ct. 873 (2012); *Cartoon Network, LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), *cert denied CNN, Inc. v. CSC Holdings, Inc.*, 557 U.S. 946 (2009); *MDY Industries, LLC v. Blizzard Entertainment, Inc.*, 629 F.3d 928 (9th Cir. 2010); *Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010); *American Broadcasting Companies, Inc. v. Aereo, Inc.*, 2012 U.S. Dist. LEXIS 96309 (S.D.N.Y. July 11, 2012); *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011); *In re Cellco P'ship*, 663 F. Supp. 2d 363 (S.D.N.Y. 2009); *Arista Records LLC v. Lime Wire LLC*, No. 06-CV-5936 GEL 2 (S.D.N.Y. Sept. 30, 2008); *Elektra Enter. Group v. Barker*, 551 F.Supp.2d 234 (S.D.N.Y. 2008).

---

[1] Consequently, this brief will address the copyright issues surrounding the use of the Hopper DVR, but not the issue of DISH's "internal copies" or related contract disputes.

## INTRODUCTION

ABC may be in court with DISH, but its real target is the wallet of the ordinary television viewer. It wants to take away the home recording rights that all viewers enjoy, so it can sell back to them the ability to watch programs "on demand." It wants rights that go beyond what the Copyright Act gives, attempting to assert control, not only over the commercial exploitation of its programs, but also over the manner in which consumers enjoy them in their homes.

To do this it puts forth several specious arguments. It attempts to erase the long-settled distinction between direct and secondary copyright infringement in an attempt to portray their anti-consumer actions as a business dispute. It is no doubt inconvenient for ABC that, by accusing DISH of copyright infringement, it is accusing millions of ordinary viewers, whether or not they are DISH subscribers and whether or not they use DISH's Hopper, of infringement as well. ABC may try to deflect attention away from the viewer and toward DISH's purportedly "pervasive" involvement in its subscriber's actions. ABC Mem. at 27. But this only affects whether DISH is secondarily liable—not whether users themselves are infringing. *Any* secondary infringement theory necessarily requires that television viewers themselves infringe copyright any time they use the Hopper. This imperils all private, noncommercial home recording and could make the simple act of skipping commercials unlawful.

Fortunately, these theories fail. ABC attempts to blur the line between direct and secondary copyright infringement, positing that DISH becomes a direct infringer by selling a device that allows its users to time-shift programming. But courts have consistently held that providing a device or a service to users in this way cannot give rise to *direct* liability.

ABC also tries to argue that home recording is no longer a fair use, since technology has made skipping commercials too easy. But time-shifting is as lawful today as it has always been, and the legality of making a recording does not depend on the manner in which it is later viewed. Therefore, Hopper users and other television viewers do not infringe copyright when they record programs to watch them later without commercials, and DISH cannot be held secondarily liable.

This Court must reject ABC's attempts to assert rights it does not have.

**ARGUMENT**

## I.     ABC Has Not Met Its Burden to Be Granted a Preliminary Injunction

By asking for a preliminary injunction, ABC is claiming that its potential harm is so dire, its damages so severe, that it cannot wait for a full trial. However, it has not shown that it merits this extraordinary relief.

Preliminary injunctions should only be issued when there is clear and unequivocal showing that the plaintiff is entitled to such relief. *Winter v. National Resources Defense Council*, 555 U.S. 7, 24 (2008); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1259 (10th Cir. 2004) (quoting *SCFC ILC, Inc. v. VISA USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991)). For an injunction to be entered, the plaintiff must prove that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of a preliminary injunction; (3) the balance of equities, or hardships, absent an injunction, tips in its favor; and (4) the injunction is in the public interest. *Winter*, 555 U.S. at 20; *eBay v. MercExchange*, 547 U.S. 388, 391 (2006); *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 994 (9th Cir. 2011); *Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasizing the importance of analyzing the public interest factor). All four of these conditions must be met, and courts must analyze each of these factors independently. *See American Broadcasting Companies, Inc. v. Aereo, Inc.*, 2012 U.S. Dist. LEXIS 96309, **5-6, **68-69 (S.D.N.Y. July 11, 2012); *Caribbean Marine*, 844 F.2d at 674-78 (citing *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980)). ABC has not met this difficult burden.

Issuing a preliminary injunction is an exercise of the Court's equitable power. That includes balancing the competing claims of injury between the parties as well as scrutinizing the public consequences of granting such relief. *Winter*, 555 U.S. at 24. In *eBay v. MercExchange*, the Supreme Court ruled that courts could not apply "general rules" to the "traditional equitable principles" that underlie the factors in granting injunctive relief. The Court criticized both the District Court for the Eastern District of Virginia and the Federal Circuit for applying overly formulaic analyses to the test, replacing analysis with maxims and categorical generalizations. 547 U.S. at 394. Notably, the Court in *eBay* did not indicate that any factor was to be given additional weight. It did not indicate that the likelihood of success on the merits or balance of

hardships factors were more important than the other factors, as some cases have suggested. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (emphasizing the balance of hardships factor); *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (same). And it expressly rejected the frequently-advanced claim that injunctions should automatically issue after a demonstration of likelihood of success on the merits. 547 U.S. at 392-93. Rather, as the Second Circuit has explained, *eBay* requires that courts employ "traditional principles of equity" and not issue either a preliminary or a permanent injunction unless each factor is met. *Salinger v. Colting*, 607 F. 3d 68, 76-84 (2nd Cir. 2010). *See also Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 980 (9th Cir. 2011) ("the Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 985 (9th Cir. 2011) ("a plaintiff may not be granted injunctive relief until he satisfies the four-factor test."); *Caribbean Marine*, 844 F.2d at 676-77 ("The district court . . . failed to mention the harm that the government might suffer from a preliminary injunction . . . . [T]he district court [also] failed to identify and weigh the public interests at stake in its balance of harms analysis.") (overturning the Southern District of California's grant of a preliminary injunction for failing to consider all equitable factors).

ABC has not supported their claims for preliminary injunctive relief, and has not met their burdens. This Court should deny its motion.

## II.    ABC is Likely to Lose on the Merits

DISH cannot be directly liable because its users, and not it, perform the volitional act of making a copy. DISH cannot be secondarily liable because time-shifting is a fair use. Thus, ABC cannot show that it is likely to succeed on the merits.

### A.  DISH Cannot Become a Direct Infringer By Virtue of Its Customers' Acts

There can be no direct liability for copyright infringement without some volitional act. *Cartoon Network, L.P. v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) ("*Cablevision*"); *Religious Tech. Ctr. v. Netcom Online Comms. Servs.*, 907 F. Supp. 1361, 1368-69 (N.D. Cal. 1995). In order for a copyright to be infringed, a person must actually engage in an act that (1) creates a reproduction or publicly or otherwise performs a work, and (2) in itself touches on one

3

of a copyright holder's exclusive rights. *See UMG Recordings, Inc. v. Shelter Capital Partners, L.L.C.*, 667 F.3d 1022, 1035 (9th Cir. 2011); *Cablevision*, at 131 ("[V]olitional conduct is an important element of direct liability"); *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) ("While the Copyright Act does not require that the infringer know that he is infringing or that his conduct amount to a willful violation of the copyright owner's rights, it nonetheless requires *conduct* by a person who causes in some meaningful way an infringement."); *Netcom*, 907 F. Supp. at 1370 ("Although copyright is a strict liability statute, there should still be some element of volition or causation . . . ."). Volitional conduct that falls short of this may give rise to secondary liability, but not direct.

ABC attempts to contort the facts and the law to frame DISH as a direct copyright infringer. But ultimately it is television viewers, and not DISH, who choose to time-shift programming. DISH subscribers buy the Hopper, turn it on, and direct it to record free, over-the-air programming. They, and not DISH, make the choice to time-shift programming and play it back commercial-free. DISH merely provides them the tools to do this and defines the contours within which its subscribers can act—activities that can give rise to, at most, secondary liability. *See Sony Pictures, Inc. v. Universal Studios, Inc.*, 464 U.S. 417 (1984); *Cablevision*, 536 F.3d at 133 ("[I]n cases like *Sony*, the Supreme Court has strongly signaled its intent to use the doctrine of contributory infringement, not direct infringement, to 'identify [] the circumstances in which it is just to hold one individual accountable for the actions of another.'"). No matter how much support, encouragement, and advice DISH gives its users, and no matter what devices it sells them or services it provides them, DISH's actions can never constitute direct infringement as long as viewers, and not it, have volitional control over the making of a copy.

Courts have addressed the issue of "volition" in several contexts. In *UMG Recordings*, the court held that although Veoh created an "automated process" for storing works, in any given case this action "is initiated entirely at the volition of Veoh's users." 667 F.3d at 1035. DISH advertises that the Hopper works "automatically," like Veoh's service. But users still volitionally decide to activate the device, tell it to record, and are presented with several points of control during its operation. While the statutory context is different the reasoning is the same: Veoh, like DISH, does not directly infringe copyright when its users initiate the activity.

In *Sega Enters. Ltd. v. Sabella*, 1996 U.S. Dist. LEXIS 20470, **18-19 (N.D. Cal. 1996), the Northern District of California was confronted with a similar factual situation. Sabella operated a

bulletin-board system (BBS) that housed copies of Sega's copyrighted games. Even though Sabella owned and operated the BBS, and advertised and sold a video game copying machine on the BBS, the court held that she was not directly liable for copyright infringement because she did not have the requisite *volition*; she did not, herself, copy or directly cause a copy to be made. The same is the case with DISH. DISH does not, itself, make a copy or cause a copy to be made—it merely provides tools that allow others to do so. Like the users in *Sega*, ABC's viewers are the sole volitional actors.

Similarly, this Court in *Cablevision* declined to hold a service provider liable when its users had volitional control over initiating a recording on its "remote DVR" product. Cablevision, like DISH, could not be directly liable because a Cablevision subscriber "actually presses the button to make the recording[]" and "supplies the necessary element of volition" for copyright infringement. Like Cablevision, DISH is merely the party that "manufactures[ or] maintains . . . the machine." Even though Cablevision "design[ed], hous[ed], and maintain[ed] a system that exists only to produce a copy," the court found it could be, at most, secondarily liable for its users' actions. *Cablevision*, 536 F.3d at 131; *see also CoStar*, 373 F.3d at 549. Like Cablevision, DISH is merely supplying a device and providing ongoing support to enable its users to make fair use of content.

And again, in *Disney Enters. v. Hotfile Corp.*, 798 F. Supp. 2d 1303 (S.D. Fla. 2011), a court was confronted with a question of direct versus secondary liability for the owner of a website that allowed users to upload and download potentially infringing content. In that case, "Hotfile control[led] its physical premises, its servers, its databases, and the software that manages the website." *Id.* at 1306. But the court was unpersuaded by arguments similar to ABC's. As it explained, "the website hotfile.com merely allows users to upload and download copyrighted material without volitional conduct from Hotfile . . . ." *Id.* at 1308. Like DISH, Hotfile may have provided the means for its users to make copies, but in both cases it is users who "flip the switch" to make a copy. As in *Sabella* and *Hotfile*, without DISH's users' actions, no copying would occur at all. It would defy reason to hold it directly liable for reproductions it does not make.

Of course, DISH does more than sell a consumer device—it is a subscription television service and it provides its customers ongoing customer and technical support to make all its products, including the Hopper, work best. ABC claims this makes DISH directly liable for copyright infringement. ABC Mem. at 17-21. But while copyright is a strict liability statute,

*Netcom*, 907 F. Supp. at 1370, "to establish direct liability under §§ 501 and 106 of the [Copyright] Act, something more must be shown" than that the defendant owns the device used to make a copy. *CoStar*, 373 F.3d at 550.[2] In *CoStar*, while finding that an online service could not be directly liable for copyright infringement, the court explained, "[w]hen a customer duplicates an infringing work, the owner of the copy machine is not considered a direct infringer. Similarly, an ISP who owns an electronic facility that responds automatically to users' input is not a direct infringer." *Id.* ABC has not shown any "actual infringing conduct with a nexus sufficiently close and causal" to the copies that are made. *Id.*

In all the cases discussed above, when users chose to use a device or service, the providers were not held directly liable. When users press a button, use a webpage, or turn on a device, they perform the volitional act of "making a copy." In this case, without DISH users activating the service, there is no copyright infringement because there is no copy being made. The distinction between direct and secondary activity is important, and it is the law. ABC cannot wish it away, nor can it destroy the line between direct and secondary liability for appearance's sake.

### B.  ABC's Viewers Do Not Infringe Copyright When They Skip Commercials

For DISH to be liable as a secondary infringer, there must first be a direct infringer. *Perfect 10 v. Amazon*, 508 F.3d 1146, 1169 (9th Cir. 2007); *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party."). While ABC takes pains to obscure this point, the necessary implication of its claim that DISH is a secondary infringer is that viewers who record its programming are direct infringers. But recording programming in the privacy of one's home for purpose of time-shifting (regardless of whether one skips commercials) is a noninfringing fair use.[3] Because ABC's viewers are not liable for direct copyright infringement, DISH cannot be secondarily liable.[4]

---

[2] Here, assuming that "the device" in question is DISH's back-end facilities and not any customer-owned equipment.
[3] It has not been shown that viewers can make *any* infringing uses of programming with the Hopper. It is at least clear that, since the Hopper's unique features are not infringing, it is "capable of substantial noninfringing uses." *Sony*, 464 U.S. at 442.
[4] ABC argues that the "copying here is not a fair use regardless of who is deemed to be doing it." ABC Mem. at 29. But plaintiffs cannot manufacture new liability by shifting around agency, and if an action is a fair use "by" a viewer it would likely be a fair use "by" DISH.

6

This argument, that to time-shift a program and watch it commercial-free constitutes infringement, is not confined to Hopper. It entails that all viewers who record programs and skip past commercials are copyright infringers, whether they use a standard DVR, a VCR, recording programs on a PC, or any other means. ABC may be constrained by *Sony* to acknowledge that the *provider* of a standard DVR does not *secondarily* infringe as a consequence of its users "infringements," but this has no bearing on whether viewers directly infringe. Under this theory, millions of Americans, whether they subscribe to Comcast or Time Warner Cable, DISH or DirecTV, or whether they simply watch TV broadcast over the air, are copyright infringers each and every time they time-shift programming and skip commercials.[5] "One may search the Copyright Act in vain for any sign that the elected representatives of the millions of people who watch television every day have made it unlawful to copy a program for later viewing at home." *Sony*, 464 U.S. at 456.

### 1. Skipping Commercials Does Not, By Itself, Implicate Copyright

The actual locus of broadcasters' objection to Hopper is the act of skipping commercials.[6] But though broadcasters may wish to control all the uses that viewers make of their works, the Copyright Act does not give them such powers. *Sony*, 464 U.S. at 432 (copyright "protection has never accorded the copyright owner complete control over all possible uses of his work"). Most of the ordinary uses that consumers make of works simply do not implicate copyright at all—a reader does not need permission from the author of a book to read it, and a viewer does not need a license from a studio to watch a movie. Similarly, ABC's viewers do not need to clear with it the exact way they watch its programming. While Section 106 of the Copyright Act gives broadcasters the right to control the reproduction, public performance, and distribution of their works, ABC does not have the right to control their private consumption. A viewer can watch as

---

[5] Not only does ABC seek to label millions of Americans copyright infringers, it arrogates to itself the right to decide that technologies should be illegal simply because it does not like them. This would outlaw an entire class of technology (regardless of who deploys it) and pretends that the interests of broadcast networks should be given more weight than the interests of users, other creators, and technological progress. *See Sony*, 464 U.S. at 444-45 (discussing how not all creators object to time-shifting). Plaintiffs go as far as to claim that the purpose of copyright law is "to protect the copyright holder's exclusive right to control the reproduction and distribution of its works." ABC Mem. at 1. *But see* U.S. Const. art. I, § 8, cl. 8 (the purpose of copyright is to "promote the Progress of Science and useful Arts.").]

[6] *See* Cyrus Farivar, *Fox, NBCUniversal Sue Dish over Ad-Skipping DVR Service*, Ars Technica (May 24, 2012), http://arstechnica.com/tech-policy/2012/05/fox-nbcuniversal-sue-dish-over-ad-skipping-dvr-service.

much or as little of ABC's programming as she wishes, with the sound on or off, with commercials or without, on any screen. She can leave the room or change the channel during the commercials, or overlay a show with a program guide. Whether broadcasters approve of these uses or not is immaterial, since its approval is not necessary. As the Court described in *Sony*,

> Even unauthorized uses of a copyrighted work are not necessarily infringing. An unlicensed use of the copyright is not an infringement unless it conflicts with one of the specific exclusive rights conferred by the copyright statute. Moreover, the definition of exclusive rights in § 106 of the present Act is prefaced by the words "subject to sections 107 through 118." Those sections describe a variety of uses of copyrighted material that "are not infringements of copyright" "notwithstanding the provisions of section 106." The most pertinent in this case is § 107, the legislative endorsement of the doctrine of "fair use."

*Sony*, 464 U.S. at 447 (citations omitted).

### 2. Recording a Show with the Intention of Later Viewing It Without Commercials Is a Fair Use

ABC has tied its arguments to an action by its viewers that, though non-infringing, at least relates to copyright: recording. A viewer that records a program for later viewing creates a reproduction of that program. But this is a fair use now just as it was in 1984.

To determine whether a use is fair, a court must consider "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. 107. Here, as in *Sony*, users' time-shifting meets all four factors.

#### a) The Character of the Use Is Private and Noncommercial

The character of the use here is the same as it was in *Sony*: "private, noncommercial time-shifting in the home." *Sony*, 464 U.S. at 442. Since then, courts have consistently held that a use of copyrighted material that implicates a Section 106 right "for private home enjoyment must be characterized as a non-commercial, nonprofit activity," *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F. 2d 965, 970 (9th Cir. 1992), and have described similar uses, such as space-shifting, as "paradigmatic noncommercial personal use[s]." *Recording Industry Ass'n of Am. v.*

8

*Diamond Multimedia Systems, Inc.*, 180 F. 3d 1072, 1079 (9th Cir. 1999). Thus, this factor heavily weighs in favor of viewers (and therefore DISH).

ABC asserts that the Hopper DVR does not enable time-shifting, but only a form of "unauthorized copying." ABC Mem. at 33. (Again, many kinds of copying are unauthorized, but lawful.) But it is unavailing for ABC to try to characterize what the Hopper DVR enables as something other than time-shifting. Time-shifting is simply recording a program to watch it later, and the way in which the program is watched (with commercials or without, on a TV or an iPad) does not change this.[7]

### b)  Broadcast Works Are Public in Nature

The second prong likewise favors viewers because the works in question are made widely available, and broadcast over the air for the public to watch free of charge. "[T]ime-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge." *Sony*, 464 U.S. at 449. When works are broadly disseminated to the public, users' fair use rights are strong. *Cf. Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564 (1985) (finding that fair use rights are stronger for published works than for unpublished).

Because ABC is "granted the free and exclusive use of a limited and valuable part of the public domain," *Office of Communication of United Church of Christ v. FCC*, 359 F. 2d 994, 1003 (D.C. Cir. 1966), when it "accepts that franchise [it] is burdened by enforceable public obligations." *Id.* As the Supreme Court has found, "to the extent time-shifting expands public access to freely broadcast television programs, it yields societal benefits." *Sony*, 464 U.S. at 454. The Court quoted the court below approvingly, which held that this use "is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves." *Sony*, 464 U.S. at 425 (quoting *Universal City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 429, 454 (C.D. Cal 1979)). Because ABC is charged with promoting the public interest, which time-shifting also promotes, this prong of the fair use analysis favors its viewers.

---

[7] While later actions (such as the *fact* of a viewer's skipping commercials, or the opposite) can have no bearing on whether a use which took place in the past (making a recording) was fair, the *intent* of the party making a use of a copyrighted work may have bearing on fair use analysis. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) (giving weight to the "intended purpose" of an act). In this case, however, any purported market effects arising from a viewer skipping commercials should be considered as part of the fourth fair use factor.

c)   Time-Shifting Requires the Whole Work to Be Copied

To time-shift, viewers record programs in their entirety. The Supreme Court recognizes that "the extent of permissible copying varies with the purpose and character of the use," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586-87 (1994). Here, as in *Sony*, the reproduction of an entire work "does not have its ordinary effect of militating against a finding of fair use," *Sony*, 464 U.S. at 449-50, because time-shifting is a noncommercial use of broadcast programming that is made freely available.

Put another way, the third factor considers whether a person copies more of a work than is necessary for her purpose. *Harper & Row*, 471 U.S. at 63-64. Because the fair use of time-shifting requires making copies of the work as a whole, this factor favors viewers.

d)   There Is No Effect on Any Likely Markets

ABC makes much of the language in *Sony* that suggests that if a particular use "should become widespread" and "adversely affect the potential market for the copyrighted work," it might not be fair. *Sony*, 464 U.S. at 451; ABC Mem. at 24. But the Court in Sony was well aware that some users might use time-shifting to bypass commercials. *Sony*, 464 U.S. at 423 ("The pause button ... enabl[es] a viewer to omit a commercial advertisement from the recording... The fast-forward control enables the viewer of a previously recorded program to run the tape rapidly when a segment he or she does not desire to see is being played back on the television screen."). The Court found time-shifting fair nonetheless. A use that is fair if it might become widespread is also fair when it does become widespread, and ABC's attempt to get rid of fair use when it becomes too convenient must fail.  ABC, like the plaintiffs in Sony, cannot show that time-shifting, even with commercial-skipping, causes cognizable harm.

A court cannot presume that unauthorized, noncommercial reproductions cause any harm at all. Because home recording is a noncommercial activity, ABC must show through "a preponderance of the evidence that some meaningful likelihood of future harm exists" because of its viewers' actions. *Sony*, 464 U.S. at 451. But the evidence presented by DISH refutes the broadcasters' case, showing that time-shifting benefits creators. In any case, a traditional video-on-demand service and time-shifting are not the same thing: time-shifting allows users to watch recently-aired shows that they might not have been able to watch live. Video-on-demand services,

10

by contrast, offer access to a comprehensive back catalog of movies, entire runs of television series, and more. By creating a false equivalence between video-on-demand and time-shifting, ABC is attempting to show harm where there is none.

Even if ABC does claim that it plans to offer some new service that emulates time-shifting, it cannot show harm to a "traditional, reasonable, or likely to be developed" market for over-the-air broadcast programming. *Am. Geophysical Union v. Texaco, Inc.,* 60 F. 3d 913, 930 (2d Cir. 1994). A copyright holder may not postulate harm to a hypothetical market where it sells to consumers the right to do things they now enjoy for free, such as the right to record programming. As the Second Circuit observed in *Texaco,*

> a copyright holder can always assert some degree of adverse affect on its potential licensing revenues as a consequence of the secondary use at issue simply because the copyright holder has not been paid a fee to permit that particular use.... Thus, were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would always favor the copyright holder.

60 F. 3d 913, 930 n.17 (citations omitted).

As this Court observed recently, "A copyright holder cannot preempt a transformative market."[8] *Authors Guild, Inc. v. Hathitrust,* 2012 U.S. Dist. LEXIS 146169, at *20 (S.D.N.Y. Oct. 10, 2012). In that case, even though *Hathitrust* made complete copies of copyrighted literary works for the purpose of enabling full-text searching and disabled access, the Court found that its uses were transformative, did "not significantly impact a market," and were not unlawful. *Id.* at 20-21. Because of this, the Court disregarded claims by plaintiffs that Hathitrust's uses might "undermin[e] existing and emerging licensing opportunities." *Id.* at 20.

---

[8] Whether a harm is to a traditional or a hypothetical market is a fourth factor consideration, even though discussion of this point sometimes involves discussion of the first-factor consideration of whether a use is transformative. It is not necessary to find that a use is transformative to find that it belongs to a transformative market. In this case, time-shifting is a transformative use because it enables ways of viewing a program that are wholly different than watching it live over-the-air. Even so, even if this Court finds that it is not a transformative use, time-shifting is part of a transformative market because broadcasters do not traditionally sell viewers the right to record programming and watch it at other times or on other devices.

Similarly, in *S.A.R.L. Louis Feraud Int'l v. Viewfinder, Inc.*, 627 F. Supp. 2d 123, 136 (S.D.N.Y. 2008), plaintiff fashion designers alleged that press photographers interfered with a yet-undeveloped market for photographs from the designers themselves. But this Court found that fashion designers "have never operated as suppliers for such a market." *Id.* at 136. As in *Viewfinder*, while "[o]ne could imagine an alternate reality" where viewers were eager to pay new fees to ABC for the right to time-shift programming, simply postulating a "far-fetched" new market is not enough to show harm under the fourth factor of a fair use analysis. *Id.* These kinds of "implausible" markets are not sufficient to show harm. *A.V. ex rel. Vanderhye v. iparadigms, LLC*, 562 F. 3d 630, 645 (4th Cir. 2009).

ABC is attempting to "bootstrap" a market into existence, observing a fair use and proposing to charge for it. *See* 2 Nimmer § 13.05[A][4], 13-181, 182; 4 Patry on Copyright § 10:152. It cannot be permitted to undermine the Copyright Act in this way.

## III.   ABC Will Not Suffer Irreparable Harm When Its Viewers Record Its Programs

ABC must show that it is *likely* to suffer *irreparable harm* without a preliminary injunction. Relevant factors include whether harm will occur to the parties' legal interests and whether the injury can be remedied by damages or permanent injunction after a trial on the merits. *Salinger*, 607 F.3d at 81. There are no shortcuts: irreparable harm must be demonstrated, not presumed. *Flexible Lifeline*, 654 F.3d 989, 998 (9th Cir. 2011). Moreover, speculative injury is not sufficient. *Caribbean Marine*, 844 F.2d at 674 ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief."). Further, ABC must show a "sufficient causal connection between irreparable harm to [plaintiff]'s business and [defendant's behavior.]" *Perfect 10, Inc. v. Google, Inc*., 653 F.3d 976 (9th Cir. 2011).

In short, irreparable harm requires the plaintiff to show that the court should impose a preliminary injunction because the plaintiff is about to be harmed in a way that, if allowed, cannot be repaired by any other remedy in the court's repertoire. *Salinger*, 607 F.3d at 81. This is a significant burden, and ABC here does not meet it. A court should not assume that harm will occur simply because the plaintiff said so. *Humanscale Corp. v. CompX Int'l Inc*., 2010 U.S. Dist. LEXIS 42083, *12 (E.D. Va. 2011). Nowhere does ABC assert that, between now and a final determination on the merits, it will be adversely harmed in a way that cannot be adequately

12

remedied by damages or a permanent injunction. Instead, it merely recounts the same tired arguments that were rejected in *Sony* and *Cablevision*.

Plaintiff ABC claims that DISH's conduct  (1) harms its right to exclusive control; (2) disrupts its ability to promote its programs; (3) threatens its ad-supported business model; (4) disrupts its relationships with distribution partners; and (5) harms its goodwill. But these assertions of "irreparable harm" are unpersuasive. First, they amount to little more than a reiteration of claims of copyright infringement—an issue which defendants and *amicus* dispute—and which is a separate and unrelated prong of the preliminary injunction standard. In any event, the effects of normal marketplace competition and the evolution of technology and business models are not legally cognizable "harms" (and neither is any accompanying purported "loss of goodwill"). The Hopper is a new technology that directly responds to viewer demand— being new, it naturally disrupts the expectations of the broadcast industry. But this does not mean it should be shut down. Finally, none of these claims of irreparable harm are so dire and imminent as to justify the issuance of a preliminary injunction—in other words, these claims of harm are not irreparable. The effect on ABC's right to control, ability to distribute, and ad-supported business model before and during trial will likely be negligible. In any case, ABC has not demonstrated that it stands to lose substantial revenue or goodwill during the pendency of trial. Instead, it relies on ethereal "loss of control" and "disruption of business model" arguments that simply obscure the fact that that it stands to suffer no real harm. Finally, financial harms (such as any purported loss of advertising revenue) are easily quantified and may not be used as a basis for a preliminary injunction.

Because ABC has not asserted with any specificity that it will likely suffer irreparable harm if a preliminary injunction is not granted, this factor favors DISH.

## IV.    DISH, Not ABC, Would Suffer Hardship if a Preliminary Injunction Is Granted

The balance of hardships favors DISH. DISH's customers would be inconvenienced if their equipment, which they have paid for and come to rely on, is remotely disabled or taken back. DISH would face a deluge of customer complaints and service requests, and would suffer a loss of consumer goodwill. Contrariwise, as argued above, even assuming that ABC eventually proves its case at trial, the harm that it would suffer between now and that time would be

13

minimal and easily remedied. While DISH and ABC are large companies and the outcome of this suit will not seriously affect their bottom lines, the balance of the hardships favors DISH.

## V.   The Public Benefits from Balanced Copyright and Technological Innovation, Not the Enforcement of a Non-Existent "Right" to Prevent Ad-Skipping

ABC argues that "[u]pholding copyright protection is in the public interest." ABC Mem. at 39. But this case is not about whether the overall system of copyright serves the public interest—the question is whether DISH or television viewers are infringing copyright in a specific instance. Since they are not, it does not serve the public interest or the interests of copyright law for the Court to grant an injunction. Indeed, ABC upsets copyright's balance by seeking to assert rights it does not have, and to deny viewers their lawful rights. But even if ABC *were* to demonstrate a likelihood of success on the merits, this would have no bearing on whether granting its injunction would serve the public interest. Just as courts may not presume that a showing of copyright infringement demonstrates irreparable harm, *Salinger*, 607 F.3d at 79-80, they may not presume that a non-binding, pre-trial *prima facie* case for copyright infringement demonstrates that an injunction serves the public interest.

More fundamentally, this way of analyzing the issue is misguided. The public interest and the merits of the case are separate factors, each of which ABC must independently prove to prevail on its motion. The public interest factor must be considered independently, *Salinger*, 607 F.3d at 79 n.8, and is not merely an opportunity for ABC to remake its arguments on the merits, damages, or the balance of hardships. *Winter*, 555 U.S. at 20; *eBay,* 547 U.S. at 391; *Flexible Lifeline*, 654 F.3d at 994. Conflating the public interest factor with any of the others would render it superfluous, contrary to the express command of the Supreme Court in *eBay*.

ABC attempts to argue that the public interest favors the advertising-supported model for television. Even were the Court to take this assertion on faith (and to assume that this business model is necessary to fund creativity), DISH has rebutted the assertion that time-shifting causes a decline in advertising revenues. Nevertheless, the public interest does not lie merely in protecting ABC's business model, but "in the general benefits derived by the public from the labors of authors." *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932). Indeed, the Copyright Clause only grants Congress the power of "securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries" for one purpose: "To promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. By making works more convenient to

14

watch and thus more accessible, time-shifting promotes these general public benefits. *Sony*, 464 U.S. at 429 ("Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors in order to give the public appropriate access to their work product.").

Finally, the public interest would not be served by an injunction that would slow investment and choke off innovation in the video marketplace. As Michael A. Carrier has shown, the preliminary injunction granted against Napster chilled investment in music services generally and slowed the development of licensed services, leading to a "lost decade" for digital music services.[9] If this Court is going to decide an issue that could reverberate throughout the industry, slow the evolution of digital video products, and choke off investment in an area sorely in need of fresh ideas, it should do so only after a full and fair trial, where all parties have the chance to fully make their case, and more fully develop the factual record. It does not serve the public interest for any court to issue a preliminary injunction that could have such wide-ranging consequences. *See* 4 Nimmer on Copyright § 14.06 (courts should consider whether "great public injury would be worked by an injunction").

## CONCLUSION

Because ABC has not met its burden, and to protect long-established home recording rights, this Court should deny the motion for a preliminary injunction.

Dated: December 21, 2012

Respectfully submitted,

/s/ John Bergmayer
John Bergmayer (*Pro Hac Vice* pending)
PUBLIC KNOWLEDGE
1818 N Street, NW Suite 410
Washington, DC 20036
Tel: (202) 861-0020
Fax: (202) 861-0040
Email: john@publicknowledge.org
*Attorney for Amicus Curiae Public Knowledge*

---

[9] Michael A. Carrier, *Copyright and Innovation: The Untold Story*, 2012 WISC. L. REV. (forthcoming), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2099876.

## CERTIFICATE OF SERVICE

I, John Bergmayer, hereby certify that on December 21, 2012, I caused a true copy of the foregoing brief to be served on all parties via electronic filing.

Dated:  December 21, 2012

Respectfully submitted,

/s/ John Bergmayer
John Bergmayer (*Pro Hac Vice* pending)
Public Knowledge
1818 N St NW Suite 410
Washington, D.C. 20036
Phone: (202) 861-0020
Fax: (202) 861-0040
john@publicknowledge.org