**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE AUTOHOP LITIGATION<br><br>This Document Relates To:<br><br>DISH Network L.L.C., 12 Civ. 4155 (LTS)(KNF) | MASTER FILE<br>12 Civ. 4155 (LTS) (KNF)<br><br>**REDACTED PUBLIC FILING,<br>ORIGINAL FILED UNDER SEAL** |

**DISH'S MEMORANDUM IN OPPOSITION TO**
**ABC'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS .............................................................................................. 3

    ABC Authorizes DISH Customers to Record ABC Programs ........................................ 3

    The Evolution of Recording Technology
    and DISH's Innovative DVR – The Hopper ........................................................... 5

    The Networks Sue, But ABC Does Nothing While
    Judge Gee Denies Fox's Preliminary-Injunction Motion ..................................... 8

    After Months of Delay, ABC Files a Preliminary Injunction Motion
    Materially Identical To The One Judge Gee Denied ........................................... 10

ARGUMENT ................................................................................................................ 10

I.      ABC IS NOT LIKELY TO SUCCEED ON ITS CONTRACT CLAIM ........................ 11

II.    ABC IS NOT LIKELY TO SUCCEED ON
      ITS SECONDARY INFRINGEMENT CLAIM ............................................... 14

    A.    ABC Cannot Identify Any Infringing Act by the Consumer ............................. 15

    B.    The Fair Use Analysis Here Is No Different Than It Was In Sony ..................... 17

        1.    Time Shifting with Ad Skipping Is Fair No Matter How Efficient ........ 17

        2.    ABC Has Failed to Demonstrate Market Harm ...................................... 20

    C.    ABC Has Not Shown a Likely Success
        on the Required Elements of Vicarious Liability ............................................. 23

III.   ABC IS NOT LIKELY TO SUCCEED
      ON ITS DIRECT INFRINGEMENT CLAIM ............................................... 24

    A.    Consumers are Making the Copies, Not DISH ................................................ 24

    B.    Even if DISH is Making the Copies, the Use is Fair ........................................ 27

IV.   ABC WILL NOT SUFFER IRREPARABLE HARM ................................................. 28

    A.    ABC's Delay Refutes Any Claim of Irreparable and Imminent Harm ............... 28

    B.    There Is No Irreparable Harm on the Contract Claim ....................................... 29

    C.    ABC Has Not Proven Likely Irreparable Harm on its Copyright Claims .......... 30

        1.    ABC's Claimed Loss of Advertising Revenue and Promotion
            Opportunities Are Speculative and Contrary to the Evidence ................ 31

        2.    ABC's Alleged Harm by Loss of Control Is Refuted by the Facts ......... 34

        3.    ABC's Allegations of Loss of Negotiating Position and
            Relationships with Licensees are Conclusory and Insufficient .............. 36

# TABLE OF CONTENTS
(continued)

**Page**

4.      ABC's Claim of Loss of Goodwill is Conclusory
and Insufficient to Support a Preliminary Injunction ............................. 37

V.      THE BALANCE OF HARDSHIPS AND THE
PUBLIC INTEREST BOTH FAVOR DISH.................................................................. 38

A.      DISH Will Suffer More From An Injunction Than ABC Will Without One ...... 38

B.      An Injunction Would Disserve the Public Interest ............................................. 39

CONCLUSION ...................................................................................................................... 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,*
    277 F. Supp. 2d 356 (S.D.N.Y. 2003)............................................................................39 n.21

*ActiveVideo Networks, Inc. v. Verizon Commc'ns., Inc.,*
    694 F.3d 1312 (Fed. Cir. 2012)................................................................................................35

*Agee v. Paramount Commc'ns Inc.,*
    59 F.3d 317 (2d. Cir. 1995)............................................................................................21 n.8

*In re Aimster Copyright Litig.,*
    334 F.3d 643 (7th Cir. 2003) .........................................................................................21 n.8

*American Broadcasting Cos. v. Aereo, Inc.,*
    No. 12 Civ. 1540(AJN), 2012 WL 2848158 (S.D.N.Y. July 11, 2012) .........................32 n.17

*American Geophysical Union v. Texaco,*
    60 F.3d 913 (2d Cir. 1994).............................................................................................23 n.9

*Artists Music, Inc. v. Reed Publ'g (USA), Inc.,*
    93 Civ. 3428 (JFK), 1994 WL 191643 (S.D.N.Y. May 17, 1994) .........................................24

*Authors Guild, Inc. v. HathiTrust,*
    No. 11-CV-6351(HB), 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012)....................................19

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
    448 F.3d 605 (2d Cir. 2006).......................................................................................18, 23

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006)....................................................................................................28

*Buckingham Corp. v. Karp,*
    762 F.2d 257 (2d Cir. 1985).....................................................................................................36

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994)................................................................................................................28

*Cartoon Network LP v. CSC Holdings, Inc.,*
    536 F.3d 121 (2d Cir. 2008)....................................................................................... 2, 24-27

*Century Time Ltd. v. Interchron Ltd.,*
    729 F. Supp. 366 (S.D.N.Y. 1990) ...............................................................................29 n.13

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

CASES

Citibank, N.A. v. Citytrust,
   756 F.2d 273 (2d Cir. 1985)..................................................................29 n.13

Clonus Assocs. v. Dreamworks, LLC,
   417 F. Supp. 2d 248 (S.D.N.Y. 2005).............................................................32

Comic Strip, Inc. v. Fox Television Stations, Inc.,
   710 F. Supp. 976 (S.D.N.Y. 1989) ...........................................................29 n.13

Dish Network, L.L.C. v. Amermican Broad. Cos.,
   No. 12 Civ. 4155(LTS) (KNF), 2012 WL 2719161 (S.D.N.Y. July 9, 2012)..........................9

eBay Inc. v. MercExchange, L.L.C.,
   547 U.S. 388 (2006).................................................................11, 30, 35

Faiveley Transp. Malmo AB v. Wabtec Corp.,
   559 F.3d 110 (2d Cir. 2009)..............................................................28, 30

Federal Ins. Co. v. Americas Ins. Co.,
   691 N.Y.S.2d 508 (N.Y. App. Div. 1999) ............................................................14

Fox Broad. Co. v. Dish Network, L.L.C.,
   No. CV 12-04529 DMG, 2012 WL 5938563 (C.D. Cal. Nov. 7, 2012)........................ passim

Fromson v. Western Litho Plate & Supply Co.,
   853 F.2d 1568 (Fed. Cir. 1988)....................................................................40

General Motors Corp. v. Harry Brown's, LLC,
   563 F.3d 312 (8th Cir. 2009) .....................................................................40

General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.,
   862 F. Supp. 1070 (S.D.N.Y. 1994)................................................................29

Gidatex, S.r.L. v. Campaniello Imps., Ltd.,
   13 F. Supp. 2d 417 (S.D.N.Y. 1998)..............................................................29

J.P.T. Auto., Inc. v. Toyota Motor Sales, U.S.A., Inc.,
   659 F. Supp. 2d 350 (E.D.N.Y. 2009) ............................................................39

Jessup v. American Kennel Club, Inc.,
   862 F. Supp. 1122 (S.D.N.Y. 1994)..............................................................37

Kelly v. Arriba Soft Corp.,
   336 F.3d 811 (9th Cir. 2003) ................................................................19, 28

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

C<small>ASES</small>

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
   383 F.3d 1337 (Fed. Cir. 2004).................................................................40

*Leibovitz v. Paramount Pictures Corp.*,
   137 F.3d 109 (2d Cir. 1998)....................................................................20

*Lever Bros. Co. v. Mattel, Inc.*,
   609 F. Supp. 1395 (S.D.N.Y. 1985)...........................................................39

*Life Techs. Co. v. AB Sciex Pte. Ltd.*,
   No. 11 Civ. 325 (RJH), 2011 WL 1419612 (S.D.N.Y. Apr. 11, 2011) ..........................29 n.13

*Lipper Holdings, LLC v. Trident Holdings, LLC*,
   766 N.Y.S.2d 561 (N.Y. App. Div. 2003) ...........................................................13

*Litho Prestige, Div. of Unimedia Grp., Inc. v. News Am. Publ'n., Inc.*,
   652 F. Supp. 804 (S.D.N.Y. 1986) ...............................................................36

*Marlyn Nutraceuticals, Inc. v. Mucos Phrarma GmbH & Co.*,
   571 F.3d 873 (9th Cir. 2009) ...............................................................38

*Matthew Bender & Co. v. West Publ'g Co.*,
   158 F.3d 693 (2d Cir. 1998)....................................................................23

*Maxtone-Graham v. Burtchaell*,
   803 F.2d 1253 (2d Cir. 1986)....................................................................16

*MercExchange, LLC v. eBay, Inc.*,
   500 F. Supp. 2d 556 (E.D. Va. 2007) ...............................................................35

*Myron Corp. v. Holland USA, Inc.*,
   No. 07 CV 6877 (PAC), 2007 U.S. Dist. LEXIS 97261 (S.D.N.Y. Oct. 12, 2007) ........29 n.13

*National Football League Players Ass'n v. National Football League Properties, Inc.*,
   No. 90 Civ. 4244 (MJL), 1991 U.S. Dist. LEXIS 6109 (S.D.N.Y. May 7, 1991)..........37 n.20

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
   16 F.3d 1032 (9th Cir. 1994) ...............................................................40

*Oneida Nation of N.Y. v. Cuomo*,
   645 F.3d 154 (2d Cir. 2011)....................................................................38

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) ...............................................................19

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

CASES

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*,
  494 F.3d 788 (9th Cir. 2007) ..................................................................24

*Polymer Techs., Inc. v. Bridwell*,
  103 F.3d 970 (Fed. Cir. 1996)...........................................................35 n.18

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
  99 F.3d 1381 (6th Cir. 1996) ...........................................................26 n.11

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.*,
  180 F.3d 1072 (9th Cir. 1999) .................................................................16

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004)..............................................................30 n.15

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
  907 F. Supp. 1361 (N.D. Cal. 1995) .........................................................26

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010)...............................................................11, 28, 30, 35

*Shepard Indus., Inc. v. 135 E. 57th St., LLC*,
  No. 97 Civ. 8447 (DAB), 1999 U.S. Dist. LEXIS 14431 (S.D.N.Y. Sept. 17, 1999) ....... 37-38

*Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*,
  118 F.3d 955 (2d Cir. 1997)...................................................................23

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)...................................................................... passim

*T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*,
  821 F.2d 646 (Fed. Cir. 1987)...........................................................35 n.18

*This Is Me, Inc. v. Taylor*,
  157 F.3d 139 (2d Cir. 1998)..................................................................14

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d Cir. 1995)....................................................................28

*Ty, Inc. v. Publications Int'l Ltd.*,
  292 F.3d 512 (7th Cir. 2002) (Posner, J.) .............................................22

*United Retail Inc. v. Main Street Mall Corp.*,
  903 F. Supp. 12 (S.D.N.Y. 1995) ..........................................................29

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

CASES

*Warner Brothers Entertainment, Inc. v. WTV Systems, Inc.*,
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ........................................................................36 n.19

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).........................................................................................................11, 28

*Wolk v. Kodak Imaging Network, Inc.*,
    840 F. Supp. 2d 724 (S.D.N.Y. 2012)..........................................................................24 n.10

*WPIX, Inc. v. ivi, Inc.*,
    765 F. Supp. 2d 594 (S.D.N.Y. 2011)..........................................................................32 n.17

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d Cir. 2012)........................................................................................35 n.19

STATUTES

17 U.S.C. §106..................................................................................................................... 16-17

17 U.S.C. § 107.........................................................................................................................17

17 U.S.C. § 119.........................................................................................................................4

17 U.S.C. § 122.........................................................................................................................4

OTHER AUTHORITIES

Ethan O. Notken, Note, *Television Remixed: The Controversy Over Commercial-
    Skipping*, 16 Fordham Intell. Prop. Media & Ent. L.J. 899, 929 (2006)...................20

## <u>INTRODUCTION</u>

This case is about innovative technology giving consumers greater choice and control over their television experience.  Nearly 30 years ago, in *Sony Corp. of America v. Universal City Studios, Inc*., 464 U.S. 417 (1984), the Supreme Court held that consumers have the right, in the privacy of their homes, to record over-the-air television broadcasts and watch them at a later, more convenient time, fast-forwarding through commercials, as they desire.  Broadcasters howled that this "time-shifting" capability afforded by the video cassette recorder ("VCR") would be the death of television as we know it.  Their dire prediction never came to pass.  Since then, technology has advanced, evolving from the VCR to the digital video recorder ("DVR"), like TiVo, all the way to fully integrated set-top boxes that cable and satellite companies provide. The networks protested each technological innovation, with the same howl: *This time*, the threat is real.  Every time, they were wrong.  With each technological advance giving consumers more flexibility and control, they watched more TV than ever—which in turn enriched the broadcasters with ever more advertising dollars.

Here we go again.  The latest improvement in media technology is DISH's award-winning Hopper.  The Hopper is nothing but a souped-up DVR.  Its PrimeTime Anytime ("PTAT") feature gives consumers a simpler way to record blocks of programming that they are already entitled to record on DISH's licensed satellite system, and its AutoHop feature gives them a more efficient way to skip commercials they are already entitled to skip.  The networks are howling again.  The previous models of DVRs with similar features are fine, they concede, but *this* advance goes too far.  *This* one infringes the networks' copyrights because it gives users a recording mechanism that is *too streamlined* and a commercial-skipping capability that is *too effective*.

Fox tried the argument in a parallel case in California, before Judge Gee, who rejected it last month.  As Judge Gee understood in rejecting Fox's preliminary injunction motion against PTAT and AutoHop, *Sony* held that in-home time-shifting is "fair use."  Period.  *Sony* did *not* hold that in-home time-shifting is fair use so long as it is imperfect.  As Judge Gee correctly noted, "there is no specific theory under which individual PTAT users could themselves be liable for copyright infringement without circumventing *Sony*."  *Fox Broad. Co. v. Dish Network, L.L.C.*, __ F. Supp. 2d __, No. CV 12-04529 DMG (SHx), 2012 WL 5938563, at *12 (C.D. Cal. Nov. 7, 2012).  Thus, she held, *Sony* foreclosed Fox's attempt to strip millions of people of their right to watch television on their own schedule and to skip commercials they do not want to watch.  Nevertheless, ABC repeats the same argument here.

Judge Gee also rejected the second argument that ABC repeats here: Even if *consumers* are allowed to time-shift, DISH is not.  ABC says that *DISH* "causes" the PTAT copies to be made, and therefore that *DISH* is a direct infringer.  As Judge Gee recognized, this argument runs headlong into the Second Circuit's decision in *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008), which expressly held that Cablevision, by marketing and distributing a DVR with certain automated recording capabilities, was not a direct infringer because Cablevision's users actually initiate the recording process.  The only result here that is consistent with *Cablevision* is that DISH is not a direct infringer, because "it is ultimately the user who causes the copy to be made by enabling PTAT."  *Fox*, 2012 WL 5938563, at *10.  Indeed, ██████████████████████████████████████ confirming that the consumer is making a choice.  Because the user is the one who decides whether to activate PTAT, the user is the one who "causes" PTAT copies to be made.

Even if ABC's legal theories had any validity, the network could not obtain the extraordinary remedy of a preliminary injunction. ABC has acknowledged that it has not yet suffered *any* measurable harm (irreparable or not) in the 11 months since the Hopper's introduction. Indeed, Judge Gee denied Fox's motion for a preliminary injunction in early November, and none of Fox's dire predictions has come true. The only justification ABC has offered for a preliminary injunction is that DISH's new features *might in the future* impede its profits—almost exactly the same arguments that the Supreme Court rejected in *Sony*. If ABC's concerns were real, it would have sued and sought a preliminary injunction months earlier.

DISH's experts[1] confirm that the Hopper will have no negative effect on how users are currently using their DVRs or on the ratings that dictate the price the networks can charge advertisers. In fact, ABC concedes in internal pre-lawsuit studies marked "Highly Confidential" ███████████████████████████████████████████ (Rapp. Decl. Ex. 3a), and Fox admits what DISH has maintained all along, that PTAT █████████████████████████████████████ ██████████████████████████████████████ Echtman Decl. Ex. 8. Regardless, even if the networks' claims turn out to have a glimmer of merit, any harm they suffer can be compensated with damages. As Judge Gee found, DISH's ability to offer this award-winning DVR should be sustained and the motion for preliminary injunction denied.

## STATEMENT OF FACTS

### *ABC Authorizes DISH Customers to Record ABC Programs*

DISH is the nation's third-largest pay television service provider delivering satellite services to millions of families nationwide. Shull Decl. ¶3. As of September 30, 2012, DISH had more than 14 million customers in the United States. *Id.*

---

[1] In support of its Opposition, DISH offers expert declarations from economist Richard Rapp ("Rapp Decl."), consumer behavior specialist John Hauser ("Hauser Decl.") and the technology expert from *Cablevision*, Paul Horowitz ("Horowitz Decl").

In order to retransmit content from over-the-air broadcasts of the major television networks, DISH enters into retransmission consent agreements pursuant to statutory licenses in the Copyright Act.  *See* 17 U.S.C. §§ 119, 122.[2]  DISH's operative retransmission agreement with ABC is the Digital Retransmission Consent Agreement of September 15, 2005 ("2005 Agreement"), as amended.  Shull Decl. Exs. 1, 2.

The 2005 Agreement was part of a bundle of agreements that DISH (then known as EchoStar Satellite L.L.C.) made with ABC and other Disney subsidiaries.   Sahl Decl. ¶¶3, 5.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████   In fact, ABC represented to the Federal Communications Commission that the payments DISH made to ABC's cable affiliates are "comparable" to a direct "cash option" for retransmission of the broadcast stations.   Rapp Decl. Ex. 25 at 5-6; Echtman Decl. Ex. 6 at 190:3-192:9.  Given these facts, it is patently misleading for ABC's declarant Justin Connolly to claim that "ABC, Inc. did not charge DISH any license fee for the right to retransmit the Digital Signal" and to suggest that ABC's only "benefit" under the 2005 Agreement is "advertising revenue."  Connolly Decl. ¶24; s*ee* Sahl Decl. ¶¶4-8.

The 2005 Agreement approves DISH's practice of providing its customers with DVRs:

---

[2] The Declaration of David Kummer describes the technical aspects of the satellite television process, as does the Declaration of Professor Paul Horowitz.

> Except as provided herein, EchoStar shall not, for pay or otherwise, record, copy, duplicate, retransmit and/or authorize the recording, copying, duplication or retransmission of any portion of any Digital Signal without the prior written consent of Broadcaster. ***The foregoing shall not preclude EchoStar's practice of connecting subscribers' home recording devices such as VCRs or DVRs*** ….

Shull Decl. Ex. 1 at § 12 (emphasis added).  The DVRs on the market in 2005, just like those on the market now, offered recording by time, channel and program, fast-forward, and 30-second skip features.  Sahl Decl. ¶7; Minnick Decl. ¶6, 8-11, 41-43.

***The Evolution of Recording Technology and DISH's Innovative DVR—The Hopper***

DISH has been offering DVRs to its customers since the advent of DVR technology in 1999.  *Id.* ¶5.  Over time, that technology has significantly improved as hard-drive storage has become larger and cheaper.  *Id.* ¶6, 11; Horowitz Decl. ¶58-64, 99-105.  For example:

- Manufacturers have developed DVRs with "whole-home" capability, where users can record programs on a DVR hooked up to one television and play those programs back on a different television.  Minnick Decl. ¶¶18-19 & Exs. 4-6.

- Some devices have as many as five tuners, which allow the user to simultaneously record the content on five different television channels.  *Id.* ¶18 & Ex. 4; Horowitz Decl ¶105.

- Some DVRs have hard drives as large as two terabytes (i.e., two trillion bytes), which allows the consumer to store up to 300 hours of high-definition programming.  Minnick Decl. ¶20 & Ex. 7; Horowitz Decl. ¶105.

- Manufacturers have developed more sophisticated ad-skipping capabilities.  For example, most DVRs can skip forward in 30-second increments, the length of the typical television ad.  Some can skip forward in increments as long as one minute, half the length of a typical block of commercials. Minnick Decl. ¶6 & Ex. 1; Horowitz Decl. ¶100-03.

This technology has strengthened America's love affair with television.  The average Nielsen household watches almost 8½ hours of television per day, up from 6½ hours in 1980.  Rapp Decl. ¶66.  Moreover, the overwhelming majority of television viewing is done live on traditional television sets.  *Id.* ¶89; Hauser Decl. ¶9, 10, 20, 24.  Live viewing remains prevalent even though more than 45 million American families with televisions have DVRs.  Rapp Decl.

¶67, Exs. 10-11; Hauser Decl. ¶14.  And households with DVRs actually consume *more* television than households without DVRs.  Hauser Decl. ¶28-29.

On January 9, 2012, DISH announced the Hopper "Whole Home" High Definition DVR at the International Consumer Electronics Show ("CES").  Khemka Decl. ¶3.  The Hopper garnered universal acclaim for its innovative features, winning "Best in Show" at the CEA Line Shows in New York.  *Id*. ¶7 & Ex. 3.  The primary distinguishing feature of the Hopper is its "Whole Home" capability.  *Id.* ¶3.  A single Hopper can provide satellite television service, as well as DVR functionality, to as many as four televisions in one home.  *Id.*  No matter which of those four televisions the customer may want to watch at a particular time, the customer's DVR recordings are readily available.  Minnick Decl. ¶13-14.

***PrimeTime Anytime ("PTAT")*.**  When the Hopper was introduced in January 2012, PTAT debuted with it.  Khemka Decl. ¶3.  PTAT allows a user, at his election, to record all of the primetime programming on any or all of the four major broadcast networks.  Minnick Decl. ¶16-17, 21.  When a DISH customer receives the Hopper, PTAT is turned off.  *Id*. ¶22.  To activate PTAT, the user must press a button on the Hopper's remote control, access the PTAT set-up screen, and select "Enable."  *Id.* ¶¶23-24.  The user can turn PTAT off by accessing the same set-up screen and selecting "Do Not Enable."  *Id.* ¶24.  DISH and EchoStar *do not* pre-activate PTAT for the user.  *Id.* ¶22.  ███████████████████████████████████████████████████

A Hopper user who activates the PTAT recording feature is offered a menu of customizable recording options.  Minnick Decl. ¶¶24-25 & Ex. 8.  The user decides which networks to record, on which days of the week, and how many days the recordings will remain on the DVR (between 2 and 8) before they are automatically deleted.  *Id.*; Horowitz Decl. ¶91.

There are more than 13,000 unique configurations of the user settings. Minnick Decl. ¶25. The user can also elect to save a specific recording for a longer period of time. *Id.* ¶36.

After the Hopper user configures PTAT, timers are set to record the primetime shows on each selected networks on each selected night. *Id.* ¶32. The PTAT software interacts with the electronic program guide to make sure that, if at least half of a program falls within the primetime window, the entire program (including the portion that falls outside the window) will be recorded. *Id.* ¶¶32-33. Contrary to ABC's assertion, employees from EchoStar (DISH's satellite services provider) do not manually select which programs are included in primetime and whether programs that extend beyond the primetime block should be recorded. *Id.* ¶33.

Technologically, this is nothing new. Most DVR recording is currently done by way of a sophisticated timer system that interacts with the electronic program guide. *Id.* ¶34; Horowitz Decl. ¶89. A user may select a show for recording by clicking on a listing for that show in the guide, or by using a search function to find a show for recording. Minnick Decl. ¶34. Once a show is selected for recording, the software within the DVR makes sure that it is recorded by searching for the program identifier associated with the show, regardless of when it might be aired. *Id.*; *see* Horowitz Decl. ¶62 (noting that the DVR is really just another computer with hardware and software).

Like all other DVR recordings, the PTAT recordings are unique copies made from the local television signal received in the consumer's home that are saved on the hard drive of the user's DVR, in their home, without alteration. Minnick Decl. ¶32; Horowitz Decl. ¶92.

***AutoHop.*** DISH added the AutoHop feature to the Hopper on May 10, 2012. Shull Decl. ¶15. AutoHop is an ad skipping feature that works only with PTAT. Minnick Decl. ¶59. It gives Hopper users the option to efficiently skip commercials while playing back certain

PTAT-recorded shows.  *Id*.  If AutoHop is available for a particular show, a red kangaroo icon will appear on the tile for that show, and if selected for viewing, the Hopper will query the viewer whether to "Enable AutoHop."  *Id*.  The default is "No, Thanks."  *Id*.  The user has to take affirmative steps to use AutoHop.  If the user selects "Yes," she can put down the remote control and watch the entire show without ads.  *Id*. ¶60.  At the end of each show segment, the DVR software will automatically fast-forward (over the commercial) to the beginning of the next show segment.  *Id*.

AutoHop thus functions like a souped-up version of the 30-second skip feature available on most DVRs.  *Id*. ¶61.  AutoHop has merely simplified that process.  Horowitz Decl. ¶¶94-100.  Instead of five 30-second skip "clicks," a consumer can make one "click" on the remote.  AutoHop is not available for use with live viewing (when the majority of Americans watch their favorite shows) or with a recording that is in progress or even for same-day viewing of a PTAT-recorded show.  Rather, it only becomes active the following day.  Minnick Decl. ¶62.[3]  Until recently, DISH quality-checked the nightly AutoHop announcement files before sending them out by testing them on PTAT recordings for three separate markets.  *Id*. ¶79-82.

### *The Networks Sue, But ABC Does Nothing While Judge GeeDenies Fox's Preliminary Injunction Motion*

On May 24, 2012, DISH commenced this action against all four networks seeking a declaration that its new Hopper DVR did not violate the Copyright Act or breach any of the retransmissions agreements with the networks.  On July 9, 2012, after all networks but ABC

---

[3] AutoHop works by   During playback, the consumer's PTAT recordings are *not* altered in any way.  *Id*. ¶¶67, 78.

initiated motion practice, this Court issued an order dismissing the action as to Fox, allowing that action to proceed in the Central District of California (where Fox had separately sued) and dismissing the copyright claims as to NBC and CBS.  In splitting the case between New York and California, this Court indicated that inconsistent verdicts would not be a concern because "the courts can, with the cooperation of the parties, coordinate the proceedings."  *Dish Network, L.L.C. v. American Broad. Cos.*, No. 12 Civ. 4155(LTS) (KNF), 2012 WL 2719161, at *5 (S.D.N.Y. July 9, 2012).

Fox moved for a preliminary injunction in the California action.  Judge Gee received evidentiary submissions (materially identical to the submissions here), received briefing (making essentially the same arguments being made here), and heard oral argument.  On November 7, 2012, in a thorough 33-page opinion, Judge Gee denied Fox's motion.

Judge Gee found that the PTAT copies cannot expose DISH to liability for direct infringement.  The "threshold question," Judge Gee recognized, was "Who makes the copies?"  *Fox*, 2012 WL 5938563, at *8.  More specifically, whose "'volitional conduct … causes the copy to be made.'"  *Id.* (quoting *Cablevision*, 536 F.3d at 131).  She concluded that "the user, not Dish, must take the initial step of enabling PTAT after deciding that he or she wants to initiate the recording."  *Id.* at *11.

Moreover, Judge Gee held, DISH is not liable as a secondary infringer, either.  She found the record was "devoid of any facts suggesting direct infringement by PrimeTime Anytime users."  *Id.* at *6.  *Sony* held that "time-shifting for private home use … was a fair use."  *Id.*  And "Fox … identified no specific theory under which individual PrimeTime Anytime users could themselves be liable for copyright infringement without circumventing *Sony*."  *Id.*

9

Nor do the cutomer's PTAT copies breach Fox's retransmission agreement (which has a provision that is similar to ABC's). Those agreements "invoke[] the long-recognized rule, set forth in *Sony*, that in-home copying by private consumers for the purpose of 'time-shifting' is" permissible. *Id.* at *27.

Despite finding that AutoHop, and commercial skipping generally, implicate no copyright interest whatsoever, Judge Gee concluded that the three nightly quality assurance recordings (the "QA Copies") were likely to infringe. But she observed that "Fox has not established that it will suffer irreparable harm as a result of the QA copies" and that "the alleged harm that Fox will suffer as a result of the QA copies is essentially contractual in nature." *Id.* at *17-18 (capitalization and emphasis omitted). DISH stopped making those "QA copies" in November 2012 following this decision. Minnick Decl. ¶79-82.[4]

### After Months of Delay, ABC Files a Preliminary Injunction Motion Materially Identical To The One Judge Gee Denied

On November 23, 2012, ABC filed its own motion for preliminary injunction, rehashing the same arguments that Judge Gee had already rejected. That was **11 months** after DISH introduced PTAT, **6 months** since it introduced AutoHop, and **5 months** after ABC alleged any infringement or breach. Yet, there is still no evidence of any harm, let alone harm that is immediate and irreparable. Indeed, even Fox's prediction that other competitors would flood the market if the injunction was denied in California, has not come to fruition.

### ARGUMENT

Preliminary injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to seek such relief," and is "never awarded as of

---

[4] Although DISH believes that it is permissible to make the QA Copies to ensure that the non-infringing AutoHop feature functions properly, to eliminate a dispute between the parties and in light of this ruling, DISH agrees that it will not resume making the QA Copies of ABC programming until an adjudication on the merits as to their legality.

right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21, 24 (2008).  A plaintiff seeking

a preliminary injunction must establish all of the following:  (1) likelihood of success on the

merits, (2) irreparable harm in the absence of preliminary relief, (3) that remedies available at

law, such as monetary damages, are inadequate to compensate for the injury, (4) that the balance

of hardships favors plaintiff, and (5) that an injunction is in the public interest.  *Id.* at 20; *eBay*

*Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Irreparable injury must be *likely* in the

absence of an injunction.  *Winter*, 555 U.S. at 20.  An injunction does *not* follow "automatically

[from] a determination that a copyright has been infringed."  *eBay*, 547 U.S. at 392-93; *Salinger*

*v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).  As set forth below, ABC has not and cannot satisfy

these requisites for preliminary injunctive relief.

## I.      ABC IS NOT LIKELY TO SUCCEED ON ITS CONTRACT CLAIM

ABC leads its motion with a contract argument.  It invokes a provision of the 2005

Agreement—§ 12—prohibiting DISH from "copy[ing]" or "authoriz[ing] the … copying" of

ABC's "Digital Signal."  ABC Mem. at 15.  ABC performs linguistic acrobatics to try to avoid

the savings clause, which could not be clearer.  It reads:  "The foregoing shall not preclude

EchoStar's practice of connecting subscribers' home recording devices such as VCRs or DVRs

…."  Shull Decl. Ex. 1 at § 12.  Despite this exception, ABC argues that "[b]oth PrimeTime

Anytime and DISH's quality control copies [which DISH no longer makes][5] violate Section 12

of the 2005 Agreement."  ABC Mem. at 16.  ABC is wrong.

*PrimeTime Anytime does not violate Section 12 of the 2005 Agreement.*  First, as Judge

Gee held, when a customer presses the buttons on his remote control to direct the PTAT software

to record a three-hour slate of ABC shows on Tuesday and Thursday, the customer, not DISH, is

---

[5] As DISH has suspended the QA Copies, this issue is moot for purposes of this preliminary injunction motion. ABC agrees.  *See* ABC Mem. at 16 n.7.

the one "copy[ing]" ABC's broadcast signal. *See, e.g.*, *Fox*, 2012 WL 5938563, at *15 ("[I]t is ultimately the user who causes each copy to be made."); *id.* at *10-11 ("[T]he user, not D[ISH], must take the initial step of enabling PTAT after deciding that he or she wants to initiate the recording[,]" so the user's volitional conduct "causes the copy to be made[.]").  To be sure, DISH devised the DVR and equipped it with functions that a customer can choose to activate (or not to activate), just as Sony made a Betamax and Cablevision made a DVR with various automated functions.  But that is not "copying."

The same goes for ABC's assertion that "DISH is … 'authoriz[ing]' its subscribers to do the copying."  ABC Mem. at 15.  Furnishing the recording device that can efficiently record designated chunks of programming is not the same as "authoriz[ing]" the recording.  One could easily say (as ABC does of PTAT) that a conventional Cablevision DVR's "express purpose is to copy" specified shows off a digital TV guide.  *Id.*  But that does not mean that Cablevision has "authorized" the copying.

Second, PTAT falls squarely within the savings clause blessing "EchoStar's practice of connecting subscribers' home recording devices such as VCRs or DVRs …."  Shull Decl. Ex. 1 at § 12.  ABC admits the Hopper is a DVR.  Echtman Decl. Ex. 6 at 73:7-10, 217:15-17.  And loading the Hopper with PTAT functionality does not make it any less a DVR.  That should end the discussion.  *See Fox*, 2012 WL 5938563, at *15 (finding that retransmission agreement "invokes the long-recognized rule, set forth in *Sony*, 464 U.S. at 454-55, that in-home copying by private consumers for the purpose of 'time-shifting' is a fair use under the Copyright Act"); *id.* ("[U]ser-initiated copying … is permissible under the contract.").

Nevertheless, ABC maintains that the savings clause is inapplicable because it is limited to the installer's act of "merely 'connecting' subscribers' DVRs."  ABC Mem. at 16.  In other

words, according to ABC, DISH violates the contract every time a customer uses a digital video *recorder* to *record* something—whether it is five minutes of *Dancing With The Stars* or the whole Monday night primetime schedule.  That is absurd.  And ABC does not even try to explain why it would ever craft such a provision nor how such a reading can be reconciled with the precept of New York law (which controls here) that "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."  *Lipper Holdings, LLC v. Trident Holdings, LLC*, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003) (citations omitted).

What we do know is that ABC has never before complained that DISH violates the retransmission agreement by connecting DVRs that customers actually use as recording devices. Shull Decl. ¶13; Sahl Decl. ¶¶7-8.  We also know that ABC had not even thought of reading the retransmission agreement this way until it filed this motion.  ABC's Amended Counterclaims alleged that "[t]he intent of Section 12 was, among other things to make clear that DISH would not be permitted to make a copy itself, or to grant permission (explicitly or implicitly) to anyone else to make a copy, of the ABC Programming*, except by connecting home recording devices owned by DISH's subscribers that at the time permitted only the recording of single programs (or at most two programs at a time)*."  Def.'s Am. Countercl. ¶36 (emphasis added).  ABC evidently realized that this reading would get it nowhere, as nothing in 2005 Agreement precluded DISH from offering DVR functionality that was different from what it offered "at the time."  But regardless of when exactly ABC concocted this interpretation, it runs afoul of another basic precept of contract law that "the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed to be

13

of great, if not controlling, influence." *Federal Ins. Co. v. Americas Ins. Co.*, 691 N.Y.S.2d 508, 512 (N.Y. App. Div. 1999) (citations omitted).

Nor does ABC even try to reconcile its interpretation of the moment with the analogous terms of related agreements, which must be read together.  Specifically, ABC and DISH signed several agreements with ABC affiliates for carriage of (for example) ABC Family, SOAPnet, and ESPN Classic.  Shull Decl. ¶12 & Ex. 3-5.  Two of them were executed on the same day as the 2005 Agreement and therefore must be read in harmony.  *See This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998). ███████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████ ABC would never have agreed to this term if, in fact, there was something in a concurrent contract (§ 12) that prohibited exactly that. Indeed, to read this clause consistently with ABC's position would be to suggest that ███████

█████████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████

## II.     ABC IS NOT LIKELY TO SUCCEED ON ITS SECONDARY INFRINGEMENT CLAIM

ABC concedes that it cannot hold DISH liable for vicarious infringement[6] unless it can identify a direct infringer.  ABC Mem. at 28.  Although ABC is cagey about just who its supposed direct infringer is, the network's theory is that every DISH customer is guilty of copyright infringement every time he or she activates PTAT and uses AutoHop.  *Id.* at 29 ("[E]ven if one assumes that the subscribers, not DISH, make the copies, the copying still

---

[6] Although asserting claims for other categories of secondary infringement, namely contributory infringement and inducement, ABC seeks a preliminary injunction only on its theory of vicarious infringement.  ABC Mem. at 14 n.6.

violates ABC's exclusive right of reproduction.").  If ABC is right, then tens millions of consumers nationwide who regularly use DVRs to time-shift and skip commercials have been equally guilty for years.

### A.     ABC Cannot Identify Any Infringing Act by the Consumer

ABC accuses DISH's customers of infringing ABC's copyrights in two separate ways—by (1) activating PTAT; and (2) skipping commercials with AutoHop.  *Id.* at 29-32.  Neither constitutes infringement.

*PrimeTime Anytime.*  ABC's argument that the customers are liable for direct infringement boils down to this simple point:  "[T]here is no question that the wholesale copying of **all** of ABC's primetime programming is unauthorized[,]" because "ABC did not authorize" it. *Id.* at 28.  To appreciate just how far-reaching ABC's argument is, consider two complementary facts.  On the one hand, since the advent of the VCR four decades ago, consumer could copy "**all** of ABC's primetime programming."  On the other hand, ABC has not authorized *any* consumer to copy *anything*.  If a consumer is liable for direct infringement for recording "**all** of ABC's primetime programming," then she is equally liable for recording just one program.  Whatever the scope of ABC's accusation, it runs headlong into the Supreme Court's decision in *Sony*.

In *Sony*, the Supreme Court held that Sony was not secondarily liable for infringing the copyrights of content-providers (including ABC's parent, Disney) just because it provided the device—there, the Betamax VCR—that consumers used to make the copy.  *See Sony*, 464 U.S. at 456.  The Court held that consumers had the right to record over-the-air network broadcasts for the purpose of watching them at another time in the privacy of their own homes.  *Id.*  The Court observed that "[o]ne may search the Copyright Act in vain for any sign that the elected representatives of the millions of people who watch television every day have made it unlawful to copy a program for later viewing at home, or have enacted a flat prohibition against the sale of

machines that make such copying possible." *Id.*  The Second Circuit and other courts have

repeatedly characterized *Sony* as holding that "time-shifting by owners of home video tape

recorders constitutes fair use." *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1261, 1265 (2d

Cir. 1986); *see Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.,* 180 F.3d 1072,

1079 (9th Cir. 1999) (*Sony* holds that "'time-shifting' of copyrighted television shows with

VCR's constitutes fair use under the Copyright Act, and thus is not an infringement.").

In the three decades since the Supreme Court reached that conclusion, our "elected

representatives" have not grown any less solicitous "of the millions of people who watch

television every day."  As Judge Gee observed, this case is nothing but a modern version of

*Sony*, "fast-forward[ed]" to keep pace with current technology.  *Fox*, 2012 WL 5938563, at *1.

After all, the Hopper does not enable a customer to copy any more of ABC's content now than

DISH's DVR's did last year—or even more than his parents could have copied back in 1984

with a fresh box of Betamax tapes.  As Judge Gee understood, nothing in the copyright law

punishes efficiency and user-convenience:  "Fox has identified no specific theory under which

individual PrimeTime Anytime users could themselves be liable for copyright infringement

without circumventing *Sony*." *Id.* at *6.

*AutoHop.*  Although ABC complains about the Hopper's AutoHop feature, the fact is

that AutoHop does not implicate *any* copyright interest at all.  No copy of anything is made by

the consumer when using the AutoHop ad-skipping feature.  And ABC does not own the

commercials as part of the programs shown on its network.  Thus, AutoHop does not copy, skip

or alter in any way the programming content owned and asserted by ABC.  Skipping without

copying simply does not implicate any of the protected rights in the bundle of copyrights—there

is no reproduction, no distribution, and no public performance by the consumer.  *See* 17 U.S.C.

§106.  Judge Gee agreed:  "Importantly … neither the marking announcements nor the ad-skipping effect of AutoHop implicates any copyright interest or breach of contract …."  *Fox*, 2012 WL 5938563, at *18.  As such, the consumer's use of AutoHop provides no basis for a claim of infringement of ABC's asserted copyrights.

For as long as there have been commercials, consumers have been skipping them—and the copyright laws have never required consumers to watch commercials.

### B.  The Fair Use Analysis Here Is No Different Than It Was In *Sony*

Significantly, ABC concedes that the recording and commercial-skipping that consumers used to do with the Betamax and that they currently do with every DVR other than the Hopper boxes are all fair use under *Sony*.  *See* ABC Mem. at 29-31.  Yet, it insists that there is something about the Hopper that crosses the line.  *See id.* at 27-33.  ABC gives several reasons, but they all amount to the same proposition: The *law* must be different here because the *technology* is different, at least with respect to the most important fair-use factors—the first factor, measuring the "purpose and character of the use," § 107(1), and the fourth factor, assessing "the effect of the use upon the potential market for or value of the copyrighted work[,]" § 107(2).  Not so.  As Judge Gee found, this "fast-forward [of] *Sony*" keeps the law exactly where it is.[7]  *Fox*, 2012 WL 5938563, at *1.

### 1.  Time Shifting with Ad Skipping Is Fair No Matter How Efficient

With respect to the first fair use factor, ABC argues that because PTAT and AutoHop let users record and commercial-skip much more efficiently than the VCR, *Sony's* finding that the consumers' time-shifting is noncommercial fair use somehow does not apply:  "[T]he copying …

---

[7] ABC claims that the second and third fair use factor weigh in its favor.  ABC Mem. at 23.  They do not.  Just as in *Sony*, "when one considers the nature of a televised copyrighted audiovisual work, *see* 17 U.S.C. § 107(2) (1982 ed.), and that time-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirely free of charge, the fact that the entire work is reproduced, *see* § 107(3), does not have its ordinary effect of militating against a finding of fair use."  *Sony*, 494 U.S. at 449.

is fundamentally different from the time-shifting of individual programs that was approved as a fair use based on the record before the Court in *Sony*."  ABC Mem. at 30-31.  Fox made essentially the same arguments in the California action, and Judge Gee rejected them summarily. *See Fox*, 2012 WL 5938563, at *5-7.  This Court should too.

The simple facts remains that, just like the VCRs in *Sony*, the PTAT copies made by the consumer are used in the privacy of the consumer's home; they reside on the consumer's Hopper (i.e., in their possession); and they are not distributed, sold or exploited in any way other than for the consumer "to see such a work which he had been invited to witness in its entirety free of charge" (or in this case for the fee he has already paid to DISH).  *Sony*, 464 U.S. at 449.  ABC sets out the test as "whether the user stands to profit from [the] exploitation of the copyrighted material without paying the customary price" (ABC Mem. at 29), but fails to identify how these consumers are not paying the customary price when they pay DISH their subscription fee, or how they are "exploiting" anything by sitting in their home watching the program the day after it airs.  Despite the Hopper's technological advances, this use remains a private noncommercial use.

Moreover, the consumers' purpose in recording programming using the PTAT feature is to time-shift.  As such, the use is functionally transformative—that is, the user is making these copies for the purpose of watching them at a time and in a way that is more convenient to them—that is not the purpose for which ABC transmits the programs.  The fact that the programs themselves remain unchanged matters not, as the purpose for which these copies are being used is fundamentally different.  *See Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605, 606-07, 609 (2d Cir. 2006) (images displayed unchanged in defendant's book were fair use as "the use of each image [was] transformatively different from the original expressive purpose");

*Authors Guild, Inc. v. HathiTrust*, No. 11-CV-6351(HB), 2012 WL 4808939, at *11 (S.D.N.Y.

Oct. 10, 2012) (holding creating digital copies of books transformative "because the copies serve

an entirely different purpose than the original works," namely "superior search capabilities"); *see*

*also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007); *Kelly v. Arriba*

*Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003). The VCR copies in *Sony* were similarly

unchanged.

In any event, the Court in *Sony* did not consider ad-skipping capability to change the

result, despite the evidence that ad-skipping could cut into revenues. Universal presented

evidence that up to 85% of VCR playback was without commercials and that the skipping would

impact its bottom line. *See* Echtman Decl. Ex. 9 at 21 n.14. The Court acknowledged that there

was ad-skipping and still found the time-shifting to be fair. *Sony*, 464. U.S. at 423, 456; *see also*

*Fox*, 2012 WL 5938563, at *18 n.18.

Nevertheless, ABC suggests that the Supreme Court decided *Sony* the way it did

"precisely because it was not easy to fast-forward through commercials." ABC Mem. at 31.

"With AutoHop, by contrast, no guess work is involved because DISH skips over not only the

entire commercial, but the entirety of all commercials in a given program." *Id.* at 32 (emphasis

omitted). But ABC does not even hint at anything revealing this to be the *Sony* Court's basis for

decision. Nor does ABC offer even so much as a guess as to how the Court could draw a

principled line in the sand separating technology that makes time-shifting and ad-skipping "too

easy" from technology that keeps it just difficult enough not to infringe. As one scholar has said:

> [I]t could be argued that time-shifting implies a broad swath of
> intentions for shifting prerecorded blocks of programming, both
> large and small. Bathroom breaks must be taken, popcorn popped,
> and nudity skipped through—especially when young children
> watch an R-rated movie with their parents. All of these varied
> intentions fall under the umbrella of time-shifting, and it seems

19

> arbitrary to extract commercial-skipping from the umbrella and
> expose it to the cold rain of infringement.

Ethan O. Notken, Note, *Television Remixed: The Controversy Over Commercial-Skipping*, 16

Fordham Intell. Prop. Media & Ent. L.J. 899, 929 (2006).

### 2.     ABC Has Failed to Demonstrate Market Harm

*PrimeTime Anytime and AutoHop will not harm ad revenue.*  ABC attempts to put a

new spin on an old argument that *Sony* squarely rejected.  Namely, according to the network,

"eliminating viewers' exposure to a program's advertisements altogether—as opposed to manual

fast-forwarding—deprives ABC of the *opportunity* to interest viewers in its commercial

messages and derive advertising revenue *should* viewers be sufficiently interested to play them

back at normal speed."  ABC Mem. at 30 (emphases added).  ABC actually asks this Court to

accept that "the value of [a] commercial to ABC" lies in the fact that "[t]he viewer is exposed, *if*

*only for a moment or fleetingly*, to the commercial, and the advertiser has the *opportunity* to

attract her attention and prompt her to watch."  *Id.* at 32 (emphases added).

That is fanciful—speculation piled on top of conjecture—and does not come close to

demonstrating "by a preponderance of the evidence that some meaningful likelihood of future

harm exists."  *Sony*, 464 U.S. at 451; *see also Leibovitz v. Paramount Pictures Corp.*, 137 F.3d

109, 116-17, 116 n.6 (2d Cir. 1998).  And factually, it is completely off-base.  The networks'

advertising revenue has *risen* over time since *Sony* and the widespread adoption of home

recording and fast-forwarding technology.  Rapp Decl. ¶¶55-56, 36, 69-69 & Ex. 13 &14.  And

there is no reason to think that PTAT and AutoHop, which merely allow a consumer to time-shift

and ad-skip more efficiently, will cause harm where it has not previously occurred.  Indeed,

every DVR currently on the market enables the user to record, time-shift, and commercial-skip

the primetime lineup of all the networks.  Both DIRECTV and TiVo, for example, have boxes

that can record and store all the network primetime programs, just like the Hopper.  Minnick Decl. ¶¶18-20 & Exs. 3-7.  Yet, ABC points to no actual harm flowing from those devices.

Moreover, even in this DVR age, most TV watching remains live.  Rapp Decl. ¶89.  And those who own a DVR, such as the Hopper, typically watch more television than those who do not.  *Id.* ¶¶20-21 & Ex. 5; Hauser Decl. ¶¶28-30.  ABC argues that PTAT and AutoHop will somehow result in more commercial skipping, but ABC provides absolutely no support for this statement.  In fact, given the relatively small number of Hopper users, and the even smaller number who activate PTAT, there is no expectation that their viewing behavior will reflected in the Nielsen ratings, which are what ABC and the rest of the industry use to set advertising prices.  Rapp Decl. ¶¶79, 84-86; Hauser Decl. ¶¶10, 14, 35-41.

Even considering future Hopper projections, ABC provides no evidence that any new Hopper users will be new commercial skippers—that is, turn into commercial skippers when they had not been before—or that they will use AutoHop more than they previously used fast-forward or skip, or that such users will not in fact watch more of ABC's programming, inuring to ABC's benefit instead of harm.  Hauser Decl. ¶¶18-23.[8]

***PrimeTime Anytime and AutoHop will not harm the on-demand/commercial-free market.***  Contrary to ABC's doomsday prediction, PTAT and AutoHop will not "usurp the market for the on-demand and commercial-free versions of primetime programs that ABC or its licensees distribute via a variety of distribution channels."  ABC Mem. at 23.  The content owners tried exactly this argument in *Sony*, claiming that they had established a new market for

---

[8] ABC's reliance on *In re Aimster Copyright Litig.*, 334 F.3d 643, 647-48 (7th Cir. 2003) and *Agee v. Paramount Commc'ns Inc.*, 59 F.3d 317, 323 (2d. Cir. 1995) is misplaced.  ABC Mem. at 33.  The Seventh Circuit's discussion of commercial skipping in *Aimster* was not only dicta (as there was no commercial skipping at issue in that case at all), it also was wrong on the law of derivative works, as it seems to have assumed that the defendants in *Sony* owned the programs plus the commercials, but they made no such allegation – nor does ABC here.  Similarly, in *Agee*, the defendants went beyond time-shifting and were making copies of the plaintiff's work for promotions and commercials.  That is not the case here.

videotape cassettes; they provided evidence that they had begun marketing motion pictures on tape.  The district court, whose findings were embraced by the Supreme Court, concluded that this alleged market harm was too speculative to prevent a finding of fair use.  The same is true here.  ABC provides no evidence of actual harm.  While ABC argues that PTAT with AutoHop is somehow harming ABC's "authorized" Video on Demand ("VOD") services, claiming that PTAT with AutoHop "diminishes existing and potential on-demand markets" (ABC Mem. at 24), this alleged VOD market is virtually nonexistent in the first place.  Rapp Decl. ¶¶126, 131; Hauser Decl. ¶60-61.  And at a more fundamental level, there are no ABC on-demand offerings on DISH, so there is no opportunity for a DISH customer to use PTAT in lieu of ABC on demand.  Rapp Decl. ¶130.

With respect to ABC's claims that PTAT harms its market for commercial-free internet streaming in particular, all the existing evidence, including statements by ABC itself, point to the conclusion that the internet markets serve as a complement, not a replacement, for TV viewing.  Rapp Decl. ¶142; Hauser Decl. ¶¶59-64 & Exs. 12, 14 at 3.  Uses that are complementary do not harm each others' markets and are fair.  *See Ty, Inc. v. Publications Int'l Ltd.*, 292 F.3d 512, 517 (7th Cir. 2002) (Posner, J.) ("Generalizing from this example in economic terminology that has become orthodox in fair-use case law, we may say that copying that is complementary to the copyrighted work … is fair use ….").

Moreover, courts and commentators alike have cautioned against permitting a copyright holder to usurp a market that was previously considered fair:

> A danger of circularity is posed here—a potential market, no matter how unlikely, has always been supplanted in every fair use case, to the extent that the defendant, by definition, has made some actual use of plaintiff's work, which use could in turn be defined in terms of the relevant potential market.  In other words, it is a given in every fair use case that plaintiff suffers a loss of a *potential*

> market if that potential is defined as the theoretical market for
> licensing the very use at bar.  For example, if the plaintiff
> complains that snippets of her rock-and-roll song lyrics have been
> appropriated by defendant for a quiz in its book of 1960's trivia,
> one could define the supplanted potential market as the possibility
> of licensing rock song lyrics for quiz books.

4 Nimmer on Copyright § 13.05[A][4] (2012); *see also Bill Graham Archives*, 448 F.3d at 614-15 ("[A] copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for parody, news reporting, educational, or other transformative uses of its own creative work." (internal quotation marks omitted)).[9]

### C. ABC Has Not Shown a Likely Success on the Required Elements of Vicarious Liability.

In addition to failing to establish that consumers directly infringe, ABC also fails to satisfy the remaining requirements of its claim for vicarious liability.  To impose vicarious liability, ABC must establish that the "defendant possess the right and ability to supervise the infringing conduct," *Matthew Bender & Co. v. West Publ'g Co*., 158 F.3d 693, 707 n.22 (2d Cir. 1998), and that it have an "obvious and direct financial interest in the exploitation of the copyrighted materials."  *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc*., 118 F.3d 955, 971 (2d Cir. 1997) (quoting *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)).  In order to have the right and ability to control infringing activity, DISH must be able to identify and prevent just that activity.  *Matthew Bender & Co.*, 158 F.3d at 707 n.22

---

[9] The Second Circuit also acknowledged the risk of circularity in *American Geophysical Union v. Texaco*, 60 F.3d 913, 929 n.17, 930 (2d Cir. 1994) ("a copyright holder can always assert some degree of adverse effect on its potential licensing revenues" but "not every effect … enters the analysis under the fourth factor.").  Making clear that its "ruling [did] not consider photocopying for personal use by an individual," the court found a photocopy licensing market to be sufficient only because many major corporations were already paying license fees to an established, industry-wide agency, the Copyright Clearance Center.  *Id.* at 931.  By contrast, this record is devoid of any evidence that individual consumers are paying license fees for the right to record TV shows on their DVRs.  To the contrary, the thirty-year history of consumers making such recordings without payment, and the absence of any infrastructure to even seek such payment, is powerful evidence that there is no established market for the licensing of the right for individuals to record TV shows for later viewing.

("[P]laintiffs cannot be subject to liability for vicarious infringement because they cannot control the conduct of the direct infringer.").

But DISH cannot control what its users record and how they watch it.  Moreover, it would be impossible for DISH to distinguish what ABC concedes is fair use (time-shifting only with small-capacity recorders, and old-fashioned fast-forwarding or 30-second skipping) from the purportedly infringing use of PTAT with AutoHop.  Indeed, the copying and ad-skipping can continue even without PTAT and AutoHop using the regular DVR features.  Accordingly, DISH lacks the requisite control over the alleged direct infringer. *See Artists Music, Inc. v. Reed Publ'g (USA), Inc.,* 93 Civ. 3428 (JFK), 1994 WL 191643, at *5 (S.D.N.Y. May 17, 1994) (finding no vicarious liability where "defendant [landlord] had no right and ability to supervise and control the actions of the exhibitors," specifically "the performance of music"); *see also Sony*, 464 U.S. at 439 ("There is no precedent in the law of copyright for the imposition of vicarious liability" for selling "equipment with constructive knowledge of the fact that … customers may use that equipment to make unauthorized copies of copyrighted material."); *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 806 (9th Cir. 2007).[10]

## III.   ABC IS NOT LIKELY TO SUCCEED ON ITS DIRECT INFRINGEMENT CLAIM

### A.   Consumers Are Making the Copies, Not DISH

The law in the Second Circuit is clear:  As *Cablevision* held, only someone whose "volitional conduct … causes the copy to be made" can be a direct infringer.  536 F.3d at 131. And there is no question here that that person is the consumer.  Indeed, as ABC admits, but for consumers' enabling of PTAT, no PTAT copies ever would come into existence.  *See* ABC

---

[10] DISH also has no "direct financial benefit" from consumers' use of PTAT to watch recordings in their home.  *See Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 748 (S.D.N.Y. 2012) ("there is no evidence indicating that [either defendant] capitalizes specifically because a given image a user selects to print is infringing.  The Defendants' profits are derived from the service they provide, not a particular infringement.").  Same with DISH.

Mem. at 20 (PTAT copies are made only "after the subscriber makes her .... decision to enable

PrimeTime Anytime").  Yet, ABC refuses to accept the inevitable consequence of that

admission.  Considering these exact facts on Fox's motion for a preliminary injunction, Judge

Gee held that it is the *user* making the PTAT copies.  *Fox*, 2012 WL 5938563, at *11.

      As Judge Gee found, the user must decide she wants to record using PTAT and must then

click her remote control to "enable" PTAT before the Hopper records any of ABC's programs.

Minnick Decl. ¶¶22-24.  The user has the option to select which networks to record and which

nights they want to record.  *Id.* ¶25.  Once the user enables PTAT, the recordings are saved on

the user's DVR hard drive on the Hopper—they are not saved at DISH and are never transferred

to or from DISH.  *Id.* ¶32.  The user can elect how long the copies reside on their Hopper—from

2-8 days.  *Id.* ¶25.  And it is the user who decides if he or she wants to keep any particular

program longer.  *Id.* ¶36.  When a user enables PTAT, the Hopper automatically records the

selected networks and nights—no individual at DISH is involved in any way with the mechanics

of that recording process once the consumer directs her box to record.  *Id.* ¶¶27, 32-33.  That

PTAT is a choice by the consumer, rather than DISH, ████████████████████████████

████████████████████████████████████████████████████████████████████████████

Gerhards Decl. ¶5 & Ex. 1.

      ABC says that *DISH*'s volitional conduct (not consumers') causes the PTAT copies to be

made because DISH has elected to offer PTAT only for the four networks and that by doing so,

"DISH is like the provider of a VOD service that 'actively selects and makes available

beforehand the individual programs available for viewing ...."  ABC Mem. at 19 (quoting

*Cablevision*, 536 F.3d at 132).  This argument ignores the facts.  As Judge Gee found, unlike

VOD, "DISH has no control over what programs Fox and the other networks choose to make

available during primetime ….."  *Fox*, 2012 WL 5938563, at *9.  As such, Judge Gee found that

this discretion in *what* is available on PTAT has nothing to do with the question *who* causes the

PTAT copies to be made.  *Id.* ("As the *Cablevision* court found, these factors are not 'sufficiently

proximate to the copying to displace the customer as the person who 'makes' the copies' for

liability purposes.").  Moreover, and also like VOD, DISH does not make copies "available

beforehand" – it does not make or house copies at all.  *See Id.*, at *30 ("The PTAT recording  . .

.resides on the user's local DVR and is not transmitted from a remote supplier's library of

collected works.").

ABC's argument that EchoStar employees' reviewing of the primetime lineups to

determine the start and stop times of the primetime recordings constitutes a "human employee …

volitionally operating the copying system to make a copy" is just wrong.  ABC Br. at 20, 21

First, it is inaccurate.  It is actually a software program that identifies the programs that each

network is putting into primetime, not human reviewers, as argued by ABC.  Minnick Decl. ¶33.

This is similar to *Cablevision* and *Netcom* where lawful recordings were made "[a]ccording to

prearranged pattern[s] established by … software" without any volition by any employee.

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1367 (N.D.

Cal. 1995).[11]  Indeed, standard DVRs operate in the same way when a show is requested for

recording from the program guide—if it runs outside its normal viewing times, most DVRs will

record the show at the time that it is on regardless of its standard start and stop times.  Minnick

Decl. ¶34.  Second, the *identification* of primetime shows does not result in any copying.  The

---

[11] *See Cablevision*, 536 F.3d at 131 ("In determining who actually 'makes' a copy, a significant difference exists
between making a request to a human employee, who then volitionally operates the copying system to make the
copy, and issuing a command directly to a system, which automatically obeys commands and engages in no
volitional conduct.").  It is for this reason that the copy shop cases that ABC alludes to (ABC Br. at 20) are
distinguishable.  *See Princeton Univ. Press v. Michigan Document Servs., Inc*., 99 F.3d 1381, 1384 (6th Cir. 1996)
(copy shop directly liable because it made the copies itself, as opposed to providing the copy machine for customers
to use to copy themselves).

software simply reviews the network's schedules to see what they are showing during primetime. The Networks define what primetime is and what programs they will air, not DISH. *See Id.* ¶¶28, 33. As Judge Gee found when considering this same point as made by Fox, "[a]lthough DISH defines some of the parameters of copying for time-shifting purposes, it is ultimately the user who causes the copy to be made by enabling PTAT." *Fox*, 2012 WL 5938563, at *12.[12]

It is hard to sum it up any more succinctly than Judge Gee did in the *Fox* action: "Despite D[ISH]'s involvement in the copying process, the fact remains that the user, not DISH, must take the initial step of enabling PrimeTime Anytime after deciding that he or she wants to initiate the recording," and this "fact" compels the conclusion that consumers—and *not* DISH— are the only potential direct infringers. *Id.* at *11.

### B.      Even If DISH Is Making the Copies, the Use Is Fair

Consumers are the ones whose "volitional conduct … causes the [PrimeTime Anytime] cop[ies] to be made," *Cablevision*, 536 F.3d at 131, and this case should be analyzed (as Judge Gee in the *Fox* action determined) under the rubric of secondary infringement. *See Fox*, 2012 WL 5938563, at *11. But even if this Court does treat DISH as a potential direct infringer, ABC will still not succeed on its direct infringement claim, because PTAT is a fair use.

In discussing why DISH cannot be liable as a secondary infringer, we explained (*supra* pp. 17-23) why *consumers'* use of PTAT is fair. And there is (at most) one difference in the direct-infringement context: with respect to DISH, PTAT is a commercial endeavor. ABC Mem. at 22. True enough, but this alone does not tip the first-factor analysis (much less the end-of-the-day multi-factor balancing) in the network's favor. *Sony*, 464 U.S. at 448-49 (whether use

---

[12] Judge Gee reached the same conclusion with respect to the fact that once a recording starts, it may not be stopped. *Fox*, 2012 WL 5938563, at *10. Moreover, Judge Gee also recognized the reason for this – it was to protect family harmony by making sure that one family member did not accidentally delete an entire night's programming when attempting to merely stop one show from recording. *Id.* at *3.

is commercial or not is "not conclusive").  This is because, as explained above (*supra* pp. 18-19), the use—time-shifting—is still functionally transformative.  That is, the time-shifted programs still serve a fundamentally different purpose than the live, over-the-air broadcasts.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism …."); *Blanch v. Koons*, 467 F.3d 244, 254 (2d Cir. 2006) ("'Finding the work substantially transformative, the district court properly discounted the secondary commercial nature of the use.'") (quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477-78 (2d Cir. 2004)); *Kelly*, 336 F.3d at 818-20.

## IV.    ABC WILL NOT SUFFER IRREPARABLE HARM

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).  ABC bears the burden to "demonstrate that irreparable harm is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22.  The mere "possibility" of irreparable harm will not suffice.  *Id.*  Irreparable harm may not be presumed; it must be proven, with actual evidence.  *eBay*, 547 U.S. at 393-94; *Salinger*, 607 F.3d at 80.  ABC has failed to prove any harm whatsoever, let alone harm that is irreparable.

### A.    ABC's Delay Refutes Any Claim of Irreparable and Imminent Harm

ABC's lengthy delay in seeking injunctive relief precludes a finding of irreparable harm. *See Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (delay "standing alone" may "preclude the granting of preliminary injunctive relief" because it "suggests that there is, in fact, no irreparable injury").  ABC representatives were there in person when the Hopper with PTAT was publicly announced, to great fanfare at CES on January 9, 2012—*nearly a year ago*.  Echtman Decl. Ex. 6 at 15:8-16:18; Khemka Decl. ¶3.  AutoHop was announced, with advance notice to the networks, on May 10, 2012—*over 6 months ago*.  Echtman Decl. Ex.

6 at 13:2-15-7; Shull Decl. ¶15.  DISH, not ABC, commenced this lawsuit, and ABC waited just

shy of six months after it was served with DISH's declaratory judgment complaint to move for a

preliminary injunction.  Echtman Decl. ¶3, 6-8.  Courts have found delays far shorter to call for

the denial of an injunction.  *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 419

(S.D.N.Y. 1998) ("[C]ourts typically decline to grant preliminary injunctions in the face of

unexplained delays of more than two months.").[13]  There simply is nothing urgent or imminent

here.  After waiting months on end to seek an injunction, ABC has failed to produce any tangible

evidence of harm, and its delay shows that there is none.[14]

### B.    There Is No Irreparable Harm on the Contract Claim

ABC claims that it is entitled to an injunction in part because DISH has breached the

2005 Agreement.  But the network ignores the well-worn proposition that injunctive relief based

on a breach of contract "is the exception and not the rule."  *United Retail Inc. v. Main Street Mall

Corp.*, 903 F. Supp. 12, 14 (S.D.N.Y. 1995).  "[T]he classic remedy for breach of contract is an

action at law for damages.  If the injury complained of may be compensated by an award of

monetary damages, then an adequate remedy at law exists and no irreparable harm may be found

as a matter of law."  *General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862

F. Supp. 1070, 1075 (S.D.N.Y. 1994).  ABC expressly seeks "damages for breach of contract" in

its Counterclaim.  Def.'s Am. Countercl. at p. 35.  Judge Gee made it clear that money damages

---

[13] *See also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276-77 (2d Cir. 1985) (ten-week delay); *Life Techs. Co. v. AB Sciex Pte. Ltd.*, No. 11 Civ. 325 (RJH), 2011 WL 1419612, at *8 (S.D.N.Y. Apr. 11, 2011) (three-month delay); *Myron Corp. v. Holland USA, Inc.*, No. 07 CV 6877 (PAC), 2007 U.S. Dist. LEXIS 97261, at *5, 9 (S.D.N.Y. Oct. 12, 2007) (three-month delay); *Century Time Ltd. v. Interchron Ltd.*, 729 F. Supp. 366, 369 (S.D.N.Y. 1990) (over two-month delay); *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) (three-month delay).

[14] The lack of a swift and concerted response from the other networks further belies ABC's claim of irreparable harm.  NBC and CBS have both sued DISH over PTAT and AutoHop, but, to date, neither has moved for a preliminary injunction.  Echtman Decl. ¶¶2, 5.  Fox did, but when its motion was denied, it did not seek emergency relief by motion in the Ninth Circuit.  *Id.* ¶4.

can be calculated here, where ABC has a widespread licensing program.  *See Fox*, 2012 WL 5938563, at *15 n.13.

Moreover, the networks and their affiliates have already put a price on AutoHop.  After PTAT and AutoHop were introduced, DISH closed several retransmission deals with local affiliates, including ABC affiliates.  During the negotiations, some local affiliates attempted, unsuccessfully, to obtain an additional per-customer fee from DISH specifically for each customer's use of AutoHop; specific numbers were even proposed.  Shull Decl. ¶22.  CBS's CEO agrees, recently proclaiming that DISH should pay a per-customer fee for offering AutoHop:  "I suppose if DISH wanted to pay us $5 a sub[scriber], we might consider letting them [offer AutoHop]."  Rapp Decl. ¶154 & Ex. 26.  These specific demands for a fee for AutoHop conclusively demonstrate that any alleged harm to ABC is readily compensable with money damages.[15]  This fact precludes the issuance of an injunction not only on ABC's contract claims but also its copyright claim.

## C.    ABC Has Not Proven Likely Irreparable Harm on Its Copyright Claims

Following *eBay* and *Salinger*, a court may no longer "presume" that there is irreparable harm in a copyright case.  *Salinger*, 607 F.3d at 80.  Rather "plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm."  *Id.* at 82; *see Faiveley Trans. Malmo AB*, 559 F.3d at 118 ("[P]laintiffs must *demonstrate* that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." (emphasis added)).  This ABC has failed to do.  Although ABC purports to

---

[15] ABC's reliance on *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) is accordingly misplaced.  After recognizing that "[i]t is true that specific relief is not the conventional remedy for breach of contract," the *Register.com* court concluded that the district court did not abuse its discretion in finding, based on the facts at hand, that it was "impossible to estimate" damages "with any precision" due to the loss of goodwill at issue in that case. *Id.* at 404.  The facts here show that damages are readily calculable.

identify several categories of alleged harm, it provides not a shred of evidence with respect to any single one.  On the other hand, the mountains of evidence presented by DISH's expert witnesses, Richard T. Rapp and John Hauser, including network admissions of no harm, disprove any such harm conclusively.

> **1.    ABC's Claimed Loss of Advertising Revenue and Promotion Opportunities Are Speculative and Contrary to the Evidence**

Advertising spots are bought and sold based *solely* on Nielsen's C3 rating.  Echtman Decl. Ex. 7 at 12:2-13:8.[16]  It does not matter, for purposes of calculating the C3 rating, whether an ad is skipped using AutoHop or some other commercial-skipping feature; all Nielsen measures is whether an ad is skipped, or not.  *Id.* at 13:9-15:4.  ABC has offered no proof—no survey, no study, no other empirical data of any sort—showing that there has been or will be an incremental increase in ad-skipping because of AutoHop.  *Id*  at  15:20-16:15, 60:17-63:13.

To the contrary, ABC's corporate designee and expert on consumer behavior testified that **DVRs**



*Id.* Ex. 6 at 55:10-61:24.  Without any evidence that AutoHop will increase the overall

---

[16] C3 is Nielsen's metric for measuring television audiences viewing of commercials live plus 3 days of time-shifted playback.  Hauser Decl. ¶33.

amount of ad-skipping, and hence impact the C3 ratings for ABC's programming, ABC's claim

that its advertising revenues will be harmed is completely speculative.  *See Clonus Assocs. v.*

*Dreamworks, LLC*, 417 F. Supp. 2d 248, 254 (S.D.N.Y. 2005) (rejecting claim of irreparable

harm as "unsupported by concrete evidence" and collecting Second Circuit cases that have

"rejected such speculative arguments in deciding whether to issue a preliminary injunction.").[17]

     Actual data, as presented by experts Rapp and Hauser, confirms that the Hopper is not

likely to have any effect on C3 ratings (which ABC admits are the all-important currency of the

advertising world, Echtman Decl. Ex. 7 at 12:2-13:8).  And if it does, as with any DVR, it is

likely to increase television, and commercial, viewing, not decrease it.  ████████████████

████████████████████████████████████████ Rapp Decl. Ex 3a.

     The facts are that the vast majority of television viewing is done live or on the same day

that a program airs, when AutoHop is unavailable.  Rapp Decl. ¶89; Hauser Decl. ¶20.

Approximately 57% of the nearly 115 million households with television sets in the United

States have VCRs, and 41% have DVRs.  *Id.* ¶13. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██  AutoHop is not creating ad skippers.  And it is only the incremental increase in ad skips that

would matter to ABC—i.e, those people among DISH Hopper users, who turn on PTAT and who

use AutoHop, who were <u>not previously skipping</u> advertisements.  Rapp Decl. ¶¶14, 99-100.

---

[17]  ABC relies on *American Broadcasting Cos. v. Aereo, Inc.*, No. 12 Civ. 1540(AJN), 2012 WL 2848158 (S.D.N.Y. July 11, 2012) and *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011) in support of its claim of lost advertising revenues, but those cases are not, as ABC claims, "similar cases."  [cite].  The defendants in each case provided Internet access to network programming and viewers were not counted by Nielsen.  *Aereo, Inc.*, 2012 WL 2848158, at *22; *WPIX, Inc.*, 765 F. Supp. at 619-20.  Here, in contrast, ABC has not offered any evidence of harm to its Nielsen ratings.

Moreover, even if there is an incremental change in commercial viewing habits, it is just too small to have any effect on ABC's advertising revenue or ability to sell ads based on its C3 ratings.  *Id.* ¶¶ 84-86.



ABC has not offered any evidence suggesting that the effect of the Hopper will be any different.

This fact makes ABC's claim that AutoHop will "harm [its] ability to promote its own programming" particularly flawed.  ABC Mem. at 38.  DVR owners watch more television.  And PTAT makes it especially easy to sample new shows because the shows will be in the user's PTAT folder.  Arguably, having the actual shows available is more effective than simply having the viewer watch a promotional spot.  At least one network executive saw things that way, writing (before litigation positions were staked out) that

Echtman Decl. Ex. 8.  In fact, PTAT has been lauded for enabling users "to discover new shows."  Khemka Decl. ¶7 & Ex. 7.

Financial analysts and the trading market agree that PTAT and AutoHop do not pose a threat to the networks' advertising revenue.  For example:

- An analyst from Deutsche Bank stated "We see **minimal risk** from Aereo or the Hopper cases."  Rapp Decl. ¶35.

- Another analyst from MagnaCapital stated "DVRs have **never been a meaningful threat** because the bulk of television consumption occurs live (even in homes with DVRs)."  *Id.* at ¶36

- An analyst from SNL Kagan explained that "the Hopper box as a percentage of total industry is **unlikely to have a significant impact**."  *Id.* ¶30.

- And according to an analyst from Janney Capital, "ad-skipping risks [are] **overstated**."  *Id.* ¶37.

These conclusions are supported by other financial data, such as the lack of reaction in the marketplace to the introduction of PTAT and AutoHop.  There was no change in the credit ratings for the senior unsecured debt of Disney or CBS.  *Id.* ¶39-40.  There was no stock price reaction to PTAT or AutoHop.  *Id.* ¶¶41-47.  Upfront ad sales immediately following the feature's release were a noted success, Disney's CEO boasting to investors that ABC sold "roughly 80% of its inventory in the upfront at increased rates."  *Id.* ¶31.  The collective opinion of knowledgeable, objective observers is that the Hopper poses no material risk to network television.  Indeed, as television recording devices have become widespread, and although the networks have lost audience to pay-television channels, network advertising prices have continued to rise.  *Id.* ¶¶103-108.

## 2.    ABC's Alleged Harm by Loss of Control Is Refuted by the Facts

ABC claims irreparable harm by virtue of DISH's "making unauthorized copies of ABC's prime time programming available on-demand and without commercials."  ABC Mem. at 34.  This "interferes with ABC's exclusive right to control the time and manner in which its programs are distributed," ABC says, and "[t]hat loss of control is itself irreparable harm."  *Id.* at 34.  That argument is doubly dubious.

First, ABC has no "control" left to "lose."  ABC has already ceded control by licensing its content on a widespread, nonexclusive basis in almost every imaginable venue.  And the Supreme Court established nearly three decades ago that networks could not "control the time

34

and manner" of watching shows, as ABC wants to do here.  Second, this licensing practice makes clear that, whatever harm may result, it is imminently calculable and compensable with money damages.  *See Fox*, 2012 WL 5938563, at *18.  As ABC admits, "licensed distributors of its content … bargained for the right to distribute its programming."  ABC Mem. at 35. Whatever "bargain" they struck can readily be used to measure any potential damages here.

Indeed, a plaintiff with an established licensing program does not get a *permanent* injunction, let alone a preliminary one.  *MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d 556, 569-73 (E.D. Va. 2007) (denying permanent injunction and explaining that "willingness to license" undercuts irreparable harm).[18]  Only months ago the Federal Circuit reversed the issuance of an injunction in a patent case where the plaintiff, a provider of VOD technology, "sought to broadly and extensively license [its] technology," making any damages from lost license fees "clearly quantifiable."  *ActiveVideo Networks, Inc. v. Verizon Commc'ns., Inc.*, 694 F.3d 1312, 1337-40 (Fed. Cir. 2012).

Moreover, even though PTAT was released over nine months ago, and AutoHop was rolled out two months later, ABC cannot point to any actual harm from the claimed "loss of control" over its content; the best ABC can come up with is that the Hopper "threatens to" or "may" cause it harm at some uncertain point in the future.  Connolly Decl. ¶¶15, 17, 21.  To accept ABC's pat assertion of "loss of control" as sufficient to demonstrate irreparable harm would be tantamount to resurrecting the presumption of irreparable harm rejected in *eBay* and *Salinger*.[19]

---

[18] *See also Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996) (recognizing plaintiffs' "pattern of granting licenses" as evidence of lack of irreparable harm); *T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (established history of granting licenses is "incompatible with … the right to exclude").

[19] ABC relies heavily on *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012).  The defendant in *WPIX* was, however, streaming network programming over the Internet without paying retransmission fees and its customers were not counted by Nielsen.  765 F.2d 277-78, 285-86.  Here, that is not the case.  Shull Decl. ¶7.  ABC also relies on

As part of its loss of control argument, ABC contends that the harms it allegedly faces are "even greater" because DISH's competitors "may" offer technology similar to PTAT and AutoHop, and because DISH has "plans" to expand PTAT to other units.  ABC Mem. at 8, 25. This alleged increased risk of harm is speculative and anything but "imminent."  Facing this same argument from Fox, Judge Gee denied Fox's preliminary injunction motion six weeks ago and there has been no flooding of the market by competitors.  ABC offers no proof, other than rank hearsay, that DISH's competitors are considering offering similar technology.  *See* Connolly Decl. ¶¶27-32.  That hearsay, a news article quoting the CEO of DIRECTV, makes clear that DIRECTV does not believe that there is consumer demand for ad-skipping technology like AutoHop and, in any event, "is waiting to see the outcome of this litigation before implementing that technology."  Connolly Decl. ¶27 & Ex. 6.  DISH, for its part, does not intend to expand PTAT or AutoHop beyond the Hopper at this time.  Minnick Decl. ¶40.  Events that may or may not come to pass until *after* a judgment on the merits have no bearing whatsoever on the irreparable harm inquiry.  *See Buckingham Corp. v. Karp*, 762 F.2d 257, 261 (2d Cir. 1985).

### 3.    ABC's Allegations of Loss of Negotiating Position and Relationships with Licensees Are Conclusory and Insufficient

ABC's arguments based on loss of negotiating position and detriment to its relationships with its licensees are similarly meritless.  ███████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████  ABC has not "described the allegedly impacted negotiations in anything but the most vague and unspecified terms."  *Litho Prestige, Div. of Unimedia Grp., Inc. v. News Am. Publ'n., Inc.*, 652 F. Supp. 804, 809 (S.D.N.Y. 1986).  Not a single name or detail has been

---

*Warner Brothers Entertainment, Inc. v. WTV Systems, Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011).  That case, however, found the presence of an *exclusive* licensing program established irreparable harm.  There was specific evidence of exclusive licensing windows for major movies harmed by the DVD streaming service business proposed by the defendant.  *Id.* at 1005-06, 1012-13.  There is no such evidence here.

provided.  Such conclusory allegations do not satisfy ABC's burden.  Moreover, a mere

"disruption in business does not constitute irreparable harm."  *Jessup v. American Kennel Club,*

*Inc.*, 862 F. Supp. 1122, 1127 (S.D.N.Y. 1994).[20]

 In fact, ABC's very own statements are contrary to its argument that DVR viewing on the

Hopper will harm its online market.  As Disney's CEO and CFO have both publicly

acknowledged, internet streaming services do not directly compete with television viewing; they

are "complementary" to television viewing and create "incremental revenue."  Rapp Decl. ¶¶128,

141; Hauser Decl. ¶¶59-64.  As a result, and contrary to ABC's assertions, PTAT and AutoHop

will not have a negative impact on ABC's efforts to license programming to providers of those

services.

### 4. ABC's Claim of Loss of Goodwill Is Conclusory and Insufficient to Support a Preliminary Injunction

 The factual basis for ABC's loss-of-goodwill claim is its unadorned assertion that

viewers will be "unhappy" if PTAT and AutoHop are taken away and blame "any company that

they perceive as responsible."  Loughney Decl. ¶22.  ABC makes no effort to explain how that

displeasure will manifest itself, or why viewers will blame ABC, rather than DISH or any of the

other networks, for any complications, or why it is better for ABC to be responsible for taking

away these features now, rather than later.  *Id.*  Indeed, ABC contends that consumers "accept

the implicit bargain of broadcast television," which (at least in ABC's view) requires "their being

exposed to advertising shown with the television programming," so it is not at all clear why ABC

believes that it will be held to account.  *Id.*  Such "conclusory statements of loss of reputation

and goodwill constitute an insufficient basis for a finding of irreparable harm."  *Shepard Indus.,*

---

[20] *See National Football League Players Ass'n v. National Football League Properties, Inc.*, No. 90 Civ. 4244 (MJL), 1991 U.S. Dist. LEXIS 6109, at *10-11 (S.D.N.Y. May 7, 1991) ("[I]n order to meet the standards required for a preliminary injunction, a party must show more than mere 'disruption.'").

*Inc. v. 135 E. 57th St., LLC*, No. 97 Civ. 8447 (DAB), 1999 U.S. Dist. LEXIS 14431, at *24 (S.D.N.Y. Sept. 17, 1999).

## V.      THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST BOTH FAVOR DISH

ABC must also establish that the "balance of hardships" tips in its favor, *Salinger*, 607 F.3d at 80, and "that a preliminary injunction is in the public interest." *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). Neither is true.

### A.      DISH Will Suffer More From an Injunction Than ABC Will Without One

If DISH is required to disable PTAT and AutoHop for existing customers (akin to a recall), or is enjoined from providing those features to future customers, DISH will suffer severe, immediate hardship in the form of damaged customer relations, lost good will, and other costs.

***Disabling PrimeTime Anytime and AutoHop will deal a devastating blow to DISH.***

The launching of a new product is always a risky proposition. DISH has invested over ██ ████████████ in PTAT and AutoHop. Khemka Decl. ¶11. If these features are enjoined now, the investment will effectively be lost. And DISH will be forced to mount a massive campaign to notify its ████████████ Hopper users. *Id.* ¶¶8-10. That process itself will be costly, but the aftermath will be far costlier. Some users will demand refunds or downgrade their service. *Id.* ¶10. Others will cancel their service completely and sign up with DISH's competitors. *Id.* There is a good reason why courts "particularly disfavor" preliminary injunctions, like the one ABC wants here, that effectively rip an already-purchased product from consumers' innocent hands. *See Marlyn Nutraceuticals, Inc. v. Mucos Phrarma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).[21]

---

[21] Customers have been enabling PTAT since March and AutoHop since May. ████████████ customers have already purchased the Hopper and obtained these features; ABC proposes to deprive them of what they have already purchased and activated. In requesting an order requiring DISH to take PTAT and AutoHop away from

The reputational blow will also be significant.  As ABC has made clear already, DISH markets itself as the provider of PTAT and AutoHop.  *See, e.g.*, ABC Mem. at 8 ("As part of the largest advertising campaign in its history, DISH has spent millions of dollars advertising the PrimeTime Anytime/AutoHop service ….").  If ABC's motion is not properly denied, and these features thus turn into duds, DISH will lose credibility with consumers.  *See J.P.T. Auto., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 659 F. Supp. 2d 350, 355 (E.D.N.Y. 2009) (harm to "goodwill" tips balance of hardship in favor of defendant); *Lever Bros. Co. v. Mattel, Inc.*, 609 F. Supp. 1395, 1403 (S.D.N.Y. 1985) (damage to defendant's "relationship with its customers" weighs against injunction).

*Regardless, a preliminary injunction will put DISH at an unacceptable competitive disadvantage.*  Removing PTAT puts DISH at a distinct competitive disadvantage, because doing so removes the capability of the Hopper to record six shows at one time during primetime. TiVo and AT&T have DVRs that records four shows at one time, and DIRECTV has a DVR that can record five shows at one time.  Horowitz Decl. ¶105.  Without PTAT, the Hopper can record no more than three shows at one time.  Even if consumers are willing to give DISH another chance, DISH simply will not have a competitive product with which it can try to win them back.

### B.     An Injunction Would Disserve the Public Interest

Without a hint of irony, ABC purports to stand in the shoes of consumers and tell this Court that the public interest—what would best serve those very consumers—favors making them less able to watch ABC's primetime programming when and how they want.  "Upholding

---

existing customers, ABC seeks to "alter the status quo," but has made no attempt to meet the applicable "higher standard."  *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356, 361 (S.D.N.Y. 2003) (applying "higher standard" where movant sought to "alter the status quo by halting" defendant's "already-established use" of trademark).

copyright protection," ABC says, "is in the public interest as a general matter."  ABC Mem. at 39.

    But whatever may be true "as a general matter"—and, to be sure, as a general matter "[p]ublic policy does not advocate the liberal issuance of *preliminary* injunctions in copyright infringement actions," *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1038 (9th Cir. 1994)—a preliminary injunction would *disserve* the public here.  At the expense of the real public interests at stake here—privacy, consumer autonomy, and technological innovation, *see Sony*, 464 U.S. at 430-32—a preliminary injunction will serve only the private commercial ends of ABC.  *See General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009) (public has an interest in "consumer choice"); *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1675 (Fed. Cir. 1988) (recognizing "the public interest in technological advancement"), *overruled on other grounds*, *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004).

## CONCLUSION

    For the foregoing reasons, ABC's motion for a preliminary injunction should be denied.

Dated: December 21, 2012

                    ORRICK HERRINGTON & SUTCLIFFE LLP

                    Peter A. Bicks
                    pbicks@orrick.com
                    Elyse D. Echtman
                    eechtman@orrick.com
                    Lisa T. Simpson
                    lsimpson@orrick.com
                    E. Joshua Rosenkranz
                    jrosenkranz@orrick.com
                    51 West 52nd Street
                    New York, New York 10019-6142
                    (212) 506-5000

                    40

Annette L. Hurst (admitted pro hac vice)
ahurst@orrick.com
The Orrick Building
405 Howard Street
San Francisco, California  94105-2669
(415) 773-5700

Of Counsel:

Mark A. Lemley
mlemley@durietangri
Michael Page
MPage@durietangri
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, California  94111
(415) 362-6666

*Attorneys for DISH Network L.L.C. and
EchoStar Technologies L.L.C.*

41