## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE AUTOHOP LITIGATION

MASTER FILE
12 Civ. 4155 (LTS)(KNF)

**REDACTED PUBLIC FILING**
**ORIGINAL FILED UNDER SEAL**

This Document Relates To:

Dish Network L.L.C. v. American Broadcasting
Companies, Inc., et al., Civil Action No. 12-cv-
4155 (LTS)(KNF)

## REPLY MEMORANDUM IN SUPPORT OF THE MOTION OF ABC, INC., AMERICAN BROADCASTING COMPANIES, INC., AND DISNEY ENTERPRISES, INC. FOR A PRELIMINARY INJUNCTION

Kevin T. Baine
Thomas G. Hentoff (admitted *pro hac vice*)
Hannah M. Stott-Bumsted
Stephen J. Fuzesi
Julia H. Pudlin (admitted *pro hac vice*)

WILLIAMS & CONNOLLY LLP
  725 Twelfth Street, N.W.
  Washington, DC 20005
  Telephone: (202) 434-5000
  Facsimile: (202) 434-5029

*Attorneys for ABC, Inc., American*
*Broadcasting Companies, Inc., and Disney*
*Enterprises, Inc.*

**TABLE OF CONTENTS**

I.    DISH IS BREACHING THE RETRANSMISSION CONSENT AGREEMENT ............2

II.   DISH IS DIRECTLY INFRINGING ABC'S COPYRIGHTS ...........................................3

    A.    ABC Has Established DISH's Volitional Conduct That Causes Infringement ...................................................................................................................3

    B.    DISH Has Failed To Establish Its Fair Use Defense ................................6

III.  DISH IS INDIRECTLY INFRINGING ABC'S COPYRIGHTS ......................................9

IV.   ABC WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION ......................................................................................11

    A.    The Impact of DISH's Service Is Neither Speculative Nor "Too Small" ..............12

    B.    Injunctive Relief Is Available on the Breach of Contract Claim ...........................15

V.    DISH CAN SHOW NO COGNIZABLE HARM FROM AN INJUNCTION .................16

CONCLUSION ...............................................................................................................16

APPENDIX A .................................................................................................................*a*1

## **TABLE OF AUTHORITIES**

### **CASES**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)..............................10

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012)............14

*Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012) ..........................12, 13

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009)...........................5

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ......................................................6, 7, 8

*Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) .............................3, 5

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998).......................8

*Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372 (S.D.N.Y. 2003) .................16

*Fox Broadcasting Co. v. Dish Network L.L.C.*, No. CV 12-04529 (C.D. Cal. Nov. 7, 2012) ...................................................................................................................................3, 4

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) ...................................................6

*Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008) .............................................................. 13-14

*King v. Innovation Books*, 976 F.2d 824 (2d Cir. 1992)..............................................................16

*Kuklachev v. Gelfman*, 361 Fed. App'x. 161 (2d Cir. 2009) ......................................................15

*Newport-Mesa Unified Sch. Dist. v. Calif. DOE*, 371 F. Supp. 2d 1170 (C.D. Cal. 2005) ...........6

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ........................................5, 6

*Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543 (N.D. Tex. 1997) ........................5-6

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004).....................................................15

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .........................................................................11

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012) .............................................................................................................................................5

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ..........................2, 10, 11

*Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995)................................ 15-16

*Universal City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 429 (C.D. Cal. 1979)...............11

*Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255 (5th Cir. 1988) ................................................9

*Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256 (S.D.N.Y. 2008) ...............................................9

*Warner Bros Ent'mt Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011) ............12, 13

*WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594 (S.D.N.Y. 2011) ................................................12, 13

*WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012) ....................................................7, 12, 14, 16

**STATUTES**

17 U.S.C. § 107 .............................................................................................................................7

DISH copies ABC's entire primetime lineup every night, for two purposes: (i) to provide a library of the latest primetime programs for on-demand playback, and (ii) to enable viewers to watch those programs commercial-free.  Nowhere in its 200 pages of briefing and expert declarations does DISH deny that these are its objectives or provide any reason to believe that it has not been, and will not be, successful in accomplishing them.  Instead, DISH seeks to obscure the facts about the purpose and effect of its PrimeTime Anytime/AutoHop service by either ignoring or flatly contradicting its many public and private admissions about the service:

- DISH has spent ████████████ promoting the service as providing "instant On Demand access to your favorite primetime shows" and "commercial-free TV" that will save subscribers "an hour each night."  Ex. 8, at 301, 305.  But now it says that it is not really on-demand television and will not really reduce the viewing of primetime commercials after all.[1]

- ███████████████ REDACTED-FILED UNDER SEAL ██████████████ ████████████████████████████████████████████████████ ████████████  But now it says that its service does not really compete with VOD services.

- DISH introduced PrimeTime Anytime out of "frustration" with competition from iTunes, Ex. 22, at 608, and promised that "you'd [n]ever need Hulu Plus . . . after this," Ex. 35, at 743.  Now it says those paid digital distribution and Internet services will be unaffected.

- DISH told the public that PrimeTime Anytime will "[a]utomatically record all four networks of primetime TV" while subscribers "don't have to do anything."  Ex. 33, at 716. But now it says that the subscribers, not DISH, are doing the copying.

- DISH touted AutoHop as "a revolutionary development that no other company offers."  Ex. 21, at 605.  Now it says that AutoHop is just "a souped-up version of the 30-second

---

[1] "Ex. __, at __" refers to the exhibits to the initial or supplemental Hentoff Declaration.

skip feature," Opposition ("Opp.") 8— ████████ REDACTED-FILED UNDER SEAL ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

     This case is not about anyone frustrating the pace of progress: DISH admits that ABC already makes its programming available for viewing in "almost every imaginable venue." Opp. 34. It is not about DVRs, time-shifting, or the fast-forward or 30-second skip buttons on a remote control. And it is not controlled by *Sony*—because the nature and extent of the copying here is fundamentally different and because the markets that are affected here did not even exist when *Sony* was decided. There is simply no principle of contract or copyright law that permits the massive copying that DISH has orchestrated for the explicit purpose of undermining every source of revenue that supports the creation of primetime network programming.

## I.  DISH IS BREACHING THE RETRANSMISSION CONSENT AGREEMENT

    The 2005 Agreement prohibits DISH from "record[ing], copy[ing]," or "duplicat[ing]" ABC's Digital Signal, and from "authoriz[ing]" the same. Ex. 47, at 856. The parties specifically exempted **only** the "practice of connecting subscribers' home recording devices such as VCRs or DVRs." *Id.* They did not exempt the creation and maintenance of a separate **service** designed to copy in perpetuity all of ABC's primetime programming. DISH is anything but a passive agent in the massive copying its service produces. It is actively engaged in the copying or, at a minimum, is "authoriz[ing]" the same. DISH is, for that reason, in breach of the contract.

    That does not mean, as DISH construes the argument, that DISH "violates the contract every time a customer uses a digital video **recorder** to **record** something." Opp. 13. By permitting DISH to connect a DVR, ABC was obviously allowing for use of the DVR by subscribers.[2]

---

[2] ████████ REDACTED-FILED UNDER SEAL ████████

But that is a far cry from allowing a **service** that DISH has advertised as "the only way to get access to 100 percent of primetime shows from the last eight days on demand."  Ex. 33, at 721. That is also a far cry from allowing copying for the express purpose of supporting a commercial-skipping service REDACTED-FILED UNDER SEAL  ABC Mem. 12.[3]  It is preposterous for DISH to suggest that ABC authorized these direct assaults on its revenue streams by merely granting a limited right to connect a user's DVR.[4]

## II.   DISH IS DIRECTLY INFRINGING ABC'S COPYRIGHTS

### A.   ABC Has Established DISH's Volitional Conduct That Causes Infringement

Both before and long after a subscriber has made a one-time decision to activate the PrimeTime Anytime service, DISH makes and executes decisions about what and how to copy and thereby "volitionally operates the copying system to make the copy."  *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) ("*Cablevision*").

1.   DISH's first volitional act is to "actively select[] and make[] available beforehand the individual programs available for viewing."  536 F.3d at 132.  DISH selects the programs

---

[3]  DISH asserts that "'the ad-skipping effect of AutoHop implicates [no] copyright interest or breach of contract.'"  Opp. 17 (quoting *Fox* Op. at 31) (Ex. 1).  This misapprehends ABC's argument.  By copying ABC's lineup to provide content for DISH's commercial-skipping service, DISH is exceeding any contractual right to connect subscribers' DVRs and abusing any asserted copyright privilege to make unauthorized copies of ABC's programs as a fair use.



[4]   REDACTED-FILED UNDER SEAL

But ABC never said that advertising revenue was the "only" benefit it received; it said that was the "critical" benefit, Connolly Decl. ¶ 24, which DISH cannot deny.

available for on-demand viewing—the most popular and valuable network programs—and it emphasizes as a selling point that it makes them available for viewing before a user may even be aware of a particular show: "The magic of PrimeTime Anytime is that it allows DISH subscribers to catch up on all primetime shows, including episodes . . . recommended by friends . . . after they've already been broadcast." Ex. 21, at 605. Thus, as with other VOD services, a DISH subscriber does not choose in advance any particular program to view, but chooses later from among the shows DISH has made available. DISH argues that it "'has no control over what programs'" the "'networks choose to make available during primetime,'" Opp. 26 (quoting *Fox* Op. at 17), but that misses the point. DISH has complete control over the decision to make that particular group of programs available for later on-demand viewing, to the exclusion of the thousands of other programs it broadcasts live.[5]

DISH also argues that it does not make programs available like a VOD service because the PrimeTime Anytime recordings "reside[] on the user's local DVR and [are] not transmitted from a remote supplier's library." Opp. 26 (citing *Fox* Op. at 30). But, as DISH's own expert testified, this is essentially how a user accesses VOD content from a satellite company: "To provide VOD services, . . . satellite providers can pre-deliver a suite of popular VOD titles . . . to the DVRs of subscribers" to be selected from later. Horowitz Decl. ¶ 70.

2.    DISH's volitional conduct continues long after the subscriber's one-time decision to opt in to the service: DISH subscribes to a weekly electronic programming guide ("EPG") to ensure that it copies all network programs that fit its definition of primetime (including series

---

[5] DISH asserts that because ▇▇▇▇▇REDACTED-FILED UNDER SEAL▇▇▇▇▇, this means that they are "making a choice," Opp. 2, but that choice is only to receive a service from DISH. And while subscribers may deselect channels or days of the week from the PrimeTime Anytime settings, *id.* 6-7, they cannot expand the library, and if they accept DISH's default settings, DISH copies every primetime show on all four networks every day. Minnick Decl. ¶ 25.

and programs that were not even in existence when the subscriber activated PrimeTime Any-

time); ███████████████ REDACTED-FILED UNDER SEAL ███████████████

████████████████████████████; controls the start and stop times of all record-

ings; ███████████████ REDACTED-FILED UNDER SEAL ███████████████

█████████████████ Minnick Decl. ¶¶ 25, 33, 34, 38.  In contrast to the remote-DVR user

in *Cablevision*, who each time had to "order[] that system to produce a copy of a specific pro-

gram," 536 F.3d at 130, 131, a DISH subscriber need opt in to the service only once, and may re-

ly on DISH to manage all primetime recording in perpetuity.  Thus, unlike in *Cablevision*, DISH

in no way "automatically obeys" a user "command [issued] directly to a system." *Id.* at 131-32.[6]

DISH may have automated some of its decisions, but those decisions are still DISH's.[7]

*See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 & n.6 (9th Cir. 2007) (prima facie

case of direct infringement for displaying thumbnail images where "Google's computers . . . ini-

tiate[d] and control[led] the storage and communication of" the images); *Arista Records LLC v.*

*Usenet.com, Inc.*, 633 F. Supp. 2d 124, 147-49 (S.D.N.Y. 2009) (applying *Cablevision* to find

"volitional conduct" where defendants' "active steps" included "automated filtering"); *Playboy*

---

[6] *Cablevision* did not hold that the direct copier must be **either** the service **or** the subscriber; it analyzed the volitional conduct of each.  536 F.3d at 131.  Copyright's doctrine of joint and several liability recognizes that more than one actor may join in directly infringing a copyright. *See Soc'y of the Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 57-58 (1st Cir. 2012).  In addition, *Cablevision* expressly left open the question whether "one's contribution to the creation of an infringing copy" made by another "may be so great that it warrants holding that party directly liable for infringement."  536 F.3d at 133.

[7] ███████████████ REDACTED-FILED UNDER SEAL ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

*Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 549, 552 (N.D. Tex. 1997) (direct infringe-

ment where defendants' "affirmative steps to cause the copies to be made" included deploying

"software [they] had developed" to "troll the Usenet" for photographs) (quotation omitted).

**B.    DISH Has Failed To Establish Its Fair Use Defense**

1.    DISH ignores two critical aspects of the fair use test.  First, DISH bears the bur-

den of proof to establish a likelihood of success on its fair use defense, including on each fair use

factor.  ABC Mem. 21; *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107, 109-10 (2d Cir.

1998).  Second, the crucial market-harm analysis is not limited to current or near-term harm, or

harm caused by DISH alone, but must consider whether "unrestricted and widespread conduct of

the sort engaged in by the defendant . . . would result in a substantially adverse impact on the po-

tential market" for ABC's copyrights.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590

(1994) (quotation omitted); ABC Mem. 24.  DISH has not even attempted to address this harm.

2.    DISH admits that its copying is "commercial" but asserts that it is a fair use be-

cause "time-shifting" by subscribers is "functionally transformative."  Opp. 27-28.  This is

wrong for three reasons.  First, a "transformative use" is one that "adds something new, with a

further purpose or different character, altering the first with new expression, meaning, or mes-

sage," *Campbell*, 510 U.S. at 579, or uses the first work "in a different context such that" it "is

transformed into a new creation," *Perfect 10*, 508 F.3d at 1165 (quotation omitted).  The Su-

preme Court has made clear that recording a show to view it later is **not** a transformative use.

*See Campbell*, 510 U.S. at 579; *Newport-Mesa Unified Sch. Dist. v. Calif. DOE*, 371 F. Supp. 2d

1170, 1177 (C.D. Cal. 2005) (time-shifting is "not transformative").  Second, creating a 100-hour

library of the latest primetime shows for on-demand, commercial-free viewing stretches the

meaning of "time-shifting" beyond recognition.  Third, a direct infringer cannot defend its own

copying by asserting the fair use defense of others.  *See Infinity Broad.*, 150 F.3d at 108.

PrimeTime Anytime copies programs for exactly the same entertainment and informational purposes for which ABC and its licensees make them available via VOD, Internet streaming, and other platforms.  This copying is, obviously, "mere duplication for commercial purposes."  *Campbell*, 510 U.S. at 591.  It "clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur."  *Id.* (quotation omitted).  The authority DISH cites regarding "theoretical" markets for fair uses like criticism and parody, Opp. 22-23, is thus inapposite.

3.     Relying on the testimony of two experts with no experience working in the television industry, DISH contends that harm to ABC's VOD, Internet, and digital distribution platforms may be ignored because they are a mere "complement" to ABC's primary, broadcast platform.  Opp. 22 (citing Rapp Decl. ¶ 142; Hauser Decl. ¶¶ 59-64).  But this argument ignores the many admissions by DISH executives that DISH is, in fact, using PrimeTime Anytime/AutoHop to compete directly with these platforms today.  ABC Mem. 12-14.[8]

DISH cannot dismiss as "virtually nonexistent," Opp. 22 (citing Rapp Decl. ¶¶ 126, 131), a VOD market for ABC primetime programs REDACTED-FILED UNDER SEAL and in which dozens of cable and satellite providers across the country participate, including every single one of the top ten providers except for DISH.  *See* Connolly Decl. ¶¶ 25-26.[9]  And DISH's

_____

[8] These platforms can be considered "complementary" to ABC's broadcast model only because of licensing rules that minimize the risk of cannibalizing audience—*e.g.*, requiring that VOD fast-forwarding be disabled for commercials and delaying the availability of Internet streaming.  Connolly Decl. ¶¶ 12-20; *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012), *petition for cert. filed*, No. 12-798 (U.S. Dec. 12, 2012).  These platforms certainly are not "complementary" to DISH, which swore in a 2012 SEC filing that "[w]e face . . . increasing competition from companies providing[] the delivery of video content via the Internet."  Ex. 27, at 626.

[9] That ABC's revenue from VOD, Internet streaming, and digital distribution platforms is smaller than its broadcast revenue does not mean that DISH may substitute for those offerings with impunity.  The fair use test protects copyright owners' "potential" markets as well as established ones, 17 U.S.C. § 107, and recognizes that a challenged use causes unfair market harm if it is

"more fundamental" argument—that ABC is not harmed because "there are no ABC on-demand offerings on DISH, so there is no opportunity for a DISH customer to use PTAT in lieu of ABC on demand," Opp. 22—is specious.  ABC and its licensees are harmed when DISH diverts customers from licensed VOD providers to DISH's infringing service.  This is what DISH is trying to do now in an advertisement titled "DISH Beats DirecTV."  Ex. 48, at 863.

4.      It is not reasonably open to debate that consumers who can skip all commercials by responding to a single prompt will watch fewer commercials.  DISH itself promises that subscribers who use AutoHop will "save an hour each night."  Ex. 8, at 301.  DISH does not dispute that viewers watch a substantial and growing percentage of ABC primetime shows the next day or later, ████████████████REDACTED-FILED UNDER SEAL████████████████
████████████████  ABC Mem. 4.  And it cannot deny that the effect of AutoHop is to reduce that figure to 0% each time it is deployed.

████████████████REDACTED-FILED UNDER SEAL████████████████
████████████████  Those homes do not have a service specifically deployed to eliminate commercials.[10]  To use a 30-second skip feature to replicate what AutoHop does automatically, a subscriber would have to execute a total of 32 "clicks"—not a mere five, as DISH contends, Opp. 8—to skip the 16 minutes of non-program time in a single hour-long program.  The difficulty of

---

"likely to fill a market niche that" the copyright owner "would in general develop," *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 (2d Cir. 1998).

[10] ████████████████REDACTED-FILED UNDER SEAL████████████████
████████████████████████████████  For the purpose of considering DISH's fair use defense, this is in any event the wrong focus because it fails to address the obvious harm to ratings caused by future "unrestricted" use of services like AutoHop, *Campbell*, 510 U.S. at 590, harm addressed by ABC's declarant, McGovern Decl. ¶¶ 8-10.  DISH misstates the testimony of ABC's corporate witness, Opp. 31, ████████████████REDACTED-FILED UNDER SEAL████████████████
████████████████████████████████

even remembering to do this at every break of every program every time a consumer plays back shows is one reason why DISH described AutoHop as "a revolutionary development" that is "not like fast-forwarding."  Ex. 21, at 605; Ex. 16, at 545.[11]

There is no question that AutoHop results in massive commercial skipping. REDACTED-FILED UNDER SEAL

REDACTED-FILED UNDER SEAL

## III.   DISH IS INDIRECTLY INFRINGING ABC'S COPYRIGHTS

DISH does not dispute the legal authority that a direct financial benefit from infringement exists where the availability of the infringing material "act[s] as a 'draw' for customers," *Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256, 261 n.3 (S.D.N.Y. 2008) (quotation omitted), REDACTED-FILED

REDACTED-FILED UNDER SEAL

Nor can DISH seriously dispute

---

[11] DISH speculates that commercial minutes automatically skipped by AutoHop could be offset by additional viewing spurred by PrimeTime Anytime. Opp. 21.  Even if that unsupported speculation were true, the purported effect of one portion of the service, PrimeTime Anytime, does not excuse the indisputably harmful effect of the other portion of the service, AutoHop.  *See Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 263-64 (5th Cir. 1988) (analyzing different features of software separately for fair use analysis).

[12] REDACTED-FILED UNDER SEAL

that it has the "right and ability to supervise the infringing activity." The "infringing activity" here is the wholesale copying of ABC primetime programs for the purpose of on-demand and commercial-free playback— **REDACTED-FILED UNDER SEAL**

[13]

DISH agrees that when the fair use inquiry shifts from copying by DISH to copying by subscribers, "there is (at most) one difference" in the analysis, Opp. 27—whether the challenged copying is commercial. And DISH does not dispute that copying "to save the expense of pur-chasing authorized copies" is commercial in character. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001); ABC Mem. 29. DISH's argument that ABC "fails to identify how these consumers are not paying the customary price," Opp. 18, ignores what ABC said: DISH's "service offers a substitute for a number of services that charge for on-demand and commercial-free viewing," ABC Mem. 29. These include iTunes and Hulu Plus, which DISH's executive said subscribers won't "ever need . . . after this," Ex. 35, at 743.

Even if the challenged copying were considered noncommercial, DISH's effort to rely on *Sony*, Opp. 17-23, still fails. First, DISH ignores that ABC need only show "**some** meaningful likelihood" that if the conduct "should become widespread, it would adversely affect the poten-tial market for the copyrighted work." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984). ABC has done so here. ABC Mem. 30-33. Second, copying to create an on-demand library of 100 hours of the latest primetime shows for commercial-free playback is fundamentally different from the time-shifting at issue in *Sony*—in its nature, extent, and effect.

---

[13] DISH cannot rely on a reference in *Sony* to "vicarious liability," Opp. 24 (citing 464 U.S. at 439), because the *Sony* Court only used the term "broadly and outside of a technical analysis of . . . vicarious copyright infringement." *Napster*, 239 F.3d at 1023.

It is undisputed that today's VOD, Internet streaming, and other on-demand markets did not exist in 1984. *Id.* at 31.  As for markets that did exist then, the *Sony* district court "concluded that th[e] alleged market harm was too speculative," Opp. 22, but for reasons that undermine DISH's case.  The court doubted that off-air recording would harm later theatrical exhibitions because "[b]y definition, time-shift recording entails viewing and erasing, so the program will no longer be on tape"; it observed that the expense of blank tapes suppressed library building; and it noted that prerecorded movies "arguably are more desirable than off-the-air recordings" because "they have no commercials."  *Sony*, 480 F. Supp. 429, 467 (C.D. Cal. 1979).  Here, DISH is providing on-demand, commercial-free versions of ABC shows in direct competition with ABC and legitimate ABC licensees that are offering the same programs at the same time.[14]

## IV.   ABC WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION

DISH's experts' commentary on technological innovation, DVR usage, stock prices, and Nielsen ratings is largely irrelevant to the issue before the Court—whether ABC is suffering any loss that "is difficult to replace or . . . to measure," or that "one should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (ABC Mem. 33).  Nothing in those declarations rebuts the self-evident propositions that (i) consumers who are able, by responding to a single prompt, to skip all commercials will watch fewer commercials, (ii) consumers who can watch programs on-demand without commercials are less likely to want to use on-demand services that

---

[14] *Sony*'s time-shifting holding did not, as DISH asserts, Opp. 1, endorse commercial skipping as a fair use.  DISH cites a party brief regarding the extent of commercial skipping, Opp. 19, but the Supreme Court instead relied on evidence that attempting to skip commercials "may be too tedious" as reflected by the fact that "92% of the programs were recorded with commercials and only 25% of the owners fast-forward through them."  464 U.S. at 452 n.36.  This limited fast-forwarding did not "change the result," Opp. 19, because under the "staple article of commerce doctrine," a defense that is not available to DISH here, the Court only had to find **enough** fair use to qualify as "commercially significant noninfringing uses."  464 U.S. at 442.  It thus only needed to consider the behavior of the majority of Betamax users who did not skip commercials.

prevent commercial-skipping, and (iii) consumers who can watch commercial-free programs for free will be less likely to use services that sell or rent commercial-free programming.  Moreover, those declarations ignore, but cannot obscure. REDACTED-FILED UNDER SEAL

And nothing in those declarations explains how these ever-expanding harms can be measured or why anyone should be expected to suffer them.

### A.    The Impact of DISH's Service Is Neither Speculative Nor "Too Small"

DISH's irreparable harm argument is ultimately a challenge to the Second Circuit's decision in *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012), and other recent copyright decisions.[15]  Acknowledging that ABC "relies heavily" on *ivi*, DISH nonetheless limits its discussion of the case to a footnote that fails to address the holdings on which ABC relies.  Opp. 35 n.19.

DISH argues that the harm to ABC is speculative.  But there is nothing speculative about the assertion that subscribers will use PrimeTime Anytime and AutoHop for the purposes for which they are promoted.  Courts addressing similar copyright claims have found irreparable harm based on exactly the type of evidence presented here.  *See ivi*, 691 F.3d at 285-87; *Aereo*, 874 F. Supp. 2d at 397-99; *WTV Sys.*, 824 F. Supp. 2d at 1012-14.  DISH's contention that ABC has not suffered any "measurable harm," Opp. 3, itself "unwittingly demonstrate[s] why the harm . . . is irreparable."  *ivi*, 765 F. Supp. 594, 620 (S.D.N.Y. 2011).  That plaintiffs have not "'submitted' specifically identifiable, enumerated, and quantified harms" is precisely the reason why injunctive relief is required—"because they cannot specifically demonstrate or quantify" the harm that defendant has caused.  *Id.*; *ivi*, 691 F.3d at 286; *see also Aereo*, 874 F. Supp. 2d at 397-99 (finding that harm to plaintiffs' advertising revenue, negotiation position, and control, testified to by television executives based on "many years of experience," is not speculative).

---

[15] *E.g.*, *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 874 F. Supp. 2d 373 (S.D.N.Y. 2012); *Warner Bros Ent'mt Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003 (C.D. Cal. 2011).

Nor can DISH avoid an injunction by asserting that its service is "just too small," Opp.

33: "Defendants . . . cannot contend that since ivi is small and plaintiffs are large, they should be

allowed to continue to steal plaintiffs' programming for personal gain until a resolution of this

case on the merits," *ivi*, 765 F. Supp. 2d at 619.   REDACTED-FILED UNDER SEAL

REDACTED-FILED UNDER SEAL

**Harm to ABC's Control.**  DISH's argument that ABC has "already ceded control" by

making its content available widely, Opp. 34, gets it entirely backwards.  ABC's careful licens-

ing decisions, *see* Connolly Decl. ¶¶ 8-21, reflect the **exercise** of control.  As the *ivi* district court

put it: "Defendants cannot seriously argue that the existence of thousands of companies who le-

gitimately use plaintiffs' programming and pay full freight means that ivi's illegal and uncom-

pensated use does not irreparably harm plaintiffs."  765 F. Supp. 2d at 619 (emphasis omitted).

Nor does ABC's licensing its works make damages "readily calculable."  Opp. 30 n.15,

35.  ABC does not license to anyone the right to provide at no cost a next-day commercial-free

VOD library of all ABC's primetime shows,   REDACTED-FILED UNDER SEAL

.  "Copyright licenses are designed to support the **right to exclude**;

13

money damages alone do not support or enforce that right." *Jacobsen v. Katzer*, 535 F.3d 1373, 1381-82 (Fed. Cir. 2008) (emphasis added). In the patent cases cited by DISH, Opp. 35, courts found no irreparable harm because the plaintiffs had actively sought to license the very patents at issue to defendants. *See, e.g.*, *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1339 (Fed. Cir. 2012).[16]

**Harm to ABC's Relationships and Negotiations with Authorized Licensees.** The difficulty of measuring harm to a copyright owner's relationships with its licensees is one of the factors that renders the harm from infringement irreparable. *See ivi*, 691 F.3d at 285. In arguing that evidence of such harms here is "conclusory," Opp. 36-37, DISH ignores *ivi*'s ruling—based on the exact same type of evidence submitted here—that "retransmissions of plaintiffs' copyrighted programming without their consent" caused irreparable harm by "undermining existing and prospective retransmission fees, negotiations[] and agreements." 691 F.3d at 285-86. ▮ REDACTED

REDACTED-FILED UNDER SEAL

**Advertising Revenues and Promotion of ABC Programs.** The *ivi* court held that irreparable harm arises from services that "reduce the value of [plaintiff's] . . . advertisements." 691 F.3d at 286. In its start-up period, DISH's service may or may not have a noticeable impact on C3 ratings, but that is irrelevant: REDACTED-FILED UNDER SEAL

And it will be impossible to measure

---

[16] DISH asserts that third-party broadcast affiliates have "put a price on AutoHop" REDACTED-FILED UNDER SEAL

REDACTED-FILED UNDER SEAL

the impact on ratings, because no one will know how many Nielsen homes use the service.

DISH does not even attempt to deny that the harm to ABC from the automatic skipping

of ABC promotional spots is immeasurable.  ████ REDACTED-FILED UNDER SEAL ████

████████████████████████████████████████████████████████

████████████████████████████████████████████  DISH's claim

that "[a]rguably, having the actual shows available [in a PrimeTime Anytime folder] is more ef-

fective than simply having the viewer watch a promotional spot," Opp. 33, is baseless.  ABC

forgoes millions of dollars in potential advertising revenue a week to broadcast spots crafted to

attract audiences.  McGovern Decl. ¶ 13.  A program's mere listing with 100 other programs in a

PrimeTime Anytime folder is no serious substitute.  And even if such a listing were beneficial,

that would not excuse the harm caused by AutoHop, which DISH could independently disable.

### B.      Injunctive Relief Is Available on the Breach of Contract Claim

DISH asserts that seeking "damages for breach of contract" precludes a showing of irrep-

arable harm.  Opp. 29.  This is incorrect.  As the Second Circuit explained in *Register.com, Inc.*

*v. Verio, Inc.*, irreparable harm flowing from breach of contract "may be found where damages

are difficult to establish and measure."  356 F.3d 393, 404 (2d Cir. 2004).  The harm found to be

irreparable in *Register.com* was not limited to "loss of goodwill," Opp. 30 n.15, but included

"loss of reputation, good will, and business opportunities," 356 F.3d at 404.  ABC is suffering

the same irreparable harm here.  Connolly Decl. ¶¶ 30-34; Loughney Decl. ¶¶ 21-22.[17]

---

[17] ABC did not unduly sleep on its rights.  Opp. 28-29.  DISH filed a declaratory action on May
24, 2012, two weeks after AutoHop launched and two months after PrimeTime Anytime
launched, and ABC (the only party not to dispute venue) filed counterclaims on June 22. ████
████████████ REDACTED-FILED UNDER SEAL ████████████
██████     The expedited discovery and preliminary injunction schedule was jointly proposed
by the parties five weeks later.  *See* Hentoff Supp. Decl. ¶¶ 5-16.  None of this lessens the need
for a preliminary injunction.  *See Kuklachev v. Gelfman*, 361 Fed. App'x. 161, 163 (2d Cir.
2009) (noting "need to investigate the nature of the infringement"); *Tom Doherty Assocs. v.*

## V.   DISH CAN SHOW NO COGNIZABLE HARM FROM AN INJUNCTION

REDACTED-FILED UNDER SEAL

# REDACTED-FILED UNDER SEAL

REDACTED-FILED UNDER SEAL  Opp. 38.  It is in any event well established that "an infringer of copyright

cannot complain about the loss of ability to offer its infringing" service.  *ivi*, 691 F.3d at 287.[18]

### CONCLUSION

ABC's motion for a preliminary injunction should be granted.

Dated: January 15, 2013                          Respectfully submitted,

WILLIAMS & CONNOLLY LLP

By:  *Thomas G. Hentoff*

Kevin T. Baine
Thomas G. Hentoff (admitted *pro hac vice*)
Hannah M. Stott-Bumsted
Stephen J. Fuzesi
Julia H. Pudlin (admitted *pro hac vice*)

725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-Mail: kbaine@wc.com

---

[18] *Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) (delay inexcusable only when "fair inference" can be drawn that copyright owner "had concluded that there was no infringement but later brought an action because of the strength of the commercial competition"); *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992) (only unexplained delay undercuts a showing of irreparable harm); *Elite Licensing, Inc. v. Thomas Plastics, Inc.*, 250 F. Supp. 2d 372, 390 (S.D.N.Y. 2003) (agreed-upon period of expedited discovery not counted against movant).

REDACTED-FILED UNDER SEAL

*Attorneys for ABC, Inc., American Broadcasting Companies, Inc. and Disney Enterprises, Inc.*

