# EXHIBIT 04

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DISH NETWORK,

                    Plaintiff(s),

        -against-

ABC et al.,

                    Defendant(s).

No. 12 Civ. 4155 (LTS) (KNF)
PRE-TRIAL
SCHEDULING ORDER NO. _____

LAURA TAYLOR SWAIN, DISTRICT JUDGE:

        A pre-trial conference was last held in this matter on August 3, 2012. The Court hereby makes the following provisions for scheduling and trial in this matter. To the extent copies of this Order were not distributed to all parties in open court or posted on ECF in an ECF case, Plaintiff's counsel must serve a copy of this Pre-Trial Scheduling Order on counsel for each other party and must also serve a copy on each unrepresented party, within fourteen (14) days from the date hereof. A copy of this Pre-Trial Scheduling Order shall be served with any subsequent process that brings in additional parties. Proof of such service must be filed promptly with the Court.

1.      Amendments to Pleadings, Additional Parties

        All applications to amend pleadings or join parties, or amendments or joinders as of right, must be made by **November 30, 2012, except that applications regarding amendments identifying new copyrighted works alleged to have been infringed may be made up to 30 days before the close of fact discovery**.

2.      Discovery

      a.      The discovery procedures set forth in the Pilot Project description annexed to the Court's October 31, 2011 Standing Order (11 Misc. 00388) (the "Pilot Project Description") apply unless otherwise ordered.

b.    Rule 26(a)(1) disclosures

     \_\_\_ are not required, OR
Must be made by **August 24, 2012.**

c.    All non-expert witness discovery in this matter must be completed by **March 29, 2013**.

d.    Each party must make its expert witness disclosures described in Rule 26(a)(2) of the Federal Rules of Civil Procedure concerning expert(s), if any, to be offered on issues as to which such party has the burden of proof or otherwise in support of the party's case, no later than **60 days before the date set forth in paragraph 2.e. below**. Rebuttal disclosures must be made no later than **30 days before the date set forth in paragraph 2.e. below.**  Such disclosures must be made in writing, signed and served, but must <u>not</u> be filed with the Court.

e.    All expert witness discovery must be completed by **June 21, 2013**.

f.    (If applicable) All class certification-related discovery must be completed by **N/A**

g.    Additional limitations or provisions:  **Expedited phase discovery per Exhibit A to Initial Conference report (including CBS/NBCU as applicable).**

3.    <u>Class Certification Motion Practice</u>

   **N/A**

4.    <u>Joint Preliminary Trial Report</u>

The Joint Preliminary Trial Report covering the matters enumerated in subdivision IV.A. of the Pilot Project Description must be filed, with one courtesy copy provided for Chambers, within 14 days after the completion of fact discovery, unless otherwise ordered.  At the time the Report is filed, the parties must make a written request to the Court to schedule a Case Management Conference.

5.    <u>Dispositive Pre-Trial Motions</u>

Dispositive motions, if any, seeking resolution, in whole or in part, of the issues to be raised at trial must be served and filed on or before **July 19, 2013**.  Section B.3 of the undersigned's Individual Practices Rules governs pre-motion procedures.  If the movant believes the motion, if granted, would obviate entirely the necessity of a trial in this matter, the movant may so state in a separate MOTION FOR STAY, which must be served and filed with the moving papers, and may in such stay motion request that the Court defer the remaining requirements of this Order pending its decision on the dispositive motion.  Unless the Court grants such stay

motion, the filing of a dispositive motion <u>does</u> <u>not</u> affect the parties' obligations under this Order.

6.      <u>Other Pre-Trial Motions</u>

   a.      Any <u>Daubert</u> motion practice must be initiated no later than sixty (60) days before **the date set forth in paragraph 9 below**.

   b.      Other motions, including but not limited to non-<u>Daubert</u> motions <u>in</u> <u>limine</u> relating to evidentiary issues, must be filed and served no later than thirty (30) days before **the date set forth in paragraph 9 below**.

7.      <u>Joint Final Trial Report</u>

   The Joint Final Trial Report covering the matters enumerated in subdivisions IV.C. and IV.D. of the Pilot Project Description must be filed, with one courtesy copy provided for Chambers, no later than twenty-eight (28) days **before the date set forth in paragraph 9 below**.

   a.      The Joint Final Trial Report must also state clearly the parties' positions as to whether the case is to be tried, in whole or in part, to a jury, and must state whether all parties consent to trial of the case by a magistrate judge (without identifying which parties have or have not so consented).

   b.      The format of the exhibit list presented in the Joint Final Trial Report must be substantially as illustrated below.

| Exhibit Number or Letter | Description | Objection(s), if any | Status |
|---|---|---|---|
|  |  |  |  |

      i.      If there is more than one Plaintiff or Defendant, the parties must coordinate their designations so as to avoid duplication.

      ii.      In the "Objection(s)" column of the table, any objections must be explained briefly, with citation to the relevant Federal Rule of Evidence or other legal authority.

      iii.      The "Status" column should be left blank, for later use by the Court.

   c.      The Joint Final Trial Report should also be submitted to Chambers on a CD-Rom in WordPerfect or Microsoft Word format.

d.   One copy of each documentary exhibit to be offered at trial should be provided to the Court at the time the Joint Final Trial Report is filed.  Such exhibits must be pre-marked.  In the event that a party intends to offer more than 15 documentary exhibits at the trial, the exhibits should be tabbed and included in a binder, or otherwise organized for easy reference and access.  On the day of trial, counsel must bring additional pre-marked copies for use by witnesses, the courtroom deputy, the court reporter, opposing parties and (if applicable) the jury.

e.   Proposed verdict forms (with any objections noted) must also be provided to the Court at the time that the Joint Final Trial Report is filed.  Courtesy copies and electronic versions in WordPerfect or Microsoft Word format must be provided.

8.   Requests to Charge

Requested final jury instructions must be filed as a single document, captioned Joint Requests to Charge and including the full text of the parties' proposed jury instructions and a brief explanation (with legal citations) of the objections, if any, to disputed requests to charge, must be filed (and a courtesy copy provided for Chambers) **with the Joint Final Trial Report.**

The Joint Requests to Charge must also be submitted to Chambers on a CD-Rom in WordPerfect or Microsoft Word format.

9.   Final Pre-Trial Conference

The parties are directed to appear before the undersigned in Courtroom No. 11C[1], 500 Pearl Street, New York, NY 10007, for a final pre-trial conference on **December 6, 2013**, at **10:00 a.m**.  The parties must be trial-ready by this conference date.  The conference will cover the matters enumerated in subdivision IV.E. of the Pilot Project Description.  The trial date will be set at the conference if one has not previously been designated.

The Court will not adjourn the final pre-trial conference or excuse the appearance of a party or its counsel unless a stipulation of settlement is on file prior to the pre-trial conference date set forth in this paragraph 9.

10.  No Adjournment of Deadlines

The deadlines set forth in this Pre-Trial Scheduling Order will not be adjourned except in the Court's discretion upon good cause as shown in a written application signed by both counsel and counsel's client and served upon all parties.  "Good cause," as used in this paragraph, does not include circumstances within the control of counsel or the client.

---

[1]On the day of the conference, check the electronic board in the lobby to be certain of the proper courtroom.

11.    Non-Compliance with This Order

In the event that any party fails to comply with this Pre-Trial Scheduling Order, or is not prepared to go forward with trial on the date scheduled, the Court may impose sanctions or take other action as appropriate. Such sanctions and action may include assessing costs and attorney's fees, precluding evidence or defenses, dismissing the action, granting judgment by default, and/or other appropriate penalties.

12.    Other Matters

   a.    Trial witnesses not previously deposed _X__ will ___ will not be made available for deposition before the commencement of trial.

   b.    The parties must begin meeting with Magistrate Judge Fox for settlement purposes by **January 31, 2013.**

   c.    The parties must use their best efforts to agree on e-discovery protocols by **October 26, 2012**. If no joint protocol proposal has been submitted to the Court by that date, the parties must submit the disputed issues to Judge Fox by **November 14, 2012.**

   d.    Liability and damages discovery will proceed on the same timetable.

   e.    The parties must continue to use their best efforts to coordinate discovery activities in the New York and California proceedings, including notifying judges in both proceedings of problems that implicate both proceedings.

   f.    ABC's preliminary injunction motion practice must be commenced within 30 days following the completion of the expedited discovery schedule.


IT IS SO ORDERED.


Dated: New York, New York
       August 3, 2012


                                        ____/s/LTS_____
                                        LAURA TAYLOR SWAIN
                                        United States District Judge

# EXHIBIT 05



October 5, 2012

BY FACSIMILE

The Honorable Laura Taylor Swain
United States District Judge
United States District Court
 for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

**MEMO ENDORSED**

     Re:    *In re AutoHop Litigation*, Master File No. 12 Civ. 4155 (LTS)(KNF)
             **This Document Relates to:** *DISH Network, L.L.C. v. American
             Broadcasting Companies, Inc., et al.*, No. 12-cv-4155 (LTS)(KNF)

         **Joint Letter Application to Extend Deadline for Completion of
         Discovery Relating to the ABC Parties' Preliminary Injunction
         Motion to October 23, 2012**

Dear Judge Swain:

       Undersigned counsel represent defendants/counterclaim plaintiffs the ABC Parties (ABC,
Inc., American Broadcasting Companies, Inc., and Disney Enterprises, Inc.) and plaintiff/
counterclaim defendant DISH Network, L.L.C. (collectively, "the Parties").

       The Parties submit this joint letter application requesting that the Court approve the
Parties' agreement to extend by three weeks, until October 23, 2012, the deadline for completion
of discovery relating to the ABC Parties' preliminary injunction motion.

       The Parties had previously proposed to conclude this discovery by October 2, *see* Initial
Report of Parties Before Pretrial Conference (D.I. 100 at 17, 8/1/12), incorporated in Pre-Trial
Scheduling Order No. 1 (D.I. 103 at 2), but request Court approval of the additional three weeks
to complete their respective document productions and Rule 30(b)(6) depositions. The Parties
have been working cooperatively to complete this discovery in a timely fashion.

       As set forth in the Court's Pre-Trial Scheduling Order No. 1 (D.I. 103 at 5, 8/3/12), the
ABC Parties' preliminary injunction deadline remains thirty days after the completion of this
discovery. This request does not affect any other pretrial deadline set by the Court and is the
first such request by the Parties.

The Honorable Laura Taylor Swain
October 5, 2012
Page 2

The Parties thank the Court for its consideration of this request and are available if the Court has any questions.

Respectfully submitted,

*Thomas G. Hentoff*

Thomas G. Hentoff
Williams & Connolly LLP
725 12th Street, N.W.
Washington, DC 20008

*Counsel for the ABC Parties*

*Elyse D. Echtman /TGH*

Elyse D. Echtman
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019

*Counsel for DISH Network, L.L.C.*

cc:     All Counsel (by facsimile)
        Magistrate Judge Kevin Nathaniel Fox (by facsimile)

The request is granted.

SO ORDERED.

NEW YORK, NY

LAURA TAYLOR SWAIN
Oct 10 2012 UNITED STATES DISTRICT JUDGE

# EXHIBIT 06

# REDACTED IN ITS ENTIRETY

# EXHIBIT 07

# REDACTED IN ITS ENTIRETY

# EXHIBIT 08

# REDACTED IN ITS ENTIRETY

# EXHIBIT 09

**SONY** CORPORATION OF AMERICA, et al., Petitioners, vs. UNIVERSAL CITY STUDIOS, INC. and WALT DISNEY PRODUCTIONS, Respondents.
No. 81-1687

OCTOBER TERM, 1982

October 27, 1982

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit.

BRIEF FOR RESPONDENTS, UNIVERSAL CITY STUDIOS, INC. AND WALT DISNEY PRODUCTIONS.

STEPHEN A. KROFT, (Counsel of Record ), JOHN G. DAVIES, SONDRA E. BERCHIN, 9601 Wilshire Boulevard, Suite 444, Beverly Hills, Calif. 90210, (213) 858-7700, Attorneys for Respondents, Universal City Studios, Inc. and Walt Disney Productions.

Of Counsel: ROSENFELD, MEYER & SUSMAN.

TABLE OF AUTHORITIES

Cases

Aluminum Extrusion Co. v. Saule Steel Co., 260 F.Supp. 221 (C.D. Cal. 1966)

Aro Mfg. Co. Inc. v. Convertible Top Replacement Co., 377 U.S. 476 (1964)

Benny v. Loew's Inc., 239 F.2d 532 (9th Cir. 1956), aff'd by equally divided court, 356 U.S. 43 (1958)

Berlin v. E.C. Publications, Inc., 329 F.2d 541 (2d Cir. 1964)

BMI v. Marshall, 201 U.S.P.Q. 30 (E.D. Mich. 1978)

Broadcast Music, Inc. v. CBS, Inc., 441 U.S. 1 (1979)

Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348 (9th Cir. 1964), cert. denied, 379 U.S. 989 (1965)

CBS, Inc. v. Democratic Nat'l Comm., 412 U.S. 94 (1973)

CBS, Inc. v. Documentaries Unltd., Inc., 248 N.Y.S.2d 809, 42 Misc.2d 723 (1964)

Chess Music, Inc. v. Sipe, 442 F.Supp. 1184 (D. Minn. 1977)

City of Harrisonville, Mo. v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334 (1933)

Costello Publishing Co. v. Rotelle, 670 F.2d 1035 (D.C. Cir. 1981)

Dallas Cowboys Cherrleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184 (5th Cir. 1979)

Dawson Chem. Co. v. Rohm And Haas Co., 448 U.S. 176 (1980)

Diamond v. Chakrabarty, 447 U.S. 303 (1980)

Eastern Microwave, Inc. v. Doubleday Sports, Inc., 534 F.Supp. 533 (N.D.N.Y. 1982)

Elcktra Records Co. v. Gem Elec. Distribs., Inc., 360 F.Supp. 821 (E.D.N.Y. 1973)

Elsmere Music v. NBC, 623 F.2d 252 (2d Cir. 1980)

Encyclopaedia Britannica Educational Corp. v. Crooks, 447 F.Supp. 243 (W.D.N.Y. 1978) (I)

Encyclopaedia Britannica Educational Corp. v. Crooks, 542 F.Supp. 1156 (W.D.N.Y. 1982) (II)

Famous Music Corp. v. Bay State Harness Horse Racing etc., 554 F.2d 1213 (1st Cir. 1977)

F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, 214 U.S.P.Q. (BNA) 409 (7th Cir. Mar. 25, 1982)

Filmvideo Releasing Corp. v. Hastings, 668 F.2d 91 (2d Cir. 1981)

Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390 (1968)

Fox Film Corp. v. Doyal, 286 U.S. 123 (1932)

Fromberg, Inc. v. Thornhill, 315 F.2d 407 (5th Cir. 1963)

Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159 (2d Cir. 1971)

Ingersoll-Rand Co. v. Rockwell Int'l. Corp., 420 F.Supp. 277 (S.D. Fla. 1976)

Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 102 S.Ct. 2182 (1982)

Iowa State University Research Foundation v. ABC, 621 F.2d 57 (2d Cir. 1980)

Jerome H. Remick & Co. v. General Electric Co., 16 F.2d 829 (S.D.N.Y. 1926)

Jones v. RCA, 131 F.Supp. 82 (S.D.N.Y. 1955)

Kalem Co. v. Harper Bros., 222 U.S. 55 (1911)

Kleindienst v. Mandel, 408 U.S. 753 (1972)

Leon v. Pacific Tel. & Tel. Co., 91 F.2d 484 (9th Cir. 1937)

Libby Rod & Gun Club v. Poteat, 594 F.2d 742 (9th Cir. 1979)

Loew's Inc. v. CBS, Inc., 131 F.Supp. 165 (S.D. Cal. 1955), aff'd sub. nom. Benny v. Loew's Inc., 239 F.2d 532 (9th Cir. 1956) aff'd by equally divided court, 356 U.S. 43 (1958)

Loretto v. Teleprompter Manhattan CATV Corp., 102. S.Ct. 3164 (1982)

MCA INC. v. Wilson, 677 F.2d 180 (2d Cir. 1981)

Meeropol v. Nizer, 560 F.2d 1061 (2d Cir. 1977), cert. denied, 434 U.S. 1013 (1978)

Meredith Corp. v. Harper & Row Publishers, Inc., 378 F.Supp. 686 (S.D.N.Y. 1974), aff'd 500 F.2d 1221 (2d Cir. 1974)

MGM, Inc. v. Showcase Atlanta Coop. Prods., Inc., 479 F.Supp. 351 (N.D. Ga. 1979)

NBC v. United States, 319 U.S. 190 (1943)

New Boston Television, Inc. v. Entertainment Sports Programming Network, Inc., 2 Copyrt. L. Rep. (CCH) P25,293, pp. 16,625, 16,626-27 (D. Mass. Aug. 3, 1981)

North Haven Bd. of Ed. v. Bell, 102 S.Ct. 1912 (1982)

Ortho-O-Vision, Inc. v. Home Box Office, 474 F.Supp. 672 (S.D.N.Y. 1979)

Red Lion Broadcasting Co. v. FCC, 395 U.S. 367 (1969)

Reynolds Metals Co. v. Aluminum Co. of America, 457 F.Supp. 482 (N.D. Ind. 1978)

Rice v. American Program Bureau, 446 F.2d 685 (2d Cir. 1971)

Richards v. United States, 369 U.S. 1 (1962)

Roe v. Wade, 410 U.S. 113 (1973)

Rohauer v. Killiam Shows, Inc., 379 F.Supp. 723 (S.D.N.Y. 1974), rev'd on other grounds, 551 F.2d 484 (2d Cir. 1977), cert. denied, 431 U.S. 949 (1977)

Rohm And Haas Co. v. Dawson Chem. Co., 599 F.2d 685 (5th Cir. 1979), aff'd, 448 U.S. 176 (1980)

Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir. 1966)

Roy Export Company v. CBS, 672 F.2d 1095 (2d Cir., cert. denied, 51 U.S.L.W. 3254 (U.S. Oct. 5, 1982) No. 81-2111

Rubin v. Boston Magazine Co., 645 F.2d 80 (1st Cir. 1981)

Russell v. Price, 612 F.2d 1123 (9th Cir. 1979), cert. denied, 446 U.S. 952 (1980)

Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384 (1951)

Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 256 F.Supp. 399 (S.D.N.Y. 1966) (I)

Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 327 F.Supp. 788 (S.D.N.Y. 1971), rev'd on other grounds, 453 F.2d 552 (2d Cir. 1972)

Shapiro, Bernstein & Co., Inc. v. H.L. Green Co., 316 F.2d 304 (2d Cir. 1963)

Shumaker v. Gem Mfg. Co., 311 F.2d 273 (7th Cir. 1962)

Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157 (9th Cir. 1977)

Silver King Mines, Inc. v. Cohen, 261 F.Supp. 666 (D. Utah 1966)

SPEE-FLO Mfg. Corp. v. Gray Co., Inc., 255 F.Supp. 618 (S.D. Tex. 1964)

Stanley v. Georgia, 394 U.S. 557 (1969)

Teleprompter Corp. v. CBS, Inc., 415 U.S. 394 (1974)

Tennessee Valley Authority v. Hill, 437 U.S. 153 (1978)

Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171 (5th Cir. 1980)

Twentieth Century Music Corp. v. Aiken, 422 U.S. 151 (1975)

Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851 (2d Cir. 1967)

United States Fidelity etc. Co. v. Royal Nat'l Bank, 545 F.2d 1330 (2d Cir. 1976)

United States v. Grayson County State Bank, 656 F.2d 1070 (5th Cir. 1981)

United States Gypsum Co. v. National Gypsum Co., 440 F.2d 510 (7th Cir. 1971), cert. denied, 403 U.S. 923

United States v. International Union, etc., 352 U.S. 567 (1957)

United States v. Loew's, Inc., 371 U.S. 38 (1962)

United States v. Mississippi Valley Generating Co., 364 U.S. 520 (1961)

United States v. NBC, 449 F.Supp. 1127 (C.D. Cal. 1978)

Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council Inc., 425 U.S. 748 (1976)

Walt Disney Prods. v. Air Pirates, 581 F.2d 751 (9th Cir. 1978) cert. denied, 439 U.S. 1132 (1979)

Walt Disney Prods. v. Alaska Television Network, Inc., 310 F.Supp. 1073 (W.D.

Wash. 1969)

Wainwright Secs. Inc. v. Wall Street Transcript Corp., 558 F.2d 91 (2d Cir. 1977), cert. denied 434 U.S. 1014 (1978)

Wells v. Universal Pictures Co., 166 F.2d 690 (2d Cir. 1948)

Weyerhaeuser Timber Co. v. Bostitch, Inc., 178 F.Supp. 457 (D.R.I. 1959)

WGN Continental Broadcasting Co. v. United Video, Inc., 685 F.2d 218 (7th Cir. 1982)

Wihtol v. Crow, 309 F.2d 777 (8th Cir. 1962)

Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct.Cl. 1973) aff'd by equally divided court, 420 U.S. 376 (1975)

Zacchini v. Scripps-Howard Broadcasting Co., 422 U.S. 562 (1977)

Zuber v. Allen, 396 U.S. 168 (1969)

Constitution

United States Constitution, First Amendment

Miscellaneous

Amendment No. 1242 to S. 1758, 97th Cong., 1st Sess., 127 Cong. Rec. S15723-24 (daily ed. Dec. 16, 1981)

Amendment No. 1331 to S. 1758, 97th Cong., 2d Sess., 128 Cong. Rec. S1287-90 (daily ed. Mar. 1, 1982)

Amendment No. 1333 to S. 1758, 97th Cong., 2d Sess., 128 Cong. Rec. S1675 (daily ed. Mar. 4, 1982)

Assembly Bill No 3483, 1981-82 Reg. Sess., Ch. 574 (Aug. 25, 1982)

Baumgarten, "Private Audio Recording of Copyrighted Music" 1-9 (Apr. 21, 1982) to be reprinted in April 21, Senate Committee Hearings   , 97th Cong., 2d Sess. (1982) (Memo for Nat'l Music Publishers' Ass'n, Mar. 8, 1982)

California Legislative Service (1982), p. 3508 (West)

CATV, Second Report & Order, Nos. 14895, 15233, 15591, 2 F.C.C.2d 725 (1966)

 128 Cong. Rec. H.322 (daily ed., Feb. 9, 1982)

General Revision of Copyright Law, Pub. L. No. 94-553, 90 Stat. 2541 (17 U.S.C. §§ 101 et seq.)

1967 House Report 35

1967 House Report 61

1971 House Report 1-2

1976 House Report 52

1976 House Report 57-58

1976 House Report 61

1976 House Report 63

1976 House Report 65

1976 House Report 66-67

1976 House Report 72-73

1976 House Report 77

1976 House Report 78

1976 House Report 86-101

1976 House Report 87

1976 House Report 93-94

1976 House Report 98

1976 House Report 101

1976 House Report 103

1976 House Report 106

1976 House Report 148

1976 House Report 162, P1

H.R. 4783, 97th Cong., 1st Sess., 127 Cong. Rec. H7504 (daily ed. Oct. 20, 1981)

H.R. 4794, 97th Cong., 1st Sess., 127 Cong. Rec. H7504 (daily ed. Oct. 20, 1981)

H.R. 4808, 97th Cong., 1st Sess., 127 Cong. Rec. H7591 (daily ed. Oct. 21, 1981)

H.R. 5250, 97th Cong., 1st Sess., 127 Cong. Rec. H9928 (daily ed. Dec. 16, 1981)

H.R. 5488, 97th Cong., 2d Sess., 128 Cong. Rec. H333 (daily ed. Feb. 9, 1982)

H.R. 5705, 97th Cong., 2d Sess., 128 Cong. Rec. H664 (daily ed. Mar. 3, 1982)

H.R. Rep. No. 83, 90th Cong., 1st Sess. 31 (1967)

H.R. Rep. No. 2237, 89th Cong., 2d Sess. 64 (1966)

H.R. Rep. No. 92-487, 92d Cong., 1st Sess. 5-6 (1971), reprinted in [1971] U.S. Code Cong. & Ad. News 1566, 1570-71

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 134 (1976), reprinted in [1976] U.S. Code Cong. & Ad. News 5659 (1976 House Report)

H.R. Rep. No. 94-1733, 94th Cong., 2d Sess. 75 (1976)

Media Statistics, Inc., Mediastat: Third Annual Diary of VCR Homes (Fall, 1981) 8120 Fenton Street, Silver Spring, Maryland

Public Law No. 92-140, 85 Stat. 391 (1971)

Register's House Statement, 4-7

Register's House Statement, 18-19

Register's House Statement, 19, 22, 25

Register's House Statement, 23

Register's Senate Statement, 4-7

Register's Senate Statement, 18-19

Register's Senate Statement, 19, 22, 25

Register's 1965 Supplementary Report 132

S. 1758, 97th Cong., 1st Sess., 127 Cong. Rec. S11810 (daily ed. Oct. 21, 1981)

S. Rep. No. 94-473, 94th Cong., 1st Sess. 71 (1975) (1975 Senate Report)

1975 Senate Report 57

1975 Senate Report 61-62, 64, 65, 66

1975 Senate Report 66

Statement of Bruce L. Christensen, President of National Association of Public Television Stations 1 (Sept. 22, 1982) to be reprinted in Hearings on Home Video Legislation before Subcommittee on Courts, Civil Liberties and Administration of Justice of the House Judiciary Comm., 97th Cong., 2d Sess.      (1982)

Statement of David Ladd, Register of Copyright and Assistant Librarian of Congress for Copyright Services 25, 29 (Apr. 21, 1982) to be reprinted in Hearings on S. 1758 before Senate Comm. on Judiciary, 97th Cong., 2d Sess.      (1982)

Statement of David Ladd, Register of Copyrights and Assistant Librarian of Congress for Copyright Services 25, 29 (June 24, 1982) to be reprinted in Hearings

on Home Video Legislation before Subcomm. on Courts, Civil Liberties and Administration of Justice of House Judiciary Comm., 97th Cong., 2d Sess.    (1982)

Statement of David Ladd, United States Register of Copyright to the American Bar Association, Patent, Trademark and Copyright Law Section (Aug. 10, 1982) reprinted in Patent, Trademark & Copyright Journal (BNA), Vol. 24, No. 593, at 421-22 (Aug. 26, 1982)

Statement of Francis S. M. Hodsall, Chairman, National Endowment for the Arts 4-5 (June 24, 1982) to be reprinted in June 24 House Committee Hearings    , 97th Cong., 2d Sess.    (1982)

Statement of Jack Valenti, President, Motion Picture Association of America, Inc. (Apr. 21, 1982) to be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess.    (1982)

Statement of Jay Eliasberg, Reseach, CBS Broadcast Group 4-5 (April 21, 1982), to be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess. (1982)

Statement of Joan Gantz Cooney, President, Children's Television Workshop 2-3 (Apr. 21, 1982) to be reprinted in April 21, Senate Committee Hearings    , 97th Cong., 2d Sess.    (1982)

Statement of MPAA, March 2, 1962 in Copyright Law Revision, Part 28 Discussion and Comments on Report of the Register of Copyrights 345, 351, 88th Cong, 1st Sess. (House Comm. Reprint) (1963)

Supplementary Report of the Register of Copyrights on the General Revision of U.S. Copyright Law: 1965 Revision Bill, Copyright Law Revision, Part 6 at 16-17, 89th Cong., 1st Sess. (1965)

Testimony of Sidney Sheinberg, President and Chief Operating Officer of MCA INC. 92-93 (Nov. 30, 1981) to be reprinted in Hearings on S. 1758 before the Senate Comm. on the Judiciary, 97th Cong., 1st Sess.    (1981)

Publications

20 Television Digest, No. 27, July 7, 1980, at 13

Wall Street Journal, Apr. 30, 1982

 Rules

Federal Rules of Civil Procedure, Rule 52

Federal Rules of Civil Procedure, Rule 52(a)

Rules of Superior Court, Rule 28.1

Rules of Superior Court, Rule 34.5

Statutes

California Civil Code, Sec. 980

Copyright Act of 1909, Pub. L. No. 60-349, Ch. 320, 35 Stat. 1075 (17 U.S.C. §§ 1 et seq.)

United States Code, Title 17, Sec. 1(f)

United States Code, Title 17, Sec. 26

United States Code, Title 17, Sec. 101

United States Code, Title 17, Sec. 101(b)

United States Code, Title 17, Sec. 102

United States Code, Title 17, Sec. 103

United States Code, Title 17, Sec. 106(1)

United States Code, Title 17, Sec. 106(4)

United States Code, Title 17, Sec. 107

United States Code, Title 17, Secs. 107-118

United States Code, Title 17, Sec. 107(2)

United States Code, Title 17, Sec. 108

United States Code, Title 17, Sec. 108(h)

United States Code, Title 17, Sec. 110

United States Code, Title 17, Secs. 110(1), (2), (3), (4), (6), (7), (8), (9)

United States Code, Title 17, Sec. 110(5)

United States Code, Title 17, Sec. 111

United States Code, Title 17, Sec. 111(c)(3)

United States Code, Title 17, Sec. 111(e)

United States Code, Title 17, Sec. 112

United States Code, Title 17, Sec. 112(a)

United States Code, Title 17, Sec. 114(a)

United States Code, Title 17, Sec. 114(b)

United States Code, Title 17, Sec. 118

United States Code, Title 17, Sec. 118(f)

United States Code, Title 17, Sec. 302(a)

United States Code, Title 17, Sec. 405(b)

United States Code, Title 17, Sec. 408(a)

United States Code, Title 17, Sec. 411(a)

United States Code, Title 17, Sec. 502(a)

United States Code, Title 17, Sec. 504(c)

United States Code, Title 35, Sec. 271

United States Code, Title 35, Sec. 271(b)

United States Code, Title 35, Sec. 271(c)

United States Code, Title 47, Secs. 151 et seq.

United States Code, Title 47, Sec. 414

Treatises

Nimmer, "The Legal Status of Home Audio Recording of Copyrighted Works" 1-2, 16-26 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings, 97th Cong., 2d Sess.   (Statement of Recording Industry Ass'n of America, et al.)

1 Nimmer on Copyright, Sec. 3.04, at 3-12 - 3-14

2 Nimmer on Copyright, Sec. 7.16[A][1], at 7-111, 7-129-30

3 Nimmer on Copyright, Sec. 12.04[A], at 12-34

3 Nimmer on Copyright, Sec. 13.05[A][2], at 13-63 (1982)

3 Nimmer on Copyright, Sec. 13.05[B], at 13-65 - 13-71

3 Nimmer on Copyright, Sec. 13.05[E][4][c], at 13-84

3 Nimmer on Copyright, Sec. 13.05[F], at 13-96, n. 159

Seltzer, L., Exemptions and Fair Use in Copyright, 24, 33-34 (1978)

Counterstatement of Questions Presented.  *


* Respondent Universal City Studios, Inc. ("Universal") is a wholly-owned subsidiary of MCA INC. ("MCA").  MCA and/or Universal have the following partially owned subsidiaries and/or affiliates within the meaning of Supr. Ct. Rule 28.1: Two-

Beat Music Corp., MCA New Ventures, Inc., Discovision Associates, Saticoy Technology, Inc., Mood Music Company, Inc., Fontaine Music Corp., Roncom Films, Inc., Supreme Music Corporation, Western Costume Co., MPD Leasehold Corp., Afram Films, Inc., American Motion Picture Export Company (Africa), Inc., Motion Picture Export Association of America, Inc., Cinema International Corporation N.V., CIC International B.V., Pincus-Gil Music Pty. Limited, Leeds Music Hans Gerig GmbH & Co. KG, Spoone Music Pty. Limited, Tangerine Music Pty. Limited, Eugene Music Limited, Evita Music Limited, Jeeves Music Limited, Rawlou Music Limited, Spoone Music Limited, Valley Music Limited, Academy Investments No. I Pty. Ltd., United Video International N.V., Regent Investments Pty. Limited, Town Cinema Investments Pty. Ltd., United International Pictures B.V., Universal-RKO, Oak Industries Joint Venture, Hotel Two Associates, T.E.M. Programs International, USA Network, Optical Programming Associates, Overland State, Inc., Thoremea Productions, Inc. and MCA Foundation, Ltd. Universal and MCA also partially own many companies and/or partnerships formed for the purpose of producing individual motion pictures and/or television programs.  These entities are not listed here because of Universal's understanding that they do not fall within the term "affiliates" as used in Rule 28.1.

   Respondent Walt Disney Productions' only partially owned subsidiary or affiliate within the meaning of Rule 28.1 is Vista-United Telecommunications, Inc.


   1.  Whether the fair use doctrine excuses unlimited home videotape recorder copying solely for purposes of entertainment and convenience of entire copyrighted motion pictures.

   2.  Whether those who manufacture, market and sell videotape recorders intending, expecting and encouraging that they be used primarily to copy entire copyrighted motion pictures are liable for such copying as contributory infringers.

   3.  Whether this Court should determine the appropriate remedy to be imposed in this case before the district court has had an opportunity to fashion a remedy on remand, and, if so, whether the district court's traditional equitable power to deny an injunction against unauthorized use of property on condition that the defendant pay compensation for such continued use is constricted in this copyright case.

   4.  Whether reversal of a district court for failing properly to apply settled legal principles violates the clearly erroneous rule of Fed. Rule Civ. Proc. 52(a).

   COUNTERSTATEMENT OF THE CASE.

   A.  Prefatory Statement.

   This is an action by two leading motion picture copyright owners, supported by virtually the entire motion picture industry and many others, n1 to protect their televised motion pictures from unlimited videotape recorder copying ("VTR copying") without compensation.  n2 Respondents simply seek protection against the permanent loss of control over their property and the concomitant erosion of their copyrights that will necessarily result as millions of VTRs are sold and hundreds of millions of unauthorized VTR copies of respondents' works are made.

n1 In addition to respondents, virtually all other producers and distributors of televised entertainment programs as well as many major producers and distributors of documentary, educational, children's and public television programming have filed objections in this action to home video recording. See Brief Amicus Curiae of Creators and Distributors of Programs in Support of Respondents; Clerk's Record ("C.R.") docket sheet p. 18, entry 190 ("18/190"), 19/191-2, 19/208.

n2 These motion pictures are very costly to produce. In 1979 respondents spent between $2,000,000 and $25,000,000 per picture to produce televised feature length motion pictures and between $400,000 and $1,500,000 per episode to produce one hour television series episodes (Reporter's Transcript ("R.") 203, 440, 1167, 1424-25). These costs have increased substantially since 1979.

Notwithstanding this inevitable detrimental impact, petitioners assert that respondents' property rights should be completely disregarded ostensibly for one overriding reason: to ensure that the public is not deprived of a new technological convenience that allegedly increases access to copyrighted material broadcast on television. n3 The premise which underlies this argument, however, is spurious.

n3 Behind this assertion -- at the heart of the case -- is petitioners' desire to reap tremendous profits from the sale of a device whose primary consumer appeal lies in its ability to reproduce copyrighted works without compensation to copyright owners (Appendix to Petition ("P.A.") 19 n. 9; see text accompanying notes 114 & 118, infra ).

Contrary to what petitioners would have this Court believe, to protect respondents' property, the sale of VTRs need not come to a halt. There are several possible remedies that could accommodate the interests of copyright owners, VTR manufacturers and the public, which, ironically, petitioners have eschewed and in fact have sought to suppress. n4 Thus, the social benefits that some segments of the public may derive from use of these machines are not necessarily jeopardized by protecting respondents' property rights. n5

n4 For example, an order requiring petitioners to pay respondents a continuing royalty for VTR sales rather than permanently enjoining such sales would accomplish this purpose (P.A. 28-29). So too would an order requiring a technological modification of VTRs which prevents recording of respondents' copyrighted programs (and those of other objecting program owners) but permits recording of all other programs (P.A. 103; R. 3159-71; Appellants' Opening Ninth Circuit Brief 58-59).

Rather than support a continuing royalty, petitioners assert that this Court should prohibit such a remedy (Brief for Petitioners ("P.B.") 45-46). Similarly, after learning of a technological system which would prevent VTR copying of copyrighted programs, Sony immediately studied and discovered a method of overcoming this system and objected to introduction of evidence of the system at trial (R. 1781-84, 1802-03, 3159-71; Plaintiffs' Exhibit ("PX") 986-87 *).

  \* Each trial exhibit referred to herein is listed in numerical order in Appendix A hereto.  The pages in the record at which each exhibit was identified and admitted are also set forth in the Appendix pursuant to Supr. Ct. Rule 34.5.


  n5 Given the expense of VTRs ($875 to $1000 at the time of trial, P.A. 40), not all members of the public can afford to purchase these devices.  Thus, the persons most likely to benefit from the use of VTRs are primarily the affluent. See PX 730 (Table 19); Defendants' Exhibit ("DX") OT (Table 77).


  In contrast, if petitioners are permitted to continue their activities without compensating respondents and others similarly situated, public access to television programming, far from increasing, will actually diminish.  For, without some mechanism to compensate copyright owners for the unlimited taking and unsupervised use of their creative property, the economic incentive to risk enormous sums to produce high-quality television programming will be substantially undermined.  n6 This in turn will result in the production of cheaper, lower-quality television programs and a refusal to license popular, top-quality theatrical motion pictures for exhibition and "free" viewing on commercially sponsored television, thereby prejudicing the entire television viewing public, VTR and non-VTR owners alike.  n7


  n6 Statement of David Ladd, Register of Copyrights and Assistant Librarian of Congress for Copyright Services 25, 29 (June 24, 1982), to be reprinted in Hearings on Home Video Legislation before the Subcomm, on Courts, Civil Liberties and Administration of Justice of the House Judiciary Comm., 97th Cong., 2d Sess. (1982) ("June 24 House Committee Hearings") ("Register's House Statement"); Statement of David Ladd, Register of Copyrights and Assistant Librarian of Congress for Copyright Services 25, 29 (Apr. 21, 1982), to be reprinted in Hearings on S. 1758 before the Senate Comm. on the Judiciary, 97th Cong., 2d Sess.    (1982) ("April 21 Senate Committee Hearings") ("Register's Senate Statement"); Statement of Jack Valenti, President, Motion Picture Association of America, Inc. 3 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings  , 97th Cong., 2d Sess. (1982) ("Valenti Statement"); Statement of Francis S.M. Hodsall, Chairman, National Endowment for the Arts 4-5 (June 24, 1982), to be reprinted in June 24 House Committee Hearings    , 97th Cong., 2d Sess.    (1982) ("Hodsall Statement"); Testimony of Sidney Sheinberg, President and Chief Operating Officer of MCA INC. 92-93 (Nov. 30, 1981) (unofficial transcript), to be reprinted in Hearings on S. 1758 before the senate Comm. on the Judiciary, 97th Cong., 1st Sess.    (1981).

  n7 R. 263-67, 1200-01; H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. 134 (1976), reprinted in [1976] U.S. Code Cong. & Ad. News 5659 ("1976 House Report") ("[i]n some cases the lack of copyright protection actually restrains dissemination of the work, since publishers and other users cannot risk investing in the work unless assured of exclusive rights."); Statement of Bruce L. Christensen, President of the National Association of Public Television Stations 1 (Sept. 22, 1982), to be reprinted in Hearings on Home Video Legislation before the Subcomm. on Courts, Civil Liberties and Administration of Justice of the House Judiciary Comm., 97th Cong., 2d Sess.    (1982); Valenti Statement, supra note 6, at 15-16; Statement of Joan Ganz Cooney, President, Children's Television Workshop 2-3 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess.    (1982);

Hodsall Statement, supra note 6, at 4-5.

B.  The Parties and the Products at Issue.

Respondents produce, own and license for television exhibition thousands of motion pictures.  n8 Petitioners manufacture, advertise and sell VTRs under the brand name Betamax for the primary purpose of making copies of copyrighted television programming, especially copyrighted motion pictures owned by respondents and amici. n9 This use is advertised, intended, expected and encouraged by petitioners, and is the source of the VTR's consumer appeal.  n10

n8 (P.A. 37-39).  Respondents produce two types of motion pictures, those made initially for theater exhibition ("theatrical motion pictures") and those made for initial television exhibition, including television series episodes. After theater exhibition, most of respondents' theatrical motion pictures are licensed for exhibition on pay television, then on network television and finally on local stations.  Respondents' motion pictures made for television are first exhibited on prime time network television, and if successful are re-licensed to the networks and then licensed for exhibition on local stations (P.A. 36-39).

Petitioners also sell and rent to the public copies of many of their motion pictures on pre-recorded video cassettes and video discs which can be viewed on a home television screen with the aid of a video cassette or video disc player. In addition, petitioners rent prints and sell excerpts of their motion pictures to the public (P.A. 36-39; 20 Television Digest, No. 27, July 7, 1980, at 13).

Since motion pictures rarely recoup their costs from initial theatrical or network exhibition, the subsequent markets in which those works are exploited -- the very markets most seriously threatened by VTR copying -- are essential to the continued health of the motion picture industry (P.A. 37, 39); R. 204-05, 250-58, 260-62, 274-77, 323-24, 440-41, 451-55, 539, 991-1002, 1169-70; Valenti Statement, supra, note 6, at 11-12.

n9 P.A. 26, 27; R. 1776-79, 1820-21, 1852-53, 1966, 1968, 2077-80, 2094-95; PX 143, 648-49, 716 (p. 8), 723 (p. 2), 1063, P5.  Most Betamax models have a built-in television tuner that permits Betamax to record off-the-air. Petitioners also sell some models without built-in tuners that can record off-the-air with a separate outboard tuner and that can make home movies with a video camera (P.A. 40; R. 735-37).  In addition, petitioners sell other models which cannot record, but can only play back prerecorded cassettes (PX 552). Respondents do not object to the sale of models without built-in tuners, but do object to the sale without compensation to copyright owners of separate outboard tuners for off-the-air recording of their property.

n10 P.A. 27, 41-42, 96-97; PX 454, 460, 461, 463, 466, 519, 546, (pp. 2-3), 548, 554 (p. 8); see note 9, supra. Petitioners err in stating that VTRs have been sold for home recording continuously since 1965 (P.B. 3).  Indeed, Sony's officers admitted that prior to introducing Betamax in late 1975, all attempts to sell home use VTRs failed (R. 1777, 1789-92, 1840, 2018-19, 2058-61, 2140-41; PX 109-14, 716 (p. 4); Pre-Trial Conference Order, C.R. 22/68, p. 9, PPT, U).

VTR owners engage in several types of recording and playback activities. First, the majority collect large libraries of VTR recordings, including recordings of motion pictures owned by respondents, which are saved indefinitely for unlimited repeat viewings (P.A. 43-48).  In fact, at the time of trial the average Betamax owner owned approximately 30 Betamax tapes (P.A. 47).  n11 Second, Betamax owners time-shift, i.e., they record for later viewing television programs which they do not watch at the time of broadcast.  n12 Third, because VTR copies do not self-erase, many Betamax owners view time-shift recordings several times before erasure, thereby effectively using these recordings for library purposes.  n13 Fourth, Betamax owners regularly delete commercials from their recordings.  n14

n11 Petitioners' statements that "[t]here was no evidence of any librarying of any work of respondents" and that "this case is only time shift" (P.B. 5; Petition 17) are grossly inaccurate.  The district court expressly found pervasive librarying activities, and the uncontroverted survey evidence established that 69% to 75% of all Betamax owners maintain large libraries of off-the-air recordings and that the vast majority of programs in those libraries are copyrighted motion pictures (P.A. 43-48; PX 717 (pp. 0619, 0636, 0637), PX 730 (Tables 6A, 10), DX OS (Tables 4, 6, 7).  See DX OT (Table 60).  If Betamax were merely a "time-shift" machine, consumers would need only a handful of tapes -- not 30 -- because tapes are eraseable and reusable.

n12 The time-shift concept assumes that Betamax owners voluntarily erase time-shift recordings immediately after they are played back and viewed once (P.A. 111; P.B. 4-5).  Subsequent erasure of these recordings does not, however, alter the fact that they -- like library recordings -- constitute illegal copies under the Copyright Act.

n13 P.A. 111; DX OT (Table 43).

n14 P.A. 48; P.B. 14 n. 19.  Deletion of commercials is accomplished with either Betamax' pause control, which petitioners admit is designed primarily to avoid recording commercials, or the fast forward control, which permits Betamax owners to skip over recorded commercials on playback (P.A. 41; R. 822-26, 1779, 1795-96, 1827-29; PX 559 (P51), 1063 (P6(b)); see P.B. 3 n. 3).

Deleting commercials is a very significant activity.  The surveys unanimously show that from 40% to 85% of all VTR recordings are viewed without commercials (PX 717 (pp. 0391, 0515, 0630, 0713), PX 730 (Tables 11, 12), DX OT (Table 38); R. 2390-91; Media Statistics. Inc., Mediastat: Third Annual Diary of VCR Homes, Fall, 1981, 8120 Fenton Street, Silver Spring, Maryland.

Petitioners mislead the Court in stating that over 95% of all television programming is "available for unchallenged home recording" (P.B. 4, 29, 40). n15 Virtually all programs broadcast on television are protected by federal or state law from unconsented VTR copying.  (See note 110, infra ).  Furthermore, over 80% of the material copied is entertainment programming, the bulk of which is owned by respondents and supporting amici, all of whom -- along with many educational producers, also amici -- object to such copying.  (See notes 112, 114, 116 & accompanying text, infra ).  Moreover, despite the contrary position taken by petitioners in this litigation, they have always believed that home video recording

violates the Copyright Act.  n16


   n15 Petitioners make these statements without any citation to supporting facts or authority and in total disregard of copyright law.  (See notes 110, 112, 114-16 & accompanying text, infra ).

   n16 See note 95, infra. Indeed, the advertisements, brochures and operating instructions for VTRs sold by Sony prior to introducing Betamax stated: "THIS VIDEOTAPE RECORDER IS NOT TO BE USED TO RECORD COPYRIGHTED MATERIAL" (R.T. 638-44, 921-24; PX 147-52, 155-70, 228, 252, 253, 326, 328-30, 448-49, 452-53).


   C.  The Proceedings Below.

   Respondents brought this action alleging that VTR copying constitutes copyright infringement and that petitioners are liable for such infringement under the doctrines of contributory infringement, direct infringement, vicarious liability and unfair competition (P.A. 54, 101).  n17 Respondents sought equitable and monetary relief, electing prior to trial to recover statutory damages in lieu of actual out of pocket damages or petitioners' profits.  n18


   n17 The action was brought pursuant to both the Copyright Act of 1909, Pub. L. No. 60-349, ch. 320, 35 Stat. 1075, 17 U.S.C.  §§ 1 et seq. (superseded 1978) ("1909 Act") and the General Revision of Copyright Law, Pub. L. No. 94-553, 90 Stat. 2541, 17 U.S.C.  §§ 101 et seq. ("1976 Act").

   n18 See 1909 Act § 101(b); 1976 Act § 504(c); R. 69-70, 3265-68; C.R. 28/88, pp. 65-66.


   Since respondents had the absolute statutory right to make this election (Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1178-79 (9th Cir. 1977); 17 U.S.C.  § 504(c); 1976 house Report 162, P1), they did not attempt to prove their actual out of pocket damages or petitioners' profits. Petitioners' statement that respondents "admitted at trial that they had suffered no damage of any kind to date... because of home Betamax recording" (P.B. 13) is incorrect.  Due to the small number of Betamax which had been sold by the time of trial (only 130,000 units representing less than 1/5 of 1% of the 73 million television households then in the United States, PX 124, 1068), respondents were unable to measure the amount of harm which they had suffered from unknown VTR copies. Respondents, however, adamantly maintained that such harm had in fact occurred through, among other things, loss of the value of each unauthorized VTR copy and loss of control over access to respondents' copyrighted works.  Respondents also vigorously urged that such harm will be extensive in the future (P.A. 76-77; R. 263, 288-94, 394, 513-15, 542-44, 1206-08, 1256-57, 1284-87, 1370-71, 1475, 1493-94, 2281-89).


   The district court (Ferguson, J.) found for petitioners, holding that VTR copying for private viewing is impliedly excepted from the express statutory prohibition in the 1976 Act against unauthorized copying (P.A. 57-65) n19 and, alternatively, that such

copying is permitted by the fair use doctrine (P.A. 66-87).  The district court further
concluded that even if VTR copying constitutes infringement, petitioners are not
liable for such infringement (P.A. 89-102) and, even if they are liable, respondents
are entitled to no relief (P.A. 102-15).  The latter two holdings were based primarily
on the district court's analogy to the patent statute's staple article of commerce
doctrine and the court's conclusion that VTRs are staple articles of commerce capable
of some non-infringing uses (P.A. 92, 97, 104, 114).  Importantly, however, and
contrary to petitioners' assertion (P.B. 19, 40), the court refused to find that VTRs
are suitable for substantial non-infringing uses (P.A. 97, 114).

   n19 The district court did not find an implied statutory exemption in the 1909 Act
(P.A. 14, 56-57).


   The Court of Appeals (Kilkenny, J.) unanimously reversed the district court in all
respects, ruling that based on the facts found by the district court and petitioners'
admissions, the district court's decision was incorrect as a matter of law.  The Ninth
Circuit first held that under the unambiguous language and legislative history of the
Copyright Act, VTR copying constitutes copyright infringement and that the district
court contravened Congressional intent in finding -- separate and apart from the fair
use doctrine -- an implied exception to the statutory prohibition against unauthorized
copying (P.A. 4-12).  n20


   n20 Petitioners now concede that the 1976 Act does not contain such an implied
statutory exemption (see P.B. 20-21, 23, 33, 39).  In this Court petitioners rely
entirely on the fair use doctrine to support their contention that VTR copying does
not constitute copyright infringement (P.B. 20-39).


   Relying on two independent grounds, the Court of Appeals next ruled that the
district court erred in concluding that VTR copying constitutes fair use (P.A. 12-25).
The Court of Appeals initially held that since the fair use defense may be invoked
only if an unauthorized use involves creation of new works, and VTR copying does
not involve such independent creation, VTR copies do not qualify as fair use (P.A. 14-
18).  Alternatively, the Court held that the district court erred in its application of the
four fair use criteria set forth in § 107 of the 1976 Act, and concluded that, properly
applied, these criteria require rejection of the fair use defense (P.A. 18-25).  n21


   n21 The Court of Appeals first held that the fact that VTR copies are made merely
for convenience weighs against the fair use defense.  In so ruling, the Court rejected
the district court's view that because VTR copying allegedly increases access to
broadcast material this non-productive copying constitutes fair use (P.A. 19).  The
Court of Appeals then ruled that the expense and the creative and entertainment
nature of respondents' motion pictures tip strongly against the fair use defense,
rejecting the district court's conclusion that VTR copying is justified because
respondents' works are presented through the broadcast medium (P.A. 20-21).  The
Court of Appeals next held that the fact that VTR copying generally involves copying
the entire work weighs against the fair use defense (P.A. 21-22).  Finally, as to the
effect of VTR copying on the potential market for or value of respondents' works, the
Court held that the district court erred in (a) placing the burden of proving this

element of the defense on respondents rather than on petitioners, (b) applying an incorrect legal standard and (c) failing to recognize that under the correct standard, the requisite potential adverse impact exists as a matter of law (P.A. 22-25).

The Court of Appeals next ruled that the district court erred in concluding that petitioners are not liable as contributory infringers (P.A. 25-27).  n22 In so ruling, the Ninth Circuit held that the district court misinterpreted the knowledge requirement of the contributory infringement doctrine and misapplied the staple article of commerce rationale.  n23 The Court of Appeals then concluded that under the proper legal test, petitioners' admitted activities constitute contributory infringement as a matter of law (P.A. 27).  n24

n22 The Court of Appeals did not consider respondents' contentions that petitioners are also liable under the doctrines of direct infringement, vicarious liability and unfair competition.  These issues are therefore not before this Court.  See Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 102 S.Ct. 2182, 2190 (1982).

n23 The Court of Appeals held that the district court erred in refusing to hold petitioners liable merely because VTRs may have some non-infringing uses, stressing that any such non-infringing uses can be accommodated in this copyright case by fashioning appropriate relief (P.A. 25-26, 28).  The Court of Appeals further held that since any such uses are not substantial, the staple article doctrine is inapplicable (P.A. 25-26).

n24 In so ruling, the Court of Appeals relied on the district court's findings and petitioners' admissions that (a) Betamax is manufactured, advertised and sold for the primary purpose of reproducing television programming, (b) petitioners' advertisements exhort such copying, (c) Betamax in fact contributes to VTR copying, and (d) petitioners knew that Betamax would be used to copy copyrighted works, including works produced by respondents (P.A. 41-42, 96-97; see notes 91, 92, 95, 99 & accompanying text, infra ).

Finally, the Court of Appeals remanded the case to the district court to fashion an appropriate remedy, observing that a continuing royalty may be an appropriate "resolution in this context" (P.A. 28-29).  In so doing, the Court of Appeals noted that the "district court is in a better position [than the Court of Appeals] to resolve, in an appropriate fashion, the relief question" and therefore declined to direct the entry of any particular type of relief on remand (P.A. 28).
D.  Congressional Reaction to the Court of Appeals' Decision.

In response to the Court of Appeals' decision, several bills were introduced in Congress dealing with home video recording.  The initial bills seek to exempt home video recording from copyright liability without compensating copyright owners.  n25 These bills would essentially overturn the decision below.  Several subsequent bills, while completely exempting VTR owners from liability, would exempt VTR manufacturers and distributors only if they pay compulsory royalty fees to copyright owners.  n26 These latter bills, which are supported by the United States Copyright Office, n27 would modify the decision below and retain copyright protection against mass uncompensated VTR copying.  Versions of all bills are expected to be re-introduced when the Ninety-eighth Congress convenes in January, 1983.

n25 S. 1758, 97th Cong., 1st Sess., 127 Cong. Rec. S11810 (daily ed. Oct. 21, 1981); H.R. 4783, 97th Cong., 1st Sess., 127 Cong. Rec. H7504 (daily ed. Oct. 20, 1981); H.R. 4794, 97th Cong., 1st Sess., 127 Cong. Rec. H7504 (daily ed. Oct. 20, 1981); H.R. 4808, 97th Cong., 1st Sess., 127 Cong. Rec. H7591 (daily ed. Oct. 21, 1981); H.R. 5250, 97th (Cong., 1st Sess., 127 Cong. Rec. H9928 (daily ed. Dec. 16, 1981).

n26 Amendment No. 1242 to S. 1758, 97th Cong., 1st Sess., 127 Cong. Rec. S15723-24 (daily ed. Dec. 16, 1981); Amendment No. 1331 to S. 1758, 97th Cong., 2d Sess., 128 Cong. Rec. S. 1287-90 (daily ed. Mar. 1, 1982); Amendment No. I333 to S. 1758, 97th Cong., 2d Sess., 128 Cong. Rec. S1675 (daily ed. Mar. 4, 1982); H.R. 5488, 97th Cong., 2d Sess., 128 Cong. Rec. H333 (daily ed. Feb. 9, 1982); H.R. 5705, 97th Cong., 2d Sess., 128 Cong. Rec. H664 (daily ed. Mar. 3, 1982).

n27 Register's House Statement, supra note 6, at 4-7; Register's Senate Statement, supra note 6, at 4-7.

SUMMARY OF ARGUMENT.

The Ninth Circuit correctly held that home VTR copying violates the Copyright Act and that petitioners are contributory infringers.  This result is compelled by the language, structure and legislative history of the Act and time-honored principles protecting copyrighted works.

I.

The purpose of the fair use doctrine is to promote creativity in areas of universal social concern such as criticism, scholarship or research by permitting authors to make limited use of the works of others in creating new works.  The fair use defense thus may be invoked only where the unauthorized activity results in the creation of new works.  Since home VTR copying involves no independent creativity and therefore does not meet the fundamental justification for the fair use defense, the defense is inapplicable.

Even if this lack of independent creation were overlooked, home VTR copying would not satisfy the four statutory criteria used to determine whether a given use is fair (17 U.S.C.  § 107).  This copying is merely for the convenience of the viewer, is not for a traditionally accepted purpose such as criticism, comment, news reporting, teaching, scholarship or research, involves taking entire works which are entertainment -- rather than informational -- in nature, and results in the making of an unlimited number of copies (often without the accompanying broadcast commercials) which serve the same function as and compete with the copyrighted originals.  Under established case law interpreting the four fair use criteria, these characteristics individually and collectively require rejection of the fair use defense.

Nor does federal communications policy support petitioners' central argument that because VTR copying increases access to works broadcast on the public airwaves, settled fair use principles should be disregarded.  This argument, which would essentially override all statutory copyright protection for televised works, has been categorically rejected by Congress as well as by this Court.

Moreover, the overall statutory scheme and legislative history of the 1976 Act demonstrate special concern for the protection of motion pictures and overwhelmingly refute petitioners' contention that Congress intended home VTR copying of these works to be fair use.  Accordingly, the Court of Appeals' rejection of the fair use defense was proper in all respects.

II.

A contributory infringer is one who knowingly induces, causes, furthers or materially contributes to the infringing activity of another.  This test is satisfied here. Given the district court's findings and petitioners' admissions that petitioners manufacture, advertise and sell Betamax for the primary purpose of reproducing programming from television, especially copyrighted motion pictures, that Betamax sales contribute to such copying, that petitioners know and intend that Betamax will be used to copy copyrighted works owned by respondents and others, and that petitioners actively encourage such infringing activity through their advertisements, brochures and instruction manuals, the Court of Appeals was compelled under established authority to hold petitioners liable as contributory copyright infringers.

Petitioners' reliance on the patent law's staple article of commerce doctrine to shield them from contributory copyright infringement liability is misplaced. Petitioners predicate their staple article argument on their belief that it would be difficult or impossible to devise a remedy in this case without unjustifiably inhibiting alleged non-infringing uses of VTRs.  However, once liability is established under accepted legal principles, it is impermissible to deny relief merely because the fashioning of an appropriate remedy may be difficult.  Moreover, there are remedies, such as a continuing royalty, that can accommodate any potential non-infringing uses.  The staple article of commerce theory is also inapposite because it is found in the patent statute -- not the copyright statute -- and represents a legislative balance of competing considerations unique to patent law.

Even if it were proper in a copyright case to analogize to the staple article doctrine, that doctrine would not absolve petitioners of liability here.  The staple article theory shields the seller of a staple article from contributory infringement liability only if (a) the seller does not actively cause, urge, encourage or aid purchasers to use the article for infringing purposes, and (b) the article is suitable and actually used for substantial non-infringing uses.  The uncontroverted evidence and the district court's findings establish both that petitioners cause, urge, encourage and aid infringing VTR copying and that VTRs do not have actual, substantial non-infringing uses. Accordingly, the Court of Appeals properly rejected the staple article argument.

III.

Since the district court has not yet considered the remedy question, it would be premature for this Court to do so without the benefit of a factual record. In any event, general equitable principles incorporated in the Copyright Act as well as specific provisions of that Act make clear that the district court has the authority to impose a continuing royalty in lieu of an injunction.

IV.

The "clearly erroneous" standard of Fed. Rule Civ. Proc. 52(a) does not apply to

review of a district court's legal conclusions drawn from facts found at trial.  Since the Court of Appeals merely held that the facts found by the district court did not support the legal conclusions which the district court drew therefrom, Rule 52(a) is inapplicable.

TEXT: ARGUMENT.

 I.

 VTR COPYING DOES NOT CONSTITUTE FAIR USE.

 The Court of Appeals relied on two independent grounds in ruling that VTR copying does not constitute fair use.  First, it held that infringing activity such as VTR copying which does not involve a "productive use" -- i.e., a use of the copyrighted original to create a new work -- can never constitute fair use (P.A. 14-18).  Alternatively, the Court held that even if the non-productive character of VTR copying were overlooked, a balancing of the traditional four fair use criteria codified in § 107 of the 1976 Act requires rejection of the fair use defense (P.A. 18-25).

 Petitioners seek to overturn each of these holdings, asserting that independent creativity is not necessary to establish the fair use defense and that the Court of Appeals erred in its analysis of the traditional four fair use factors.  However, the Ninth Circuit's determination that VTR copying is not fair use is fully consistent with all applicable statutory and judicial authorities.  n28


 n28 Section 107 of the 1976 Act is a codification of the judicially created fair use doctrine.  1976 House Report 65.  The 1976 Act "endorses the purpose and general scope of the judicial doctrine" and does not "change, narrow, or enlarge it in any way." Id. at 66.  The fair use question in this action therefore must be resolved according to settled principles of fair use case law.
A.  VTR Copying Is Not Fair Use Because It Does Not Involve Independent Creation.

 The district court found that "in this case there is no independent use. Betamax owners use the copy for the same purpose as the original.  They add nothing of their own" (P.A. 81).  The Court of Appeals called this use "intrinsic use," meaning that it does not result in the creation of new intellectual works (P.A. 15-18).  The Court of Appeals correctly reasoned that such non-productive use does not qualify as fair use because it does not fulfill the underlying purpose of the fair use doctrine (P.A. 15-18).

 Petitioners' characterization of this holding as "inflexible" and "contrary to the spirit of § 107" (P.B. 29) manifests a fundamental misconception of the limited purpose and scope of fair use.  The doctrine is not an omnibus defense applicable in all contexts.  It is available only in those few situations where rigid application of the copyright statute "would stifle the very creativity which that law is designed to foster." n29 Thus, application of the fair use doctrine is limited to uses by subsequent authors who build on the works of others to create new works.  n30 Without some independent creation, there can be no fair use.  n31


 n29 Iowa State University Research Foundation v. ABC, 621 F.2d 57, 60 (2d Cir. 1980); Rubin v. Boston Magazine Co., 645 F.2d 80, 83 (1st Cir. 1981).

n30 Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 307 (2d Cir. 1966); L. Seltzer, Exemptions and Fair Use in Copyright 24 (1978) ("Seltzer").  See Elsmere Music v. NBC, 623 F.2d 252, 253 n. 1 (2d Cir. 1980) (per curiam).

n31 Wainwright Secs. Inc. v. Wall Street Transcript Corp., 558 F.2d 91, 94, 96-97 (2d Cir. 1977), cert. denied, 434 U.S. 1014 (1978); Benny v. Loew's, Inc., 239 F.2d 532, 536 (9th Cir. 1956), aff'd by equally divided court, 356 U.S. 43 (1958); Seltzer, supra, at 24.

In holding that VTR copies do not constitute fair use, the Court of Appeals correctly recognized the limits of the fair use doctrine.  n32 Since VTR copies involve no independent creation, they simply do not fall within "the fundamental justification for the [fair use] privilege... to wit, 'to promote the progress of science and the useful arts.'" Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d at 307; Rubin v. Boston Magazine Co., supra, 645 F.2d at 83.  Where, as here, this fundamental purpose is not fulfilled, the fair use defense may not be invoked (P.A. 15-18).

n32 Williams & Wilkins Co. v. United States, 487 F.2d 1345 (Ct. Cl. 1973), aff'd by equally divided court, 420 U.S. 376 (1975), relied upon by petitioners, did not expand application of the fair use doctrine beyond these limits.  In Williams & Wilkins, the Court of Claims held that library photocopying by the Government of individual articles from copyrighted medical journals was fair use.  Despite petitioners' contrary assertion (P.B. 27), this copying was not an intrinsic use. Although nothing new was added to the copies at the time they were made, they were subsequently used for medical research purposes and thus constituted a permissible productive use.  For this reason, the Court of Appeals found Williams & Wilkins "clearly distinguishable" from the instant case (P.A. 16-17).  The district court agreed, stating that Williams & Wilkins "has little precedential value" and is "specifically limited to its unique factual situation" (P.A. 73).  Accord, S. Rep. No. 94-473, 94th Cong., 1st Sess. 71 (1975) ("1975 Senate Report").

B.  Under a Balancing of the Four Fair Use Criteria VTR Copying Is Not Fair Use.

The Court of Appeals did not, as petitioners suggest (P.B. 28-29), end its fair use analysis after concluding that VTR copying constitutes impermissible non-productive use.  Rather, the Court went on to consider each of the four fair use factors listed in § 107 (P.A. 18-25).  Its conclusion that each of these factors requires rejection of petitioners' fair use defense is correct in all respects.

1.  Purpose and Character of the Use.

The fair use doctrine was developed to promote the "public's interest in dissemination of information affecting areas of universal concern, such as art, science, history, or industry." n33 Accordingly, as recognized by both courts below, the purpose and character of the use factor has traditionally been analyzed by determining whether the copyrighted material is used for criticism, scholarship, news reporting or other utilitarian purposes (P.A. 19, 81).  n34 Because VTR copies do not involve a traditionally accepted purpose, the Court of Appeals determined that this factor weighs against a finding of fair use (P.A. 19).  This conclusion is further

necessitated by the fact -- conceded by petitioners and acknowledged by the district court (R. 965; PX 113, P3; P.A. 82) -- that VTR copies are made for entertainment and convenience.  Congress made clear in passing the 1976 Act that off-the-air recording merely for convenience cannot under any circumstances be fair use.  n35


   n33 Meeropol v. Nizer, 560 F.2d 1061, 1068 (2d Cir. 1977), cert. denied, 434 U.S. 1013 (1978); Wainwright Secs. Inc. v. Wall Street Transcript Corp., supra, 558 F.2d at 94.

   n34 Indeed, the defense has previously been allowed only when the unauthorized use is for a purpose such as criticism, comment, news reporting, scholarship or research.  E.g., Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171 (5th Cir. 1980) (use for comparative advertising); Williams & Wilkins Co. v. United States, supra, 487 F.2d 1345 (use for medical research); Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d 303 (use for preparation of biography); Berlin v. E.C. Publications, Inc., 329 F.2d 541 (2d Cir. 1964) (use for parody); see H.R. Rep. No. 83, 90th Cong., 1st Sess. 31 (1967) ( § 107 is intended "to characterize a fair use as generally being 'for purposes such as criticism, comment, news reporting, teaching scholarships or research'") ("1967 House Report").

   n35 1975 Senate Report 66 ("[t]he Committee does not intend to suggest however, that off-the-air recording for convenience would under any circumstances, be considered 'fair use'").  Cf.  F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, 214 U.S.P.Q. (BNA) 409, 415 (7th Cir. Mar. 25, 1982) ("[a] copyright owner is not required to market its copyrights in a form most convenient to its customers").


   The district court disregarded the foregoing authorities based on its findings that VTR copying (1) takes place in the home, (2) for non-commercial purposes, (3) allegedly to increase access to television broadcasts (P.A. 81-82).  In reversing, the Court of Appeals correctly held that these attributes do not render VTR copying fair use.

   That VTR copies are generally made in the home has no relevance in assessing the first fair use factor.  The purpose, character and effect of VTR copying by an individual in the home are no different from the purpose, character and effect of copying by the same individual outside the home.  Moreover, as the Court of Appeals ruled, any privacy concerns raised by the "in home" locus of VTR copying may appropriately be considered in fashioning the remedy; but these concerns do not justify a blanket fair use exemption from liability (P.A. 19). For, it is settled that Congress may validly prohibit the unauthorized taking and retention of property, including films and tapes, in homes.  n36


   n36 (P.A. 65); Stanley v. Georgia, 394 U.S. 557, 568 n. 11 (1969).  This Court has made clear that the constitutional right of privacy encompasses "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty'...." Roe v. Wade, 410 U.S. 113, 152 (1973).  The making of unauthorized recordings of copyrights works obviously is not such a fundamental right.

Similarly, the fact that VTR copies may be used generally for non-commercial private playbacks (i.e., private performances) does not render VTR copying permissible (P.A. 19).  It is true that private performances do not constitute copyright infringement.  See 17 U.S.C.  § 106(4).  However, the right to perform a copyrighted work privately "contemplates that the... work is performed from memory or from legal copies.  Neither the [in home] element nor the non-profit element of a performance will protect illegal copying...." n37

n37 F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago, supra, 214 U.S.P.Q. at 411 (emphasis added).  As both courts below recognized, a non-profit motive, although relevant, is not sufficient in and of itself to establish fair use (P.A. 19 n. 9, 81; see 1976 House Report 66).

Petitioners' additional claim that VTR copying is immune from liability because it is merely a mechanical step for later viewing is also unpersuasive. All unauthorized reproductions are for subsequent viewing or reading.  Thus, this characteristic actually highlights that VTR copying is no different from any other infringing copying.

Finally, that VTR copying purportedly increases access to broadcast works does not justify such copying as fair use.  n38 In the courts below, petitioners based their access argument primarily on the First Amendment, contending that the First Amendment guarantees the greatest possible access to reception of ideas even if this reception involves taking entire copyrighted works (P.A. 19, 82).  The Court of Appeals rejected this argument, reasoning that "'[t]he first amendment is not a license to trammel on legally recognized rights in intellectual property'" (P.A. 19) (quoting Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184, 1188 (5th Cir. 1979)).  In so ruling, the Court of Appeals followed an unbroken line of authority holding that the First Amendment is no defense to copying of entire copyrighted works, including works broadcast on television.  n39 This result obviously is correct if the Copyright Act is to have any vitality whatsoever: copyright protection by definition inhibits access.  n40

n38 The assumption underlying the increased access argument -- that VTRs are used exclusively to permit viewing of broadcasts of copyrighted works which would otherwise be missed -- is factually inaccurate.  According to petitioners' own survey, 17.6% of Betamax recordings are made while Betamax owners are watching the live broadcast of the show being recorded (P.A. 48; DX OT (Table 16)).  Since those owners view the original broadcast, they obviously do not need to make simultaneous recordings to obtain "access." The survey also shows that over 41% of Betamax recordings have been or will be viewed more than once (DX OT (Table 43)).  Other surveys in evidence establish that most Betamax owners retain off-the-air recordings in home video libraries (see note 11, supra ).  Multiple replays and retention of library recordings are certainly not necessary for "access." Thus, despite petitioners' contrary suggestion (e.g., P.B. 5), this case involves far more than simply time-shifting for purposes of increased access.

n39 Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 577 n. 13 (1977) ("Zacchini"); Roy Export Co. v. CBS, 672 F.2d 1095, 1099-1100 (2d Cir.), cert. denied, 51 U.S.L.W. 3254 (U.S. Oct. 5, 1982) (No. 81-2111); Walt Disney Prods, v. Air Pirates, 581 F.2d 751, 758-59 (9th Cir. 1978), cert. denied, 439 U.S. 1132

(1979); Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., supra, 562 F.2d at 1171; Wainwright Secs. Inc. v. Wall Street Transcript Corp., supra, 558 F.2d at 95; Encyclopaedia Britannica Educational Corp. v. Crooks, 542 F.Supp. 1156, 1180-81 (W.D.N.Y. 1982) ("Encyclopaedia Britannica II"). See Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., supra, 626 F.2d at 1178-82 (Brown, J., concurring in part and dissenting in part).

n40 E.g., Fox Film Corp. v. Doyal, 286 U.S. 123, 127 (1932) ("[t]he owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property"); Iowa State University Research Foundation, Inc. v. ABC, Inc., supra, 621 F.2d at 62.


Apparently recognizing the futility of their First Amendment argument, petitioners now contend that their increased access justification for the fair use defense, although carrying First Amendment overtones, lies primarily in the national public policy underlying the Communications Act of 1934, 47 U.S.C. §§ 151 et seq. (P.B. 24-27). In short, petitioners argue that national communications policy overrides statutory copyright protection against unauthorized copying of copyrighted works. The argument lacks merit. n41


n41 The argument is based on a patchwork of statements by this Court having nothing to do with the effect of federal, communications policy on copyright law. Most of the cases relied upon by petitioners do not even involve copyright. Virtinia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976); CBS, Inc. v. Democratic Nat'l Comm., 412 U.S. 94 (1973); Kleindienst v. Mandel, 408 U.S. 753 (1972); Red Lion Broadcasting Co. v. FCC, 395 U.S. 367 (1969); NBC v. United States, 319 U.S. 190 (1943).

Furthermore, the few copyright cases mentioned by petitioners (Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390 (1968); Teleprompter Corp. v. CBS, Inc., 415 U.S. 394 (1974); Twentieth Century Music Corp. v. Aiken, 422 U.S. 151 (1975)) all involve public performance of copyrighted works, not copying, and with one exception (see note 42 & accompanying text, infra ) do not address the interrelationship between copyright law and federal communications policy. These cases -- none of which involves the fair use doctrine -- merely hold that certain retransmissions of broadcast television and radio signals did not constitute public performances under the 1909 Act. Congress, however, overruled or severely restricted application of each of these cases in the 1976 Act. 17 U.S.C. §§ 110(5), 111; 1976 House Report 63, 87, 86-101; H.R. Rep. No. 94-1733, 94th Cong., 2d Sess. 75 (1976) ("Conference Report"). Moreover, these cases were all based on the fact that the retransmissions at issue merely permitted simultaneous viewing and hearing of broadcast television and radio signals by the public. 392 U.S. at 399-400; 415 U.S. at 408; 422 U.S. at 157-61. In contrast, VTRs interrupt the instantaneous process of broadcasting and simultaneous viewing and replace it with a system of copying, storage, retrieval and multiple playbacks. Thus, contrary to petitioners' assertion (P.B. 18, 25), VTRs do not simply "enhance television reception." VTRs make copies, an activity neither considered nor condoned by Fortnightly and its progeny. This important distinguishing characteristic has been held to make the Fortnightly rationale inapplicable to VTR use. Walt Disney Prods. v. Alaska Television Network, Inc., 310 F.Supp. 1073 (W.D. Wash. 1969).

The issue raised by petitioners was specifically addressed and unequivocally set to rest by Congress when it enacted the Communications Act of 1934.  That Act states:

"Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

47 U.S.C.  § 414.

In view of this clear expression of Congressional intent, this Court, the lower courts and the Federal Communications Commission have unanimously concluded that nothing in the Communications Act curtails the rights of copyright owners.  n42

n42 E.g., Teleprompter Corp. v. CBS, Inc., supra, 415 U.S. at 406 n. 11 ("[t]he FCC has consistently contended that it is without power to alter rights emanating from other sources, including the Copyright Act...  This position is consistent with the terms of the Communications Act of 1934...."); Id. at 419 (Burger, C.J., dissenting) ("[t]here is nothing in the Communications Act that qualifies, limits, modifies or makes exception to the Copyright Act"); Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348, 349 (9th Cir. 1964), cert. denied, 379 U.S. 989 (1965) ("Congress ha[s] not pre-empted the adjustment of property rights in the communication field by passage of the Communications Act of 1934"); CATV, Second Report & Order, Nos. 14895, 15233, 15971, 2 F.C.C.2d 725, 768-69 (1966).  Cf.  Loretto v. Teleprompter Manhattan CATV Corp., 102 S.Ct. 3164 (1982) (increasing the public's access to television programs transmitted by cable does not justify even a minimal taking of an apartment owner's property without fair compensation).

The 1976 Act also dispels any notion that federal communications policy somehow precludes copyright liability for unauthorized videotaping of motion pictures from the public airwaves.  Congress stated plainly that videotaping from the public airwaves merely for convenience can never be fair use (see note 35, supra ).  Moreover, in the rare situations in which Congress determined that videotaping from the public airwaves is justified, it provided specific statutory exemptions permitting such activity.  n43 These statutory exemptions obviously would have been unnecessary had Congress believed that national communications policy provided an overriding non-statutory justification for videotaping from public airwaves.  Thus, all courts which have considered the issue under the 1976 Act have held that the fair use doctrine does not permit unauthorized off-the-air videotaping -- even for educational or news reporting purposes -- merely because it increases the public's access to broadcast material.  n44

n43 17 U.S.C.  §§ 108, 111(e), 112.  With one limited exception not applicable to home VTR copies (17 U.S.C.  § 111(e)), none of these exemptions permits videotape recording of motion pictures from public airwaves.  (See 17 U.S.C.  §§ 108(h), 111(e), 112(a); 1976 House Report 78, 98, 101, 103; § I.C.I., infra ).

n44 New Boston Television, Inc. v. Entertainment Sports Programming Network, Inc., 2 Copyrt. L. Rep. (CCH) P25,293, p. 16,625, at pp. 16,626-27 (D. Mass. Aug. 3, 1981) ("New Boston Television"); Encyclopaedia Britannica II, supra, 542 F.Supp. at 1175-77, 1179-81.  See Zacchini, supra, 433 U.S. at 574-78.

Petitioners' increased access argument proves too much.  If accepted, it would logically also permit VTR owners to steal VTR tapes from petitioners to obtain increased access to television broadcasts.  Neither the First Amendment nor federal communications policy condones either result.  The purpose and character of VTR copies thus weight heavily against a finding of fair use.

   2.  Nature of the Copyrighted Works at Issue.

   Under this factor, an unauthorized use is more appropriately characterized as "fair" if the nature of the copied material is primarily informational and therefore "serve[s] the public interest in the free dissemination of information" (P.A. 20).  n45 Conversely, characterization of an unauthorized use as "fair" is less appropriate if the copied work is primarily entertainment in nature (P.A. 20).  n46 The availability of the fair use defense is additionally constricted if the copyrighted work is "creative, imaginative, and original" and "represent[s] a substantial investment of time and labor made in anticipation of a financial return." MCA INC. v. Wilson, 677 F.2d 180, 182 (2d Cir. 1981).  n47

   n45 Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d at 307.  Accord, 3 Nimmer on Copyright, § 13.02[A][2], at 13-63 (1982) ("Nimmer"); Seltzer, supra, at 33-34.

   n46 Rohauer v. Killiam Shows, Inc., 379 F.Supp. 723, 733 (S.D.N.Y. 1974), rev'd on other grounds, 551 F.2d 484 (2d Cir. 1977), cert. denied, 431 U.S. 949 (1977); Register's Senate Statement, supra note 6, at 2o; 3 Nimmer, supra, § 13.05[A][2], at 13-63.  See Zacchini, supra, 433 U.S. at 573-78 (state law protection under right of publicity greater for entertainment than informational works).

   n47 Petitioners simply overlook these uncontroverted fair use principles in asserting that it is impermissible to distinguish between entertainment and informational works as § 107(2) requires (P.B. 29-30).

   Petitioners concede that respondents' works are primarily "entertainment" in subject matter (P.B. 29).  It is also undisputed that respondents' works are highly creative, imaginative and original and represent a large investment made in anticipation of financial return.  n48 Applying the established authorities to these undisputed facts, the Court of Appeals properly concluded that the nature of respondents' works weighs against a finding of fair use.

   n48 See notes 2 & 8, supra; Register's Senate Statement, supra note 6, at 23; Register's House Statement, supra note 6, at 23.

   Petitioners argue that the foregoing attributes of respondents' motion pictures should be disregarded because they are voluntarily telecast over public airwaves (P.B. 29).  However, use of the broadcast medium to exhibit respondents' motion pictures does not qualify VTR copies as fair use (P.A. 20-21).  The proper focus obviously is on the intrinsix qualities of the infringed work, not on the medium of its

presentation.  n49


n49 Encyclopaedia Britammica II, supra, 542 F.Supp. at 1180 ("[t]he plaintiffs' choice of media... does not abrogate their rights as copyright holders' even if they "knew and expected that the broadcasts would be received free of charge").  See United States v. Loew's, Inc., 371 U.S. 38, 48 (1962) ("a copyrighted feature film does not lose its legal or economic uniqueness because it is shown on a television rather than a movie screen").


3.  Amount and Substantiality of Taking.

It is undisputed, and the district court found, that VTR recording "usually involves copying the entire work" (P.A. 83).  Virtually every fair use case had held that such entire taking can never be fair use because it exceeds the bounds of "reasonableness" required by the fair use defense.  n50 Under these authorities, the substantiality of the taking involved in VTR copying tips decidedly against the fair use defense (P.A. 21-22).  n51


n50 E.g., Walt Disney Prods. v. Air Pirates, supra, 581 F.2d at 756; Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d at 310; Wihtol v. Corw, 309 F.2d 777, 780 (8th Cir. 1962); Leon v. Pacific Tel. & Tel. Co., 91 F.2d 484, 486 (9th Cir. 1937); Loew's, Inc. v. CBS, Inc., 131 F.Supp. 165, 184-85 (S.D. Cal. 1955), aff'd sub. nom. Benny v. Loew's, Inc., 239 F.2d 532 (9th Cir. 1956), aff'd by equally divided court, 356 U.S. 43 (1958).  See Zacchini, supra, 433 U.S. at 574-78.  Even in the case of historical and scholarly works, as distinguished from entertainment works, fair use is restricted to the copying of small excerpts.  See, e.g., Meeropol v. Nizer, supra, 560 F.2d at 1068-71; 1975 Senate Report 61-62, 64.

Only two appellate decisions have ever intimated that copying an entire work can in any circumstance be fair use.  However, these statements are mere dictum because neither decision involved the taking of entire copyrighted works. Williams & Wilkins Co. v. United States, supra, 487 F.2d at 1353 (copying of individual articles from copyrighted medical journals); Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., supra, 626 F.2d at 1177 n. 15 (quoting Williams & Wilkins ) (copying of cover page of copyrighted magazine).  Moreover, it has been expressly held that this dictum does not justify off-the-air videotaping of entire motion pictures, even for educational purposes, because such copying exceeds the bounds of reasonableness required by the fair use defense.  Encyclopaedia Britannica II, supra, 542 F.Supp. at 1179; Encyclopaedia Britannica Educational Corp. v. Crooks, 447 F.Supp. 243, 251 (W.D.N.Y. 1978) ("Encyclopaedia Britannica I" ).  The House and Senate Reports also state that the fair use provisions of § 107 do not permit unauthorized reproductions of entire motion pictures.  1976 House Report 72-73; 1975 Senate Report 64.

n51 Notwithstanding this clear line of authority, petitioners assert that copying an entire copyrighted work should be fair use unless the copyright owner demonstrates actual past or future damage from the unauthorized taking (P.B. 31).  However, there is no authority whatever to support this novel approach (see P.A. 21-22).  Indeed, such an approach would essentially render the substantiality factor meaningless by completely subordinating it to the fourth fair use factor -- the effect

of the use upon the value of the copyrighted work. See Loew's, Inc. v. CBS, Inc., supra, 131 F.Supp. at 184 ("[t]he mere absence of competition or injurious effect upon the copyrighted work will not make a use fair.").

4.  Effect of the Use on the Potential Market for or Value of the Copyrighted Work.

   Given the excessive taking and lack of independent creation involved in VTR copying, any one of which requires rejection of the fair use defense, see supra, at §§ I.A, I.B. 3, it was unnecessary for the Court of Appeals even to consider the effect of VTR copies on the potential market for or value or respondents' motion pictures (P.A. 22).  Nevertheless, the Court examined this factor and concluded that it does not support the fair use defense.

   In analyzing this factor, the Court of Appeals noted that in copyright infringement cases, irreparable harm to the copyright owner is presumed unless adequately rebutted by the defendant.  n52 It also recognized that to overcome this presumption, petitioners had the burden of proving that the unauthorized use would not tend to affect any potential market for or value of respondents' copyrighted works.  n53


   n52 (P.A. 23 n. 11); Encyclopaedia Britannica I, supra, 447 F.Supp. at 251. Accord, Rice v. American Program Bureau, 446 F.2d 685, 688 (2d Cir. 1971); Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851, 582 n. 1 (2d Cir. 1967).

   n53 (P.A. 23, 24); Meeropol v. Nizer, supra, 560 F.2d at 1069; Meredith Corp. v. Harper & Row Publishers, Ind., 378 F.Supp. 686, 689 (S.D.N.Y. 1974) (quoting 3 Nimmer, supra ), aff'd, 500 F.2d 1221 (2d Cir. 1974).


   Applying these legal principles to VTR copying, the Court of Appeals first ruled that the presumption of harm compelled the conclusion that the effect factor weighs against a finding of fair use (P.A. 23 n. 11).  This conclusion was required because the district court did not, and indeed, based on the record rationally could not, find that petitioners had carried their burden of proving that VTR copying will not tend to affect any potential market for or value of respondents' copyrighted works.  n54 To the contrary, the district court ignored the presumption of harm and sustained the fair use defense because it was "hesitant" to find that respondents had proved that future harm from VTR copying was "probable" (P.A. 75-78).  n55 As the Court of Appeals ruled, the district court thus applied the wrong legal test in failing to recognize that a "probability" of harm is unnecessary and further erred by imposing the burden of proof on respondents, thereby placing them in the novel and onerous position of having to disprove a defense raised by petitioners (P.A. 23, 75-79).  n56


   n54 (P.A. 23 & n. 11, 24); see Encyclopaedia Britannica I, supra, 447 F.Supp. at 247, 251.

   Petitioners presented evidence on the issue from two expert witnesses.  One, Mr. Blay, conceded that Betamax recordings of a copyrighted motion picture will cause respondents to lose revenue from sales of that motion picture on pre-recorded video cassettes.  The other witness conceded that his testimony about the future effect of VTRs on television ratings way "just a guess" (R. 2975-76, 3054-55, 3059-61; see

note 8, supra ).

Despite this negligible evidence, petitioners unbelievably assert that "[t]he evidence showed that [VTR] viewing would be measured and paid for under existing practice" (P.B. 31). There was no such evidence. Indeed, respondents' seven expert witnesses testified to the contrary (R. 250-58, 260-62, 274-77, 451-55, 539, 991-1002, 1051-52, 1182-1200, 1312-38, 1379-80, 1448-70, 1721-30). Nor did the district court find that such viewing will be measured or that, if measured, such measurements will prevent a reduction in respondents' television licensing revenues (P.A. 109). Moreover, the district court could not have made any such findings because there was no evidence from the ratings services that they are capable of measuring, or that they will measure, VTR playback activity (as distinguished from VTR recording activity). See Statement by Jay Eliasberg, former vice president, Research, CBS Broadcast Group 4-5 (April 21, 1982), to be reprinted in April 21 Senate Committee Hearings , 97th Cong., 2d Sess.   (1982) (meters used for audience measurement indicate that a TV set is turned on to a particular channel but cannot ascertain VTR play-backs or the extent to which commercials have been deleted).

n55 The district court acknowledged that the issue is not whether the infringement has caused past damage (P.A. 75). As Professor Nimmer explains: "Far from this justifying a defense of fair use, failure to prove damages will in the usual case give rise to a minimum statutory damages liability." 3 Nimmer, supra, § 13.05[E][4][c], at 13-84. It is therefore difficult to understand the relevance of petitioners' discussion of alleged lack of evidence of past harm (P.B. 30, 31).

n56 As with any defense, the burden of proving each element of the fair use defense was on defendants (P.A. 18, 23 & n. 11); Rubin v. Boston Magazine Co., supra, 645 F.2d at 84; Encyclopaedia Britannica I, supra, 447 F.Supp. at 251.


In addition to relying on the legal presumption of harm, the Court of Appeals properly ruled that the district court's fact findings established that VTR copying will tend to have the requisite potential adverse impact (P.A. 23-25). First, because VTR copies are undisputably made as complete substitutes for the viewing of licensed broadcasts of respondents' works, the district court found that VTR copies are used "for the same purpose as the original" (P.A. 81). Under settled judicial authority, whenever the copyrighted work and the infringing copy have the same function, the fourth fair use factor must be resolved against the infringer.  n57 Accordingly, the Court of Appeals held that the district court's finding that VTR copies serve the same purpose as the original required that the effect factor be resolved against petitioners (P.A. 23 & n. 13).


n57 MGM, Inc. v. Showcase Atlanta Coop. Prods., Inc., 479 F.Supp. 351, 361 (N.D. Ga. 1979); 3 Nimmer, supra, § 13.05[B], at 13-65-13-71. See Iowa State University Research Foundation, Inc. v. ABC, Inc., supra, 621 F.2d at 61. Indeed, because the function of a VTR copy is the same as the copied original, petitioners' own expert conceded that a VTR owner is not likely to purchase a pre-recorded cassette of the original from respondents (see notes 8 & 54, supra ). In addition, petitioners' survey shows that Betamax has caused 10.5% of all Betamax owners to decrease theater attendance and 31.4% of Betamax owners who had previously rented or purchased licensed motion pictures to decrease such activities (DX OT

(Tables 6 & 9); see note 8, supra ).

   Second, the district court repeatedly found that respondents will have to compete in the marketplace with VTR copies of their works (e.g., P.A. 78, 116). Since respondents obviously will not always prevail in such competition, the Court of Appeals ruled that this finding required the conclusion that VTR copies will tend to affect the value of or market for respondents' works (P.A. 23-24).

   Third, the Court of Appeals recognized the obvious: the licensing of the right to make VTR reproductions is itself a potential market for respondents' copyrighted works (P.A. 24). Uncontrolled and uncompensated VTR copies interfere with respondents' ability to grant and secure a fee for licenses to copy their works off-the-air (P.A. 24). n58 That respondents have not yet attempted to exploit this potential market does not permit petitioners "to appropriate [respondents'] copyrighted material and effectively preclude such efforts in the future." n59

   n58 This is neither a hypothetical nor unreal market. The ABC television network recently announced that it intends to exploit this market in late night and early morning hours through the use of new technology. Wall Street Journal, Apr. 30, 1982.

   n59 New Boston Television, Inc. v. Entertainment Sports Programming Network, Inc., supra, 2 Copyrt. L. Rep. (CHH) at p. 16,627; Iowa State University Research Foundation, Inc. v. ABC, Inc., supra, 621 F.2d at 62. See Fox Film Corp. v. Doyal, supra, 286 U.S. at 127. The Register of Copyrights recently stressed the importance of preventing the fair use defense from swallowing such emerging markets: "[T]he specific reference [in § 107] to 'potential' underscores the need to secure future markets from pre-emption, and leaves their exploitation to the designs of the copyright owner. The import is that potential markets may be as valuable as those presently exploited. Too narrow a view of adverse market impact may simply have the effect of destroying future markets... Unauthorized off-air taping prejudices the integrity of other emerging markets. " Remarks of David Ladd, United States Register of Copyrights, to the American Bar Association, Patent, Trademark & Copyright Law Section (Aug. 10, 1982), reprinted in Patent, Trademark & Copyright Journal (BNA), Vol. 24, No. 593, at 421-22 (Aug. 26, 1982) (emphasis added).

   Fourth, the unlimited number of unauthorized VTR copies which Betamax makes possible also establishes the requisite potential adverse effect as a matter of law. n60 Congress stated on numerous occasions during consideration of the bills which evolved into the 1976 Act that mass proliferation of minor infringements constitutes a major inroad on the value of copyrights which cannot be justified as fair use. n61 The massive scope of VTR copying activity thus requires rejection of the fair use defense (P.A. 24-25).

   n60 The Electronic Industries Association estimates that 20 million VTRs will be sold in this country by 1986. Brief Amicus Curiae In Support Of Petition 6. Armed with an average of 30 cassettes per machine (P.A. 47), the owners of these devices will have approximately 600 million cassettes available for infringing copies.

   n61 E.g., "Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented. " (Emphasis added.)
1975 Senate Report 65; 1967 House Report 35; H.R. Rep. No. 2237, 89th Cong., 2d Sess. 64 (1966).  Accord, 1976 House Report 77.  The reason for Congress' concern is obvious: the economic effect of millions of individuals making VTR copies is identical to the effect of those same individuals acquiring millions of copies from a film pirate.  In both cases the unauthorized copies supplant a substantial potential market for licensed copies of respondents' works.


   Finally, the consistency with which VTR owners delete commercials from their VTR copies (see note 14, supra ) also requires the conclusion that VTR copying will tend to affect a market for respondents' works -- the television licensing market. Congress explicitly recognized throughout its deliberations of the bill which became the 1976 Act that owners of televised motion pictures suffer harm when commercials telecast with such pictures are deleted without permission. n62


   n62 E.g., under § 111(c)(3) of the 1976 Act cable television systems cannot retransmit copyrighted television programs pursuant to the compulsory license provisions of the Act if they alter or delete the commercial messages broadcast therewith.  The 1976 House Report explains that § 111(c)(3) is necessary to prevent harm to the advertiser "and, in turn, the copyright owner, whose compensation for the [copyrighted] work is directly related to the size of the audience that the advertiser's message is calculated to reach." 1976 House Report 93-94.


   A potential adverse impact on any one of the existing or potential markets for respondents' motion pictures would be sufficient for rejection of the fair use defense. n63 Thus, the cumulative potential impact on the various markets demonstrated by the district court's findings overwhelmingly establishes that the effect factor of the fair use equation weighs heavily against the defense (P.A. 23-25).


   n63 Meeropol v. Nizer, supra, 560 F.2d at 1070; see MGM, Inc. v. Showcase Atlanta Coop. Prods., Inc., supra, 479 F.Supp. at 360-61.

C.  The Overall Statutory Scheme and Legislative History of Section 107 Confirm That VTR Copying Is Not Fair Use.

   The overall statutory scheme of the 1976 Act n64 as well as its legislative history make clear that Congress did not intend § 107 to permit as fair use the massive and uncontrolled VTR copying at issue here.


   n64 In interpreting a statutory provision, courts must be guided by the legislative intent evidenced by the overall scheme of the statute taken as a whole, Richards v. United States, 369 U.S. 1, 11 (1962).

1.  The Overall Statutory Scheme Compels the Conclusion That VTR Copying Is Not Fair Use.

The 1976 Act sets forth the copyright owner's exclusive rights in broad terms, subject only to narrowly-defined limitations, qualifications and exemptions contained in §§ 107-118.  Thus, unless the Act expressly exempts from liability a particular use of a copyrighted work, the use falls within the copyright owner's exclusive rights. n65

   n65 1976 House Report 61; 1975 Senate Report 57; Register's House Statement, supra note 6, at 18-19; Register's Senate Statement, supra note 6, at 18-19.

   This carefully drawn statutory scheme demonstrates special Congressional concern for the protection of motion pictures, a concern which contradicts petitioners' contention that Congress intended a blanket fair use exemption for VTR copying of those works.  Indeed, with one narrow exception (see note 69 & accompanying text, infra ), Congress refused to permit reproduction of motion pictures for any purpose. n66

   n66 The statutory scheme also requires the conclusion, now conceded by petitioners, that the 1976 Act contains no implied statutory home use exemption (P.A. 4-12; P.B. 20-21, 23, 33, 39).  Not only does the Act confer a higher degree of protection to motion pictures than to all other works, but none of the express exemptions in §§ 107-118 permits the copying of any work for private use.  It is therefore clear that Congress did not intend a statutory home copying exemption for motion pictures or any other works.  See Diamond v. Chakrabarty, 447 U.S. 303, 30, (1980); Tennessee Valley Authority v. Hill, 437 U.S. 153, 188 (1978); Appellants' Opening Ninth Circuit Brief 11-17.

   The most graphic example of Congress' desire to protect motion pictures is found in the ephemeral recording exemption, 17 U.S.C. § 112.  Section 112 permits copying of some copyrighted works so long as the copies are destroyed within a specified time period.  However, that provision does not allow copying of motion pictures under any circumstances.  This intentional exclusion of motion pictures from the scope of § 112 represents a change from prior bills. Congress explained this change as follows:

   "Very strong criticism was leveled at the 1965 bill because it would have permitted the making of ephemeral recordings of all types of works, including motion pictures and other audiovisual works.  The producers of these materials argued that bootlegging of illegal copies is already a serious problem, and that a provision allowing duplication by an indefinite number of transmitters and without permission from the copyright owner would greatly aggravate the situation.  The committee concluded that the special nature of motion pictures and audiovisual works makes them exceptionally vulnerable to copyright impairment under an ephemeral recording exemption, and therefore removed them from the scope of Section 112. ""

   1967 House Report 61 (emphasis added).  n67

   n67 Congress thus did not intend to excuse unauthorized copying of motion pictures merely because the copies are later erased.  The Register of Copyrights

expressed similar sentiments in his 1965 Report, noting that the exclusive § 106(1) right to reproduce embraces all copies, whether or not they are later erased: "reproduction on magnetic tape would come within clause (1) even though the tape is later erased." Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill, Copyright Law Revision, Part 6 at 16-17, 89th Cong., 1st Sess. (1965) ("Register's 1965 Supplementary Report") (emphasis added).  Time-shift recordings are thus on no different footing than other unauthorized copies merely because they are erased after they are made.

   Similarly, although § 108 permits reproduction of certain copyrighted works for library and archival purposes, motion pictures are specifically excluded from the exemption.  17 U.S.C.  § 108(h).

   Section 111 shows a like concern for the protection of motion pictures, particularly televised motion pictures.  Under § 111, cable television retransmission of motion pictures is permitted, but only if royalties are paid to the copyright owner and no portion of the motion pictures or the commercial messages transmitted therewith is deleted during the retransmission.  n68 Furthermore, § 111(e), the sole exemption for VTR copying of motion pictures in the Act, permits such copies only for limited use by off-shore cable television systems, and, again, only if royalties are paid and commercials are not deleted. n69

   n68 In a similar vein, the other performance exemptions contained in the Act ( §§ 110, 118) have only limited application to unauthorized uses of motion pictures. Sections 110(2), (3), (4), (6), (7), (8) and (9) apply only to musical works and literary works -- not to motion pictures.  And, although §§ 110(1) and (5) permit limited unlicensed performances of copyrighted works, including motion pictures, they do not permit unauthorized reproductions. Furthermore, while § 118 permits public broadcasting entities, upon paying a royalty, to broadcast copyrighted works without permission of the copyright owner, § 118(f) expressly excludes audiovisual works -- including motion pictures -- from the exemption.

   n69 17 U.S.C.  § 111(e); 1976 House Report 98.

   Given Congress' special solicitude for the protection of motion pictures and its recognition of the unusual vulnerability of such works to copyright impairment, it is clear that Congress never intended a blanket fair use exemption for unlimited home VTR copying of motion pictures.  This conclusion is compelled by the legislative history of § 107.
2.  The Legislative History of Section 107 Compels the Conclusion That VTR Copying Is Not Fair Use.

   The legislative history of § 107 demonstrates the same concern for motion pictures found in all other provisions of the Act.  n70 Indeed, Congress stressed that applicability of the fair use doctrine is "narrowly circumscribed" and must "be applied strictly to" unauthorized uses of motion pictures.  1975 Senate Report 65, 64. Consistent with this special concern for motion pictures, Congress emphasized that it did not intend off-the-air tape recordings to have any special status under the fair use doctrine.  n71

n70 Petitioners' representation that the Court of Appeals refused to consider the legislative history of § 107 (P.B. 16, 32-33) is irresponsible.  In rejecting the fair use defense, the Court thoroughly considered the legislative history of the 1976 Act in general and § 107 in particular (P.A. 4-12, 14, 20, 24 & n. 14).

n71 "[T]he reference to fair use [in § 107] 'by reproduction in copies or phonorecords or by any other means' is mainly intended to make clear that the doctrine has as much application to photocopying and taping as to older forms of use; it is not intended to give these kinds of reproduction any special status under the fair use provision or to sanction any reproduction beyond the normal and reasonable limits of fair use."
1976 House Report 66.


Definitive proof that Congress did not intend a blanket fair use exemption for VTR copying is found in the 1976 House Report's specific rejection of a similar exemption for reproductions made "for educational and scholarly purposes." 1976 House Report 66-67.  Since Congress rejected a blanket exemption for educational and scholarly use (a far more salutary use than home use), it follows that Congress did not intend a blanket fair use exemption for home VTR copying of motion pictures.

Finally, Congress' recognition that "[i]solated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented," and its unequivocal statement that "[t]he committee does not intend to suggest... that off-the-air recording for convenience would under any circumstances, be considered 'fair use'" (1975 Senate Report 65, 66) conclusively illustrate that Congress did not intend § 107 to provide a blanket exemption for the making of millions of VTR copies for convenience.

Post-enactment history of § 107 also demonstrates that the Ninth Circuit properly rejected the fair use defense.  n72 Several bills were introduced in response to the Court of Appeals' decision (see notes 25, 26 & accompanying text, supra).  During hearings on those bills, David Ladd, the Register of Copyrights who is charged with administration of the 1976 Act, stated emphatically that the Ninth Circuit correctly interpreted the fair use provisions of the 1976 Act.  n73 At these same hearings, several Congressmen, Jon A. Baumgarten, General Counsel of the Copyright Office at the time the 1976 Act was enacted, and Professor Melville B. Nimmer, the country's leading copyright expert, also expressed their unqualified agreement with the Ninth Circuit's interpretation of the fair use doctrine.  n74


n72 Although not accorded the same weight as pre-enactment legislative history, post-enactment history is relevant in determining the intended scope of legislation. North Haven Bd. of Ed. v. Bell, 102 S.Ct. 1912, 1923-25 (1982).

n73 "Making a copy of an audio visual work under copyright through the use of a videorecorder infringes the reproduction right of Section 106.

At the time of passage of the 1976 Copyright Act, videotaping was a known technology, yet no specific exemption was included in the legislation to exempt the practice in the home.

Despite the absence of an explicit exemption for home videotaping, proponents of unrestricted videotaping have often cited the fair use provision of section 107 in support of their views.  Yet the terms of that provision and its legislative history do not support such a sweeping interpretation.

None of the purposes articulated in [ § 107] fits home videotaping...  [T]he four factors listed in Section 107 would not excuse unrestricted videotaping, as the Ninth Cicuit held in the Betamax case." Register's House Statement, supra note 6, at 19, 22, 23, 25 (emphasis added); Register's Senate Statement, supra note 6, at 19, 22, 23, 25 (emphasis added).

n74 E.g., 128 Cong. Rec. H322 (daily ed. Feb. 9, 1982) (Statement of Rep. Edwards); Baumgarten, "Private Audio Recording of Copyrighted Music" 1-9 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess.    (1982) (Memo for Nat'l Music Publishers' Ass'n, Mar. 8, 1982); Nimmer. "The Elegal Status of Home Audio Recording of Copyrighted Works" 1-2, 16-26 (Apr. 21, 1982), to be reprinted in April 21 Senate Committee Hearings    , 97th Cong., 2d Sess. (1982) (Statement of Recording Industry Ass'n of America, et al.).

In the face of this overwhelming expression of legislative intent, petitioners' attempt to divine from legislative history a blanket fair use exemption for VTR copying is unpersuasive.  Petitioners do not base their analysis on any legislative history of § 107.  Rather, they focus entirely on legislative history concerning the performance right granted in § 106(4), the ephemeral recording exemption contained in § 112 and the rights granted to sound recordings in the 1971 Sound Recording Act.  n75 More importantly, the result which petitioners seek to deduce from this history clashes head-on with Congress' expressed intention (a) to grant special protection to motion pictures under the Act as a whole and § 107 in particular and (b) to refrain from granting special fair use status to VTR copies.

n75 Pub. L. No. 92-140, 85 Stat. 391 (1971).

Petitioners' reliance on the 1961 Report of the Register of Copyrights concerning the scope of a copyright owner's performance right is particularly inapposite (P.B. 33-34).  The report advocates only that the 1976 Act, like the 1909 Act, not grant copyright owners the right to control private performances of copyrighted works. The report does not suggest that unauthorized private VTR copying be permitted as a necessary adjunct of the private performance right. To the contrary, such private performances presuppose the use of lawfully made copies.  n76 Thus, the public's right privately to perform copyrighted works cannot possibly encompass unconsented copying such as VTR copying.  Were the law otherwise, it would be legal to steal a print of a motion picture or to make an unauthorized reproduction in a movie theater so long as the sole purpose of the theft or reproduction were to allow a subsequent private performance by the offender.  Such activities are, of course, prohibited.  n77

n76 See note 37 & accompanying text, supra.

n77 See Elektra Records Co. v. Gem Elec. Distribs., Inc., 360 F.Supp. 821 (E.D.N.Y. 1973).

Petitioners' citation to statements of respondents at Congressional hearings in 1965 is also unavailing.  Petitioners note that while referring to the prospective development of home use VTRs respondents "made no assertion that home use recording... should be infringement" (P.B. 34).  However, petitioners overlook that as early as 1962 the Motion Picture Association of America ("MPAA"), the representative of respondents and supporting amici, had already registered respondents' strong objections to such activities.  Statement of MPAA, March 2, 1962, in Copyright Law Revision, Part 2, Discussion and Comments on Report of the Register of Copyrights 345, 351, 88th Cong., 1st Sess. (House Comm. Reprint) (1963) (App. B hereto).


The legislative history of the Sound Recording Act of 1971 also fails to support petitioners' fair use argument (P.B. 34-39).  The Sound Recording Act and accompanying House Report unequivocally state that the Act did not apply to motion pictures and therefore did not limit or alter the rights in motion pictures in any way. n78 Accordingly, even if Congress in 1971 intended home copying of sound recordings -- a practice which unlike video recording was common and unrestrained for over 20 years -- to be fair use, Congress did not also intend such an exception to apply to the incipient practice of making VTR copies of televised motion pictures. n79


n78 The Act defined sound recordings as "works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture. " 1909 Act § 26 (emphasis added).  The 1971 House Committee Report explained: "In excluding 'the sounds accompanying a motion picture' from the scope of this legislation the Committee does not intend to limit or otherwise alter the rights that exist currently in such works." H.R. Rep. No. 92-487, 92d Cong., 1st Sess. 5-6 (1971), reprinted in [1971] U.S. Code Cong. & Ad. News 1566, 1570-71 ("1971 House Report").  Accord, 1976 Act § 101.


n79 This distinction between the protection afforded motion pictures and sound recordings is consistent with the disparate treatment of these different classes of works throughout the history of the Copyright Act.  Whereas motion pictures were granted copyright protection in 1912 (P.A. 11 n. 7), sound recordings did not receive such protection until 1971 when the immediate threat of commercial record piracy made interim protection imperative.  1971 House Report 1-2.  Moreover, although the Copyright Act has always prevented imitation of all copyrighted works, including motion pictures, the Sound Recording Act prohibited only complete duplication, and specifically allowed imitation.  (17 U.S.C.  § 1(f), Accord, 17 U.S.C.  § 114(b).)  Similarly, although the proprietors of all copyrighted works have always enjoyed an exclusive performance right, no such right was granted to proprietors of sound recordings (1976 House Report 106.  Accord, 17 U.S.C.  § 114(a)).  Thus, if the 1971 Sound Recording Act contained a home recording exemption it was merely another example of the differing treatment of motion pictures and sound recordings under the 1909 Act.


Furthermore, assuming arguendo that Congress had intended to impose a home recording limitation on the rights granted in the 1971 Sound Recording Act, Congress clearly did not intend to carry forward that exemption in the 1976 Act. In contrast to the 1971 House Report relied upon by petitioners (P.B. 36 n. 41), the 1976 House

Report makes no reference to a home recording exemption, even for sound recordings.  Indeed, the Report makes clear that subject only to the narrow exceptions contained in §§ 107-118, the 1976 Act precludes all off-the-air recording of sound recordings whether or not done in the home.  n80 As the Court of Appeals recognized, it would therefore be improper to imply Congressional intent for a fair use home recording exemption in the 1976 Act from the history of an entirely different bill, i.e., the Sound Recording Act of 1971.  n81 It is Congress' intention in 1976, not in 1971, that is signficant in interpreting the 1976 Act.  See North Haven Board of Education v. Bell, supra, 102 S.Ct. at 1922.


   n80 "Thus, infringement takes place whenever all or any substantial portion of the actual sounds that go to make up a copyrighted sound recording are reproduced in phonorecords by repressing, transcribing, recapturing off the air, or any other method, or by reproducing them in the soundtrack or audio portion of a motion picture or other audiovisual work."
1976 House Report 106 (emphasis added).

   n81 (P.A. 10 n. 5); 3 Nimmer, supra, § 13.05[F], at 13-96 n. 159; see Schwegmann Bros. v Calvert Distillers Corp., 341 U.S. 384, 390-94 (1951).


   Finally, the isolated references to video recording made between 1961 and 1971 by individual witnesses and legislators fall far short of establishing a Congressional intent to bring VTR copies within the fair use doctrine.  The unequivocal statements in the 1976 House Report and the 1975 Senate Report, which indicate that Congress did not intend VTR copying to be fair use, are undeniably the most persuasive indicia of Congressional intent, and take precedence over isolated comments made in committee hearings or floor debates more than five years prior to passage of the 1976 Act.  n82 That these comments were made extemporaneously during discussion of issues unrelated either to the copying of televised motion pictures or to fair use highlights their unreliability.  It is settled that such isolated statements cannot form the basis for statutory interpretation when Congress as a whole did not engage in a considered review of the issue at hand.  n83


   n82 Zuber v. Allen, 396 U.S. 168 (1969); United States v. International Union, etc., 352 U.S. 567, 585 (1957).

   n83 Tennessee Valley Authority v. Hill, supra, 437 U.S. at 191-93; Libby Rod & Gun Club v. Poteat, 594 F.2d 742, 746 (9th Cir. 1979).  It is obvious that the comments relied upon the petitioners do not represent a considered review by Congress as a whole of the complex home video recording issue.  Petitioners feebly respond that there was no need for a considered review because "there was no diversity of opinion" on the issue (P.B. 32).  It is difficult to understand how petitioners can conclude that there was no diversity of opinion among Congress as a whole when only three Congressmen (P.B. 35 n. 39, 37 n. 42) and no Senators ever expressed any thoughts on the subject, and those thoughts were expressed during consideration of a bill that did not affect the rights in motion pictures in any way (see note 78 & accompanying text, supra ).  Moreover, petitioners' claim that the home videotape recording issue was resolved in their favor in 1971 is belied by their continued warnings to VTR purchasers after that date that VTRs were "not to be used to record copyrighted works" (see note 16, supra; PX 166, 167, 170; R. 638-44).

II.
PETITIONERS ARE LIABLE AS CONTRIBUTORY INFRINGERS FOR UNAUTHORIZED
VTR COPYING.
A.  The Court of Appeals' Application of Contributory Copyright Infringement
Principles Was Correct in All Respects.

From a practical standpoint, contributory infringement is the most important issue
in this case.  If petitioners are absolved of liability as contributory infringers, to
obtain adequate relief respondents will be faced with the prospect of bringing suits
against each of the millions of VTR owners who have copied respondents' works,
virtually an impossible task.  n84 Such a result would deprive respondents of a
realistic remedy n85 and would be contrary to law.

n84 Respondents brought this action against only the manufacturers, advertisers
and sellers of VTRs because they -- not individual VTR owners -- are the ones
profiting from unauthorized copying of respondents' motion pictures. Despite the
contrary implications in petitioners' brief (P.B. 17 n. 20, 40-41), respondents have
the absolute right to sue these contributory infringers alone without joining the
primary infringers, i.e., individual VTR owners, as defendants.  Costello Publishing
Co. v. Rotelle, 670 F.2d 1035, 1043 (D.C. Cir. 1981); Wells v. Universal Pictures Co.,
166 F.2d 690, 692 (2d Cir. 1948). See Kalem Co. v. Harper Bros., 222 U.S. 55
(1911) ("Kalem") (contributory copyright infringer sued without joining direct
infringers).  There is no authority for petitioners' assertion (P.B. 44) that merely by
publicly announcing their intention to excercise this right, respondents have granted
a "license" to VTR owners for future VTR copying.  Indeed, such a result would
render meaningless respondents' right to sue only the contributory infringers.
Petitioners' reliance on Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., 377
U.S. 476 (1964) is unavailing.  In Aro, unlike here, plaintiff executed a written
license agreement expressly permitting the alleged direct patent infringers to engage
in the infringing activity.

n85 A similar consideration recently influenced the Seventh Circuit to reject
arguments which would have absolved a supplier of infringing technology from
copyright liability and thereby would have required the copyright owner to bring "a
thousand or more copyright infringement suits" against the suppliers' customers.
WGN Continented Broadcasting Co. v. United Video, Inc., 685 F.2d 218, 221 (7th Cir.
1982).

Both courts below agreed that a contributory infringer is "one who, with knowledge
of the infringing activity, induces, causes, or materially contributes to the infringing
conduct of another." n86 Under this established standard, a contributory infringer
need not have actual knowledge of the infringing activity; constructive knowledge is
sufficient.  n87 Further, actual "inducement" of the infringing activity is not required;
conduct which "furthers" or "materially contributes to" the infringing activity will
suffice. n88 Nor is direct contact between the contributory infringer and the ultimate
infringer necessary; indirect contact or participation in a chain of distribution
resulting in the infringement in sufficient.  n89

n86 Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2d Cir. 1971) ("Gershwin" ).  Accord, 3 Nimmer, supra, § 12.04[A], at 12-34.  The contributory infringement doctrine in the copyright context is predicated on the "basic common law doctrine that one who knowingly participates in or furthers the tortious act is jointly and severally liable with the prime tort feasor." Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 256 F.Supp. 399, 403 (S.D.N.Y. 1966) ("Screen Gems I") (Weinfeld, J.).  Accord, Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc., 327 F.Supp. 788, 791-92 (S.D.N.Y. 1971), rev'd on other grounds, 453 F.2d 552 (2d Cir. 1972). See Kalem, supra, 222 U.S. at 62-63 (seller who knows and expects that its product will be used to assist in copyright infringement "contribute[s] to the infringement... [and] is liable on principles recognized in every part of the law").

n87 E.g., Screen Gems I, supra, 256 F.Supp. 399 (contributory defendant who "should have been aware" of infringing activities because of suspicious nature of primary infringers' conduct had sufficient constructive knowledge).  See Inwood Laboratories, Inc. v. Ives Laboratories Inc., supra, 102 S.Ct. at 2188 (one who supplies a product to another with "reason to know" that the other is using the product in an infringing manner may be held liable as a contributory trademark infringer).

n88 Kalem, supra, 222 U.S. at 62-63; Gershwin, supra, 443 F.2d at 1162; Screen Gems I, supra, 256 F.Supp. at 403 (non-infringing advertisements which "further" the sale of infringing recordings sufficient to hold advertiser contributorily liable).

n89 Kalem, supra, 222 U.S. at 62 (producer who sells film to jobbers for resale to exhibitors contributorily liable for infringing performances by exhibitors).  See Inwood Laboratories, Inc. v. Ives Laboratories, Inc., supra, 102 S.Ct. at 2188 ("[e]ven if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their [trademark] infringing activities...."); Jerome H. Remick & Co. v. General Electric Co., 16 F.2d 829 (S.D.N.Y. 1926).


Applying these principles to the instant case, the Court of Appeals correctly concluded that petitioners are liable as contributory copyright infringers.  n90 First, the Court of Appeals ruled that petitioners had the requisite knowledge, noting that reproduction of copyrighted materials is the most conspicuous use of Betamax and is the use intended, expected and encouraged by petitioners (P.A. 27).  This holding was mandated by petitioners' stipulation that Betamax is manufactured, advertised and sold for the primary purpose of reproducing television programming, as well as by the district court's finding that petitioners' advertisements "exhort" Betamax purchasers to record "favorite shows," "movies," "classic movies" and "novels for television" and to "build a library." n91 It was also required by petitioners' uncontroverted admissions, alluded to by the district court, that petitioners knew the main use of Betamax would be to record copyrighted material.  n92 Given these clear admissions of actual knowledge and intent, petitioners far exceed the minimum requirements of constructive knowledge necessary to establish contributory infringement.  n93


n90 Petitioners and many of their amici confuse the contributory infringement doctrine with the "vicarious liability" theory.  Under the latter theory, liability is predicated on the defendants' right and ability to supervise, control or influence the

direct infringer's activities coupled with a financial interest in those activities. Neither an ability to control nor a financial interest is necessary to find contributory infringement.  Gershwin, supra, 443 F.2d at 1162.  Thus, the district court's finding that petitioners could not control the use of VTRs in homes (P.A. 98; P.B. 12, 40) is irrelevant to the contributory infringement analysis.

   n91 P.A. 41-42; R. 1778-79; PX 87, 90-99, 454, 460, 461, 463, 466, 504-06, 511, 519, 544 (p. 4), 546 (pp. 2-3), 547 (p. 2), 548, 550, 554 (p. 8), 555-56, 1063, P5.

   n92 P.A. 27, 90, 94; see note 9, supra. For example:

   "Q.  And therefore you knew that the majority of the uses of the Betamax to record television programs off-the-air would be to record copyrighted television programs off-the-air; isn't that also right?

   A.  You mean the majority use of the copying of programs off-the-air would be of copyrighted material?

   Q.  That's right.

    A.  Yes."
(Testimony of Harvey Schein, President, Sony Corp. of America ("Sonam"), R. 1821).

   "Q.  And you knew the motion pictures produced by [respondents] were copyrighted?

   A.  Yes.

   "Q.  Is it a fact, Mr. Gallagher, that you knew that the main use of the Betamax by consumers would be to record copyrighted television programs off-the-air?
(Testimony of Daniel Gallagher, Vice President, Advertising, Sonam, R. 2078, 2094-95).

   n93 See Inwood Laboratories, Inc. v. Ives Laboratories, Inc., supra, 102 S.Ct. at 2188 & n. 13; id., at 2191-92 (White, J., concurring); Kalem, supra, 222 U.S. at 62-63.


   Contrary to petitioners' assertion (P.B. 43), the district court did not dispute that petitioners knew and intended that Betamax would be used primarily to record copyrighted works, especially motion pictures such as those owned by respondents. The district court merely concluded that this knowledge was insufficient because in its view a finding of contributory infringement requires not only knowledge of the challenged activity but also knowledge that the activity violates copyright law. Acknowledging that petitioners knew of the challenged activity, the district court held that as a matter of law petitioners "could not" also have known that VTR copying is infringement because the issue is allegedly one of first impression (P.A. 94, 96, 97-98).

   However, knowledge of the illegal status of the infringing activity is not a prerequisite of contributory copyright infringement, much less an absolute bar to liability whenever the legality issue is allegedly one of first impression (P.A. 26-27). n94 Accordingly, the Court of Appeals properly rejected as an erroneous

interpretation of the law the district court's conclusion that petitioners' knowledge was insufficient.  n95

   n94 No court has ever held that in addition to knowing of the activity itself, a contributory copyright infringer must also know that such activity is a copyright violation.  To the contrary, courts have consistently rejected such an approach (e.g., Famous Music Corp. v. Bay State Harness Horse Racing, etc., 554 F.2d 1213 (1st Cir. 1977); BMI v. Marshall, 201 U.S.P.Q. 30, 33 (E.D. Mich. 1978); Chess Music, Inc. v. Sipe, 442 F.Supp. 1184, 1185 (D. Minn. 1977); Screen Gems I, supra, 256 F.Supp. at 403), and for good reason.  Arguably, no person sued as a contributory copyright infringer could ever "know" that an activity violates copyright law prior to a final adjudication as to the legality of such activity, particularly where, as here, the issue is allegedly one of first impression.  If such knowledge were required, the doctrine of contributory infringement would become meaningless, since a defendant could virtually always evade liability by asserting his belief that the activity is non-infringing.  As explained in Famous Music, supra, 554 F.2d at 1215, a defendant "could otherwise reap the benefits of countless violations... by merely claiming ignorance that any violation would take place." Accord, Shapiro, Bernstein & Co., Inc. v. H.L. Green Co., 316 F.2d 304, 309 (2d Cir. 1963).

   n95 Even if knowledge of the illegal nature of the activity were required, the uncontroverted evidence overwhelmingly establishes such knowledge.  From 1964 to 1975 petitioners consistently received legal advice concerning the illegality of off-the-air recording (R. 921-24, 960-61, 964-65, 2017, 2108, 2116-22).  During this period, petitioners' advertisements, brochures and operating instructions warned purchasers of Sony's pre-Betamax VTRs that those VTRs could not be used to record copyrighted material (P.A. 42, 94; see note 16, supra ).  With the advent of Betamax, Sonam and DDBI constantly admonished each other that VTR copying, especially for library purposes, is illegal (R. 1852-53, 1923, 1961-62, 2017, 2108, 2116-18; PX 143, 648, 649, 716 (p. 8), 723 (p. 2)). Indeed, petitioner DDBI secured a written indemnity agreement from Sonam (P.A. 90) because, in the words of the agreement, "our legal counsels were concerned about the risks of advertising a video recording product which can be used to record copyrighted material" (PX 143) (emphasis added).  Moreover, in September, 1976, two months prior to commencement of this action, respondents advised petitioners that their sale of VTRs infringes respondents' copyrights (R. 2723-25).  Petitioners thus have always believed that VTR copying violates copyright law.

   With respect to the second element of contributory infringement, there can be no doubt that the manufacture, advertisement, demonstration and sale of Betamax induce, cause, further and materially contribute to the unauthorized copying of copyrighted motion pictures.  To repeat, petitioners stipulated that that is the primary use for which Betamax is designed and marketed.  As the district court found, such copying is also the precise conduct that petitioners both encourage with their Betamax advertisements, brochures and operating instructions and contribute to through their sales and marketing activities (P.A. 41-42, 97). n96

   n96 Despite petitioners' contrary assertion (P.B. 12, 43), the district court did not find that petitioners did not induce or cause to be made VTR copies of respondents' motion pictures.  It merely found that "[i]t is... doubtful" whether petitioners'

admitted conduct met the "inducement" or "contribution" requirement because (a) the record did not show that any particular Betamax advertisement induced or caused the recording of any of the specific copies of the copyrighted motion pictures identified by title in the complaint, and (b) no petitioner (except petitioner Henry's Camera (P.A. 43) had any direct contact or involvement with the VTR owners who testified at trial (P.A. 93-94, 96-97) (emphasis added).  However, inducing infringement of specifically identified works, as opposed to copyrighted works in general, is unnecessary to sustain copyright infringement liability.  See Shapiro, Bernstein Co., Inc. v. H.L. Green Co., supra, 316 F.2d at 309; Famous Music Corp. v. Bay State Harness Horse Racing, etc., supra, 554 F.2d at 1215; Chess Music, Inc. v. Sipe, supra, 442 F.Supp. at 1185; Elektra Records Co. v. Gem Elec. Distribs., Inc., supra, 360 F.Supp. 821.  Direct contact between the manufacturer/distributors and the ultimate infringers is also unnecessary.  See note 89 & accompanying text, supra.

   Given petitioners' undisputed activities, the Court of Appeals properly held that petitioners' conduct was overwhelmingly sufficient to satisfy the contribution requirement, reasoning that reproduction of copyrighted works "is the most conspicuous use of [Betamax].  That use is intended, expected, encouraged, and the source of the product's consumer appeal" (P.A. 27).  n97 This holding is in complete harmony with this Court's decision in Kalem Co. v. Harper Bros., supra, 222 U.S. 55. In Kalem, the Court held the seller of an unauthorized film version of a copyrighted story contributorily liable for subsequent infringing exhibitions of the film by others. The Court rejected the argument that the seller could not be held liable because it had not exhibited the film itself (i.e., Kalem like Sony had not committed the final act of infringement) and specifically made clear that suppying the means to accomplish an infringing activity and encouraging that activity through advertisement are sufficient to establish liability:

   n97 See notes 9, 10 & 91, supra. Not only did petitioners blatantly foster VTR copying, but they affirmatively sought to counteract attempts to discourage such behavior.  For example, when Sony learned that television broadcasters could broadcast a jamming signal to prevent VTR copying, Sony immediately studied and discovered a method to override the jamming signal (see note 4, supra ).  Moreover, despite the recommendations of their own lawyers and one network to place warning on Betamax advertisements advising that VTR copying might be illegal, petitioners refused to do so because Sonam's president felt that such warnings might decrease Betamax sales (P.A. 42; R. 1818-19, 1970, 2023-26, 2108, 2116-18; PX 648, 649, 681 and 682).

   Petitioners mislead the Court by stating that they clearly warned potential purchasers against Betamax copying (P.B. 3 n. 4, 40, 46).  A purchaser receives no warning before he buys his Betamax (P.A. 42).  In fact, the only "warning" he receives appears at the end of an 18-page booklet of operating instructions which is delivered with his Betamax in a sealed carton (P.A. 42, PX 98, p. 17). Moreover, the warning -- which differs markedly from pre-Betamax warnings, P.A. 42; note 16, supra -- is so vague that one Betamax owner who testified at trial thought it meant that "you couldn't use this machine to distribute and make a business out of taping people's movies and selling them" (R. 1579).

   "The defendant not only expected but invoked by advertisement the use of its films for dramatic reproduction [i.e., exhibition] of the story.  That was the most conspicuous use for which they could be used, and the one for which especially they were made." 222 U.S. at 62-63.

Accord, Elektra Records Co. v. Gem Electronic Distributors, Inc., supra, 360 F.Supp. 821 (retail store that furnished its customers with a duplicating machine to copy copyrighted sound recordings held liable for the infringing copies).  The Court of Appeals' decision thus fully adheres to settled principles of contributory copyright infringement.

B.  The Staple Article of Commerce Argument Does Not Immunize Petitioners From Contributory Copyright Infringement Liability.

   In arguing that they are not liable as contributory infringers, petitioners -- as did the district court -- analogize VTRs to "staple articles of commerce" under the patent statute and rely on the staple article of commerce doctrine from patent law to avoid contributory copyright infringement liability.  n98 This reliance on the staple article rationale is improper for several reasons. First, petitioners' analysis is based primarily on a perceived difficulty in fashioning appropriate relief rather than on any assertion that petitioners lack culpability under established contributory copyright infringement principles.  n99 Second, analogies to this statutory patent doctrine are inappropriate in the copyright context.  Third, even if such an analogy were proper, the doctrine would not shield petitioners from liability here.


   n98 This doctrine is codified in 35 U.S.C.  § 271(c) as follows:

   "(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."

   n99 Indeed, petitioners candidly admit that their sale of Betamax contributes to VTR copying.  (Appellees' Ninth Circuit Brief and Cross-Appellants' Brief 70).


   Petitioners predicate their staple article analysis primarily on their view that to hold them liable for VTR copying would require an injunction which would unjustifiably inhibit possible non-infringing uses of VTRs.  The district court engaged in an identical analysis, absolving petitioners of liability simply because the court assumed that it would be impossible to devise a remedy which would both protect respondents' works and at the same time permit possible non-infringing uses to continue.  n100 This approach was manifestly improper. As the Court of Appeals noted, where, as here, liability is established under accepted legal principles, it is impermissible to deny relief merely because it may be difficult to fashion an appropriate remedy (P.A. 25-26, 28).  n101


   n100 The district court stated that a finding of liability would expand the theory of contributory infringement "arguably beyond judicial management," that under such a finding "[c]ommerce would indeed be hampered" and "an injunction which seeks to deprive the public of the very tool or article of commerce capable of some

noninfringing use would be an extremely harsh remedy" (P.A. 97, 114; see P.B. 39-40).

n101 Cf.  Silver King Mines, Inc. v. Cohen, 261 F.Supp. 666, 674-75 (D. Utah 1966).


Moreover, contrary to the district court's belief, appropriate relief can be devised to accommodate any non-infringing uses.  One example is the continuing royalty suggested by the Court of Appeals (P.A. 28-29).  A continuing royalty instead of a permanent injunction would permit non-infringing uses, if any, to continue unabated. n102 Such uses could also continue if petitioners were directed to devise a technological means to prevent VTR copying only of programs owned by respondents and others who object to such copying.  n103 Accordingly, the district court could have resolved its dilemma without issuing a sweeping decree absolving petitioners of all liability.


n102 Similarly, an award of statutory damages (17 U.S.C.  § 504(c)) would require payment only for infringing recordings of respondents' copyrighted works, not recordings of unprotected works.

n103 See notes 4 & 97, supra.


The staple article of commerce theory is also inapposite because it is found in the patent statute -- not the copyright statute -- and represents a legislative accommodation of competing considerations arising from the unique nature of patents.  n104 Analgies to this statutory defense are therefore inappropriate in a copyright case.


n104 Dawson Chem. Co. v. Rohm And Haas Co., 448 U.S. 176 (1980).  Unlike copyrights, patented products and processes consist, as petitioners have noted, of many elements or components, the unique combination of which is protected by the patent (P.B. 41).  As the very language of § 271(c) demonstrates ("[w]hoever sells a component of a patented [product]... or a material... for use in practicing a patented process, constituting a material part of the invention...."), the staple article defense is predicated on this unique characteristic of patents.  See, Jones v. RCA, 131 F.Supp. 82, 83 (S.D.N.Y. 1955).


Even if such an analogy were proper, petitioners would nevertheless be liable here. First, because § 271 must be read in its entirety (see note 64, supra ), an analogy to § 271(c) also calls § 271(b) into play.  Section 271(b), which provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer," would proscribe petitioners' conduct even if § 271(c) would not.

Section 271(b) forbids any conduct which "causes," "urges," "encourages" or "aids" another to infringe a patent.  n105 Significantly, § 271(b) contains no staple article of commerce limitation.  Therefore, if the seller of an article causes, urges, encourages or aids another to use the article to infringe, the seller is liable for the infringement under § 271(b) regardless of whether the article is a "staple" and

regardless of whether it meets the "substantial non-infringing use" test of § 271(c). n106 The reason for this rule is clear: while there may be a societal interest in permitting the sale of articles capable of a variety of non-infringing uses, there is obviously no legitimate social interest in permitting a seller of those articles to encourage their use in an infringement.  Since petitioners' advertisements, brochures and instruction manuals unquestionably cause, urge, encourage and aid VTR purchasers to infringe respondents' copyrights (see notes 9, 10, 91, 96 & accompanying text, supra ), petitioners are liable by analogy to § 271(b) notwithstanding their claim that VTRs are staple articles of commerce.


   n105 Fromberg, Inc. v. Thornhill, 315 F.2d 407, 411 (5th Cir. 1963) ("inducement has connotation of active steps knowingly taken -- knowingly at least in the sense of purposeful, intentional, as distinguished from accidental or inadvertent.  But with that qualifying approach, the term is as broad as the range of actions by which one in fact causes, or urges, or encourages or aids another to infringe a patent"). Accord, Ingersoll-Rand Co. v. Rockwell Int'l, Corp., 420 F.Supp. 277, 281 (S.D. Fla. 1976); Aluminum Extrusion Co. v. Saule Steel Co., 260 F.Supp. 221, 224 (C.D. Cal. 1966).

   n106 Rohm And Haas Co. v. Dawson Chem. Co., 599 F.2d 685, 700 (5th Cir. 1979), aff'd, 448 U.S. 176 (1980) (the seller of a staple article is liable for infringements by his customers if he "actively induc[es] infringement (as by advertising or giving detailed instructions for practicing the invention with his products -- conduct prohibited by paragraph (b))" (emphasis added); Fromberg, Inc. v. Thornhill, supra, 315 F.2d at 410-12; see SPEE-FLO Mfg. Corp. v. Gray Co., Inc., 255 F.Supp. 618, 620 (S.D. Tex. 1964); Weyerhaeuser Timber Co. v. Bostitch, Inc., 178 F.Supp. 757, 760 (D. R.I. 1959).


   Second, even if § 271(b) were disregarded, the requirements of § 271(c) would not be satisfied in this case.  Under subsection (c) a seller of a staple article can avoid contributory infringement liability only if the article is "suitable for substantial non-infringing use." 35 U.S.C.  § 271(c) (emphasis added).  Importantly, the district court refused to find that Betamax meets the substantial non-infringing use requirement (P.A. 97, 114).  The district court found only that VTRs are capable of some potential non-infringing uses (P.A. 97, 106-7, 114).  n107 The Court of Appeals likewise concluded that the record did not establish that VTRs are capable of substantial non-infringing uses (P.A. 26).


   n107 Petitioners' and supporting amici's repeated assertions that the district court found substantial non-infringing uses (e.g., P.B. 40, 43 n. 53) are false.  In fact, the district court determined to apply the staple article rationale regardless of the substantiality of such uses (P.A. 97) ("[w]hether or not... Betamax is capable of 'substantial' noninfringing use....").


   The refusal of both courts below to find VTRs suitable for substantial non-infringing uses was entirely proper.  To meet the substantiality test, proof of minor non-infringing uses will not suffice, nor will a showing of a mere possibility of such uses. n108 Rather, petitioners had the burden of proving that any non-infringing uses were both actual (not merely possible) and substantial.  n109 Petitioners did not satisfy

this test.

   n108 United States Gypsum Co. v. National Gypsum Co., 440 F.2d 510, 516 (7th Cir. 1971), cert. denied, 403 U.S. 923; Slumaker v. Gem Mfg. Co., 311 F.2d 273, 276 (7th Cir. 1962); Reynolds Metals Co. v. Aluminum Co. of America, 457 F.Supp. 482, 509-10 (N.D. Ind. 1978).

   n109 Fromberg, Inc. v. Thornhill, supra, 315 F.2d at 415; Reynolds Metals Co. v. Aluminum Co. of America, supra, 457 F.Supp. at 507-10.


   As petitioners concede, the primary function of VTRs is to reproduce copyrighted television programming.  Petitioners' claim (P.B. 4, 29, 40) that the vast majority of this programming is available for non-infringing reproduction lacks any legal or factual support.  First, virtually all of this programming is protected by federal or state law from unconsented copying, including VTR copying.  n110 Accordingly, VTRs are simply incapable of substantial non-infringing uses.


   n110 All television programs are protected by copyright if, as is usually the case, they are filmed (i.e., "fixed") prior to telecast.  1976 House Report 52. Even live events such as concerts and live news coverage are protected by copyright if they are fixed simultaneously with the live broadcast.  Id. And, live programs not simultaneously fixed are protected by state law.  Id.; Cal. Civ. Code § 980, as amended, A.B. No. 3483, 1981-82 Reg. Sess., ch. 574 (Aug. 25, 1982), 1982 Cal. Legis. Serv. p. 3508 (West); CBS, Inc. v. Documentaries Unltd., Inc., 248 N.Y.S.2d 809, 42 Misc.2d 723 (1964); see Zacchini, supra, 433 U.S. 562.  Thus, the Court of Appeals' conclusion that virtually all television programming is protected from unconsented copying (P.A. 26) is inescapably correct, notwithstanding petitioners' criticism of the authority relied upon by the Court (P.B. 43 n. 53).

   Nor does the fact that a few television stations may not be able to meet the deposit requirements necessary for copyright registration of some of their locally produced programs render these programs available for unconsented VTR copying, as petitioners assert (P.B. 9).  Statutory copyright protection subsists continuously from the moment a work is first fixed in a tangible medium of expression, whether or not the work is ever registered.  17 U.S.C.  § 302(a); 2 Nimmer, supra, § 7.16[A][I], at 7-111.  Registration and deposit are merely prerequisites to filing an infringement action (17 U.S.C.  § 411(a)).  As the very language of the statute makes clear, "such registration is not a condition of copyright protection." 17 U.S.C. § 408(a); see 2 Nimmer, supra, § 7.16[A][I], at 7-111, 7-129-30.  Thus, VTR copying is no less a copyright violation merely because the program copied has not been registered.


   Petitioners attempt to avoid this inescapable conclusion by arguing that some alleged program owners testified that they did not object to VTR copying and that this somehow renders VTRs suitable for substantial non-infringing use (P.B. 40-43). However, the testimony of the few witnesses upon which petitioners rely is both uniformly inconclusive n111 and legally insufficient.  Indeed, even in the rare cases where program owners might consent to VTR copying (see note 116, infra ), under basic precepts of copyright law reproduction of these programs will nevertheless

usually constitute infringement unless the consent of many others is also obtained. n112 For example, virtually all programs contain copyrighted music, see Broadcast Music, Inc. v. CBS, Inc., 441 U.S. 1 (1979), and are normally based on underlying written works (e.g., books, plays and television scripts) which are protected by a copyright distinct from the copyright in the broadcst television program.  See 17 U.S.C.  §§ 102, 103; 1976 House Report 57-58; 1 Nimmer, supra, § 3.04, at 3-12 - 3-14.  Without the consent of the owners of these musical and underlying written works, the television programs incorporating this material cannot be legally copied. n113

   n111 Some of the deficiencies in this testimony are described in note 116, infra. Space considerations, however, preclude a thorough analysis of this testimony in this brief.  For such an analysis, see Plaintiffs' Opening Post-Trial Memorandum, C.R. 28/88, pp. 79-107.

   n112 Despite petitioners' contrary assertion (P.B. 8), NBC does not consent to VTR copying.  Indeed, NBC broadcasts a prohibition against off-the-air recording of its programs (R. 3004-06, 3159; PX 1070).  In any event, NBC obviously has no power to consent to the copying of programs which are owned by others (such as respondents) and merely licensed to NBC for television exhibition (see, e.g., PX 890, P21; United States v. NBC, 449 F.Supp. 1127, 1134-36 (C.D. Cal. 1978).

   n113 Filmvideo Releasing Corp. v. Hastings, 668 F.2d 91, 92-93 (2d Cir. 1981); Russell v. Price, 612 F.2d 1123, 1128 (9th Cir. 1979), cert. denied, 446 U.S. 952 (1980).  For example, the testimony of the owner of the Spider Man series that he did not object to VTR copying does not render that copying legal. There is no evidence that the owners of the copyrighted music contained in the series or the owners of the copyrights in the underlying Spider Man comic books (R. 2932-34; P.B. 9) ever consented to such copying.  Similarly, petitioners did not present such evidence with respect to the works allegedly owned by their other witnesses.

   Second, there is no consent by anyone to the vast majority of VTR copying. Petitioners' own survey shows that over 80% of all Betamax recordings consists of protected entertainment programs, nearly all of which are owned by respondents and supporting amici, all of whom object to such copying (see note 1, supra ).  n114 This same survey shows that less than 9% of all recordings consists of religious (0%), educational (1.6%), and sports (7.3%) programs -- the type of material purportedly owned by most of the limited number of witnesses who testified that they did not object to VTR copying.  n115 Even as to this 9%, petitioners did not establish that the copied material is owned by program owners who do not object to VTR copying.  n116

   n114 See DX OT, Tables 20, 40 and Questionnaire 14, 26.

   n115 (DX OT, Tables 20, 40).  Petitioners' statements that 49% of Betamax owners records sports, 10% record religious and 63% record educational programs are gross mischaracterizations of the evidence (P.B. 7).  The survey on which these statements are based asked Betamax owners merely "Have you ever used the Betamax to record" such programs (DX OT, Questionnaire 9).  Affirmative answers to this question allow only the inference that the respondents recorded sports, religious

and educational programs once, not that they make a regular practice of doing so.

   n116 This showing was necessary because so few owners of such protected material consent to VTR copying.  Petitioners presented testimony from only a few educational and religious program owners (R. 2564-87, 2593-2640, 2823-44, 2863-2902).  But they clearly do not speak for all owners of educational and religious programs.  Indeed, both in this Court and below many major producers and distributors of educational and religious programs have registered strong objection to VTR copying (R. 3173-3200; Brief Amicus Curiae of Creators and Distributors of Programs in Support of Respondents; see Encyclopaedia Britannica I, supra, 447 F.Supp. 243; Encyclopaedia Britannica II, supra, 542 F.Supp. 1156) (objection by 3 large educational program producers to VTR copying for educational purposes).

   Similarly, petitioners presented testimony from representatives of the commissioners of five sports leagues.  However, none of these witnesses purported to speak either for the leagues as a whole or for individual team members (R. 2460-63, 2468, 2491-94, 2511-12, 2517, 2520-21, 2526-28, 2532, 2537-38, 2545, 2550, 2554-56, 2561-62).  Moreover, each witness' testimony was addressed only to the copying of network broadcasts, not the thousands of local station broadcasts owned by individual teams.  Even many network broadcasts may not be copied without permission of individual teams (R. 2509).  No individual team has expressed its consent to VTR copying (R. 2454-55, 2468, 2491-93). Indeed, three teams (New York Mets, Boston Red Sox and Boston Bruins) recently indicated that they object to unauthorized viewing of their televised games. See Eastern Microwave, Inc. v. Doubleday Sports, Inc., 534 F.Supp. 533 (N.D.N.Y. 1982) ("Eastern Microwave"); New Boston Television, supra, 2 Copyrt. L. Rep. (CCH) P25,293.

   It should also be noted that all of the testimony upon which petitioners rely was given four to five years ago when the VTR industry was in its infancy. There is no indication that the witnesses who testified continue to adhere to their previously expressed views.  See Eastern Microwave, supra; New Boston Television, Inc., supra.


   Thus, petitioners' evidence does not support, and indeed refutes, their claim that non-infringing uses of Betamax are both actual and substantial.  n117 Since both courts below refused to find on this evidence that VTRs are suitable for substantial non-infringing uses, and since such a finding is required to invoke the staple article of commerce argument, petitioners' reliance on the district court's conclusion that VTRs are theoretically capable of some non-infringing uses is unavailing.


   n117 Contrary to the contentions of petitioners' amici, the use of VRTs to make home movies with a video camera and to play back licensed, pre-recorded videocassettes is not relevant to the issue of possible non-infringing uses. Those uses do not involve Betamax' off-the-air recording capability and can be accomplished with machines (not challenged in this action) that cannot record off-the-air (see note 9, supra ).


   Because VTRs are advertised and sold for the primary purpose of infringement, petitioners' additional claim that imposition of liability in this case would be tantamount to imposing liability on the suppliers of cameras, typewriters and Xerox machines is spurious (P.B. 43).  Unlike cameras, typewriters and Xerox machines,

whose primary market is derived from non-infringing uses, there would be little, if any, market for VTRs if they could not be used for infringing purposes (see notes 114, 115 & accompanying text, supra ).  Petitioners' unwillingness to devise a technological means of preventing copying of copyrighted works makes plain that without the ability to make unconsented copies of the copyrighted motion pictures owned by respondents and amici, there would be little if any market for VTRs.  The Court of Appeals correctly held that petitioners should not be allowed to build an industry based on this unconsented copying merely because VTRs may also be capable of some non-infringing uses (P.A. 25-29).  n118


   n118 See Ortho-O-Vision, Inc. v. Home Box Office, 474 F.Supp. 672, 686 n. 14 (S.D.N.Y. 1979).  Accord, United States v. Loew's, Inc., supra, 371 U.S. at 53.


   III.
IT WOULD BE PREMATURE FOR THIS COURT TO DETERMINE AT THIS TIME WHETHER A CONTINUING ROYALTY IS AN APPROPRIATE REMEDY.  IN ANY EVENT THE DISTRICT COURT CLEARLY HAS THE POWER TO ORDER SUCH A REMEDY.

   The question whether the district court, after remand, may order the payment of a continuing royalty as a condition to denying a permanent injunction is premature. The Court of Appeals did not direct the district court to enter such a remedy.  Rather, recognizing the difficulties posed by the remedy question, the Court of Appeals simply remanded the case for the fashioning of an appropriate remedy, noting that the district court might consider whether a continuing royalty would be "an acceptable resolution in this context" (P.A. 28-29).  Since the district court has not yet considered the remedy question, any pronouncement by this Court concerning the issue would be wholly advisory and without the benefit of a factual record.

   Not only is the remedy issue premature, but petitioners' analysis of the issue is defective.  Petitioners assert that there is no statutory or decisional authority for imposition of a continuing royalty in lieu of a permanent injunction (P.B. 45).  To the contrary, 17 U.S.C.  § 502(a) authorizes the district court to issue "final injunctions on such terms as it may deem reasonable." This is simply "a reaffirmation of the usual power of courts to grant injunctions...." Register's 1965 Supplementary Report 132.  Under this power, courts have the unquestioned authority in appropriate cases to withhold an injunction against unauthorized use of property on the condition that the defendant adequately compensate the plaintiff for continued use of the property. n119 A continuing royalty in lieu of a permanent injunction would accomplish precisely this result.  That the district court has power under the Copyright Act to impose a continuing royalty pursuant to its general equitable powers is further confirmed by 17 U.S.C.  § 405(b) which expressly authorizes courts, in cases where copyright notice has been omitted from the infringed work, to permit the infringing activity to continue "on condition that the copyright owner be paid a reasonable license fee." House Report 148.


   n119 City of Harrisonville, Mo. v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 339-40 (1933).


   It is evident from the foregoing that a continuing royalty is authorized by law.

Moreover, such a remedy could accommodate the interests of all parties and the public by ensuring fair compensation to respondents for the use of their works while avoiding a total ban against future VTR sales.  For this latter reason alone, this Court should not decide whether such a remedy is appropriate until the district court has had an opportunity to evaluate the ramifications of a continuing royalty and to develop a full record upon which an informed review by this Court can be based. n120


   n120 The sincerity of petitioners' countrary position is questionable since Sonam's president suggested such a remedy early in this litigation (Depo. of Harvey L. Schein, May 12, 1977, pp. 375-76, App. Chereto).  Petitioners' resistance to a compulsory royalty is also difficult to understand in view of their continued expressions of concern over the harshness of the alternate equitable remedy of an injunction against VTR sales (e.g., P.B. 39-40).


   IV.
THE COURT OF APPEALS' DECISION FULLY COMPORTS WITH THE "CLEARLY ERRONEOUS" STANDARD OF APPELLATE REVIEW.

   Petitioners accuse the Court of Appeals of violating the clearly erroneous standard of reiview (Fed. Rule Civ. Proc. 52(a)) by substituting its own findings of fact for those of the district court without holding the district court's findings clearly erroneous.  The argument lacks merit.

   It is settled that the clearly erroneous limitation does not apply to review of legal conclusions drawn by a district court from facts found at trial, and that a reviewing court is therefore free to make an independent determination as to those legal conclusions.  n121 Consistent with this rule the Court of Appeals merely held that the facts found by the district court did not support the legal conclusions which it drew therefrom, and that these findings and petitioners' admissions required a holding of liability on both the fair use and contributory infringement issues as a matter of law.  See discussion at §§ I.A., I.B. & II, supra. n122 In so doing, the Court of Appeals neither substituted its own findings for those of the district court nor made new findings based on disputed evidence.  Thus, the decision below comports with Rule 52 in all respects.


   n121 United States v. Mississippi Valley Generating Co., 364 U.S. 520, 526 (1961); United States v. Grayson County State Bank, 656 F.2d 1070, 1975 (5th Cir. 1981); United States Fidelity etc. Co. v. Royal Nat'l. Bank, 545 F.2d 1330, 1333 (2d Cir. 1976); see Inwood Laboratories, Inc. v. Ives Laboratories, Inc., supra, 102 S.Ct. at 2189 n. 15 (clearly erroneous limitation inapplicable where, as here, the district court's findings are based on an erroneous view of the law).

   n122 On the fair use issue, the Court of Appeals held that the district court's findings that VTR copies involve no independent creation, usually involve copying the entire copyrighted work, serve the same purpose as the original, have economic value which petitioners -- rather than respondents -- currently receive from VTR owners, require respondents to compete with such copies in the marketplace and involve frequent delection of commercial messages from the television broadcasts thereof necessitate rejection of the fair use defense as a matter of law.  The Court of

Appeals further held that the district court's findings that VTR copies are made (1) in the home (2) from the public ariwaves (3) for non-commercial purposes (4) allegedly to increase access to respondents' broadcast copyrighted works and that (5) respondents did not prove any damages to date nor a "probability" of such damages in the future are insufficient as a matter of law to qualify, such copies as fair use. (See §§ I.A. & I.B, supra ).

   On the issue of contributory infringement, the Court of Appeals held that the district court's findings, and the stipulations and admissions by petitioners, that Betamax is manufactured, advertised and sold for the primary purpose of reproducing television programs, that petitioners know that such reproductions include copyrighted works, including works produced by respondents, that petitioners' advertisements exhort such copying and that Betamax contributes to the making of such reproductions establish contributory infringement as a matter of law.

   The Court of Appeals further held that the district court's finding that petitioners "could not" know that VTR copies violate copyright law does not preclude contributory infringement liability because knowledge of the legal consequences of the infringing activity is unnecessary.  The Court of Appeals also discounted the finding that petitioners' advertisements did not induce copying of the specific titles alleged in the complaint because neither inducement nor the singling out of specific titles for copying is a necessary element of contributory infringement.  Finally, the Court of Appeals ruled that the district court's findings that VTRs are staple articles of commerce capable only of some non-infringing uses cannot as a matter of law preclude contributory infringement liability because the staple article doctrine requires a finding -- which the district court refused to make -- that VTRs are suitable for substantial non-infringing use and because application of the doctrine here improperly absolved petitioners of liability merely because the district court assumed that fashioning a remedy would be difficult.  (See § II, supra ).


   V.

   CONCLUSION.

   For all of the foregoing reasons, the decision of the Court of Appeals should be affirmed.

   Respectfully submitted,

   STEPHEN A. KROFT, (Counsel of Record), JOHN G. DAVIES, SONDRA E. BERCHIN, Attorneys for Respondents, Universal City Studios, Inc. and Walt Disney Productions.

   Of Counse: ROSENFELD, MEYER & SUSMAN.

   APPENDIX A.

   The following Table sets forth in numerical order each exhibit referred to in Respondents' Brief.  The page numbers in the Reporter's Transcript ("R.") at which each exhibit was identified and admitted are also set forth pursuant to Supr. Ct. Rule 34.5.

| Exhibit No. | Identified | Admitted |
| --- | --- | --- |
| 87 | R. 684 | R. 684 |

| | | |
|---|---|---|
| 90 | 577 | 579, 713 |
| 91 | 577 | 579, 713 |
| 92 | 577 | 579, 713 |
| 93 | 710 | 713 |
| 94 | 710 | 713 |
| 95 | 710 | 713 |
| 96 | 710 | 713 |
| 97 | 710 | 713 |
| 98 | 710 | 713 |
| 99 | 710 | 713 |
| 110 | 1925 | 1925 |
| 111 | 1925 | 1925 |
| 113 | 1925 | 1925 |
| | | |
| 114 | 1925 | 1925 |
| 124 | 1297 | 1299 |
| 143 | 1869 | 1869 |
| 147 | 670 | 671 |
| 148 | 670 | 671 |
| 149 | 670 | 671 |
| 150 | 1944 | 1944 |
| 151 | 672 | 673 |
| 152 | 672 | 673 |
| 155 | 674 | 675 |
| 156 | 674 | 676 |
| 157 | 678 | 679 |
| 158 | R. 926 | R. 926 |
| 159 | 926 | 926 |
| 160 | 926 | 926 |
| 161 | 926 | 926 |
| 162 | 926 | 926 |
| 163 | 926 | 926 |
| 164 | 926 | 926 |
| 165 | 926 | 926 |
| 166 | 926 | 926 |
| 167 | 644 | 644 |
| 168 | 644 | 644 |
| 169 | 644 | 644 |
| 170 | 644 | 644 |
| 228 | 670 | 670 |
| 252 | 670 | 670 |
| 253 | 670 | 670 |
| 326 | 678 | 679 |
| 328 | 674 | 677 |
| 329 | 674 | 677 |
| 330 | 674 | 677 |
| 448 | 645-46 | 646 |
| 449 | 645-46 | 646 |
| 452 | 642 | 642 |
| 453 | 642 | 642 |
| 454 | 1937-38 | 1938 |
| 460 | 1937-38 | 1938 |
| 461 | 1937-38 | 1938 |

| 463 | 1937-38 | 1938 |
| 466 | 597 | 616 |
| 504 | 1932-33 | 1933 |
| 505 | 631 | 635 |
| 506 | 1932-33 | 1933 |
| 511 | 1932-33 | 1933 |
| 519 | 1942-43 | 1943 |
| 544 | R. 1847 | R. 1847 |
| 546 | 1847 | 1847 |
| 547 | 685-86 | 686 |
| 548 | 685-86 | 686 |
| 550 | 685-86 | 686 |
| 552 | 685-86 | 686 |
| 554 | 685-86 | 686 |
| 555 | 682 | 684 |
| 556 | 682 | 684 |
| 559 | 1814 | 1819 |
| 648 | 1929 | 1929 |
| 649 | 1929 | 1929 |
| 681 | 1814 | 1819 |
| 682 | 1814 | 1819 |
| 716 | 1854 | 1854 |
| 717 | 1830 | 1831 |
| 723 | 1930 | 1931 |
| 730 | 1082 | 1120 |
| 890 | 1165 | 1166 |
| 986 | 973 | 974 |
| 987 | 973 | 974 |
| 1063 | 1771-80 | 1780 |
| 1068 | 2945 | 2945 |
| 1070 | 3006 | 3006 |
| OS | 2650 | 2680 |
| OT | 2308 | 2309 |

APPENDIX B.

"We do not think our copyrighted motion pictures in whole or in part, should be physically copied in homes, in libraries, for private research, entertainment, or otherwise, without our permission, if new technologies were to permit the easy duplication of our works by taking the same off a television screen onto a tape or wire recorder, or by duplicating a rented film, tape, or wire."

"We have no present comment as to photocopying by libraries, other than to be sure that any such right does not extend to permit our motion picture films to be duplicated in whole or in part for any purpose. "
Statement of MPAA, March 2, 1962, in Copyright Law Revision, Part 2, Discussion and Comments on Report of the Register of Copyrights 345, 351, 88th Cong., 1st Sess. (House Comm. Reprint) (1963) (emphasis added).

APPENDIX C.

"Q.  Now, Mr. Schein, you attended the International Tape Association Seminar or Convention in Hilton Head, South Carolina last month, did you not?

A.  That's correct.

Q.  And at that convention you made the statement in substance that Sonam would not oppose a law or a judicial decision which required the sellers of videotape recording machines with off-the-air recording capabilities to pay a -- I don't know if it was a tax, but some kind of a fee, some amount of money to the owners of television, copyrighted television shows.

Do you remember saying that?

A.  In substance.

Q.  Is one of the reasons that you made that statement because you believe that the payment of a fee such as that would in part reimburse the owners of the copyrighted television programs for revenue that they would lose because of off-the-air recording of their programs?

MR. DOSKOW: I object to that question.  It's totally irrelevant.  His reasons for saying that he would advocate a particular type of legislative program has no bearing on this case.

THE WITNESS: Not advocate.  I believe I said I would not object to it."

(Deposition of Harvey L. Schein, May 12, 1977, pp. 375-76).

# EXHIBIT 10

# REDACTED IN ITS ENTIRETY