**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE AUTOHOP LITIGATION

12-CV-4155 (LTS) (KNF)

**REDACTED PUBLIC FILING**
**ORIGINAL FILED UNDER SEAL**

**MEMORANDUM OF LAW IN OPPOSITION TO DISH NETWORK LLC'S MOTION TO DISMISS COUNT VII OF CBS CORPORATION'S AMENDED COUNTERCLAIMS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

    A.    CBS Entered Into The Retransmission Agreement So That DISH Subscribers Would Be Included In The Potential Audience For Commercials Aired On CBS.4

    B.    DISH Knew That CBS Would Not Enter Into The Retransmission Agreement If It Knew That DISH Was Going To Offer "Commercial-Free TV." ......................... 5

    C.    DISH Knew That It Was Going To Offer Commercial-Free TV, But Deliberately Concealed That Fact From CBS. ...................................................................... 6

    D.    DISH Made A Partial Disclosure Regarding The Hopper That Was Misleading Because DISH Did Not Disclose That The Hopper Would Offer Commercial-Free TV. ..................................................................................................................... 7

    E.    Because Of DISH's Concealment, CBS Relied On Its Mistaken Understanding That DISH Would Retransmit The Entirety Of CBS's Programming To Its Subscribers, Without Offering "Commercial-Free TV." ........................................ 8

ARGUMENT ........................................................................................................................ 9

    I.    NEW YORK LAW APPLIES TO THE CBS FRAUD CLAIM. ......................... 10

        A.    The Choice-of-law Provision In The Retransmission Agreement Is Irrelevant. ...................................................................................... 10

        B.    Because There Is No Relevant Conflict Between New York And Colorado Law, New York Law Governs. ................................................... 10

        C.    New York's Choice-of-Law Rules Provide That If There Is A Relevant Conflict Between New York And Colorado Law, New York Law Governs. .................................................................................... 11

    II.    CBS HAS ALLEGED FACTS THAT STATE A CLAIM FOR FRAUDULENT CONCEALMENT AND INDUCEMENT. ............................... 12

        A.    DISH Owed CBS A Duty To Disclose Its Plan To Offer "Commercial-Free TV" Through Its "Revolutionary" AutoHop Service. .................................................................................................... 13

            1.    DISH Had A Duty To Disclose Under The "Special Facts" Or "Basic Facts" Doctrine. ........................................................... 15

            2.    DISH Had A Duty To Disclose Because Its Partial Disclosure About The Hopper Was Misleading Without

Also Disclosing That The Hopper Was Going To Provide
"Commercial-Free TV." ............................................................ 20

3.    At Most, DISH Raises Factual Disputes Relating To
Whether It Had A Duty To Disclose, Which Cannot Be
Resolved On A Motion To Dismiss.............................................. 23

B.    CBS Reasonably Relied On Its Understanding That DISH Would
Not Be Offering "Commercial-Free TV." ................................................. 24

CONCLUSION................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*,
   404 F.3d 566 (2d Cir. 2005).........................................................................15, 21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................................... 9

*Ballow v. PHICO Ins. Co.*,
   875 P.2d 1354 (Colo. 1993)............................................................................ 12

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*,
   57 F. 3d 146 (2d Cir. 1995)…………………………………………………….……21

*Berger v. Sec. Pac. Info. Sys., Inc.*,
   795 P.2d 1380 (Colo. App. 1990)................................................................... 13

*Brass v. Am. Film Technologies*,
   987 F.2d 142 (2d Cir. 1993)................................................................3, 13, 14

*Century Pacific, Inc. v. Hilton Hotels Corp.*,
   528 F. Supp. 2d 206 (S.D.N.Y. 2007)........................................................... 23

*Curley v. AMR Corp.*,
   153 F.3d 5 (2d Cir. 1998) ............................................................................. 11

*Dandong v. Pinnacle Performance Ltd.*,
   No. 10-cv-8086, 2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011)........................ 25

*Day Spring Enters., Inc. v. LMC Int'l, Inc.*,
   No. 98-CV-0658A, 2004 WL 2191568 (W.D.N.Y. 2004) .................................. 12

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011)............................................................ 21

*Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*,
   414 F.3d 325 (2d Cir. 2005)....................................................................10, 11

*Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*,
   No. 00-CV6739, 2001 WL 11543820 (S.D.N.Y. Dec 4, 2001) ......................... 10

*Forest Park Pictures v. Universal Television Network, Inc.*,
   683 F.3d 424 (2d Cir. 2012)........................................................................... 10

*Fox Broad. Co. v. Dish Network, L.L.C.*,
   -- F. Supp. 2d --, No. 12-CV-04529, 2012 WL 5938563 (C.D. Cal. Nov. 7, 2012)................ 6

*Gaines Serv. Leasing Corp. v. Carmel Plastic Corp.*,
   105 Misc.2d 694 (N.Y. Civ. Ct. 1980)........................................................................ 3

*Gonzales v. National Westminster Bank PLC*,
   847 F. Supp. 2d 567 (S.D.N.Y. 2012).................................................................... 9

*Greenway Univ., Inc. v. Greenway Arizona, LLC*,
   No. 11-CV1055, 2012 WL 1801948 (D. Colo. 2012)...................................................14

*Hoeffner v. Orrick, Herrington & Sutcliffe LLP*,
   2008 WL 4065922 (N.Y. Sup. Ct. 2008)........................................................... 23

*In re Refco Sec. Litig.*,
   759 F. Supp. 2d 301 (S.D.N.Y. 2010)............................................................. 23

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
   153 F.3d 82 (2d Cir. 1998)....................................................................... 12

*J.A.O. Acquisition Corp. v. Stavitsky*,
   745 N.Y.S.2d 634 (N.Y. Sup. Ct. 2001) ......................................................... 12

*Krock v. Lipsay*,
   97 F.3d 640 (2d Cir. 1996)....................................................................... 10

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*
   No. 01-CV-2946, 2003 WL 262507 (S.D.N.Y. Feb. 7, 2003)........................................ 23

*Level 3 Commcn's, LLC v. Liebert Corp.*,
   535 F.3d 1146 (10th Cir. 2008) .................................................................. 20

*Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*,
   965 P.2d 105 (Colo. 1998) ............................................................... 16, 17, 20

*Martinez v. Nash Finch Co.*,
   886 F. Supp. 2d 1212 (D. Colo. 2012)............................................................ 25

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
   595 F.3d 86 (2d Cir. 2010)...................................................................... 9, 13

*Poly Trucking, Inc. v. Concentra Health Servs., Inc.*,
   93 P.3d 561 (Colo. App. 2004)............................................................... 18, 19, 20

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
   46 F.3d 230 (2d Cir. 1995)....................................................................... 23

*RHC, LLC v. Quizno's Franchising, LLC*,
   No. 04-CV-985, 2005 WL 1799536 (Colo. Dist. Ct. July 19, 2005).................................. 25

*San Diego Cnty. Emps. Ret. Ass'n v. Maounis*,
    749 F. Supp. 2d 104 (S.D.N.Y. 2011) ............................................................. 11, 12

*Solutia Inc. v. FMC Corp.*,
    456 F. Supp. 2d 429 (S.D.N.Y. 2006) ............................................................. 2, 23

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) .............................................................................................. 22

*Todaro v. Orbit Int'l Travel, Ltd.*,
    755 F. Supp. 1229 (S.D.N.Y. 1991) ...................................................................... 9

*TVT Records v. Island Def Jam Music Grp.*,
    412 F.3d 82 (2d Cir. 2005) .................................................................................... 21

*Vickery v. Evelyn V. Trumble Living Trust*,
    277 P.3d 864 (Colo. Ct. App. 2011) ..................................................................... 18

*Wall v. CSX Transp., Inc.*,
    471 F.3d 410 (2d Cir. 2006) .................................................................................. 11

*Wisehart v. Zions Bancorporation*,
    49 P.3d 1200 (Colo. App. 2002) ........................................................................... 23

*Wood v. Houghton Mifflin Harcourt Publ'g Co.*,
    569 F. Supp. 2d 1135 (D. Colo. 2008) ................................................................. 21

**Other Authorities**

Restatement (Second) of Torts §551 ............................................................... 15, 23

*Handbook of the Law of Torts* § 106 (4th ed. 1971) ...................................... 3

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 9

Fed. R. Civ. P. 9(b) ............................................................................................... 10

**PRELIMINARY STATEMENT**

During 2011 and continuing through early January 2012, DISH negotiated a new agreement with CBS Corporation ("CBS") to obtain the right to retransmit CBS's programming to millions of DISH subscribers (the "Retransmission Agreement").[1]  DISH knew that the essential reason CBS was entering into the Retransmission Agreement was so that DISH's subscribers would be part of the potential audience for the commercials shown on CBS.  That is, after all, the primary way in which CBS derives revenue from its television programming:  it sells commercial advertising.

Unbeknownst to CBS, at exactly the same time DISH was negotiating the Retransmission Agreement, it was also secretly finalizing what it calls its "revolutionary" AutoHop service, which allows DISH subscribers to watch CBS's primetime television programming (and that of the other three networks) with all of the commercials *automatically removed*.  Thus, DISH has heralded AutoHop as offering "Commercial-Free TV," and as the "Holy Grail" of television.  DISH knew that AutoHop's "Commercial-Free TV" would fundamentally undermine the basic nature and economics of the Retransmission Agreement, and that CBS would not agree to the terms of the Retransmission Agreement if it knew about AutoHop.  DISH also knew that it planned to release AutoHop soon after DISH and CBS executed the Retransmission Agreement.  Thus, in order to ensure that CBS would enter into the Retransmission Agreement, DISH *deliberately concealed* from CBS its plan to offer "Commercial-Free TV" through AutoHop.

Moreover, before the Retransmission Agreement was executed, DISH made statements to CBS that, it is now clear, were incomplete and hence misleading.  DISH informed CBS that it planned to offer a new digital video recorder ("DVR") called the "Hopper."  And DISH made a

---

[1] Capitalized terms not defined herein have the same definition as provided in CBS's Amended Counterclaims.

1

partial, but ambiguous disclosure to CBS regarding its plan to offer a service on the Hopper called "PrimeTime Anytime" ("PTAT"), which CBS now knows automatically copies the primetime programming of all four of the broadcast networks (CBS, ABC, NBC, and Fox).  But DISH *deliberately concealed* the fact that a central purpose of the Hopper and PTAT was to offer "Commercial-Free TV" through the AutoHop service, which is a "companion service" to PTAT. DISH concealed this even though CBS made clear it did not want the Retransmission Agreement to address any "new businesses" or "new platforms."  In addition, DISH knew that in order to offer its AutoHop service, DISH would have to make unauthorized copies of CBS's programming in order to run "quality assurance" checks on the AutoHop process, which would violate the terms of the Retransmission Agreement.  Despite all this, DISH chose to conceal from CBS its plan to offer "Commercial-Free TV."[2]

This kind of deliberate concealment constitutes fraud.  Under both New York and Colorado law, a party to a commercial transaction has a duty to disclose a material fact to its counterparty if it knows that the counterparty is entering into the transaction based on a mistaken understanding of a material fact that is known to the party, but not known by (and not reasonably discoverable by) that counterparty.  Here, DISH knew that CBS was entering into the Retransmission Agreement based on a mistaken understanding of the facts because CBS did not know something that only DISH could know:  i.e., that DISH was about to offer a "revolutionary" service that would provide "Commercial-Free TV," thereby destroying the economic basis for the Retransmission Agreement.  Separately, under both New York and

---

[2]  DISH's concealment had nothing to do with a legitimate desire to keep business plans confidential.  DISH provided CBS with other confidential business information (such as that relating to the Hopper and PTAT), and could have asked CBS to keep any information about AutoHop confidential.  Moreover, the confidential nature of information does not obviate a duty to disclose where such information is central to one party's willingness to enter into an agreement.  *See Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 438, 448 (S.D.N.Y. 2006).

Colorado law, a party to a commercial transaction has a duty to disclose facts necessary to ensure that a partial or ambiguous statement is not misleading. Here, DISH made partial disclosures about the Hopper and PTAT, without ever disclosing that it planned to use the Hopper and PTAT to provide "Commercial-Free TV."

DISH claims that, as a matter of law, even if all of the facts alleged by CBS are taken as true (along with all reasonable inferences), the conduct described above cannot possibly give rise to any liability for fraudulent concealment. According to DISH, "mere silence" can never give rise to a fraudulent inducement claim. That is simply wrong. For decades, courts have recognized that a duty to disclose can arise in the absence of any affirmative misrepresentation. Indeed, over forty years ago, the leading authority on tort law noted that "the law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made whenever elementary fair conduct demands it." W. Prosser, *Handbook of the Law of Torts* § 106 (4th ed. 1971). Over thirty years ago, New York courts recognized that "It is no longer acceptable, if it ever was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when . . . he would reasonably expect a disclosure." *Gaines Serv. Leasing Corp. v. Carmel Plastic Corp.*, 105 Misc.2d 694, 697 (N.Y. Civ. Ct. 1980) (internal quotation and citation omitted). Twenty years ago, the Second Circuit confirmed that a duty of disclosure arises "in an array of contexts in which silence would at one time have escaped criticism." *Brass v. Am. Film Technologies*, 987 F.2d 142, 151 (2d Cir. 1993) (abrogated on unrelated grounds).

Thus, based upon the facts CBS has alleged, the law imposed on DISH a duty to disclose its plan to offer "Commercial-Free TV," which it knew would undermine the basic economics of the Retransmission Agreement. DISH may dispute some of the facts CBS has alleged that

3

establish the existence of that duty, but any such factual dispute cannot be resolved on a motion to dismiss.  DISH's motion should therefore be denied.

## STATEMENT OF FACTS

A.     **CBS Entered Into The Retransmission Agreement So That DISH Subscribers Would Be Included In The Potential Audience For Commercials Aired On CBS.**

CBS is one of the four major networks that broadcasts television programming to the American public for free, via traditional over-the-air broadcasts.  [Am. Countercls. ¶ 23].  In addition to being broadcast for free to millions of Americans "over-the-air," CBS's television programming is also retransmitted to many Americans by subscription-based cable and satellite companies such as DISH.  [*Id.*].  While CBS receives retransmission fees from cable and satellite providers, the "primary means of payment" for the television content that CBS broadcasts comes from the sale of commercial advertising.  [*Id.* at ¶ 24].  Indeed, commercial advertising is the primary revenue source that supports the programming aired by CBS regardless of "whether viewers watch programming free over-the-air or through paid services that retransmit broadcast signals (such as those offered by the DISH Parties)."  [*Id.*].  As alleged in the Amended Counterclaim:  "Commercial advertising is the lifeblood of broadcast television," as it "generates the revenue necessary to support the enormously expensive investment required to create this television programming."  [*Id.* at ¶ 6].

The more viewers who are exposed to the commercials contained within CBS programming, the more money CBS is able to generate from the sale of the air time used to run those commercials.  [*Id.* at ¶ 9].  Thus, an essential reason why CBS enters into retransmission agreements with cable and satellite providers like DISH is that "the existence of those DISH viewers contributes to CBS's ability to generate advertising revenue from commercials."  [*Id.* at

4

¶ 4].  Accordingly, "the basic economics and nature of the Retransmission Agreement" depends upon exposing DISH's subscribers to the commercials shown on CBS.  [*Id.*].  While there is no guarantee that any viewer will watch any given commercial, an essential purpose behind CBS's entering into the Retransmission Agreement with DISH was to increase CBS's advertising revenue by creating a larger potential audience for the commercials shown on CBS.  [*Id.* at ¶¶ 4-6, 23-24, 51, 96].

  **B.**  **DISH Knew That CBS Would Not Enter Into The Retransmission Agreement If It Knew That DISH Was Going To Offer "Commercial-Free TV."**

  As explicitly alleged in the Amended Counterclaims, "If DISH had requested from CBS the right to offer its subscribers the programming carried through the CBS Broadcast Signal with all commercials automatically removed from what DISH subscribers would see, that would have fundamentally altered the basic economics and nature of the Retransmission Agreement.  Indeed, at the time the Retransmission Agreement was negotiated, *DISH knew* that CBS would not have been willing to enter into the Retransmission Agreement if CBS had been aware that DISH would attempt to use its limited access to the CBS Broadcast Signal as a vehicle for offering CBS's primetime programming to DISH subscribers on an on-demand, commercial-free basis." [*Id.* at ¶ 4].

  The Retransmission Agreement was intended to provide DISH with only "*limited rights to retransmit to its subscribers*" the CBS Broadcast Signal.  [*Id.* at ¶ 3 (emphasis added)].  ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.  In order to offer commercial-free TV, DISH had to create unauthorized copies of CBS's programming in order to test AutoHop, [Am. Countercls.

¶¶ 38-40], in breach of the Retransmission Agreement.[3]  Moreover, the Retransmission

Agreement does not permit DISH to alter the content of anything aired on CBS, and does not

anywhere suggest that DISH has the right to offer its subscribers any of CBS's programming on

a "commercial-free" basis.

### C. DISH Knew That It Was Going To Offer Commercial-Free TV, But Deliberately Concealed That Fact From CBS.

DISH and CBS engaged in negotiations of the Retransmission Agreement throughout

several months of 2011, with intensive discussions in December 2011 and the first week of

January 2012.  [*Id.* at ¶ 43].  During those negotiations, DISH knew that it intended, very soon

after the Retransmission Agreement was finalized, to offer its subscribers a "commercial-

skipping" service called "AutoHop," which it planned to market to subscribers as providing

"Commercial-Free TV."  [*Id.* at ¶¶ 31-34, 43, 49, 50].  DISH also knew that offering

"Commercial-Free TV" was fundamentally inconsistent with the "basic economics and nature"

of the Retransmission Agreement.  [*Id.* at ¶ 4].  Nevertheless, at no point during those

negotiations did anyone from DISH disclose anything at all to anyone at CBS regarding

AutoHop or DISH's plan to offer its subscribers "Commercial-Free TV."  [*Id.* at ¶¶ 43-44].

Indeed, as alleged in the Amended Counterclaims:  "During discovery in this action, it

has been revealed that during 2011, DISH initially intended to release the Hopper in February

2012 with both PrimeTime Anytime and AutoHop services included.  Thus, during the

negotiation of the Retransmission Agreement, DISH intended to offer the AutoHop service as

---

[3]  These "Quality Assurance" copies that were used to test AutoHop and ensure it offered an accurate commercial-skipping service were indisputably made *by DISH and EchoStar*, and were not even arguably made by DISH's subscribers.  [*Id.* at ¶¶ 38-40, 92].  The only court to address the legality of these copies concluded that they violated copyright law.  *Fox Broad. Co. v. Dish Network, L.L.C.*, -- F. Supp. 2d --, No. 12-CV-04529, 2012 WL 5938563, at *14 (C.D. Cal. Nov. 7, 2012).  For that reason, DISH has subsequently decided to cease making these "Quality Assurance" copies.  But that does not change the fact that, during its negotiation of the Retransmission Agreement, it planned to offer a commercial-skipping service that it knew would be implemented and "quality checked" through the creation of unauthorized copies in direct breach of the Retransmission Agreement.

part of the Hopper, but deliberately chose to conceal this fact from CBS." [*Id.* at ¶ 50 (emphasis added)].  Therefore, although DISH strategically waited until May of 2012 to publicly release its AutoHop service and to begin marketing the Hopper as providing "Commercial-Free TV," [*id.* at ¶ 49], DISH originally intended to offer AutoHop immediately after the Retransmission Agreement was executed.  [*Compare id.* at ¶ 42 *with id.* at ¶ 50].

DISH chose not to disclose to CBS its plan to offer "Commercial-Free TV" even though DISH knew that (a) a material reason for CBS to enter into the Retransmission Agreement was to gain the ability to expose DISH subscribers to the paid advertising contained in the CBS Broadcasting Signal, [*id.* at ¶ 4], (b) the viewing of commercials in the CBS programming was central to the "basic economics and nature of the Retransmission Agreement" from CBS's perspective, [*id.*], and (c) CBS had specifically made clear that it did not want the Retransmission Agreement to include any "new businesses" or "other new platforms" that DISH may wish to offer in the future.  [*Id.* at ¶ 45].

    **D.    DISH Made A Partial Disclosure Regarding The Hopper That Was Misleading Because DISH Did Not Disclose That The Hopper Would Offer Commercial-Free TV.**

During the period of December 18-21, 2011, CBS executives met with DISH executives to negotiate and finalize the Retransmission Agreement.  [*Id*. at ¶¶ 45-46].  During those negotiations, DISH deliberately provided CBS with an incomplete description of its newly-planned Hopper DVR.  Specifically, during a meeting on December 21, 2011, "DISH Chairman Charles Ergen, together with DISH executives Joe Clayton and David Shull, met separately with Mr. Franks of CBS in DISH's offices.  During this meeting, Messrs. Ergen and Clayton discussed the Hopper and showed Mr. Franks the Hopper's logo, a stuffed animal in the form of a kangaroo.  However, during this meeting, neither Mr. Ergen nor anyone else at DISH made any

reference to AutoHop or any other system that had been developed to enable the Hopper to record and playback primetime broadcast programming on a commercial-free basis." [*Id.* at ¶ 47]. Moreover, as DISH concedes, shortly before the Retransmission Agreement was executed, DISH sent CBS a description of the Hopper that included what DISH now calls a "limited courtesy heads-up" regarding PTAT. [DISH Br. at 4; *see also id.* at 1, 2, 3, 10, 14]. But that disclosure was incomplete, most importantly because DISH deliberately chose not to disclose the *central* and *most important* fact about the Hopper and PTAT—that they were going to be combined with AutoHop to provide subscribers "Commercial-Free TV." [Am. Countercls. at ¶¶ 33-34, 47-49, 50].

### E.   Because Of DISH's Concealment, CBS Relied On Its Mistaken Understanding That DISH Would Retransmit The Entirety Of CBS's Programming To Its Subscribers, Without Offering "Commercial-Free TV."

CBS executed the Retransmission Agreement on January 5, 2012. [*Id.* at ¶ 42]. Four days later, DISH issued a press release on the Hopper and PTAT. [*Id.* at ¶ 48]. On March 15, 2012, DISH began selling the Hopper and PTAT, [*id.* at ¶ 28]; then on May 10, 2012, DISH began offering AutoHop, which is a "companion service" to PTAT that was originally intended to be released at the same time as PTAT, in February 2012. [*Id.* at ¶¶ 30, 50].

Had CBS known that DISH had a secret plan to offer "Commercial-Free TV" (i.e., AutoHop), and intended to do so immediately after the Retransmission Agreement was executed, CBS would not have entered into the Retransmission Agreement on the terms set forth in the current agreement. [*Id.* at ¶ 101]. CBS relied on DISH's obligation to retransmit the CBS Broadcast Signal in its entirety (including all commercials), without offering its subscribers a service that would automatically remove all commercials during the most valuable primetime programming. [*Id.* at ¶¶ 4, 6, 9, 107]. CBS also relied on the fact that, prior to AutoHop, the

8

playback of television programming recorded on a DVR always included the commercials.  By

contrast, AutoHop *automatically removes all commercials* from the playback.  [*Id.* at ¶ 30].

DISH has publicly touted the fact that AutoHop is a radical departure from anything consumers

may have used in the past to manually fast-forward through commercials, stating that AutoHop

is "*a revolutionary development*," [*id.* at ¶ 34 (emphasis added)], and that "*DISH created*

*commercial-free TV*."  [*Id.* at ¶ 33 (emphasis added)].  The *Wall Street Journal* reported that

DISH's Chief Executive called AutoHop "the Holy Grail of television viewers for 40 years."[4]

Unlike fast-forward buttons, however, AutoHop fundamentally threatens the basic economics of

the broadcast television business.  [*Id.* at ¶¶ 4-9, 23-27, 31-34, 54-55].[5]

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), the complaint need only "contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Co. v. Twombly*, 550 U.S. 544,

570 (2007)).  On a motion to dismiss, "[t]he court accepts all well-pleaded allegations in the

complaint as true, drawing all reasonable inferences in the plaintiff's favor."  *Operating Local*

*649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010).[6]

---

[4]  http://online.wsj.com/article/SB10001424052702304070304577396470142982532.html.  This Court may take judicial notice of such public reporting.  *E.g., Gonzales v. National Westminster Bank PLC*, 847 F. Supp. 2d 567, 569 (S.D.N.Y. 2012).

[5]  ███████████████████████████████████████████████████████████████  By contrast, a consumer watching a PTAT-record program that is subject to AutoHop will automatically miss all commercials.  [Am. Countercl. at ¶ 30].

[6]  In addition, Rule 9(b) requires a plaintiff alleging fraud to plead with "particularity."  While DISH refers to Rule 9(b) in a conclusory manner, [DISH Br. at 7], it does not argue that CBS's fraud claim should be dismissed for failure to satisfy Rule 9(b), and does not identify Rule 9(b) in its pre-motion letter to CBS required by this Court's Individual Practices.  [Schiller Decl. Ex. 1].  Thus, DISH has waived any argument under Rule 9(b).  *See Todaro v. Orbit Int'l Travel, Ltd.*, 755 F. Supp. 1229, 1234 (S.D.N.Y. 1991).

## I.   NEW YORK LAW APPLIES TO THE CBS FRAUD CLAIM.

DISH incorrectly asserts that Colorado law governs CBS's fraud claim.  [DISH Br. at 8].

### A.   The Choice-of-law Provision In The Retransmission Agreement Is Irrelevant.

DISH relies in part on the provision in the Retransmission Agreement stating, "This Agreement shall be governed by and construed under" Colorado law.  [DISH Br. at n.2; *see also* Schiller Decl. Ex. 1 at ¶ 18].  But this provision is inapplicable.  New York law does not construe "contractual choice-of-law clauses broadly to encompass extra-contractual causes of action." *Fin. One Public Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 334 (2d Cir. 2005). Instead, New York law treats tort claims as "outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract."  *Id.* at 335. This includes fraud-based claims that are incidental to the contract.  *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (fraud claim relating to a loan not governed by contractual provision stating that the loan agreement "shall be governed by" Massachusetts law).  The choice-of-law provision in the Retransmission Agreement does not purport to apply to anything other than the Agreement; it therefore does not govern the CBS fraud claim.[7]

### B.   Because There Is No Relevant Conflict Between New York And Colorado Law, New York Law Governs.

Since the choice-of-law provision in the Retransmission Agreement is irrelevant, the question of what law governs the CBS fraud claim is determined by New York's general choice-of-law rules.  *See Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012) ("A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state.").  Under New York's choice-of-law rules, "the first question to resolve in

---

[7]  The Retransmission Agreement's choice-of-law provision is narrow, and does not refer to claims "arising out of or relating to the Agreement."  This confirms it cannot be construed to apply to non-contractual claims such as the CBS fraud claim.  *See, e.g.*, *Krock*, 97 F.3d at 645; *Fin. One Pub. Co. Ltd.  v. Lehman Bros. Special Fin., Inc.*, No. 00-CV- 6739, 2001 WL 1543820, at *2 (S.D.N.Y. Dec. 4, 2001), *aff'd*, 414 F.3d 325 (2d Cir. 2005).

determining whether to undertake a choice of law analysis is whether there is an actual conflict

of laws." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).[8]  Where there is no conflict, a

New York court should apply New York law.  *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422

(2d Cir. 2006) (determining that if there is no conflict, "for practical reasons, that is, for ease of

administrating the case, New York, as the forum state, would apply its law").

DISH fails to identify any relevant conflict between New York and Colorado law relating

to its motion, and CBS agrees that no such conflict exists.  Thus, because there is no conflict, this

Court should apply New York law.  Nevertheless, in the event this Court disagrees with the

foregoing analysis, and in order to provide a complete presentation of the potentially relevant

law (and to demonstrate that no conflict exists), CBS will cite to both New York and Colorado

law in addressing DISH's arguments for dismissal.

### C.   New York's Choice-of-Law Rules Provide That If There Is A Relevant Conflict Between New York And Colorado Law, New York Law Governs.

In the event this Court concludes that a relevant conflict exists between New York and

Colorado law, New York's choice-of-law principles dictate that this Court should apply New

York law.  For fraud claims, "New York courts apply an 'interest analysis', giving 'controlling

effect to the law of the jurisdiction which, because of its relationship or contact with the

occurrence or the parties, has the greatest concern with the specific issue raised in the

litigation.'"  *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 124 (S.D.N.Y.

2010) (quoting *Babcock v. Jackson*, 191 N.E.2d 279, 283 (N.Y. 1963)).  Under this test, "the

locus of the fraud is the place where the injury was inflicted, as opposed to the place where the

---

[8]  A choice-of-law analysis is unnecessary "in the absence of an 'actual conflict' between the applicable rules of two relevant jurisdictions." *Fin. One*, 414 F.3d at 331 (quoting *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993)).  An "actual conflict" exists "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley*, 153 F.3d at 12.  The differences must be "relevant to the issue at hand and must have a significant possible effect on the outcome of the trial." *Fin. One*, 414 F.3d at 331 (internal quotes, cites and emphasis omitted).

fraudulent act originated." *Id.* (internal quotation marks omitted).  Thus, in most fraud cases, New York courts have held that the jurisdiction which has the greatest interest in the litigation is the state "where the plaintiff is located." *Id*.  As one court has explained, "the place of injury controls." *Day Spring Enters., Inc. v. LMC Int'l, Inc.*, No. 98-CV-0658A, 2004 WL 2191568, at *30 (W.D.N.Y. 2004) (citing cases); *see also J.A.O. Acquisition Corp. v. Stavitsky*, 745 N.Y.S.2d 634, 639 (N.Y. Sup. Ct. 2001).

CBS's principal place of business is in New York, and therefore it suffered (and continues to suffer) injury in New York.  [Am. Countercls. ¶ 11].  Since "the place of injury controls," New York law applies.[9]  The fact that some of the negotiations were conducted in Colorado does not change where the injury was suffered (moreover, CBS conducted most of the negotiations from its New York offices [*id.* at ¶ 43]).

## II.  CBS HAS ALLEGED FACTS THAT STATE A CLAIM FOR FRAUDULENT CONCEALMENT AND INDUCEMENT.

Under New York law, a plaintiff claiming fraudulent concealment must allege facts showing "(1) that the defendant failed to meet its duty to disclose," "(2) that the defendant had an intent to defraud," "(3) there was reliance on the part of the plaintiff, and (4) damages."  *Brass*, 987 F.2d at 152.[10]  DISH bases its motion solely on the assertion that CBS has failed to allege facts sufficient to satisfy the "duty to disclose" element and the "reasonable reliance" element.  [DISH Br. at 8-13, 13-14].

---

[9]  CBS also alleges injury to copyrights held by the three CBS Copyright Holders, two of which have their principal place of business in New York, and none of which are located in Colorado.  [*Id.* at ¶¶ 12-14].  The law of the state where the copyright holder resides generally has the greatest interest and should control.  *See Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 90 (2d Cir. 1998).

[10]  While numbered differently, the elements of a fraudulent concealment in Colorado are the same:  "(1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages."  *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1361 (Colo. 1993).  As shown below, there does not appear to be a conflict between the law in the two states regarding the "duty to disclose" and "reasonable reliance" elements on which DISH's motion is based.

In support of both arguments, DISH asks this Court to find that it was "unremarkable" for DISH to conceal from CBS its plan to offer the AutoHop commercial-skipping service because AutoHop is nothing more than another "product development" feature that relates to "time-shifting," and is simply an "enhanced" version of a fast-forward or 30-second skip button.  [*Id*. at 11, 13-14].  These assertions are not an appropriate basis on which to make a motion to dismiss, since they ask this Court to reject CBS's factual allegations, and to accept as true DISH's assertions in support of its motion.  That is the opposite of what the law requires.  *Operating Local 649*, 595 F.3d at 91.  Moreover, DISH itself has told the public that AutoHop is "a revolutionary development," [*id*. at ¶ 34], and the "Holy Grail" of television.  [Note 4, *supra*].

### A.   DISH Owed CBS A Duty To Disclose Its Plan To Offer "Commercial-Free TV" Through Its "Revolutionary" AutoHop Service.

DISH argues that it had no duty to disclose its plan to offer "Commercial-Free TV" because DISH and CBS are sophisticated parties who were negotiating a commercial transaction.  That is incorrect.  Sophisticated parties are not exempt from the law of fraud.  Both New York and Colorado law hold that a party to an arm's-length, commercial transaction has a duty to disclose facts to the other party in a number of situations, including these:

*First*, under the "special facts" doctrine, New York law holds that a duty to disclose arises "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."  *Brass*, 987 F.2d at 150 (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir. 1984)).  Similarly, Colorado law holds that a person has a duty to disclose material facts to the other party that "in equity or good conscience" should be disclosed, *Berger v. Sec. Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1383 (Colo. App. 1990); in applying that standard, the Colorado Supreme Court has held that "one party to a business transaction has a duty to disclose facts

basic to the transaction when objective circumstances create a reasonable expectation of disclosure of those facts"—i.e., a party must disclose such facts "if he knows that the other is about to enter into [the transaction] under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade *or other objective circumstances, would reasonably expect a disclosure of those facts*."  *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 965 P.2d 105, 111 (Colo. 1998) (quoting Restatement (Second) of Torts, Section 551(2)(e)).

*Second*, New York law holds that a party has a duty to disclose facts "where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth."  *Brass*, 987 F.2d at 152 (citation omitted).  Similarly, Colorado law recognizes that "a party has a duty to disclose if he has stated facts that he knows will create a false impression unless other facts are disclosed." *Greenway Univ., Inc. v. Greenway of Arizona, LLC*, No. 11-CV-01055, 2012 WL 1801948, at *3 (D. Colo. 2012) (quoting *Berger*, 795 P.2d at 1383).

Indeed, the two factual scenarios described above as giving rise to a duty to disclose are both expressly set forth in the Restatement (Second) of Torts as among the fact patterns that trigger a duty to disclose in the context of a commercial transaction.  Section 551(2) of the Restatement states in relevant part:

> "One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> .......
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> .........
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

Restatement (Second) of Torts § 551(2).

14

In this case, both of the foregoing fact scenarios are present, each of which independently imposed a duty on DISH to disclose its plan to offer "Commercial-Free TV" through its "revolutionary" AutoHop service.

       1.    DISH Had A Duty To Disclose Under The "Special Facts" Or "Basic Facts" Doctrine.

As shown above, New York law imposes a duty to disclose "under the special facts doctrine, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 582 (2d Cir. 2005) (internal quotation marks omitted).

Here, DISH obviously possessed "superior knowledge" about its impending release of AutoHop, which was information that was unknown to CBS and "not readily available" to CBS, until after the January 5, 2012 execution of the Retransmission Agreement (i.e., not until DISH publicly announced AutoHop in May 2012).  [Am. Countercls. ¶¶ 43-44, 50-51].[11]  DISH knew that in executing the Retransmission Agreement, CBS was "acting on the basis of mistaken knowledge"—i.e., "at the time the Retransmission Agreement was negotiated, DISH knew that CBS would not have been willing to enter into the Retransmission Agreement if CBS had been aware that DISH would attempt to use its limited access to the CBS Broadcast Signal as a vehicle for offering CBS's primetime programming to DISH subscribers on an on-demand, commercial-free basis."  [*Id.* at ¶ 4; *see also id.* at ¶¶ 6-9, 51].  Indeed, DISH knew that the fundamental reason for CBS to enter into the Retransmission Agreement was to ensure that DISH's subscribers would be included in the potential audience for the commercials shown on CBS, and that for DISH to offer "Commercial-Free TV" would destroy the "fundamental nature

---

[11]  DISH admits in its brief that it treated AutoHop as "highly confidential."  [DISH Br. at 3].  But CBS is not claiming DISH was obligated to inform *the public* about AutoHop prior to May 2012, only that it was obligated to disclose AutoHop *to CBS* prior to executing their contract, which it obviously could have done confidentially.

and purpose" of the Agreement.  [*Id.* at ¶¶ 4, 6].  Moreover, DISH knew that CBS did not intend the Retransmission Agreement to authorize DISH to launch any "new businesses" or "other new platforms."  [*Id.* at ¶ 45].  DISH also knew that the Retransmission Agreement prohibited the unauthorized copies that DISH knew it was going to use to run "Quality Assurance" checks that would enable AutoHop to offer "Commercial-Free TV."  [*Id.* at ¶¶ 38-40, 52].  Thus, CBS has alleged facts showing that DISH knew CBS was going to execute the Retransmission Agreement based upon a profoundly mistaken understanding, and knew that CBS would never have entered into that Agreement if it had known the truth about AutoHop.  These allegations must be taken as true for purposes of resolving DISH's motion, and they easily satisfy New York's "special facts" doctrine so as to impose on DISH a duty to disclose.

Even if this Court applied Colorado law, the result would be no different.  Colorado law recognizes a duty to disclose "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customers of the trade *or other objective circumstances, would reasonably expect a disclosure of those facts*."  *Mallon*, 965 P.2d at 111 (quoting Restatement (Second) of Torts § 551(2)(e) (emphasis in original)).  The facts summarized above demonstrate that the ability to expose DISH subscribers to CBS's primetime commercial advertising was central to the "basic economics and nature" of the Retransmission Agreement, [*id.* at ¶ 4], since that advertising formed the "primary means of payment" that CBS receives to cover the cost of generating its television programming, [*id.* at ¶ 24].  Thus, the removal of all commercials from CBS's primetime programming contradicts a fact that was "basic to the transaction."  *Mallon*, 965 P.2d at 111.

16

Similarly, the "objective circumstances" show that CBS reasonably could expect DISH to disclose an intention to offer "Commercial-Free TV."  It was reasonable for CBS to expect such a disclosure because:

- DISH knows that commercial advertising in primetime is fundamental to CBS's business model.  [*Id.* at ¶ 9].

- CBS told DISH that it did not want the Retransmission Agreement to enable DISH to offer any "new businesses" or "new platforms."  [*Id.* at ¶ 45].

- DISH knew that the Retransmission Agreement prohibited it from engaging in the unauthorized copying that was central to its ability to run quality control checks on AutoHop and thereby to offer "Commercial-Free TV."  [*Id.* at ¶¶ 38-40, 52].

DISH ignores all of the foregoing, and relies instead on an inaccurate assertion that under Colorado law there can be no duty to disclose unless there is an "affirmative misrepresentation" or a statement that either "was false" or "becomes false."  [DISH Br. at 9].  That is not correct. The Colorado Supreme Court has held that a person has a duty to disclose "material facts that 'in equity or good conscience' should be disclosed."  *Mallon,* 965 P.2d at 111.  This standard applies to everyone:  there is no exception for sophisticated parties engaged in commercial transactions. In addition, the Colorado Supreme Court has held that Section 551(2)(e) of the Restatement (Second) of Torts "provides helpful guidance" to "determine whether the circumstances of a particular case give rise to a duty to disclose in 'equity or good conscience.'"  *Id.*  As shown above, Section 551(2)(e) states that a party to a commercial transaction has a duty to disclose facts where necessary to avoid a partial or ambiguous statement from being misleading, and where the party knows that the other party is entering into the transaction based on a mistaken understanding of a fact that is "basic to the transaction."  Thus, there is no need to demonstrate an affirmative misrepresentation in order to bring a fraudulent concealment claim in Colorado.

The two cases on which DISH relies most heavily both involved negotiations for an agreement to settle ongoing litigation.  [DISH Br. at 8-11 (discussing *Vickery v. Evelyn V. Trumble Living* Trust, 277 P.3d 864 (Colo. Ct. App. 2011); *Poly Trucking, Inc. v. Concentra Health Servs., Inc.*, 93 P.3d 561 (Colo. App. 2004)].  DISH relies on the statement in *Poly Trucking* that "'concealment by mere silence is not enough to constitute fraud.'"  [DISH Br. at 9 (quoting *Poly Trucking*)].  But DISH fails to include the entire quote, which states that "*In such an adversarial relationship*, concealment by mere silence is not enough to constitute fraud." *Poly Trucking*, 93 P.3d at 565 (emphasis added).  In *Poly Trucking*, the parties were engaged in a classic "adversarial relationship"—a wrongful death litigation that was pending at the time they engaged in the settlement discussions that gave rise to the fraudulent concealment claim.  *Id.* at 562-63.  Indeed, *Poly Trucking* emphasized the "adversarial context of settlement negotiations" as an important consideration in its ruling.  *Id.* at 566.  Similarly, the parties in the *Vickery* case were complaining about lack of disclosure in the context of a discussion to resolve the third of three successive lawsuits over a highly contentious administration of a decedent family member's estate.  *Vickery*, 277 P.3d at 866-67.

DISH claims that *Poly Trucking* is especially "instructive," [DISH Br. at 10], but the facts of that case confirm that it is inapposite.  The plaintiff (Concentra) was complaining about a fact that was self-evident *on the face of its settlement agreement* with Poly Trucking:  i.e., that Poly Trucking was releasing *only* Concentra from any liability claims, and not the individual doctors associated with Concentra.  *Poly Trucking*, 93 P.3d at 563.  The initial draft of the settlement agreement would have released all of Concentra's "agents" and "employees," but a later draft removed that language and released *only* Concentra.  *Id.*  Moreover, "Concentra prepared each draft of the agreement," and therefore obviously knew (or should have known) the

differences between the drafts, and what parties were and were not released. *Id.* Thus, *Poly Trucking* was really a reformation case, in which Concentra was suing to have the settlement agreement rewritten to reflect its alleged understanding of the settlement, and in the alternative was advancing a fraud claim that, in essence, asserted that Poly Trucking had a duty to point out to Concentra a provision in the contract that it might wish to revise. *Id.* Since Concentra had ample opportunity to review the agreement and knew (or should have known) what it said, the appeals court held that it was not entitled to reformation. *Id.* at 563. For essentially the same reason, the court also held that Concentra could not claim fraudulent concealment. *Id.* at 565 ("we conclude that the failure of Concentra to inspect the settlement agreement adequately before signing it, or to consider thoroughly whether the agreement completely protected its interests, cannot be imputed to Poly as fraudulent behavior.").

By contrast, there is nothing in the Retransmission Agreement that authorizes DISH to offer "Commercial-Free TV." Thus, CBS is not trying to reform the Retransmission Agreement, like the plaintiff in *Poly Trucking*. To the contrary, CBS is suing DISH for breach of the Retransmission Agreement, as well as for fraud. CBS alleges that during the negotiations of the Retransmission Agreement, DISH knew that it was going to be offering "Commercial-Free TV" through its AutoHop service, [Am. Countercls. at ¶¶ 43-44, 50], knew that CBS would never agree to execute the Retransmission Agreement if it knew about that plan, [*id.* at ¶¶ 45], and also knew that in order to launch its secret AutoHop service, DISH would be making unauthorized copies of CBS programming *in violation of the Retransmission Agreement*. [*Id.* at ¶¶ 38-40]. Thus, unlike *Poly Trucking*, this is not a case in which the defendant simply kept quiet about the plain terms of the contract; this is a case in which the defendant kept secret its intent to offer a

service that would fundamentally undermine an essential purpose of the contract, and that would be implemented through a series of contractual breaches.[12]

DISH also seizes upon language used in *Poly Trucking* and *Vickery* suggesting that there needs to be "some trick or contrivance" to give rise to a fraudulent concealment claim in Colorado.  [DISH Br. at 9-10].  But the actual statement from *Poly Trucking* is much more limited.  It states that "we conclude that where mere silence is involved, as opposed to some 'trick or contrivance,' such a duty only arises where, unlike here, at least one of the criteria in Restatement § 551(2) is met."  *Poly Trucking*, 93 P.3d at 566.  Thus, *Poly Trucking* held that where one of the criteria set forth in Restatement § 551(2) is met (as is the case here), it is not necessary to show a "trick or contrivance."[13]  In any event, the deceit in this case *was* a "trick or contrivance":  DISH purported to negotiate in good faith to retransmit CBS's programming to DISH subscribers, knowing full well that (a) CBS's interest was for DISH's subscribers to be included in the potential audience for the commercials shown on CBS, especially during primetime, and (b) DISH was going to undermine that interest by offering "Commercial-Free TV" soon after the Retransmission Agreement was executed.

> 2.  DISH Had A Duty To Disclose Because Its Partial Disclosure About The Hopper Was Misleading Without Also Disclosing That The Hopper Was Going To Provide "Commercial-Free TV."

Independent of the "special facts" doctrine, DISH also owed CBS a duty to disclose AutoHop based on DISH's partial and incomplete statements about the Hopper and PTAT.  A duty to disclose is owed "where a party to a business transaction has made a partial or ambiguous statement," since "once a party has undertaken to mention a relevant fact to the other party it

---

[12]  The Tenth Circuit has refused to apply *Poly Trucking* where, as here, the defendant made misleadingly incomplete disclosures.  *Level 3 Commcn's, LLC v. Liebert Corp.*, 535 F.3d 1146, 1164 (10th Cir. 2008).

[13]  This is consistent with the fact that the Colorado Supreme Court's most recent articulation of fraudulent concealment has not mentioned a "trick or contrivance" standard.  *Mallon*, 965 P.2d at 111.

cannot give only half of the truth." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 201 (S.D.N.Y. 2011); *see also TVT Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 91 (2d Cir. 2005) ("In the context of a business transaction, the duty to disclose arises where a party, with a duty to be complete, has made only a partial or ambiguous statement . . . ."); *Aetna Cas.*, 404 F.3d at 582 ("A duty to disclose arises . . . where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure.") (internal cite omitted); *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995) ("In business negotiations, an affirmative duty to disclose material information may arise from the need to complete or clarify one party's partial or ambiguous statement . . . .") (internal citations omitted).[14]

During negotiations over the terms of the Retransmission Agreement, DISH informed CBS about current and future product developments, including its new DVR called "the Hopper." [Am. Countercls. ¶ 44]. DISH also gave CBS a partial (but ambiguous) description of PTAT. But DISH never disclosed its intent to use the Hopper and PTAT to offer "Commercial-Free TV." [*Id.* at ¶¶ 43-44, 47]. Absent a disclosure about AutoHop, the partial disclosure about the Hopper and PTAT was a misleading "half truth," since it gave no indication that the Hopper and PTAT were going to be the vehicles by which DISH was going to "create" its "revolutionary" new service of offering "Commercial-Free TV." [*Id.* at ¶¶ 31-34, 47-51].

Yet, ████████████████████████████████████████████

████████████████████████████████████████████████████

████████. According to DISH, offering "Commercial-Free TV" is just another form of "time-

---

[14]  Colorado law is the same, imposing a duty on a party to disclose "matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading." *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, 569 F. Supp. 2d 1135, 1141-42 (D. Colo. 2008).

shifting technology," since "commercial-skipping has been part and parcel of time-shifting since the days of the Betamax." [DISH Br. at 12]. That is wrong for numerous reasons.

First, AutoHop is *not* a "time-shifting technology"; it is a *commercial-skipping* service that offers "Commercial-Free TV." [Am. Countercls. ¶¶ 4, 43]. The Supreme Court's decision in the Betamax case described "time-shifting" as "the practice of recording a program to view it once at a later time, and thereafter erasing it." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 423 (1984). This definition does not include any form of commercial-skipping technology. Indeed, the Supreme Court made clear that it was *not* addressing the practice of making copies in order to fast forward through commercials, since the trial record in that case showed that most people did not use the fast forward function. *Id.* at 423 n.36. Certainly the Supreme Court did not use the term "time shifting" to encompass a technology that *automatically skips all commercials* during playback.[15]

Moreover, DISH cannot simultaneously claim that commercial-skipping has been "part and parcel" of time-shifting since the days of the Betamax, while also describing AutoHop as "revolutionary" and the "Holy Grail" of television. [*Compare* DISH Br. at 12 *with* Am. Countercl. at ¶¶33-34, note 4 *supra*]. CBS alleges that offering "Commercial-Free TV" is a radical departure from past practice, and any contrary assertion requires a fact finding that is inappropriate on a motion to dismiss.

██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[15] The fact that AutoHop works on recorded programs does not make AutoHop a "time-shifting" technology: AutoHop does not allow subscribers to watch programs at a different time (i.e., "time-shifting technology"); rather, AutoHop allows subscribers to watch programs "commercial free" (i.e., "commercial-skipping" technology).

████████████████████████████████████████████████

████████████████████████████████████.[16]

### 3. At Most, DISH Raises Factual Disputes Relating To Whether It Had A Duty To Disclose, Which Cannot Be Resolved On A Motion To Dismiss.

DISH asserts that the existence of a "duty to disclose" is a "question of law" that can be resolved on a motion to dismiss.  [DISH Br. at 8].  But DISH has cited only a single inapposite case (*Vickery*) in which a motion to dismiss was granted on a fraudulent concealment claim.  Moreover, whether or not the *ultimate determination* of a duty to disclose may be one of law, that question depends upon the existence of numerous *facts* that describe the circumstances that trigger a duty to disclose.  Whether those circumstances exist presents a factual dispute.  Restatement (Second) of Torts § 551, comment m.  Here, CBS has alleged facts sufficient to trigger the duty, and it is therefore inappropriate to grant a motion to dismiss.  Indeed, as numerous cases hold, the existence of a "duty to disclose" often turns on factual issues that cannot be resolved on summary judgment, let alone a motion to dismiss.[17]

---

[16] 

[17]  *See generally Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 238 (2d Cir. 1995) (reversing summary judgment because "genuine issues of material fact exist as to whether sufficient circumstances existed here to trigger a duty on Rachman's part to disclose in this case."); *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 319 (S.D.N.Y. 2010) ("it cannot be said as a matter of law that RCM did not have a duty to disclose."); *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 232 (S.D.N.Y. 2007) ("whether Defendants made a 'partial or ambiguous statement' giving rise to a duty to disclose" may raise triable fact issue); *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 448 (S.D.N.Y. 2006) ("summary judgment is inappropriate on whether FMC had a duty to disclose"); *Kingdom 5-KR-41*, 2003 WL 262507, at *5 (denying motion to dismiss fraudulent inducement claim); *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*,  2008 WL 4065922, at *12-13  (N.Y. Sup. Ct. 2008) ("There is an issue of fact as to whether this case falls within the ambit of the special facts doctrine."); *see also Wisehart v. Zions Bancorporation*,

**B.     CBS Reasonably Relied On Its Understanding That DISH Would Not Be Offering "Commercial-Free TV."**

DISH argues that CBS fails to state a claim for fraudulent concealment because "any reliance by CBS on a purported belief that DISH would not launch an AutoHop-type feature could not have been reasonable."  [DISH Br. at 13]. ████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████

DISH also bases its argument on the assertion that "It is common knowledge" that "consumers regularly use DVRs to skip commercials on recorded programming by using the fast-forward function or a 30-second skip button on the remote control."  [DISH Br. at 13-14]. This assertion attempts to invoke facts from outside the complaint and hence is inappropriate on a motion to dismiss.  It also contradicts the allegations showing that DISH has itself claimed that AutoHop is "revolutionary" and has "created" "Commercial-Free TV," television's "Holy Grail."  [Am. Countercls. at ¶¶ 33-34; Note 4, *supra*].  These allegations show that AutoHop is a radical change from prior technology, including anything offered by a fast-forward or 30-second skip button, and thereby establish that CBS had no reason to expect DISH to offer such a service.

In any event, "whether or not reliance on alleged misrepresentations is reasonable in the context of a particular case is intensely fact–specific and generally considered inappropriate for

---

49 P.3d 1200, 1206 (Colo. App. 2002) (reversing summary judgment because "a question of fact remains" as to defendant's "duty to disclose").

determination on a motion to dismiss." *Dandong v. Pinnacle Performance Ltd.*, No. 10-cv-8086, 2011 WL 5170293, at *13 (S.D.N.Y. Oct. 31, 2011); *see also Martinez v. Nash Finch Co.*, 886 F. Supp. 2d 1212, 1220 n.8 (D. Colo. 2012) ("dismissal at the pleading stage would be inappropriate" for a common-law fraud claim where there are questions of fact on the issue of "reliance"). DISH does not cite a case granting a motion to dismiss a fraud claim based on the failure to allege facts showing reasonable reliance.[18] Moreover, its argument that CBS's reliance was unreasonable is inherently factual, since it depends on how dramatic the difference is between AutoHop and prior technologies, what CBS knew and believed, and what was "reasonable" under all the circumstances. Thus, DISH's "reasonable reliance" argument is an inappropriate basis to seek dismissal and should be rejected.

## CONCLUSION

For the foregoing reasons, this Court should deny DISH's motion to dismiss Count VII of CBS's Amended Counterclaims.

Dated: New York, New York
April 11, 2013

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

Jonathan D. Schiller
Joshua I. Schiller
575 Lexington Avenue, 7th Floor,
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

---

[18] The case DISH cites to show that a court can decide lack of reasonable reliance as a matter of law was a directed verdict *after trial*, and hence does *not* show that such a decision is appropriate on a motion to dismiss. *See RHC, LLC v. Quizno's Franchising, LLC*, No. 04-CV-985, 2005 WL 1799536, at *11 (Colo. Dist. Ct. July 19, 2005).

Hamish P.M. Hume
5301 Wisconsin Ave., NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

*Attorneys for CBS Corporation, CBS*
*Broadcasting Inc., CBS Studios Inc. and*
*Survivor Productions, LLC*