UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

IN RE AUTOHOP LITIGATION

-------------------------------------------------------x

This document relates to

DISH NETWORK, L.L.C.,

                                           Master File

         v.                            No.  12 Civ. 4155 (LTS)(KNF)

AMERICAN BROADCASTING COMPANIES,
INC. et al.,

-------------------------------------------------------x

OPINION AND ORDER (REDACTED VERSION)[1]

APPEARANCES:

ORRICK, HERRINGTON & SUTCLIFFE LLP
  By:  Peter A. Bicks, Esq.
        Elyse D. Echtman, Esq.
        Lisa T. Simpson, Esq.
        E. Joshua Rosenkranz, Esq.
51 West 52nd Street
New York, NY 10019

     *-and-*

     Annette L. Hurst, Esq.
405 Howard Street
San Francisco, CA 94105

DURIE TANGRI LLP
        Michael H. Page, Esq.
        Mark A. Lemley, Esq.
217 Leidesdorff Street
San Francisco, CA 94111
*Counsel for DISH Network, LLC*

WILLIAMS & CONNOLLY LLP
  By:  Kevin T. Baine, Esq.
        Thomas G. Hentoff, Esq.
        Hannah Stott-Bumsted, Esq.
        Stephen Joseph Fuzesi, Esq.
        Julia H. Pudlin, Esq.
725 12th Street, N.W.
Washington, D.C. 20005
*Counsel for the ABC entities*

BOIES, SCHILLER & FLEXNER LLP
  By:    Jonathan D. Schiller, Esq.
        Joshua I. Schiller, Esq.
575 Lexington Ave, 7th Floor
New York, NY 10022

     *-and-*

     Hamish P.M. Hume, Esq.
5301 Wisconsin Ave., NW
Suite 800
Washington, DC 20015
*Counsel for the CBS entities*

---

[1]     This publicly-filed version of the Opinion and Order that was originally filed on September 18, 2013, has been redacted to protect certain commercially sensitive information.

Laura Taylor Swain, United States District Judge

DISH Network, L.L.C. ("Plaintiff" or "DISH") brings this action against Defendants ABC, Inc., American Broadcasting Companies, Inc., Disney Enterprises, Inc. (these ABC entities are collectively referred to as "ABC"), CBS Corporation, CBS Studios, Inc. and Survivor Productions, L.L.C. (these CBS entities are collectively referred to as "CBS"),[2] seeking a declaratory judgment that its PrimeTime Anytime ("PTAT") and "AutoHop" services do not infringe ABC's copyrights or breach DISH's contractual agreements with ABC or CBS.  Two motions are currently pending before this Court.  ABC moves for a preliminary injunction preventing DISH from offering its PTAT and AutoHop services to DISH subscribers (docket entry number 149) and DISH moves to dismiss Count VII of CBS's Amended Counterclaims against DISH, which asserts a claim based on fraudulent concealment during contract negotiations (docket entry number 198).

The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) and 28 U.S.C. § 1332.  The Court has considered carefully the parties' submissions and arguments and, for the following reasons, both motions are denied in their entirety.  Section I of this Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rules of Civil Procedure 52 and 65, with respect to ABC's motion for a preliminary injunction.  Section II addresses DISH's motion to dismiss Count VII of CBS's Amended Counterclaims.

---

[2]     Additional defendants Fox Entertainment Group, Inc., Fox Television Holdings, Inc., and Fox Cable Network Services, L.L.C. ("Fox") were terminated from this action on July 9, 2012, and defendant NBC Universal Media, L.L.C. was terminated on March 15, 2013.

I.

ABC's MOTION FOR A PRELIMINARY INJUNCTION

A.   Findings of Fact[3]

1.   The Parties and General Background

The following findings of fact are based on the parties' uncontroverted factual submissions.  DISH is one of the nation's largest pay-television providers.  It delivers satellite television services by, inter alia, contracting with the major television networks through retransmission agreements.  DISH pays yearly retransmission fees under these agreements.

ABC and CBS are two of the four major broadcast networks (along with NBC and Fox) that dominate primetime.[4]  ABC and CBS broadcast their programming for free to millions of Americans who watch television through over-the-air antennas and they also distribute their programming through cable, satellite, and similar services offered by providers like Comcast, Time Warner Cable, DirecTV and DISH, who charge fees to their subscribers.[5]  Although ABC and CBS

---

[3]   The subject matter of this suit has been discussed extensively in the Court's prior decisions, familiarity with which are presumed.  See, e.g., DISH Network, L.L.C. v. Am. Broad. Companies, Inc., 12 Civ. 4155(LTS)(KNF), 2012 WL 2719161 (S.D.N.Y. July 9, 2012).

[4]   The term "primetime," as used in this Opinion, means the time periods between 8:00 p.m. and 11:00 p.m. on Monday through Saturday and between 7:00 p.m. and 11:00 p.m. on Sunday for the East Coast and West Coast time zones and shows aired between 7:00 p.m. and 10:00 p.m. on Monday through Saturday and between 6:00 p.m. and 10:00 p.m. on Sunday for the Central and Mountain time zones.

[5]   ABC also provides digital versions of its programs online, on its website and authorized third party websites; commercial-free versions of its programs for paid downloading from services like Apple (iTunes) and Amazon; for sale, commercial-free, DVDs and Blu-ray Discs of its programs; and subscription, commercial-free VOD programming through sites like Netflix and Amazon Prime.  Customers with high-speed Internet access can also have ABC programming streamed to their desktop or laptop computer by visiting abc.com or hulu.com ("Hulu"), or in some cases, the websites of their cable or satellite provider.  This programming is not available for viewing immediately after live broadcasts, but is available for a set

receive retransmission fees from cable and satellite providers like DISH, both ABC and CBS assert that their primary revenue source is the sale of commercial advertising, so the more viewers exposed to the commercials contained within their programming, the more money that the networks generate.

Advertisers pay for commercial time based on the average size of the audience exposed to their commercials, which is measured by the Nielsen Media Research Company's "C3" rating.  The C3 rating measures the average audience size during the commercial minutes for the live broadcasts and the average audience size over the next three days when the commercials are played back at normal speed on a DVR[6] or viewed via a cable or satellite video-on-demand ("VOD") service.[7]  A DVR allows a subscriber to digitally record a television program for watching at a later time, a practice that is commonly known as time-shifting.[8]  If a viewer playing back a taped program fast-forwards through a commercial, or skips it entirely, the Nielsen C3 rating will not count that viewer as an audience member exposed to the commercial.  If viewers playing back primetime

---

period of time thereafter.

[6]   A DVR is a consumer electronic device that records video (or television programming) in digital format, saves it to a hard drive, and permits a viewer to play it back at a later time.  (Am. Compl. ¶ 21.)

[7]   ABC has executed various VOD agreements with cable and satellite providers, which, according to ABC, prohibit manual fast-forward functionality when a subscriber is viewing ABC programming to protect ABC's advertising revenues. VOD is a licensed service through which a network, like ABC, enters into an agreement with a cable or satellite provider to make a roster of recorded programs available for viewing by a VOD subscriber at designated times after the initial over-the-air broadcast.  This programming is available to subscribers through on-demand menus on their television screens.  The VOD subscriber does not have to make a prior request for recording of the programs or set a specific time for recording to ensure their availability.  For example, TimeWarner Cable Inc. advertises its VOD service, which offers ABC programming, as a service for which "[t]here is no need to set a DVR."  (Justin Connolly Decl. ¶ 14.)

[8]   "Sling" or place-shifting technology, which will be referred to later in this Opinion, but is not relevant to the motion for a preliminary injunction, allows viewers to watch television programming live on a range of mobile devices.

programs are skipping the commercials, the average size of the audience exposed to the commercials

will be smaller, and the networks will not be able to charge advertisers as much for commercial

time.  However, the C3 rating only measures the size of the audience during live commercial

viewing and during commercials watched through some form of playback within three days after the

live broadcast.  It does not matter, for the purposes of calculating the C3 rating, which type of

equipment a customer uses to skip a commercial; all that the C3 metric measures is whether a

commercial is skipped.


      2.      <u>2005 Retransmission Consent Agreement Between ABC and DISH</u>

On September 15, 2005, DISH's predecessor, EchoStar L.L.C., and ABC, Inc.,

executed a Retransmission Consent Agreement (the "2005 RCA"), which, as amended, granted

DISH the right to "simultaneously receive and retransmit" the digital broadcast signal ("Digital

Signal") of eight stations owned by ABC-related entities to DISH's satellite television subscribers.

The 2005 RCA prohibited unauthorized recording, copying or retransmitting of the Digital Signal,

but did not preclude DISH's practice of providing its customers with DVRs which, at the time,

offered recording by time, channel and program, fast-forward and 30-second skip features (thereby

allowing DVR users to skip ahead in a recording by the same amount of time as a typical television

commercial).  The 2005 RCA reads, in pertinent part, as follows:

> Except as provided herein, EchoStar shall not, for pay or
> otherwise, record, copy, duplicate, retransmit and/or authorize
> the recording, copying, duplication or retransmission of any
> portion of any Digital Signal without the prior written consent
> of Broadcaster.  The foregoing shall not preclude EchoStar's
> practice of connecting subscribers' home recording devices
> such as VCRS or DVRs. . . .

(Supp. Hentoff Decl., Ex. 47 at § 12.)

3.     The Hopper, PTAT and AutoHop

On January 9, 2012, DISH announced its "Hopper "as a "whole-home," high definition DVR, at the Consumer Electronics Show, an annual show attended by top executives from the entertainment, wireless, and consumer electronics industries.  DISH's Hopper DVR device improves upon previous DVRs' time-shifting capabilities in that it has a larger hard drive storage capacity, so that it can record and store up to 2,000 hours of television for later viewing. It also has a "whole-home" capability, which allows it to provide satellite television service as well as DVR functionality to as many as four televisions in one home.

The Hopper, introduced in January 2012, included the PTAT feature.  PTAT allows a viewer, at his or her election, to record all of the HD primetime TV programming on ABC, CBS, NBC or Fox, or on all four networks where available.  The Hopper saves the primetime recordings for up to eight days (with the ability to store selected recordings for a longer period), if the subscriber selects this option, and viewers can record up to six programs at once.

On May 10, 2012, DISH added its "AutoHop" feature to the Hopper DVR.  AutoHop works with most shows recorded using PTAT and allows the viewer, by pressing a button once, to fast-forward through all commercials when watching a show on the day after the show originally aired, or later.

When a DISH subscriber first receives the Hopper, the PTAT feature is turned off. To activate the PTAT, the subscriber must press a button on the Hopper's remote control, access the "PTAT set-up screen" and then affirmatively select "Enable" and choose what to record.  The subscriber can turn the PTAT off by accessing the same screen and selecting "Do not Enable."  Once the DISH subscriber activates the PTAT feature, he or she is given a menu of customizable recording options and can decide which networks to record, which days of the week to make the

recordings and how many days the recording will remain on the DVR (between two and eight days) before being automatically deleted.  There are more than 13,000 unique user-determined setting configuration possibilities.  A user can also elect to save a specific recording for longer than eight days and can choose to delete a PTAT recording prior to the date set for deletion.  If the user enables PTAT but does not select which networks or programs to record, PTAT's default configuration is to record all four networks.

After the Hopper user enables and configures PTAT, timers are set to record primetime shows on the user's selected networks on the user's selected nights.  These primetime shows are chosen by the networks themselves and DISH has no control over which shows are designated for broadcast during the primetime hours.  Because the recording is done by time block rather than by show, if a primetime show is preempted by local breaking news, the Hopper will record that breaking news or whatever else aired during primetime on the local television network. The recording process is similar to when a user sets manual timers on a DVR to record a channel during a particular time period.  With sufficient advance notice, DISH can, however, expand recording periods beyond the normal primetime hours to correspond to the networks' expansion of primetime hours for big events like the Olympics, for example, when the networks have larger blocks than normal.  When a program runs past the primetime window, the PTAT software interacts with the electronic program guide to ensure that, if at least half of a program falls within the primetime window, the entire program (including the portion falling outside the window) is recorded.  The parties disagree as to whether DISH's system for identifying the primteime program offerings is automated or manual.  However, the question of whether, as DISH represents, a software program identifies the primetime programming or, as ABC contends, the primetime offerings for PTAT are identified manually by EchoStar employees, is not material, because the DISH subscriber

initiates the challenged recording process.  As with other DVR systems, the DISH subscriber

chooses what to record.  The PTAT recordings are unique copies made from the local television

signal received in the DISH subscriber's home.  The copies are saved on the DISH subscriber's hard

drive on the Hopper DVR without alteration, just like other types of DVR recordings.  These copies

are strictly for the customer's own private home viewing on a time-shifted basis and there is no

evidence that they are being used by customers commercially.

        If AutoHop is available for a particular show, a red kangaroo icon will appear on the

subscriber's television screen, with the message "You can automatically hop over this event's

commercial breaks.  Would you like to enable AutoHop for this event?"  If the show is selected for

viewing, the Hopper will ask the user whether to "Enable AutoHop," with the default being "No,

Thanks."  If the user selects "Yes," he or she can then watch the entire show without advertisements

without having to pick up the remote control again.  At the end of each show segment, the DVR

software will automatically fast-forward through the commercial to the beginning of the next show

segment.  **[REDACTED]**  In fact, CBS's CEO has stated that, if DISH were to pay a fee per

subscriber, CBS would consider permitting DISH subscribers to use AutoHop for CBS

programming.  (Richard Rapp Decl. ¶ 154.)


        4.      <u>DISH's Quality Assurance Copies</u>

        DISH had also engaged in a quality assurance or "QA" process in which DISH

employees made at least three additional nightly sets of copies of every network's primetime

offerings to ensure that the DISH AutoHop commercial-skipping programming was working

properly.  United States District Judge Dolly M. Gee of the Central District of California, found, in

November 2012, that Fox had established a likelihood of success on the merits of its claim that

DISH's creation of nightly QA copies constituted direct infringement of Fox's copyrights.  See Fox Broad. Co. v. Dish Network, L.L.C., 905 F. Supp. 2d 1088 (C.D. Cal. 2012), aff'd, 723 F.3d 1067 (9th Cir. 2013).  DISH represents that it stopped making such copies in November 2012.  (Pl. Opp. to Mot. for Prelim. Injunction at 10, fn 4).  The legality of the QA copying is not at issue in this preliminary injunction motion practice.

B.      Procedural History

       ABC filed its motion for a preliminary injunction before this Court on November 23, 2012, eleven months after DISH had introduced PTAT, over six months after DISH had introduced AutoHop, and five months after DISH had filed suit in this case.

C.      Discussion and Conclusions of Law

       ABC seeks a preliminary injunction precluding DISH from offering PTAT in conjunction with AutoHop pending the final resolution of this litigation, contending that the combination of these services violates ABC's exclusive reproduction rights under Section 106 of the Copyright Act, as well as ABC's rights under the 2005 RCA.  DISH, ABC asserts, is making unauthorized copies of all of ABC's primetime programming for viewing without the commercials that provide the revenue necessary for ABC to create the programming in the first place.  In the alternative, ABC asserts that DISH is contributing to its customers' infringement of ABC's exclusive reproduction rights.

       In this Circuit, a court considering a preliminary injunction in a copyright case must consider four principal factors: (1) whether the plaintiff "has demonstrated either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair

ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor;" (2)

whether the plaintiff has demonstrated a likelihood of "irreparable injury in the absence of an

injunction" (likelihood of irreparable injury may not be presumed in the copyright context); (3) "the

balance of hardships between the plaintiff and defendant" and (4) "that the public interest would not

be disserved by the issuance of a preliminary injunction."   WNET, Thirteen v. Aereo, Inc., 712 F.3d

676, 684 (2d Cir. 2013) (internal quotation marks and citations omitted).  The party seeking the

injunction must demonstrate "by a clear showing" that the necessary elements are satisfied.

Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

      1.     Likelihood of Success on the Merits of ABC's Copyright Infringement and Breach of
Contract Claims

          a.     ABC's Copyright Claims

To establish copyright infringement under the Copyright Act, a plaintiff must show:

"(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are

original."  See Arista Records, LLC v. Does 3, 604 F.3d 110, 118 (2d Cir. 2010) (internal quotation

marks and citation omitted).  ABC's ownership of valid copyrights may be presumed from the

certificates of copyright registration for those works (attached as Exhibit 1 to Marsha Reed's

Declaration).  See Scholz Design Inc. v. Sard Custom Homes, LLC, 691 F.3d 182, 186 (2d Cir. 2012);

see also 17 U.S.C. § 410(c).  "One infringes contributorily by intentionally inducing or encouraging

direct infringement, . . . and infringes vicariously by profiting from direct infringement while

declining to exercise a right to stop or limit it. . . ."  Metro-Goldwyn-Mayer Studios, Inc. v.

Grokster, Ltd., 545 U.S. 913, 930 (2005).  ABC asserts that DISH's PTAT/Autohop services both

directly and secondarily/vicariously infringe ABC's exclusive reproduction rights.

i.      Direct Copyright Infringement

ABC argues that DISH is liable for directly infringing ABC's copyrights in its primetime programs by making or facilitating the creation and viewing of unauthorized copies. However, a person or entity cannot be found directly liable for copyright infringement without proof of some volitional act by the person that constitutes or causes the infringement.  Any argument that the mere provision of the technology or system through which customers can make copies constitutes infringement is foreclosed by Sony Corp. of Am. v. Universal City Studios, Inc., where the Supreme Court held that "the sale of copying equipment" for a legitimate purpose or "substantial noninfringing uses" does not constitute copyright infringement.  464 U.S. 417, 441 (1984) (finding that, after the then-new Betamax home video recording technology was sold to customers, Sony did not control the customers' home video recording); see also Cartoon Network L.P., L.L.L.P. v. CSC Holdings Inc., 536 F.3d 121, 130 (2d Cir. 2008) ("something more must be shown than mere ownership of a machine used by others to make illegal copies.  There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner") (quoting CoStar Group, Inc. v. LoopNet, Inc., 373 F.3d 544, 550 (4th Cir. 2004)).  "While the Copyright Act does not require that the infringer know that he is infringing or that his conduct amount to a willful violation of the copyright owner's rights, it nonetheless requires conduct by a person who causes in some meaningful way an infringement."  CoStar Group, Inc., 373 F.3d at 549.

As explained above, the DISH subscriber must choose to enable the PTAT feature by selecting "Enable" on the PTAT set-up screen, and also can choose which networks to record, which nights of the week to make the recordings, and how long to save the primetime shows.  If the subscriber enables PTAT, but does not choose which networks to record, PTAT will record the

primetime programming on all four major networks.  However, if the customer does not enable the

PTAT function, the Hopper will not record ABC's (or any other network's) television programing.

ABC argues that DISH's involvement in creating the key system settings and options

is sufficient to render DISH a direct infringer.  Citing the Second Circuit's statement in Cartoon

Network that "a significant difference exists between making a request to a human employee, who

then volitionally operates the copying system to make the copy, and issuing a command directly to a

system, which automatically obeys commands and engages in no volitional conduct," 536 F.3d at

131-32, ABC asserts that DISH does not simply and automatically obey subscriber commands

because the start and stop times of recordings are set by DISH and DISH prevents a subscriber from

stopping a recording once it is in progress.  ABC points out that DISH does not limit the copying to

the programs that the subscriber intends to watch and, as noted above, argues that DISH has control

over the content of the programming because EchoStar employees consult an electronic program

guide to determine which programs fall into primetime and which should be recorded.

Although the record is not conclusive as to whether the primetime programming is

identified through the operation of software (as DISH contends) or through human review of

program schedules (as ABC asserts), it is unnecessary for the Court to determine the selection

methodology at this juncture because the Second Circuit's Cartoon Network decision makes it clear

that the pivotal factor in this Circuit for direct liability is initiation of the act of copying rather than

the selection of offerings for possible copying or the creation of the technological structure.  536

F.3d at 131-32.  The defendant in Cartoon Network, Cablevision, selected the programming that its

subscribers could copy and maintained control over a system that permitted the subscribers to copy

programming onto a Cablevision server for later private viewing.  These facts were held insufficient

"to displace the customer as the person who 'makes' the copies when determining liability under the

Copyright Act."  536 F.3d at 132.   The possible involvement of DISH's agents in determining the time parameters of programming available for PTAT/Hopper recording is similarly insufficient to render DISH a direct infringer.

      DISH has no control over which programs will be shown on those networks or in what order, just as it has no control over which of its subscribers choose to copy those programs. The DISH subscriber must decide if he or she wants to use the PTAT feature and the subscriber must "enable" PTAT before the Hopper will record any programs.  See Fox Broad. Co., Inc., 905 F. Supp. 2d 1101-1102.  The DISH subscriber selects which of the networks' primetime offerings to record and which nights he or she wants to record and, once the subscriber enables the PTAT, the recordings are saved on the subscriber's personal hard drive on the Hopper, rather than at DISH headquarters.  The subscribers also decide whether their copies reside on their individual Hopper devices from two to eight days, and can decide if they want to keep certain programs longer.  DISH does set a default deletion schedule for PTAT/Hopper recordings; such control over the retention of a recording does not, however, make DISH the creator of the recording.  Cf. 905 F. Supp. 2d at 1101 ("it is not clear to the Court that this control, being exercised after the creation of the copies, is relevant to whether Dish causes the copies to be made in the first place").

      Accordingly, ABC has failed to demonstrate likelihood of success on its direct copying cause of action because the evidentiary record indicates, and the Court finds, that the consumer makes the copy.  There is thus no factual basis upon which DISH could be found liable for direct infringement of ABC's right of reproduction.  As the Second Circuit held in Cartoon Network, "[DISH's] contribution to [the] reproduction [of the TV programming] by providing the system does not warrant the imposition of direct liability."  Cartoon Network, 536 F.3d at 134.

ii.     Secondary or Vicarious Infringement

To establish secondary or vicarious copyright infringement, a plaintiff must show that the defendant "[1] had the right and ability to supervise the infringing activity and . . . [2] had a direct financial interest in such activities." Arista Records LLC v. Lime Grp.LLC, 784 F. Supp. 2d 398, 434-35 (S.D.N.Y. 2011) (internal quotation marks and citation omitted). Secondary or vicarious liability requires proof of direct infringement by a relevant third party, id. at 423, and it is generally found only when the "right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of the copyrighted materials . . ." Shapiro, Bernstein & Co. v. H. L. Green Co., 316 F.2d 304, 307 (2d Cir. 1963). ABC argues that DISH had the "right and ability to supervise" its customers' allegedly infringing activities and that DISH derives a financial benefit from the availability of ABC's copyrighted programming, as that material acts "as a draw for customers." See Viacom Intern. Inc. v. Youtube, 253 F.R.D. 256, 261, n. 3 (S.D.N.Y. 2008) (explaining the "financial benefit prong of vicarious liability") (internal quotation marks and citation omitted).

Here, DISH created the system that gives its subscribers the opportunity to record network programming, but DISH has no control over whether its subscribers will enable that technology or what they will choose to copy. Moreover, although ABC clearly can show that DISH's customers make unauthorized copies of its programming, it has failed to demonstrate that it is likely to succeed in establishing the illegality of that copying. DISH's factual proffers in this regard are sufficient to demonstrate that it is likely to succeed in establishing that copying by its customers constitutes fair use of ABC's copyrighted programming.

Fair use of a copyrighted work does not constitute infringement of the copyright holder's reproduction right. See 17 U.S.C.S. §107 (LexisNexis 2011) (identifying the four factors to

be considered when deciding whether the fair use exception applies: "(1) the purpose and character of the use, including whether such use is of a commercial nature . . .; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use on the potential market for or value of the copyrighted work").  Because "fair use serves as an affirmative defense to a claim of copyright infringement, . . . the party claiming that its secondary use of the original copyrighted work constitutes a fair use typically carries the burden of proof as to all issues in the dispute."  American Geophysical Union v. Texaco Inc., 60 F.3d 913, 918 (2d Cir. 1994).[9]

There is no evidence that the customers make any commercial use of the copies, or that DISH's technology would even enable them to do so.  The PTAT copies are made in the privacy of the DISH subscriber's home, they are stored on the DISH subscriber's Hopper, and ABC has not argued that they are distributed, sold or exploited in any way.  The improved efficiency of home recording through the PTAT/Hopper technology does not alter the non-commercial nature and purpose of such recordings.  As the Supreme Court held in Sony, "private, noncommercial time-shifting in the home" is a "legitimate, unobjectionable, purpose" and even "unauthorized [time-shifting is]  not necessarily infringing . . . unless it conflicts with one of the specific exclusive rights conferred by the copyright statute."   464 U.S. at 442-443, 447.

Moreover, although ABC's copyrighted works are original creative comedies and dramas, they are publicly broadcast.  Sony recognizes that, "to the extent time-shifting expands public access to freely broadcast television programs, it yields societal benefits."  464 U.S. at 454.  As for the third factor considered in a fair use analysis (the amount and substantiality of the portion

---

[9]        The Court assumes for purposes of this motion practice that DISH, as the party seeking to avoid vicarious liability for customer infringement, has the burden of establishing that the customer copying is protected as fair use.

of the work used), since "timeshifting merely enables a viewer to see [a televised copyrighted audiovisual work] which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced . . . does not have its ordinary effect of militating against a finding of fair use." Sony, 494 U.S. at 449-450.  Finally, with respect to the fourth factor, DISH subscribers are not offering a substitute market for a market that a copyright owner "would in general develop or license others to develop." Castle Rock Entmt. Inc. v. Carol Publ'g Grp. Inc., 150 F.3d 132, 145 (2d Cir. 1998) (finding that a Seinfeld trivia quiz book, which "borrow[ed] exclusively from Seinfeld and not from any other television or entertainment programs . . . [wa]s likely to fill a market niche that [the producer and copyright owner of the Seinfeld show] would in general develop").  The fact that DISH might be developing such a market does not defeat fair use production of copying by DISH's subscribers.

DISH has, accordingly, demonstrated that it is likely to succeed in carrying its burden of demonstrating that its subscribers' time-shifting constitutes fair use.  ABC has failed to demonstrate that it is likely to succeed on the merits of its claim of secondary or vicarious infringement.[10]

b.    Breach of Contract Claims

ABC also claims that DISH has breached the 2005 RCA between the parties. Because Section 21 of the 2005 RCA includes a choice of law provision stating that "this Agreement

---

[10]    The Court has considered the supplemental authority submitted by ABC on September 10, 2013.  The analysis in the case submitted, Fox Television Stations, Inc. v. FilmOn X LLC, No. 13 Civ. 758(RMC), 2013 WL 4763414 (D.D.C. Sept. 5, 2013), which concerns a technological structure similar to the one at issue in WNET, Thirteen v. Aereo, Inc., 712 F.3d 676 (2d Cir. 2013) is inconsistent, with current Second Circuit law and addresses a legal issue that has not been presented on this motion practice.

and all collateral matters relating thereto shall be construed in accordance with the laws of the State of New York," the Court looks to New York law in considering whether ABC has stated a viable breach of contract claim.  To establish a breach of contract under New York law, a plaintiff must establish (1) contract formation, (2) performance by the plaintiff, (3) breach by defendants and (4) damages from the breach.  See Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011).  Under New York law, contract terms "should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  Lasalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (quotation marks and citation omitted).  "When interpreting the meaning of a contract, it is the objective intent of the parties that controls. . . . [t]he secret or subjective intent of the parties is irrelevant."  Klos v. Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997).

Section 12 of the 2005 RCA prohibits DISH from "record[ing], copy[ing], duplicat[ing], retransmi[tting]" any portion of any Digital Signal "and/or authoriz[ing]" another party to do so "without prior written consent of the Broadcaster."  ABC alleges that DISH has violated Section 12 because, even if the customers are the ones actually doing the copying, DISH breaches the 2005 RCA by enabling or authorizing them to do so, as the express purpose of PTAT is to copy ABC's entire prime-time lineup.[11]  However, the 2005 RCA explicitly protects DISH's provision of DVR technology: "[t]he foregoing shall not preclude EchoStar's practice of connecting subscribers' home recording devices such as VCRs or DVRs."  ABC argues that this clause does not insulate DISH from liability here because permitting its subscribers to make nightly copies of ABC's primetime lineup – which ABC characterizes as an unauthorized VOD service with

---

[11]     ABC had also alleged that DISH breached the agreement by making nightly QA copies, but the parties have agreed that the QA issue is moot for the purposes of the instant motion practice.

commercial-skipping – goes far beyond merely connecting their DVRs.  The Hopper, with its PTAT and AutoHop features, is not, however, a VOD service.  Although more technologically advanced than previous DVRs, the Hopper is, at its core, another type of home recording device.[12]  The customer decides what he or she wants to record in advance; if the customer does not choose to record the program, there is no programming available for the customer to watch.  A VOD service, by contrast, makes time-shifted viewing of designated content available without any prior customer request.  See Cartoon Network, 536 F.3d at 125 ("unlike a VOD service, . . . DVR users can only play content that they previously requested to be recorded").  Therefore, under the plain terms of the 2005 contract, DISH's provision of DVR capability is not a breach.  ABC is not likely to succeed on the merits of its breach of contract claim.

2.     The Likelihood of Irreparable Harm

Proof of "irreparable harm" requires "an injury that is not remote or speculative but actual and imminent and for which a monetary award cannot be adequate compensation."  Tom Doherty Assocs., Inc. v. Saban Entm't Inc., 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks and citation omitted).  Here, ABC bears the burden of showing that "irreparable harm is likely in the absence of an injunction."  Winter v. Natural Resources Defense Council, 555 U.S. 7, 22 (2008).  "[T]he mere possibility of harm is not sufficient to warrant the drastic imposition of a preliminary injunction."  REDF Organic Recovery, LLC v. Kafin, No. 12 Civ. 7973(JFK), 2012 WL 5844191, at

---

[12]     ABC also argues that the DVR Clause merely permits the connection, but does not authorize the recording use, of a DVR.  This interpretation is absurd, as it would put DISH in violation of the retransmission agreement whenever a customer used a digital recorder to record an ABC program.  "A contract should not be interpreted to produce a result that is absurd . . ., commercially unreasonable . . . or contrary to the reasonable expectations of the parties."  Lipper Holdings, LLC v. Trident Holdings, LLC, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003).

*2 (S.D.N.Y. Nov. 19, 2012) and courts may no longer "presume irreparable injury in the copyright context; rather the plaintiff must demonstrate actual harm that cannot be remedied later by damages should the plaintiff prevail on the merits."  WNET, 712 F.3d at 684.

   ABC argues that, in the absence of an injunction, it will suffer irreparable harm because AutoHop's efficient commercial-skipping feature will deprive ABC of advertising revenues premised on PTAT/AutoHop commercial viewing patterns, such as live TV-watching, commercial-inclusive VOD without fast-forwarding abilities, and Hulu, which all expose viewers to opportunities to watch commercials during primetime programming, thus harming ABC's relationships and negotiations with authorized licensees.  ABC has not, however, proffered any evidence of actual and imminent injury.  Nielsen's C3 rating system does not distinguish between commercial-skipping using AutoHop and commercial skipping using other, pre-existing technologies, measuring only whether the commercial has been skipped or not.  The record does not support the conclusion that there will likely be an incremental increase in commercial-skipping due to AutoHop.  In fact, ABC's corporate designee and expert on consumer behavior testified that DVRs in general have actually boosted the C3 ratings for ABC's programming.  (Elyse Echtman Decl. Ex. 7, 62:5-63:13.)  DISH has submitted expert opinions positing that the Hopper is not likely to have any effect on the C3 ratings because the majority of television viewing is done live or on the same day when the program airs, and the AutoHop feature is not available until the day after the program airs.  ABC only speculates as to the effect of the AutoHop on the C3 ratings; even though AutoHop has been in the market for many months, ABC has not and apparently cannot demonstrate that there has been any actual increase in relevant commercial-skipping due to the AutoHop.

   ABC has thus failed to demonstrate the likelihood of any harm, much less irreparable harm, in the absence of an injunction.  See Clonus Assocs. v. Dreamworks, LLC, 417 F. Supp. 2d

248, 254 (S.D.N.Y. 2005) (rejecting claim of irreparable harm as "unsupported by concrete evidence" and collecting cases in this Circuit that have "rejected such speculative arguments in deciding whether to issue a preliminary injunction"); Procter & Gamble Co. v. Ultreo, Inc., 574 F. Supp. 2d 339, 348-49 (S.D.N.Y. 2008) (sales projections that did not purport to distinguish between lawful competitive impact of new product and impact of allegedly false advertising concerning product held insufficient to provide a reasonable basis for belief that irreparable harm will result from the alleged false advertising).

ABC's allegations of injury due to its alleged loss of negotiating position and relationships with licensees are similarly vague and are presented in a conclusory fashion, as is ABC's assertion that viewers will be "unhappy" if PTAT and AutoHop are taken away and blame "any company that they perceive as responsible." (Mark Loughney Decl. ¶ 22.) "[C]onclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." Shepard Indus., Inc. v. 135 East 57th St., LLC, No. 97 Civ. 8447 (DAB), 1999 WL 728641, at *8 (S.D.N.Y. Sept. 17, 1999).

The number of venues to which ABC has licensed its programs and its licensing practices also makes it clear that whatever harm may result is calculable and compensable with money damages.  See Fox Broad. Co. Inc., 2012 WL 5938563, at *18.[13]  To the extent that ABC relies on its allegations of contract breach, rather than copyright arguments, in seeking an injunction, its irreparable harm burden is even more challenging, since the contracts at issue are fee-based. Injunctive relief based on a breach of contract "is the exception and not the rule."  United Retail Inc.

---

[13]     Following the introduction of the PTAT and AutoHop, **[REDACTED]** even CBS's CEO has stated that CBS would consider permitting the Hopper being used to record its programming if DISH were to pay a fee per subscriber.  ( Rapp Decl. ¶ 154).

v. Main Street Mall Corp., 903 F. Supp. 12, 14 (S.D.N.Y. 1995).

Furthermore, "[d]elay in seeking a preliminary injunction may also negate a showing of irreparable harm because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief." KF ex rel. CF v. Monroe Woodbury Cent. School Dist., No. 12 Civ. 2200(ER), 2012 WL 1521060, at *5 (S.D.N.Y. Apr. 30, 2012) (finding no irreparable harm when application for preliminary injunction was brought nearly six months after the alleged harm first occurred) (internal quotation marks and citations omitted); see also Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995) (delay "standing alone" may "preclude the granting of preliminary injunctive relief" because it "suggests that there is, in fact, no irreparable injury"). The Hopper was announced nearly a year before the current motion was filed. AutoHop was announced, with advance notice to the networks, over six months before ABC moved for a preliminary injunction. This type of delay "severely undermines [ABC's] argument that absent a stay irreparable harm w[ill] result." Hirschfeld v. Bd. of Elections, 984 F.2d 35, 39 (2d Cir. 1993); see also Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985) (finding that plaintiff had failed to show irreparable harm because it had waited seven months to seek an injunction). ABC's delay in seeking injunctive relief is thus also a factor that weighs against a finding of irreparable harm.

In light of ABC's failure to proffer evidence demonstrating any connection between the use of AutoHop and actual or likely irreparable harm to its copyright or commercial interests despite the fact that AutoHop had been available to consumers for several months prior to the briefing of this motion, and ABC's delay in seeking injunctive relief, the Court finds that ABC has failed to sustain its burden of demonstrating that it will suffer irreparable harm unless injunctive relief is granted. As ABC is unable to show likelihood of success on the merits and irreparable

harm, ABC cannot meet its burden on its preliminary injunction motion and the motion is therefore denied.

II.

DISH'S MOTION TO DISMISS CBS'S FRAUDULENT CONCEALMENT CLAIM

A.    Background

    1.    Pre-Contract Negotiations

The facts alleged by CBS in support of its counterclaim are taken as true for purposes of this motion practice.  High-ranking CBS and DISH executives met in Denver, Colorado, in December 2011, to conduct contract negotiations.  (Am. Counterclms. ¶¶ 43-47.)  CBS alleges that, during the weeks of negotiations regarding the 2012 Retransmission Agreement between CBS and DISH (the "2012 RA"), DISH executives knew that DISH was planning to offer the AutoHop service, which it expected to market to its subscribers as "Commercial-Free TV," soon after the Agreement was finalized.  (Id. ¶¶ 33, 43, 49-50.)  CBS alleges that an essential purpose of its entry into the 2012 RA with DISH was to increase its advertising revenue by creating a larger audience base.  (Id. ¶¶ 4-6.)  CBS further alleges that DISH did not disclose anything about its new "Commercial-Free TV" service to CBS during negotiations because it knew that CBS would not have entered into the 2012 RA if CBS had known that DISH was planning to provide on-demand, commercial-free programming.  (Id. ¶¶ 43-44, 51.)  According to CBS, the 2012 RA was only intended to provide DISH with "limited rights to retransmit to its subscribers" the CBS broadcast signal.  (Id. ¶3.)  The 2012 RA was executed on January 5, 2012, and, on January 9, 2012, DISH issued a press release regarding the Hopper and new PTAT feature.  (Id. ¶¶ 42, 48.)[14]

---

[14]    According to CBS, DISH had originally planned to release the Hopper with both the PTAT and AutopHop services, but it had to delay the release of the AutoHop service until May 2012.  (Am. Counterclms. ¶ 50.)

During those negotiations, DISH executives described DISH's soon-to-be-introduced Hopper DVR to CBS executives.  (Id. ¶¶ 44-47.)  CBS asserts that DISH deliberately provided CBS with an incomplete description of the Hopper DVR and the PTAT feature, as no one from DISH made "any reference to AutoHop or any other system that had been developed to enable the Hopper to record and playback primetime broadcast programming on a commercial-free basis."  (Id. ¶ 47.) CBS asserts that DISH was obligated to provide full disclosure of its new AutoHop service because, among other reasons, CBS Executive Vice President Martin Franks specifically stated in a December 16, 2011, email to DISH executive David Shull that CBS was not "looking to have this arrangement include new businesses that DISH may choose to enter into in the future, whether they be Netflix-like businesses, new mobile services or other new platforms."  (Id. ¶45.)

2.      2012 Retransmission Agreement Between CBS and DISH

DISH, for its part, argues that the 2012 RA, which is incorporated by reference in the Amended Counterclaims, specifically addresses DISH's provision of home recording technology to subscribers through its long and extensively negotiated Section 2.e., which states in relevant part as follows:  **[REDACTED]**  (Echtman Decl. Ex. 5 at § 2.e.)

DISH asserts that Section 2.e. should have made CBS aware that DISH would be offering time-shifting technology and that this Section unambiguously permits DISH's implementation of the Hopper with the PTAT/AutoHop services.

B.      Discussion

1.      Pleading Standard

In assessing a motion to dismiss a pleading for failure to state a claim under Rule 12(b)(6), "[t]he court accepts all well-pleaded allegations in the [counterclaim] as true, drawing all reasonable inferences in the plaintiff's favor." Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010). The counterclaim must allege "enough facts to state a claim to relief that is plausible on its face." Hollander v. Copacabana Nightclub, 624 F.3d 30, 32 (2d Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Matson v. Bd. of Educ. of City Sch. Dist. of N.Y., 631 F.3d 57, 63 (quoting Iqbal, 556 U.S. at 678). Detailed factual allegations are not required, but the facts alleged must be sufficient "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

As CBS's pleading alleges fraud by omission, CBS is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). "Rule 9(b) requires that allegations of fraud be pleaded with particularity. Thus[,] . . . when a complaint charges fraud, it must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Harsco Corp v. Segui, 91 F.3d 337, 347 (2d Cir. 1997) (citations omitted).[15] However, "Rule 9(b) provides that fraudulent intent may be averred generally, as long as the complaint provides a factual basis that gives rise to a strong inference of intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." Schneider v. Pearson Educ., Inc., No.

---

[15]   CBS's argument that DISH waived its Rule 9(b) objection by failing to specify it in a pre-motion letter pursuant to the undersigned's individual practices rules is unavailing. CBS relies on Todaro M.D. v. Orbit Int'l Travel, Ltd., 755 F. Supp. 1229, 1234 (S.D.N.Y. 1991), in which defendants filed a detailed answer and did not raise any Rule 9(b) arguments. Todaro's holding is inapposite in the context of this pre-answer motion practice.

12 Civ. 6392(JPO), 2013 WL 1386968, at * 4 (S.D.N.Y. Apr. 5, 2013) (internal quotation marks and citation omitted).

2.      Choice of Law Issue

The parties disagree as to which state's law governs CBS's fraudulent concealment claim – DISH argues that Colorado law governs because both Section 18 of the 2012 RA and New York's choice of law rules provide for the application of Colorado law, and CBS argues that New York law governs because New York is the forum state and the choice of law clause in Section 18 applies only to post-contracting disputes regarding performance and interpretation of the Agreement. The choice of law clause in the 2012 RA provides in pertinent part that "the Agreement shall be governed by and construed under and in accordance with the laws of the State of Colorado." (Echtman Decl. Ex. 5, § 18.)

Under New York law, "a choice-of-law provision indicating that the contract will be governed by a certain body of law does not dispositively determine that law which will govern a claim of fraud arising incident to the contract." Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996); see also Fin. One Public Co. v. Lehman Bros. Special Fin., Inc., 414 F. 3d 325, 334 (2d Cir. 2005) (New York law does not construe "contractual choice-of-law clauses broadly to encompass extra-contractual causes of action"). Here, the 2012 RA is "not 'sufficiently broad' as to encompass the entire relationship between the contract parties,'" Krock, 97 F.3d at 645 (citation omitted), and therefore is not dispositive of the choice of law issue here.

Since the choice of law provision does not govern, the question of what law governs CBS's fraudulent concealment claim is determined by applying New York's general choice of law rules. See Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 433 (2d Cir.

2012) ("[a] federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state"). A choice of law analysis, however, is not warranted unless there is actually a relevant conflict between the two states's laws, i.e., when "the applicable law from each jurisdiction provides different substantive rules." Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998). If there is no conflict, "New York, as the forum state, would apply its law." Wall v. CSX Transp., Inc., 471 F.3d 410, 422 (2d Cir. 2006). The Court does not find a conflict between Colorado and New York law on this issue and, thus, applies New York law in evaluating the sufficiency of the counterclaim. (See note 15 infra.)

3.    The Merits of the Fraudulent Concealment Counterclaim

In Count VII of its Amended Counterclaims, CBS alleges that DISH engaged in fraudulent concealment and fraudulent inducement during contract negotiations in December 2011. "To prevail on a claim for fraudulent concealment pursuant to New York law, a party must prove: (1) failure to discharge a duty to disclose; (2) an intention to defraud, or scienter; (3) reliance; and (4) damages." Rodriguez v. It's Just Lunch, Intern., No. 07 Civ. 9227(SHS), 2013 WL 1749590, at * 5 (S.D.N.Y. April 13, 2013) (quotation marks and citation omitted). DISH argues that it had no duty to disclose its plan to offer the PTAT/Autohop and Hopper services because CBS and DISH were sophisticated parties negotiating a commercial transaction. However, New York law holds that a party must disclose information when it "possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 113 (2d Cir. 1984).[16] When two parties

---

[16]    In New York, this is referred to as the "special facts"doctrine. Although Colorado law does not refer to this doctrine by the same name, the Colorado Supreme Court has held that "one party to a business transaction has a duty to disclose facts basic to the transaction where objective circumstances create a reasonable expectation of

are negotiating a business transaction and one party knows a special fact that it should disclose to the other party, "the material fact [must be] information peculiarly within the knowledge of [counterclaim defendant], and . . . the information [must be] not such that could have been discovered by [the counterclaim plaintiff] through the exercise of ordinary intelligence."  Jana L. v. West 129th Street Realty Corp., 802 N.Y.S.2d 132, 135 (1st Dep't 2005).

   CBS alleges that DISH possessed "superior knowledge" about its planned, impending release of AutoHop, which was information that was unknown and not readily available to CBS at the time of 2012 RA negotiations between the parties.  (Am. Countercls. ¶¶ 43-44, 50-51.)  CBS further alleges that DISH understood, at the time of executing the 2012 RA, that CBS was "acting on the basis of mistaken knowledge" because DISH knew that "CBS would not have been willing to enter into the Retransmission Agreement if CBS had been aware that DISH would attempt to use its limited access to the CBS Broadcast Signal as a vehicle for offering CBS's primetime programming to DISH subscribers on an on-demand, commercial-free basis."  (Id. ¶¶ 4, 102.)  One of the primary reasons it contracted with DISH, CBS argues, was to increase the size of its commercial audience.  Therefore, offering customers the option to watch "Commercial-Free TV" would destroy the "fundamental nature and purpose" of the 2012 RA for CBS.  (Id. ¶¶ 4, 6.)  CBS contends that DISH knew that CBS did not intend the RA to authorize DISH to launch any "new businesses" or "other new platforms" (id. ¶ 45),[17] and that the AutoHop/PTAT services presented a substantial enough

---

   disclosure of those facts," or "if he knows that the other is about to enter into [the transaction] under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."  Mallon Oil Co. v. Bowen/Edwards Assocs., Inc., 965 P.2d 105, 111 (Colo. 1998) (citation omitted).

[17]  CBS Executive Vice President Martin Franks explicitly stated in an email message to DISH "that CBS was not 'looking to have this arrangement include new businesses that DISH may choose to enter into in the future, whether they be Netflix-like businesses, new mobile services or new other platforms."  (Am. Counterclms. ¶ 45.)

change that DISH knew that CBS would not have executed the contract had it known (id. ¶ 51).  As

DISH's PTAT/AutoHop services were secret and completely new, taking all facts in the light most

favorable to the non-moving party, CBS has sufficiently alleged that it would not have known to ask

for more information and that it could not have discovered the existence of the PTAT/AutoHop

through the exercise of ordinary intelligence.

      CBS also alleges in the Amended Counterclaims that DISH owed it a duty to make

full disclosure due to its partial and incomplete statements regarding the Hopper and PTAT.

"[W]here a party to a business transaction has made a partial or ambiguous statement" it has a duty

to disclose since "once a party has undertaken to mention a relevant fact to the other party it cannot

give only half of the truth."  Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F.

Supp. 2d 162, 201 (S.D.N.Y. 2011); see also Banque Arabe et Internationale D'Investissement v.

Maryland Nat'l Bank, 57 F.3d 146, 155 (2d Cir. 1995) ("[i]n business negotiations, an affirmative

duty to disclose material information may arise from the need to complete or clarify one party's

partial or ambiguous statement . . . .").  CBS alleges that DISH informed CBS of a new DVR called

the Hopper during negotiations over the terms of the 2012 RA, but that DISH did not disclose its

intention that the Hopper and PTAT would enable users to have "Commercial-Free TV."  (Am.

Counterclms. ¶¶ 43-44, 47.)

      In response, DISH argues CBS's counterclaim must fail on the merits because

Section 2.e. of the 2012 RA[18] should have put CBS on notice that DISH could offer new forms of

"time-shifting technology."  The question of whether the reference to "time-shifting" technology

---

Whether the PTAT and AutoHop services constituted a new business or platform is
disputed.

[18]    See supra pp. 23-24.

encompassed automated commercial-skipping is one of fact, however, precluding a determination of the issue on a motion directed to the pleadings.

CBS's factual allegations are sufficient to make plausible its allegations that DISH's deliberate failure to disclose its PTAT/AutoHop product plan was in breach of a duty and that CBS would not have entered into the 2012 RA had the information properly been disclosed.  Accordingly, taking all facts alleged in the light most favorable to the counterclaim plaintiff, CBS, the Court finds that, even under the higher Rule 9(b) pleading standard, CBS has sufficiently alleged fraudulent concealment and inducement by DISH during the contract negotiations between the parties. Therefore, DISH's motion to dismiss CBS's counterclaim is denied.


<u>CONCLUSION</u>

For the foregoing reasons, ABC's motion for a preliminary injunction is denied. DISH's motion to dismiss Count VII of CBS's Amended Counterclaims is also denied.  This Memorandum Order resolves docket entry numbers 149 and 198.

The parties are directed to contact Magistrate Judge Kevin Fox's Chambers for settlement purposes and, pending further order of the Court, to proceed in accordance with the Third Revised Pre-Trial Scheduling Order (docket entry number 226).

This Opinion and Order is to be filed under seal pending the Court's consideration of any redaction requests and further order of the Court.

SO ORDERED.

Dated: New York, New York
        September 18, 2013

        Redacted version filed
        October 1, 2013

_____/S_____
LAURA TAYLOR SWAIN
United States District Judge