**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE AUTOHOP LITIGATION

12-CV-4155 (LTS) (KNF)

**FILED UNDER SEAL**

**ORAL ARGUMENT**
**REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF**
**CBS'S MOTION TO COMPEL THE PRODUCTION**
**OF DOCUMENTS AND OTHER INFORMATION**

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

## TABLE OF CONTENTS

BACKGROUND ..................................................................................................................... 1

LEGAL STANDARD............................................................................................................. 3

ARGUMENT ......................................................................................................................... 4

    A.    DISH Negotiations with Local Broadcasting Affiliates .......................................... 4

    B.    Viewership Tracking Data Showing Usage of PTAT and AutoHop...................... 7

    C.    Addition of Warren Schlichting as a Custodian for Electronically Stored Information ......................................................................................................... 10

    D.    DISH Documents Concerning the Value of Distributing CBS Programming...................................................................................................... 12

    E.    Directives and Instructions Relating to the Operation of PTAT and AutoHop......................................................................................................... 14

    F.    Network Refusal to Carry DISH Advertisements................................................. 15

CONCLUSION..................................................................................................................... 16

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

## TABLE OF AUTHORITIES

**Cases**

*A.I.A. Holdings S.A. v. Lehman Bros.*,
  97 Civ. 4978, 2000 WL 763848 (S.D.N.Y. June 12, 2000)...................................... 3

*Artista Records LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009).................................................................. 10

*Barnes v. Smith*,
  12 Civ. 1916, 2013 WL 4447897 (S.D.N.Y. Aug. 19, 2013) .................................. 1

*Brass v. Am. Film Technologies, Inc.*,
  987 F.2d 142 (2d Cir. 1993).............................................................................. 5

*Bryant v. Media Right Prods., Inc.*,
  603 F.3d 135 (2d Cir. 2010).............................................................................. 6

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008)............................................................................. 14

*Condit v. Dunne*,
  225 F.R.D. 100 (S.D.N.Y. 2004) ........................................................................ 3

*Crawford-Bey v. N.Y. Presbyterian Hosp.*,
  08 Civ. 5454, 2009 WL 2222916 (S.D.N.Y. July 27, 2009) ................................. 12

*Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*,
  951 F.2d 1357 (2d Cir. 1991)............................................................................. 5

*DLC Mgmt. Corp. v. Town of Hyde Park*,
  163 F.3d 124 (2d Cir. 1998)............................................................................. 10

*Haber v. ASN 50th St., LLC*,
  272 F.R.D. 377 (S.D.N.Y. 2011) ...................................................................... 16

*Hammond v. Beth Israel Med. Ctr.*,
  10 Civ. 93, 2011 WL 5980952 (S.D.N.Y. Nov. 30, 2011) ............................... 7, 11

*In re AutoHop Litig.*,
  12 Civ. 4155, 2013 WL 5477495 (S.D.N.Y. Oct. 1, 2013) .................................... 3

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (1996) ........................................................................................ 6

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

*Oppenheimer Fund, Inc. v. Sanders,*
    437 U.S. 340 (1978) ................................................................................................ 6

*Quinby v. WestLB AG,*
    245 F.R.D. 94 (S.D.N.Y. 2006) ............................................................................... 9

*Religious Tech. Cent. v. Netcom On–Line Commc'n Servs.,*
    907 F. Supp. 1361 (N.D. Cal. 1995) ..................................................................... 14

*Treppel v. Biovail Corp.,*
    233 F.R.D. 363 (S.D.N.Y. 2006) ............................................................................. 9

*Trilegiant Corp. v. Sitel Corp.,*
    275 F.R.D. 428 (S.D.N.Y. 2011) ........................................................................... 10

**Rules**

Federal Rules of Civil Procedure 26(b) ......................................................... 1, 6, 8

Federal Rules of Civil Procedure 37(a) ................................................................ 1

Federal Rules of Civil Procedure 37(b)(2)(A)(ii) .................................................. 9

**Other Authorities**

8B Fed. Prac. & Proc. Civ. § 2214 (3d ed.) ........................................................... 9

Restatement (Second) of Torts § 551(2)(e) .......................................................... 5

iv

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

Plaintiff and Counterclaim-Defendant DISH Network L.L.C. and Counterclaim-Defendants DISH Network Corporation and EchoStar Technologies LLC (collectively, "DISH") have improperly refused to produce requested information directly bearing on the claims and damages of Defendants and Counterclaim-Plaintiffs CBS Corporation, CBS Broadcasting Inc., CBS Studios Inc., and Survivor Productions, LLC (collectively, "CBS"). Pursuant to Federal Rule of Civil Procedure 37(a), CBS seeks an order compelling DISH to produce that information.

## BACKGROUND

CBS is one of the four major television networks that broadcasts programming to the American public for free, via traditional over-the-air broadcasts. CBS's Am. Countercls. ¶ 23. In addition to broadcasting its signal for free to millions of Americans "over-the-air," CBS's television programming is also retransmitted to many Americans through subscription-based cable and satellite companies such as DISH. *Id.* While CBS receives retransmission fees from cable and satellite providers, the "primary means of payment" for the television content that CBS broadcasts comes from the sale of commercial advertising. *Id.* at ¶ 24. Indeed, commercial advertising is the primary revenue source that supports the programming aired by CBS regardless of "[w]hether viewers watch programming for free over-the-air or through paid services that retransmit broadcast signals (such as those offered by the DISH Parties)." *Id.*

Throughout several months in 2011 and 2012, with more intensive discussions in December 2011 and the first week of January 2012, DISH and CBS negotiated the terms of a retransmission agreement (the "Retransmission Agreement") pursuant to which DISH currently distributes CBS programming to DISH subscribers. *Id.* at ¶ 43. During those negotiations, DISH knew that it intended to offer a new digital video recorder ("DVR") called the "Hopper."

1

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

*Id.* at ¶¶ 31–34, 43, 49, 50.  It knew that this DVR would have a service called "PrimeTime Anytime" ("PTAT") that automatically copies the primetime programming of all four of the major broadcast networks (CBS, ABC, NBC, and Fox).  *Id.*  And it knew that this DVR would have a "commercial-skipping" service called "AutoHop" that automatically skips all commercials in television programming recorded through PTAT.  *Id.*  Nonetheless, DISH made only a partial and ambiguous disclosure of its plan to release PTAT and completely concealed its intent to offer its subscribers commercial-free television through AutoHop.  *Id.* at ¶¶ 43–44.  Had CBS known about DISH's plans to offer commercial-skipping technology that "fundamentally altered the basic economics and nature of the Retransmission Agreement," CBS would not have agreed to the terms set forth in the current Retransmission Agreement.  *Id.* at ¶¶ 4, 51.

The parties executed the Retransmission Agreement on January 5, 2012.  *Id.* at ¶ 42. Four days later, DISH issued a press release announcing the Hopper and PTAT.  *Id.* at ¶ 48.  On March 15, 2012, DISH began selling the Hopper with PTAT.  *Id.* at ¶ 28.  And, on May 10, 2012, DISH began offering AutoHop, which it described as a "companion service" to PTAT.  *Id.* at ¶¶ 30, 50.

As a result of DISH's release of its PTAT and AutoHop services, on May 24, 2012, CBS filed a civil action against DISH in the Central District of California asserting various copyright claims arising from DISH's illegal copying of valuable CBS primetime programming.  That same day, DISH filed suit in this Court against CBS and various ABC entities under the Declaratory Judgment Act, seeking a declaration that it had not infringed the networks' copyrights.  Once CBS's action was transferred to this Court, CBS filed counterclaims against DISH for copyright violations and breach of contract.  Later, CBS amended its counterclaims to assert a fraudulent inducement claim against DISH based on DISH's deliberate concealment of

HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

PTAT and AutoHop during negotiation of the Retransmission Agreement.  DISH subsequently

filed a motion to dismiss CBS's fraud claim, which the Court denied on October 1, 2013.  *In re*

*AutoHop Litig.*, 12 Civ. 4155, 2013 WL 5477495, at **11–15 (S.D.N.Y. Oct. 1, 2013).  The

ABC entities have since voluntarily dismissed their claims pursuant to a settlement with DISH.

CBS and DISH are now in the midst of fact discovery, which concludes on August 5,

2014, under the current discovery schedule.  Both parties have served discovery requests and

have subsequently met and conferred in an attempt to resolve any outstanding discovery

disputes.  However, when it became apparent that CBS and DISH still had several outstanding

disagreements, the parties sought leave from the Court to file formal motions to compel rather

than the usual pre-motion letters required by Your Honor's Individual Rules and Local Civil

Rule 37.2.  The Court granted that request for leave and subsequently entered a briefing schedule

agreed to by the parties.

## LEGAL STANDARD

"The scope of discovery is generally limited to any matter, not privileged, which is

relevant to the claim or defense of any party or appears reasonably calculated to lead to the

discovery of admissible evidence."  *Barnes v. Smith*, 12 Civ. 1916, 2013 WL 4447897, at *1

(S.D.N.Y. Aug. 19, 2013) (citing Fed. R. Civ. P. 26(b)(1)).  "Although not unlimited, relevance,

for purposes of discovery, is an extremely broad concept."  *Condit v. Dunne*, 225 F.R.D. 100,

105 (S.D.N.Y. 2004) (citations omitted).  "Once 'any possibility of relevance sufficient to

warrant discovery is shown, the burden shifts to the party opposing discovery to show the

discovery is improper.'"  *Id.* at 106 (quoting *A.I.A. Holdings S.A. v. Lehman Bros.*, 97 Civ. 4978,

2000 WL 763848, at *3 (S.D.N.Y. June 12, 2000)).

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

3

## ARGUMENT

### A.  DISH Negotiations with Local Broadcasting Affiliates

In addition to directly transmitting their broadcast signals to distributors like DISH, the networks also have local affiliates that transmit the networks' broadcast signals in certain regions.  These local affiliates, like the networks, enter into their own retransmission agreements with distributors.  ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ seeking the production of (i) all documents concerning any communication discussing or referencing PTAT or AutoHop that DISH has had with Gannett, Sinclair, or Hoak Media and (ii) portions of any draft or final agreements between DISH, on the one hand, and Gannett, Sinclair, or Hoak Media, on the other hand, relating directly or indirectly to PTAT, AutoHop, or commercial skipping.  *See* Declaration of Joshua I. Schiller ("Schiller Decl.") Ex. 1, Req. Nos. 15–18; Schiller Decl. Ex. 2, Req. Nos. 1–2.

Although DISH has agreed to produce some of the requested documents, it has unnecessarily limited the scope of its agreed-upon production.  Most importantly, while DISH has agreed to produce responsive external communications with Gannett, Sinclair, and Hoak Media, it has refused to produce its internal, non-privileged DISH communications relating to those negotiations.  *See* Schiller Decl. Ex. 3, at 2.  It has also refused to produce responsive provisions from its draft or final agreements unless those agreements were included in

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

"communications" between DISH and Gannett, Sinclair, or Hoak Media. *See id.*; Schiller Decl. Ex. 4, at 2. There is no justifiable basis for these limitations.

This information is highly relevant to CBS's fraud claim. CBS alleges that DISH fraudulently induced it to enter into the Retransmission Agreement by concealing its plans to release PTAT and AutoHop. DISH's internal discussions of those services in the context of negotiations with other television stations are probative of numerous issues in this litigation and directly relevant to essential elements of CBS's fraud claim. *See Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 152 (2d Cir. 1993) ("[A] claim of fraudulent concealment must allege . . . (1) that the defendant failed to meet its duty to disclose, . . . (2) that the defendant had an intent to defraud or scienter, (3) there was reliance on the part of the plaintiff, and (4) damages."). The success of CBS's fraud claim, for example, depends in part on whether DISH had a duty to disclose PTAT and AutoHop to CBS during negotiations for the Retransmission Agreement. *See* Restatement (Second) of Torts § 551(2)(e) ("One party to a business transaction is under a duty of care to exercise reasonable care to disclose to the other before the transaction is consummated . . . facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."). DISH's negotiations with other broadcasters after its release of PTAT and AutoHop bear on, or are reasonably calculated to lead to the discovery of information that bears on, this issue. *See* Fed. R. Civ. P. 26(b); *Daval Steel Prods., a Div. of Francosteel Corp. v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991) ("'Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense

5

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

of any other party.' . . . This obviously broad rule is liberally construed." (quoting Fed. R. Civ. P. 26(b)) (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978))).

DISH's negotiations with Gannett, Sinclair, and Hoak Media are also relevant to CBS's fraud and copyright damages. ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████. *See Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421 (1996) ("[Fraud damages are] computed by ascertaining the difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain." (quotation marks and citation omitted)); *Bryant v. Media Right Prods.*, Inc., 603 F.3d 135, 144 (2d Cir. 2010) ("When determining the amount of statutory damages to award for copyright infringement, courts consider: (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) *the revenue lost by the copyright holder*; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties." (emphasis added)).

DISH claims that the documents it has agreed to produce "should be more than sufficient" to satisfy its discovery obligations, but it has not explained why this is the case. Schiller Decl. Ex. 4, at 2. Instead, throughout the discovery process, it has refused to consider producing documents responsive to these requests unless CBS also agreed to produce certain documents to DISH. At one point, for example, DISH refused to produce any responsive draft and final agreements unless CBS also agreed to produce unrelated licensing agreements into

6

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

which CBS had entered. *See* Schiller Decl. Ex. 5, at 4. This sort of horse trading is not a proper

basis for refusing to produce responsive documents. *See Hammond v. Beth Israel Med. Ctr.*, 10

Civ. 93, 2011 WL 5980952, at *4 n.2 (S.D.N.Y. Nov. 30, 2011). DISH's negotiations with local

affiliates about PTAT and AutoHop are highly probative of issues in this litigation and should be

produced without limitation.

### B. Viewership Tracking Data Showing Usage of PTAT and AutoHop

CBS seeks DISH viewership data relating to the rate at which DISH subscribers use

PTAT and AutoHop. *See* Schiller Decl. Ex. 6, Req. No. 12 (Second).



. *See*

Schiller Decl. Ex. 7, Resp. to Interrog. No. 5.

. *Id.* CBS seeks this data so that it can analyze

how often DISH subscribers watch network primetime programming without commercials.

DISH's reasoning for refusing to produce this data has varied over time. DISH initially

stated that "any production of raw data would need to be subject to heightened confidentiality

protection." *See* Schiller Decl. Ex. 8, at 2. While CBS disagreed (and continues to disagree) that

this information is more confidential than other information that has been produced in this

lawsuit, CBS took steps to ameliorate DISH's concerns. Specifically, CBS agreed to treat that

data as Highly Confidential under the Stipulated Protective Order entered in this case and to

identify any expert to which CBS intends to send the data so that DISH would have the

opportunity to object. *See* Schiller Decl. Ex. 9, at 1–2 (Nov. 27, 2013). Over two months later,

without responding to CBS's suggested compromise, DISH took the position for the first time

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

7

that, apart from any confidentiality concerns, it would be infeasible for it to produce the requested data by the end of fact discovery in a "format that CBS's outside experts could interpret or analyze." *See* Schiller Decl. Ex. 5, at 2.  When CBS asked DISH to provide a more fulsome explanation of this alleged infeasibility, DISH responded that producing the data would be prohibitively expensive and time consuming because the data was regularly archived in a format that is not readily accessible. *See* Schiller Decl. Ex. 3, at 1; Schiller Decl. Ex. 4, at 1.

Because of the viewership data's importance to disputed issues central to this litigation, neither of these objections justifies DISH's refusal to produce the sought-after information.  This data, in fact, has already played a significant role in these proceedings.  In opposing both ABC's motion for preliminary injunction and ABC's subsequent appeal to the Second Circuit, DISH submitted declarations analyzing this viewership data to support its assertion that ██████████ ██████████████████████████████.  ABC vigorously challenged the accuracy of that analysis and CBS intends to do so as well.  Having relied on this data to support its defense, DISH cannot now withhold it on the ground that the data is too confidential or too costly to produce.

As an initial matter, DISH's assertion that the information is too confidential to produce is unsupported.  DISH, as noted, has already submitted declarations to the Court analyzing this data.  And DISH has not provided any reason why the data that was used to prepare these analyses is distinct from, and more confidential than, the remaining raw data sought by CBS.  Moreover, CBS is willing to agree to heightened confidentiality protections to satisfy DISH's concerns under the Stipulated Protective Order entered in this case.  There is no reason that these protections should be insufficient to allow production of the requested data.

8

**HIGHLY CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER**

DISH's objection that producing the data would be unduly burdensome is also unavailing. Undue burden can only justify withholding the production of relevant information if the claimed burden outweighs the value of the information to the requesting party. *See* Fed. R. Civ. P. 26(B); 8B Fed. Prac. & Proc. Civ. § 2214 (3d ed.). Applying this standard, the viewership data—which, as discussed, has already been at the center of deeply contested issues in this litigation—is simply too important to warrant withholding. This is particularly true in this case because the asserted burden was created by DISH. *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 372, n.4 (S.D.N.Y. 2006) ("[P]ermitting the downgrading of data to a less accessible form—which systematically hinders future discovery by making the recovery of the information more costly and burdensome—is a violation of the preservation obligation."); *Quinby v. WestLB AG*, 245 F.R.D. 94, 104 (S.D.N.Y. 2006) ("[I]f a party creates its own burden or expense by converting into an inaccessible format data that it should have reasonably foreseen would be discoverable material at a time when it should have anticipated litigation, then it should not be entitled to shift the costs of restoring and searching the data.").

DISH has been on notice that it might be required to produce this data at least since CBS served a Request for Production of this information on January 29, 2013. Counsel for the parties have since met and conferred about this issue on numerous occasions. And DISH already collects, processes, and provides this data to Rentrak in the regular course of business. However, rather than maintaining this data in that accessible format, or producing it on a regular basis to CBS, it has chosen to archive it in a format it asserts is not reasonably accessible. DISH cannot now, over a year after CBS first sought the viewership data, use this decision to shield itself from its obligation to produce discoverable information. DISH regularly processes and sends this data to Rentrak, and there is no reason that it cannot also process that data and send it to CBS.

9

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

If, however, DISH continues to refuse to produce the requested data on burden grounds, CBS requests that this Court preclude DISH from using this viewership data to support its defense in this case.  *See* Fed. R. Civ. P. 37(b)(2)(A)(ii) (listing as an appropriate discovery sanction "prohibiting the disobedient party from supporting or opposing designated claims or defense, or from introducing designated matters in evidence"); *Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 433 (S.D.N.Y. 2011) (stating that a party would forfeit the ability to rely on documents if it declined to produce them); *Artista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 138 (S.D.N.Y. 2009) (holding that in addition to Rule 37, federal courts have inherent power to impose sanctions against a party acting in bad faith or willfully) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)).  DISH, as noted, has already relied on some of the viewership data it collects to support its opposition to ABC's motion for preliminary injunction.  DISH should not get it both ways: using viewership data to support its defense, while simultaneously stripping CBS of the ability to analyze that information and test the conclusions DISH has drawn from it.

### C. Addition of Warren Schlichting as a Custodian for Electronically Stored Information

DISH has refused CBS's request to add Warren Schlichting, DISH's Senior Vice President of Media Sales and Analytics, as a document custodian.  The parties in this case have an agreed-upon protocol for conducting searches of designated custodians' electronically stored information ("ESI").  During the process of initially designating custodians, all parties reserved the right to request additional custodians if it became apparent that other individuals were likely to have relevant information.  Through its review of DISH's production, CBS subsequently

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

identified Mr. Schlichting as a DISH employee that is likely to have relevant ESI and asked that DISH search his files for responsive documents.

The documents that have been produced to date show that Mr. Schlichting has been involved in a number of internal DISH discussions bearing on issues in this case. Among other things, these documents contain:



Considered together, these documents indicate that Mr. Schlichting has been heavily involved in DISH's business strategy relating to PTAT and AutoHop and is likely to possess more relevant documents.

Nonetheless, DISH has refused to add Mr. Schlichting as a custodian. DISH has never disputed that Mr. Schlichting is likely to have responsive and relevant documents. Indeed, DISH recently indicated that it has conducted what it describes, without further explanation, as a "targeted collection" of Mr. Schlichting's documents. *See* Schiller Decl. Ex. 4, at 5–6. But DISH has continued to refuse to do a complete search of Mr. Schlichting's files unless CBS agrees to add a CBS employee, Scott Koondel, as an ESI custodian for DISH's discovery requests. *See* Schiller Decl. Ex. 5, at 3.

11

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

DISH's discovery obligations, however, are not dependent on CBS's discovery obligations. *See Hammond v. Beth Israel Med. Ctr.*, 10 Civ. 93, 2011 WL 5980952, at *4 n.2 (S.D.N.Y. Nov. 30, 2011) ( "[P]laintiff's compliance with her discovery obligations is not contingent on whether the defendant complies or fails to comply with its own discovery obligations. Federal Rule of Civil Procedure 37 addresses a party's failure to make disclosures or cooperate in discovery, and that rule nowhere provides for the self-help exercised by plaintiff." (quotation marks and citation omitted)); *Crawford-Bey v. N.Y. Presbyterian Hosp.*, 08 Civ. 5454, 2009 WL 2222916, at *4 (S.D.N.Y. July 27, 2009) (Fox, J.) (holding that a plaintiff's insistence that defendant answer her interrogatories "as a condition precedent" to her responding to defendant's discovery demands was "improper"). DISH should not be permitted to condition its willingness to designate Mr. Schlichting as an ESI custodian based solely on whether CBS will agree to a quid pro quo designation of Mr. Koondel.

### D.  DISH Documents Concerning the Value of Distributing CBS Programming

CBS has served requests for production seeking (i) all documents relating to any analysis, study, survey, research, or business plan regarding the amount DISH would be willing to pay to retransmit CBS's broadcast signal or to distribute CBS content through alternative distribution channels; and (ii) all documents relating to any analysis, study, survey, research or business plan regarding the losses or other business harms that DISH would incur if it lost the right to transmit CBS's broadcast signal or the broadcast signals of ABC, Fox, or NBC. *See* Schiller Decl. Ex. 1, Req. Nos. 19–22.[1]

---

[1] CBS has also served a related request seeking all documents relating to any slide deck presentation, memorandum, business plan, or similar document concerning any analysis of PTAT or AutoHop. *See* Schiller Decl. Ex. 1, Req. No. 26.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

This information is relevant to CBS's fraud claim and the measure of its damages. CBS, as noted, alleges that DISH fraudulently induced it to enter into the Retransmission Agreement without the knowledge that CBS's programming would be distributed to DISH subscribers on an on-demand, commercial-free basis as a result of the release of PTAT and AutoHop. CBS's fraud damages are based, at least in part, on the market value of distributing CBS programming in this manner. And one measure of that market value is the amount that DISH would be willing to pay to distribute CBS programming on a similar basis—i.e., on demand and without commercials—through alternative distribution channels such as Video on Demand.

████████████████████████████████████

████████████████████████████████████

████████████████████████████ Indeed, it has been reported that DISH's recent retransmission agreement with ABC—which resolved ABC's claims in this matter through a broad agreement under which DISH reportedly agreed to modify the availability of AutoHop on ABC programming in exchange for the right to distribute ABC programming through multiple alternative platforms—confirms that PTAT and AutoHop are part of DISH's broader alternative distribution plan. *See* Schiller Decl. Ex. 10. CBS seeks additional information about DISH's alternative distribution strategy so that it can more accurately evaluate the market value of distributing commercial-free, on-demand programming in connection with CBS's counterclaims.

DISH's objections to producing this information are unavailing. DISH refuses to produce this information on the grounds that it (i) does not "bear any relationship to issues in this litigation" and (ii) is "of the utmost commercial sensitivity." *See* Schiller Decl. Ex. 4, at 2. As just explained, contrary to DISH's objection, this information is relevant to issues in this litigation. And given this relevance, DISH's assertion that the information is commercially

13

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

sensitive is an insufficient basis for refusing to produce these documents, particularly in light of the Stipulated Protective Order in this case. Instead, as with several of CBS's other requests, DISH's refusal to produce this information appears primarily motivated by a desire to create negotiating leverage to induce CBS to produce additional documents. *See* Schiller Decl. Ex. 5, at 5–6. But litigation leverage is not a proper basis for refusing to produce responsive documents. Accordingly, DISH should be required to produce these important valuation documents.

### E. Directives and Instructions Relating to the Operation of PTAT and AutoHop

Under Second Circuit precedent, one of the central issues in this litigation is whether DISH engages in sufficient volitional conduct relating to the copying of CBS programming for DISH to be held liable for directly infringing CBS's copyrights. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) ("When there is a dispute as to the author of an allegedly infringing instance of reproduction, [*Religious Tech. Cent. v.*] *Netcom* [*On–Line Commc'n Servs.*, 907 F. Supp. 1361 (N.D. Cal. 1995),] and its progeny direct our attention to the volitional conduct that causes the copy to be made."). As a part of its effort to discover the control that DISH exercises over the operation of PTAT and AutoHop, CBS seeks all documents providing employees or contractors with directives or instructions on changing PTAT settings (i) after a local station has stopped or started an affiliation with ABC, CBS, NBC, or Fox; (ii) when DISH switches from offering standard-definition PTAT recording to offering high-definition PTAT recording in a designated market area; and (iii) for subscribers who live in

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

zip codes with more than one designated market area.  *See* Schiller Decl. Ex. 11, Req. No. 5; Schiller Decl. Ex. 12, Req. Nos. 2 and 4; Schiller Decl. Ex. 13, Req. Nos. 2–3.[2]

While DISH does not appear to dispute the relevance of the requested information, it has chosen to limit its production to formalized "guides and instruction manuals" instead of producing all documents containing the relevant directives and instructions.  *See* Schiller Decl. Ex. 4, at 4–5.  This limitation is arbitrary, however.  There is no reason to believe—nor does DISH even claim—that all such directives and instructions would have been formalized.  To minimize DISH's burden, CBS (as it has communicated to DISH) is willing to limit DISH's production to (i) formalized "guides and instructions" and (ii) other directives and instructions located in the electronic and hard copy files of custodians designated by DISH and approved by CBS.  *See* Schiller Decl. Ex. 3, at 5–6.  But CBS should not have to rely on DISH's judgment as to what qualifies as a formalized guide or instruction manual.  Any document responsive to these requests bears directly on the issue of DISH's volitional conduct in copying CBS programming, which is central to CBS's copyright claims, and should be produced.

### F.  Network Refusal to Carry DISH Advertisements

In DISH's declaratory judgment complaint, it alleges that "[a]fter the AutoHop feature was released, Fox, CBS and NBC began rejecting advertising from DISH featuring the Hopper."  Am. Compl. ¶ 45.  Based on this allegation, CBS seeks all documents referring to any harm allegedly caused to DISH by any networks' refusal to carry television advertising promoting the

---

[2] ABC initially took the lead in meeting and conferring with DISH about these requests for production.  When ABC voluntarily dismissed its claims without prejudice pursuant to its settlement with DISH, however, CBS instructed DISH that it intended to continue seeking the requested documents and subsequently met and conferred with DISH about these requests.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

Hopper.  *See* Schiller Decl. Ex. 12, Req. No. 8; Schiller Decl. Ex. 13, Req. No. 8.[3]  DISH has

thus far refused to produce any documents responsive to this request on the ground that the

information sought is irrelevant to this litigation.  *See* Schiller Decl. Ex. 4, at 5.  However,

contrary to DISH's objection, this information is relevant.  Among other things, it is probative of

the harm caused to advertisers when their advertisements are not seen by consumers.  This is the

very same harm that CBS alleges occurs as a result of DISH's PTAT and AutoHop services

being used to watch CBS programming commercial-free.  Moreover, DISH cannot put this

allegation at issue and then deny CBS the opportunity to seek discovery related to it.  *See Haber

v. ASN 50th St., LLC*, 272 F.R.D. 377, 380 (S.D.N.Y. 2011) (stating that "[d]iscovery is guided

by the allegations raised in the complaint and the defenses asserted" and ordering production of

documents relating to the allegations in the complaint).  DISH should therefore be required to

produce information responsive to this request.

## CONCLUSION

For the foregoing reasons, this Court should grant CBS's motion to compel DISH to

produce the requested information.  Specifically, the Court should enter an order directing DISH

to:

- Produce (i) all internal and external DISH communications discussing or referencing PTAT, AutoHop, or commercial-skipping in connection with its negotiations with Gannett, Sinclair, or Hoak Media and (ii) portions of any draft or final agreements between DISH, on the one hand, and Gannett, Sinclair, or Hoak Media, on the other hand, relating directly or indirectly to PTAT, AutoHop, or commercial skipping;

- Produce the subscriber viewership data DISH collects relating to the rate at which DISH subscribers use PTAT and/or AutoHop;

---

[3] As with the previous set of requests, *see supra* Part E, CBS did not become directly involved in meeting and conferring with DISH about this request for production until ABC voluntarily dismissed its claim without prejudice pursuant to its settlement with DISH.

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

16

- Add Warren Schlichting as a designated electronic custodian and search his ESI in accordance with the parties' agreed-upon protocol;

- Produce (i) all documents relating to any analysis, study, survey, research, or business plan regarding the amount DISH would be willing to pay to retransmit CBS's broadcast signal or to distribute CBS content through alternative distribution channels and (ii) all documents relating to any analysis, study, survey, research or business plan regarding the losses or other business harms that DISH would incur if it lost the right to transmit CBS's broadcast signal or the broadcast signals of ABC, Fox, or NBC;

- Produce all documents providing employees or contractors with directives or instructions, regardless of whether those directives or instructions appear in formalized guides or instruction manuals, on changing PTAT settings (i) after a local station has stopped or started an affiliation with ABC, CBS, NBC or Fox (ii) when DISH switches from offering standard-definition PTAT recording to offering high-definition PTAT recording in a designated market area, and (iii) for subscribers who live in zip codes with more than one designated market area; and

- Produce all documents referring to any harm allegedly caused to DISH by any networks' refusal to carry television advertising promoting the Hopper.

17

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

Dated: New York, New York
April 11, 2014

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

Jonathan D. Schiller
Joshua I. Schiller
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Hamish P.M. Hume
5301 Wisconsin Ave., NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

*Attorneys for CBS Corporation, CBS*
*Broadcasting Inc., CBS Studios Inc. and*
*Survivor Productions, LLC*

18

**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**

## CERTIFICATE OF SERVICE

I hereby certify that on April 11, 2014, I caused a true and correct copies of CBS's Motion to Compel the Production of Documents and Other Information and accompanying documents to be served via electronic mail, pursuant to the parties' agreement as reflected in the August 1, 2012, Initial Conference Report, to:

Elyse D. Echtman, Esq. - eechtman@orrick.com

Peter A. Bicks, Esq. - pbicks@orrick.com

Annette Louise Hurst, Esq. - ahurst@orrick.com

Lisa T. Simpson, Esq. - lsimpson@orrick.com

William A. Molinski, Esq. - wmolinski@orrick.com

Ayanna Lewis-Gruss, Esq. - alewisgruss@orrick.com

Cyrus P.W. Rieck, Esq. - crieck@orrick.com

Lauren B. Muldoon, lmuldoon@orrick.com

Oward R. Anson, oanson@orrick.com


*Counsel for CBS Corporation, CBS Broadcasting Inc., CBS Studios Inc., and Survivor Productions, LLC*


Kieran G. Gostin


**HIGHLY CONFIDENTIAL**
**SUBJECT TO PROTECTIVE ORDER**