UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE AUTOHOP LITIGATION

12-CV-4155 (LTS) (KNF)

**REDACTED PUBLIC
FILING, ORIGINAL FILED
UNDER SEAL**

**CBS'S MEMORANDUM OF LAW IN SUPPORT OF ITS
OPPOSITION TO DISH NETWORK L.L.C.'S MOTION TO COMPEL PRODUCTION
OF DOCUMENTS RESPONSIVE TO DISH'S FOURTH REQUEST FOR
PRODUCTION AND MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND
RESPONSE TO INTERROGATORY**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

    A.    CBS's Retransmission Agreements are Irrelevant in Determining the Fair Market Value of CBS's Primetime Programming on an On-Demand Commercial-Free Basis ...................................................................................... 3

    B.    CBS's Negotiation Documents from its Retransmission Agreements Also Are Irrelevant ...................................................................................................... 8

    C.    CBS Has Produced Sufficient Information on its Advertising Revenue .............. 8

    D.    CBS Will Produce Documents on Alternative Advertising ................................ 12

    E.    CBS Has Already Produced Information on Internet Television Viewing Habits and Alternative Television Viewing Platforms, But CBS Nevertheless Agrees to Conduct *Additional* Reasonable Searches for Responsive Documents ....................................................................................... 13

    F.    CBS Will Supplement its List of Primetime Shows ▮▮▮▮▮▮▮▮▮▮▮▮ ............... 16

    G.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ................................................... 18

    H.    CBS Will Produce Additional Documents Tracking Viewership on VOD Platforms ........................................................................................................... 19

    I.    CBS Will Produce Documents About its "Goal" and "Plans" to Shift DVR Viewing to VOD ............................................................................................... 20

    J.    DISH's Request for Documents Evidencing Actions CBS Has Taken Against Other Unauthorized Television Technologies is Irrelevant to This Litigation ............................................................................................................ 20

    K.    Documents About DVR and VCR Recording, Storage, and Playback Capabilities Have No Bearing On the Issues in This Litigation ........................... 22

    L.    CBS Has Agreed to Add Scott Koondel as an Electronic Document Custodian .......................................................................................................... 23

    M.    CBS's Discussions of its Cable Properties are Irrelevant to the Litigation and Should Not Be Unredacted ........................................................................... 23

ii

CONCLUSION........................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Am. Geophysical Union v. Texaco Inc.,*
   60 F.3d 913 (2d Cir. 1993)......................................................................................... 3, 6

*Beastie Boys v. Monster Energy Co.,*
   No. 12 Civ. 6065, 2014 WL 888235 (S.D.N.Y. Mar. 6, 2014) ................................. 4

*Cnty. of Ventura v. Blackburn,*
   362 F.2d 515 (9th Cir. 1966) .................................................................................. 6, 7

*East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.,*
   109 P.3d 969 (Colo. 2005)........................................................................................... 7

*Erchonia Corp. v. Bissoon,*
   No. 07 Civ. 8696, 2011 WL 3904600 (S.D.N.Y. Aug. 26, 2011) ........................... 18

*Weatherford Inter. Sec. Litig.,*
   No. 11 Civ. 1656, 2013 WL 5788680 (S.D.N.Y. Oct. 18, 2013) ............................ 18

**Other Authorities**

Fed. R. Civ. P. 33(d) ...................................................................................................... 17

Fed. R. Civ. P. 34(b)(2)(E)(i)......................................................................................... 19

Local Civil Rule 33.3 ....................................................................................................... 17

Defendants and Counterclaim-Plaintiffs CBS Corporation, CBS Broadcasting Inc., CBS Studios Inc., and Survivor Productions, LLC (collectively, "CBS") respectfully submit this opposition to Plaintiff and Counterclaim-Defendant DISH Network L.L.C. and Counterclaim-Defendants DISH Network Corporation and EchoStar Technologies LLC's (collectively, "DISH") Motion to Compel Production of Documents Responsive to DISH's Fourth Request for Production to CBS Parties and Motion to Compel Production of Documents and Response to Interrogatory.[1]

## PRELIMINARY STATEMENT

CBS has sued DISH seeking to enjoin and collect damages over two services offered by DISH with its Hopper DVR—Primetime Anytime ("PTAT") and AutoHop—that copy CBS primetime programming for on-demand, commercial-free playback. DISH's motions to compel seek the production of information that DISH claims relates to issues presented in CBS's Amended Counterclaims for copyright infringement, breach of contract, and fraudulent inducement. CBS continues to resist production of certain specific categories of documents that have no likelihood of bearing any relevance to the claims at issue and that are excessively burdensome in light of their limited potential relevance. However, for most of the requests in DISH's motion, CBS has agreed to conduct a search for and produce responsive documents; thus, these requests are no longer ripe for purposes of these motions.

In its Amended Counterclaims, CBS alleges that PTAT and AutoHop violate both CBS's copyrights in its primetime programming and the parties' Retransmission Agreement that provides DISH the right to transmit CBS's broadcast signal. Dkt. 193 ¶¶ 1 and 7. CBS also claims that DISH fraudulently induced CBS to enter into the current Retransmission Agreement

---

[1] CBS submits this opposition brief in response to the two motions to compel submitted by each of the two law firms representing DISH in this litigation—Orrick and Durie Tangri.

by failing to disclose DISH's plans to release AutoHop when the parties were negotiating the Retransmission Agreement. *Id.* at ¶¶ 42-51.

DISH now seeks documents that have no relevance to the claims at issue and that are among CBS's most proprietary and confidential documents. For example, DISH seeks to compel the production of CBS's retransmission agreements with DISH's competitors based on blanket, incorrect assertions that these agreements will quantify the value of CBS's infringed works and will evidence that CBS is comfortable with commercial-skipping technology.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████. They also say nothing about the market value for copying CBS primetime programming for on-demand, commercial-free playback—which is exactly the market supplanted by PTAT and AutoHop. ███████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████.

DISH also seeks other expansive and unsupportable discovery that could not possibly bear on the claims at issue. For example, although this case concerns the specific PTAT and AutoHop services on DISH's Hopper DVR, DISH seeks to compel the production of documents reflecting CBS's analysis of the recording, storage, and playback capabilities of decades-old VCR technology. DISH has not explained why decades-old documents have *any* relevance to the litigation. Even assuming that documents about antiquated VCR technology are potentially relevant, which they are not, DISH cannot credibly argue that documents analyzing the storage capacity of VCRs have any connection to PTAT and AutoHop.

2

As a result of CBS's on-going consideration of DISH's requests, DISH's motion to compel with respect to many of the document requests is now moot.  For the requests still outstanding in DISH's motion, CBS respectfully submits that these requests are not likely to have any bearing on the issues in the litigation and, as a result, DISH's motion should be denied.

## ARGUMENT

### A.   CBS's Retransmission Agreements are Irrelevant in Determining the Fair Market Value of CBS's Primetime Programming on an On-Demand Commercial-Free Basis

In order for cable and satellite providers to transmit CBS's broadcast signal to their customers, the providers (known as multichannel video programming distributors, or "MVPDs") enter into retransmission agreements with CBS.  The retransmission agreements detail the terms under which an MVPD can transmit CBS's broadcast signal, including the price that each MVPD must pay to CBS for this right.  DISH argues that it needs these highly commercially sensitive and proprietary retransmission agreements that CBS has entered into with DISH's competitors to establish a market value for CBS's copyrighted works.  However, DISH's argument reflects a fundamental misunderstanding about CBS's retransmission agreements and their possible relevance in determining market harm caused by PTAT and AutoHop.

The retransmission market is irrelevant to establishing the market value of CBS's works that DISH has infringed by offering PTAT and AutoHop.  DISH's technologies copy CBS primetime programming for on-demand, commercial-free playback.  Therefore, the relevant market for determining fair market value is the actual or potential market for CBS primetime programming on an on-demand, commercial-free basis.  *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1993) ("Only an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when

3

evaluating a secondary use's 'effect upon the potential market for or value of the copyrighted work.'"); *see also Beastie Boys v. Monster Energy Co.*, No. 12 Civ. 6065, 2014 WL 888235, at *3 (S.D.N.Y. Mar. 6, 2014) (stating that the role of a damages expert is to establish "the fair market value of a licensing agreement whose terms reflect the *actual use made*") (emphasis added) (citing *On Davis v. The Gap, Inc.*, 246 F.3d 152, 166 n.5 (2d Cir. 2001) ("[T]he fair market value to be determined is not of the highest use for which plaintiff might license but the use the infringer made."). Furthermore, it is the market for on-demand, commercial free playback that DISH's PTAT and AutoHop technologies threaten to supplant if these technologies were to become widespread.

The license agreements that are relevant to any analysis as to the market value or potential market for the infringed works in this litigation are those that bear on the fair market value for CBS's primetime programming in the on-demand, commercial-free market—not license agreements that speak to the fair market value for CBS's broadcast signal. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮. Schiller Decl. Ex. 11 at 1; Ex. 8 at 3-4. DISH cannot deny that these are the relevant license agreements because DISH proudly announced that PTAT and AutoHop would obviate the need for DISH subscribers to use services provided by some of CBS's licensed partners who distribute on-demand, commercial-free primetime programming. *See* Dkt. No. 193 ¶ 32 (quoting a DISH executive as stating about the Hopper: "I don't think you'd need Hulu or Hulu Plus after this."). Moreover, DISH has touted the on-demand, commercial-free capabilities of PTAT and AutoHop in its promotional advertising. Schiller Decl. Ex. 28.

4

██████████████████████████████████████, DISH also seeks

all of CBS's retransmission agreements "in effect as of January 1, 2012" and "in effect from January 1, 2012 to the present." Schiller Decl. Ex. 2 at 2. In other words, DISH wants retransmission agreements that CBS has entered into both before and after PTAT and AutoHop were released to DISH customers in March and May of 2012, respectively. DISH argues that CBS should produce its retransmission agreements—among its most sensitive business documents— for three reasons: (1) the agreements are relevant in quantifying the value of CBS's primetime programming and the harm to that programming; (2) CBS is likely to adopt ABC's argument that CBS's retransmission negotiations have been harmed by PTAT and AutoHop; and (3) DISH is entitled to review agreements executed prior to the release of PTAT and AutoHop to see what those agreements stated about commercial-skipping technology. (Durie Tangri Br. at 2-4.) None of these arguments provides a basis for CBS to produce its retransmission agreements.

*First*, DISH claims that the retransmission agreements are relevant in determining copyright damages and in considering the fourth factor of DISH's fair use defense. DISH argues that it needs the retransmission agreements to analyze the "overall economics of the deals" and to quantify the value of CBS primetime programming. (Durie Tangri Br. at 2.) However, the retransmission market is not the market at issue in this litigation because it does not speak to the value of copying CBS primetime programming for on-demand, commercial-free playback. The VOD and Internet-based markets are markets that PTAT and AutoHop threaten to usurp if they become widespread. ██████████████████████████████████

████████████████████████.



Schiller Decl. Ex. 11 at 2.

    For these reasons, the authority DISH cites in its brief on market harm is inapposite, and DISH fails to take into account controlling Second Circuit law. *See Am. Geophysical Union*, 60 F.3d 913 at 930.  DISH cites *Nimmer on Copyright* for the proposition that CBS's retransmission agreements executed prior to the release of AutoHop are relevant if the value of CBS primetime programming on an on-demand, commercial-free basis was diminished in these agreements.[2] (Durie Tangri Br. at 2.)  But again, the retransmission agreements do not address the market at issue in this litigation.  DISH also cites a Ninth Circuit case that predates the enactment of the current Copyright Act in 1976 and that has no bearing on the facts of this case.  *See Cnty. of Ventura v. Blackburn*, 362 F.2d 515 (9th Cir. 1966).  In *Blackburn*, the plaintiff possessed a copyright in a county map and granted an exclusive license to the county to reproduce the map. *Id.* at 516.  The plaintiff sued for copyright infringement after the county reproduced the map

---

[2] The section in Nimmer that DISH cites—§ 140.02[A]—does not exist.  CBS believes that DISH intended to cite § 14.02[A].

without recognition of the plaintiff's copyright. *Id.* at 516. The court held that the fair market value of the copyright must be reduced by the fact that the plaintiff granted the county an exclusive license. *Id.* at 521. As with the quote from Nimmer, *Blackburn* also is irrelevant because CBS's retransmission agreements do not address the value of its primetime programming on an on-demand, commercial-free basis.

*Second*, DISH claims that CBS's retransmission agreements should be produced because DISH presumes that CBS will argue (like ABC did in connection with its preliminary injunction briefing in November 2012) that its negotiations for retransmission agreements have been impacted since PTAT and AutoHop were released. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████. There is nothing more that DISH is entitled to.

*Third*, DISH argues that CBS's retransmission agreements executed prior to the release of PTAT and AutoHop are relevant to CBS's contract and fraud claims because anything that was said about "home recording devices and commercial-skipping bear on the meaning of the provisions at issue in the Retransmission Agreement." (Durie Tangri Br. at 3.) ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Nor does DISH

explain how or why other retransmission agreements executed prior to the release of PTAT and AutoHop "bear on the meaning" of the terms of the Retransmission Agreement at issue in this

7

case. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████.

Accordingly, the Court should deny DISH's motion with respect to Request Nos. 1 and 2 in DISH's Fourth RFP.[3]

### B.   CBS's Negotiation Documents from its Retransmission Agreements Also Are Irrelevant

DISH also seeks CBS's highly commercially sensitive and proprietary negotiation documents for retransmission agreements with other MVPDs in which the Hopper, PTAT, or AutoHop was discussed. Schiller Decl. Ex. 2 at 3 (Request Nos. 3-5). As with the production of CBS's retransmission agreements, the negotiation documents are equally irrelevant. *See supra* Part A. ████████████████████████████████████████████████

████████████████████████████████████████████. Schiller Decl. Ex. 11 at

2. This is all that DISH is entitled to.[4]

### C.   CBS Has Produced Sufficient Information on its Advertising Revenue

DISH claims that CBS has "refuse[d] to provide any meaningful[] discovery" about its advertising revenue. (Orrick Br. at 5.) This is simply false. █████████████████████

████████████████████████████████████████████████████████

████████. In its Third RFP, DISH requested CBS produce its primetime broadcast advertising

---

[3] Alternatively, if the Court does conclude that CBS's retransmission agreements should be produced, CBS respectfully submits that, due to the highly commercially sensitive and proprietary nature of these agreements and the concern that DISH would have access to agreements that its competitors have entered into with CBS, CBS should be ordered to produce only those portions of the agreements that the Court determines are directly relevant to the litigation.

[4] DISH's requests for negotiation documents also are overbroad. In addition to negotiation documents in which PTAT or AutoHop was discussed, DISH also seeks negotiation documents discussing undefined Hopper "features." Not only does CBS not know what DISH considers to be a Hopper "feature," but functions of the Hopper other than PTAT and AutoHop are irrelevant to this litigation.

8

revenue for additional years.  Schiller Decl. Ex. 1 at 5 (Request No. 7).  ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████.  Yet DISH continues to seek information about

quarterly advertising, contracts entered into during the Upfronts, and other intrusive evidence of

revenue ███████████████████████████████████████████████

███████████.  DISH asks the Court to order CBS to produce a slew of additional documents

(Orrick Br. at 6), outlined in six requests for information in DISH's Fifth RFP:

- Request No 1:  "All documents discussing, evidencing or reflecting Your Upfront presentations and agreements . . . for the last five television seasons.";

- Request No. 3:  "All documents discussing or evidencing any impact that PTAT or AutoHop may have had on Your advertising sales or demand for advertising time on CBS in connection with the 2013 Upfronts.";

- Request No. 4:  "All documents discussing or evidencing Your advertising sales results in connection with the 2013 Upfronts, including but not limited to any deals struck or contracts entered into in connection with [the] 2013 Upfronts.";

- Request No. 5:  "All documents discussing or evidencing the average CPM that advertisers agreed to pay for primetime programming airing on Your broadcast network during the 2013-2014 television season.";

- Request No. 6:  "All documents discussing or evidencing any increase in the average CPM secured by You for the 2013-2014 television season, as compared to the CPM secured by You for the 2012-2013 television season."; and

- Request No. 7:  "Documents sufficient to show Your scatter market advertising rates (including CPMs), scatter market sales volumes, . . . and revenues earned by You for scatter market advertising for the last five television season."

Schiller Decl. Ex. 3 at 3-4.

For Request No. 1, as DISH acknowledges, CBS has agreed to produce its Upfront presentations for the years 2009-2013. (Orrick Br. at 6.) However, DISH claims that this production is insufficient because "the Upfront presentations alone won't assist DISH in examining CBS's claims of harm to advertising sales." (*Id.*) DISH asks this Court to order CBS to produce the agreements that it entered into with advertisers during the Upfronts that occurred from 2009-2013. Not only are the Upfront agreements highly commercially sensitive and proprietary, but the burden of producing these agreements far outweighs any marginal relevance they may have to the litigation. The networks enter into hundreds of Upfront agreements each season. DISH's only argument as to the relevance of these contracts with third-party advertisers is an unsupported, blanket assertion that they "will be probative of whether PTAT and AutoHop have had any *actual impact* on CBS's efforts to sell advertising time since the time that the features were released in 2012." (Orrick Br. at 7.)

This argument is misleading. DISH cannot explain how these agreements are likely to reveal any connection to PTAT and AutoHop. A change in pricing from one year to the next for any specific advertising partner may be reflective of economic market factors entirely unrelated to PTAT and AutoHop. Moreover, Upfront commitments can be cancelled mid-season.[5]

███████████████████████████████████████████████████

████. DISH will gain no insight into the effect that PTAT and AutoHop have had on CBS's advertising revenue during the Upfronts by reviewing a substantial number of advertising contracts with third parties. However, in response to a separate DISH request, CBS has agreed to conduct a reasonable search for responsive documents, in electronic or hard copy form, for

---

[5] *See* Stuart Elliott, *Sooner Than Expected, CBS Largely Finishes Upfront Sales*, The New York Times, June 7, 2013, http://www.nytimes.com/2013/06/08/business/media/sooner-than-expected-cbs-largely-finishes-upfront-sales.html?_r=0 ("The numbers are not more definite because during the season, advertisers can usually cancel their upfront market commitments without penalty.").

references to PTAT and AutoHop in connection with the 2013 Upfronts. Schiller Decl. Ex. 10 at

3 (Fifth RFP, No. 2). That request is a more efficient and practical way for DISH to assess the

impact of PTAT and AutoHop on CBS's advertising revenue than asking CBS to produce a

substantial number of highly commercially sensitive and proprietary advertising contracts with

third parties.

For the remaining five requests in DISH's Fifth RFP (Request Nos. 3-7), DISH lumps

these requests together and states that CBS should be ordered to produce its "results at the

Upfronts and in the scatter market, and documents discussing those results" because DISH is

entitled to "test CBS's assertion" that PTAT and AutoHop will undermine its advertising

revenue. (*Id.* at 7.) This argument mischaracterizes the Upfronts and the scatter market. The

Upfronts and the scatter market are very fluid markets that operate based on oral advertising

commitments. Schiller Decl. Ex. 29. Simply because a company "commits" to running an

advertisement on CBS at some future date does not necessarily translate to advertising revenue

earned for CBS. *Id.* This is true because, as stated above, numerous factors affect whether a

company ultimately decides to run an advertisement on CBS, regardless of whether it had

committed to doing so earlier. For example, a pharmaceutical company who "committed"

during the Upfronts to promoting its new product on a CBS primetime program may have its

product recalled by the Food and Drug Administration prior to the advertisement of the product

airing on CBS. Therefore, CBS would not earn the revenue anticipated by the earlier

commitment for reasons unrelated to PTAT and AutoHop.

The most practical and reasonable way for DISH to test whether CBS's advertising

revenue has been affected by PTAT and AutoHop is to analyze CBS's year-end advertising

revenue, which reflects *actual revenue earned.* ███████████████████████

11

███████████████████████████. Schiller Decl. Exs. 13, 24, 25,

26, 30. Accordingly, DISH's motion to compel with respect to Request Nos. 1 and 3-7 in

DISH's Fifth RFP should be denied.

**D.    CBS Will Produce Documents on Alternative Advertising**

This case is about the potential for widespread harm to CBS's commercial advertising

revenue—the lifeblood of network television—caused by DISH's PTAT and AutoHop

technologies that copy CBS primetime programming for on-demand, commercial-free playback.

This case is *not* about whether and how CBS monetizes advertising in other ways. In other

words, CBS has not claimed harm to its entirely distinct alternative advertising efforts, and they

are therefore irrelevant to this litigation. Nevertheless, DISH seeks an order compelling CBS to

produce documents about alternative advertising pursuant to three discovery requests in DISH's

Third RFP:

- Request No. 19: "All documents discussing or evidencing any analysis or description of the market for product placement advertising . . . on Your broadcast network primetime programming content.";

- Request No. 20: "All documents discussing or evidencing any analysis or description of the market for [em]bedded advertising . . . on Your broadcast network primetime programming content."; and

- Request No. 21: "All documents discussing or evidencing any analysis or description of alternative advertising models for broadcast network primetime programming content."

Schiller Decl. Ex. 1 at 8. In short, DISH seeks all documents about "product placement"

advertising, "embedded" advertising, and, as a catchall, any and all remaining documents about

alternative advertising.

Even though CBS disputes the relevancy of documents about alternative advertising,

CBS nevertheless has been working diligently to try and reach a compromise with DISH and

12

avoid burdening the Court with this dispute. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, Schiller Decl. Ex. 27.

Accordingly, even if alternative advertising were relevant to the lawsuit (which, again, CBS

denies), CBS has satisfied DISH's requests. DISH's motion to compel with respect to Request

Nos. 19-21 in DISH's Third RFP is therefore moot.

> **E.      CBS Has Already Produced Information on Internet Television Viewing
> Habits and Alternative Television Viewing Platforms, But CBS Nevertheless
> Agrees to Conduct *Additional* Reasonable Searches for Responsive
> Documents**

DISH argues that CBS should be ordered to produce documents about alternatives to

traditional broadcast television. Here, again, this Court need not intervene because CBS has

produced, and agrees to do an additional reasonable search for, responsive documents.

Specifically, DISH asks this Court to compel production of documents pursuant to two

requests. The first, from Request No. 15 in DISH's Fifth RFP, seeks:

> • Request No. 15: "All studies and analyses of Internet television viewing habits,
> including but not limited to:  (a) advertisement viewing tolerance in relation to
> advertisement placement, timing, frequency and duration during online and/or
> CBS mobile application viewing, and the effect of advertising on viewer
> retention; (b) cord-cutting or risk of cord-cutting from Internet-television viewing;
> and (c) distribution of advertisement avoidance behavior and viewing preferences
> across any population of viewers."

Schiller Decl. Ex. 3 at 5. As DISH states, this request essentially seeks all studies and analyses

of "[h]ow consumers watch television on the internet." (Orrick Br. at 10.)  But this is not

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13

DISH's first request for documents about Internet-based television viewing.  Earlier in discovery, DISH sought "[a]ll documents discussing or evidencing any analysis of the Internet-based distribution services market and/or the use of that market for distribution of Your broadcast network primetime programming content." Schiller Decl. Ex. 1 at 4.  CBS interpreted that earlier request *broadly* and produced studies and reports covering a wide range of issues related to Internet television, including Internet-television viewing habits. *See, e.g.*, Schiller Decl. Ex. 12 at 54-69; Ex. 20; Ex. 22.  In fact, on December 8, 2013, CBS produced 260 reports devoted solely to Internet-based television.  And although CBS had satisfied its obligations under this earlier request, CBS agreed in March 2014 to conduct an additional search for documents related to Internet television viewing.  Schiller Decl. Ex. 10 at 1.

DISH attempts to refute the strength of CBS's production in response to this earlier request by turning to trivial semantics.  DISH argues that the request at issue—Request No. 15 in DISH's Fifth RFP—is worded differently from the earlier request and, therefore, technically seeks a different category of documents.  Specifically, DISH claims that Request No. 15 seeks research into Internet television viewing "habits" while the earlier request involved research into the Internet television "market." (Orrick Br. at 10.) This argument misses the mark.  Because CBS interpreted DISH's earlier request broadly, CBS already has produced responsive documents in its possession—whether styled as relating to Internet viewing "habits" or the Internet viewing "market."

The same is true of the second request at issue, Request No. 1 in DISH's Eighth RFP:

- <u>Request No. 1</u>: "All documents constituting, analyzing, discussing or evidencing research into consumer usage of alternative television viewing platforms, such as Video On Demand ('VOD') and online streaming or digital downloads, including but not limited to any impact of those platforms on DVR usage."

14

Schiller Decl. Ex. 4 at 2. In effect, the request seeks every piece of paper that CBS has regarding research into alternative television viewing platforms, such as video on demand ("VOD") and Internet-based television.

Yet again, CBS already has produced research documents on alternative television viewing platforms in response to no fewer than three DISH document requests. The two requests discussed earlier in this section (Request No. 2 in DISH's Third RFP and Request No. 15 in DISH's Fifth RFP) cover research documents regarding Internet-based television platforms. As noted, CBS has already produced those documents, and has agreed to do a reasonable search for additional documents. The third request—Request No. 5 in DISH's Third RFP—calls for: "[a]ll documents discussing or evidencing any analysis of the market for Video On Demand ('VOD') distribution of broadcast network primetime programming content via MVPDs, including but not limited to any business plans, projections, reports, or memoranda concerning such VOD distribution of Your broadcast network primetime programming content." Schiller Decl. Ex. 1 at 4-5. Likewise, CBS has interpreted Request No. 5 in DISH's Third RFP broadly and already produced studies and reports regarding the VOD platform. *See, e.g.*, Schiller Decl. Ex. 16; Ex. 23 at 79-92.

For these reasons, CBS has already produced research documents on alternative television viewing platforms. Moreover, on March 21, 2014, CBS informed DISH that it would conduct an additional reasonable search for documents on the VOD and Internet-based television markets. Schiller Decl. Ex. 10 at 1. As a result, the Court should deny as moot DISH's motion to compel for Request No. 15 in DISH's Fifth RFP and Request No. 1 in DISH's Eighth RFP.

15

**F.     CBS Will Supplement its List of Primetime Shows** ███████████████

Pursuant to another document request, CBS produced a list of primetime shows that it offers on Internet-based platforms, such as Hulu.  DISH now claims that list is insufficient because it lacks certain specificity—specificity that DISH never requested before CBS produced the list.

At issue is Request No. 1 in DISH's Third RFP, which seeks "[d]ocuments sufficient to show all broadcast primetime programming content that [CBS] ha[s] offered via Internet-based distribution services (such as, without limitation, Hulu, Hulu Plus, iTunes, Apple Store, Netflix, Vudu, Amazon, or CBS.com) since the inception of such services."  Schiller Decl. Ex. 1 at 4.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████  Schiller Decl. Ex. 5 at 1-2.  ████████████████████████

██████████████████████.  Schiller Decl. Ex. 6 at 2; Ex. 19.

Nowhere did DISH state that the list must include the specific Internet-based platforms on which the shows were available and the accompanying time period of availability on those platforms.  But that is precisely the detail DISH now claims that CBS should have provided in the first place.  (Orrick Br. at 11.)  CBS disagrees and believes that it complied with the request as written.  Nevertheless, CBS is working to supplement its previous production to include the newly requested information.  Because CBS will supplement its list, DISH's motion with respect to Request No. 1 in DISH's Third RFP is moot.

16

DISH also claims that CBS should be obligated to respond to Interrogatory No. 9 in

DISH's Second Set of Interrogatories, which states:

- Interrogatory No. 9: "For each copyrighted work that You claim to be infringed, state whether You have licensed the work to any non-linear content distributor and identify all such distributors to which You have licensed the work, state the scope and the terms of the licenses and state the time period for which and conditions under which the work is or was licensed to each distributor."

In other words, DISH wants CBS to identify all works that it has licensed to Internet-based

distributors, and then provide each and every term pursuant to which the works were licensed.

To say this sweeping request is unduly burdensome would be an understatement. For

example, just for CBS's 2013-14 primetime season, there are roughly 27 primetime shows that

air on CBS *each week*. To comply with DISH's request, CBS first would need to identify those

shows that it has licensed to Internet-based distribution platforms. Then, for those licensed

shows, CBS would be required to provide *each and every* license term for *each and every*

episode of *each and every* show.

. Schiller Ex. 8 at

3-4. These license agreements contain the information requested by the interrogatory. Under

Fed. R. Civ. P. 33(d) and Local Civil Rule 33.3 for the Southern District of New York, CBS is

permitted to respond to DISH's unduly burdensome interrogatory by a more practical and

efficient means—                                        . Indeed, under Local Rule

33.3, interrogatories are disfavored and may extend beyond introductory topics—such as the

names of key witnesses and document custodians—*only* where interrogatories "are a more

practical method of obtaining the information sought than a request for production or a

17

deposition" or when ordered by the court.  *In re Weatherford Inter. Sec. Litig.*, No. 11 Civ. 1656,

2013 WL 5788680, at *2 (S.D.N.Y. Oct. 18, 2013) (citing Local Civil Rule 33.3(b)); *see*

*also Erchonia Corp. v. Bissoon,* No. 07 Civ. 8696, 2011 WL 3904600, at *7 (S.D.N.Y. Aug. 26,

2011) ("The Local Rules reflect a preference for other forms of discovery, such as depositions

and document requests."), *aff'd*, 458 F. App'x 58 (2d Cir. 2012).

Here, DISH's far-reaching interrogatory clearly is not more practical. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████.

Accordingly, the Court should deny as moot DISH's motion to compel regarding

Interrogatory No. 9 in DISH's Second Set of Interrogatories.

G.   ████████████████████████████████████████████████

Request No. 3 in DISH's Third RFP seeks "[d]ocuments sufficient to show all revenue

[CBS has] ever earned from the licensing of [its] broadcast network primetime programming

content to Internet-based distribution services, broken down by category for advertising,

subscription, impulse-buying, and any other revenue."  Schiller Decl. Ex. 1 at 4. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



. Echtman Decl. Ex. 19. DISH

claims that these figures are insufficient because they do not contain a breakdown of revenue by

"advertising," "subscription," "impulse-buying," and "any other revenue."

, the Court should deny DISH's motion with

respect to Request No. 3 in DISH's Third RFP as moot.

**H.    CBS Will Produce Additional Documents Tracking Viewership on VOD Platforms**

In Request No. 4 in DISH's Eighth RFP, DISH seeks "[a]ll documents tracking

viewership of CBS programming on VOD platforms from January 2007 until the present,

including but not limited to all 'VOD Tracker' documents similar to the documents bates

19

numbered CBS00025241-2547 and CBS00032911." Schiller Decl. Ex. 4 at 3. CBS has been

working diligently to identify additional documents tracking viewership of CBS primetime

programming on VOD. ███████████████████████████████████████████

██████████████████████████. CBS will produce these documents, which renders

this DISH document request moot.

I.    **CBS Will Produce Documents About its "Goal" and "Plans" to Shift DVR Viewing to VOD**

In Request No. 2 in DISH's Eighth RFP, DISH seeks "all documents discussing Your

'goal' and plan 'to move as much DVR viewing to VOD as [You] can,'" as discussed in a New

York Times article dated October 6, 2013. Schiller Decl. Ex. 4 at 2-3. DISH states that CBS has

agreed to produce documents about its "goal" but has wrongly refused to produce documents

about its "plans." (Orrick Br. at 14-15.) However, DISH's request for all documents about

CBS's desire to do something general such as moving DVR viewing to VOD is incredibly

overbroad. CBS is willing to conduct a reasonable search for documents about its "plans" as

well as its "goal" to move DVR viewing to VOD, but this request should be limited to

documents sufficient to show CBS's "plans" and "goal." DISH cannot credibly claim that it

needs every piece of paper that CBS has about its "plans" and "goal."

J.    **DISH's Request for Documents Evidencing Actions CBS Has Taken Against Other Unauthorized Television Technologies is Irrelevant to This Litigation**

In Request No. 9 in DISH's Third RFP, DISH seeks:

- Request No. 9: "All documents evidencing any actions, including business agreements and legal actions or threats of legal actions, that You have taken with the objective to restrict the availability or functionality of any devices that permit consumers to record and playback television programming at another time, including but not limited to devices that might incorporate commercial avoidance technology."

Schiller Decl. Ex. 1 at 6.  In short, this request calls for documents about CBS's interactions with other devices or services to restrict those devices or services from allowing its customers to record and then watch CBS programming.  But this is a case about PTAT and AutoHop, not any other devices or services.  DISH's only argument as to why such extraneous documents are relevant is that they "bear[] directly on CBS's claims of harm *from* PTAT and AutoHop."  (Orrick Br. at 16.)  DISH offers no explanation to support this conclusory assertion, nor could it.  Whether CBS has taken any action against, for example, services that stream CBS television programming without CBS's consent has nothing to do with PTAT and AutoHop.  DISH's conclusory relevancy argument holds no water.

Although the documents DISH seeks are irrelevant to this litigation, CBS nevertheless proposed a compromise:



. Schiller Decl. Ex. 8 at 4-5.

. *Id.*

DISH rejected this compromise on the basis that its request also seeks undefined "business agreements."  Schiller Decl. Ex. 9 at 4-5; Ex. 10 at 2.  As CBS has explained, DISH's request for "business agreements" appears to be a backdoor attempt at obtaining CBS's highly proprietary and confidential retransmission agreements with other multichannel video programming distributors, a category of documents which is already the subject of a separate request in DISH's motion to compel.  *See supra* Part A.

21

For these reasons, the Court should deny DISH's motion with respect to Request No. 9 in DISH's Third RFP.

### K.   Documents About DVR and VCR Recording, Storage, and Playback Capabilities Have No Bearing On the Issues in This Litigation

This case concerns DISH's PTAT and AutoHop services, which are specific services available with DISH's Hopper DVR. Yet DISH claims that it is somehow entitled to *each and every* piece of paper CBS has studying or analyzing DVR and VCR functions that have nothing to do with this litigation. Request No. 17 in DISH's Third RFP seeks "[a]ll documents reflecting any study or analysis by You of DVR or VCR recording, storage and playback capabilities." Schiller Decl. Ex. 1 at 7.

This request is overly broad, and CBS already has produced responsive documents that would be captured by this request. DISH's request for documents about decades-old VCR technology strays far afield from the issues in this litigation. There is simply no connection between the commercial-skipping technology available in the Hopper DVR and the general recording, storage, and playback capabilities of VCRs. Moreover, as for DVRs, whether CBS has studied or analyzed issues such as DVR hard-drive space is irrelevant. But this is not to say that CBS has produced no documents about DVR technology.



. *See, e.g.,* Schiller Decl. Exs. 14, 17, 18.

. *See, e.g.,* Schiller Decl. Ex. 15.

CBS has satisfied its obligations under Request No. 17 in DISH's Third RFP.

22

**L.      CBS Has Agreed to Add Scott Koondel as an Electronic Document Custodian**

In their respective motions to compel, CBS and DISH each seek an order compelling the other side to add an electronic document custodian. DISH has requested that CBS add Scott Koondel, CBS's Chief Corporate Content Licensing Officer, while CBS has requested that DISH add Warren Schlichting, DISH's Senior Vice President of Media Sales and Analytics. Pursuant to a telephonic meet and confer on May 2, 2014, CBS and DISH have agreed to add the requested electronic document custodians. Schiller Decl. ¶ 2. DISH's motion to compel with respect to Mr. Koondel is now moot.

**M.      CBS's Discussions of its Cable Properties are Irrelevant to the Litigation and Should Not Be Unredacted**

At issue in this case is a single business arrangement: DISH's transmission of CBS's broadcast signal on the CBS Network. That transmission is made possible pursuant to the Retransmission Agreement, whereby DISH pays CBS a fee for the right to transmit the CBS broadcast signal to DISH customers. In addition to CBS's broadcasting business, CBS also owns several cable properties, including Showtime, CBS Sports Network, and Smithsonian (jointly with the Smithsonian Institute) (the "cable properties"). As CBS and DISH were negotiating the terms of the Retransmission Agreement at issue in this case, CBS and DISH concurrently negotiated the terms under which DISH would be permitted to transmit the signals from CBS's cable properties.

23

During discovery, CBS and DISH have produced their respective internal and external negotiation documents leading to the executed Retransmission Agreement. On September 19, 2013, CBS informed DISH that, because the cable properties are irrelevant to this litigation, CBS would be redacting all references to its cable properties in the internal negotiation documents that it produced. Schiller Decl. Ex. 7. DISH never responded to CBS's letter, nor did it otherwise voice any objection to these redactions until a telephonic meet and confer in February 2014. During that call, DISH claimed that CBS's redactions of its cable properties in its internal negotiation documents generally "distort" the discussion of the Retransmission Agreement in those same internal negotiation documents. CBS disagreed but stated its willingness to consider unredacting discussions of the cable properties on a case-by-case basis if DISH presented specific examples, a position CBS memorialized in a subsequent letter. Schiller Decl. Ex. 10 at 5. DISH never presented any such examples.

Instead, DISH changed course and presented an entirely new theory as to why CBS should unredact discussions of its cable properties. During a telephonic meet and confer on March 17, 2014, DISH referred to a December 16, 2011 email between the two parties' lead negotiators—CBS's Martin Franks and DISH's Dave Shull. In that email, Mr. Franks stated that he was "not looking to have this arrangement include new businesses that DISH may choose to enter into in the future." *Id.* at 6. That email, DISH now argues, may have been a reference to the negotiations over CBS's cable properties and not its broadcast property.

DISH reiterates each of these two unsupported theories in its brief. (Orrick Br. at 19-20.) As for DISH's first argument that the redactions to the cable properties distort the negotiations over the Retransmission Agreement, DISH has presented no evidence that this is, in fact, true. Instead, DISH relies on a redacted email that does not substantiate its claim. Again,

24

CBS reiterates that it was careful with its redactions so as not to redact discussions of its

broadcast property. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████. *See* Schiller Decl. Ex. 21. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████.

    As for DISH's second argument that the discussion of the cable properties "put in

context" the December 16, 2011 email from Mr. Franks, DISH's argument is nothing but

wholesale speculation. DISH has no basis to believe that discussions about Showtime will shed

light on Mr. Franks's email.

## CONCLUSION

    For the foregoing reasons, this Court should deny DISH's motion to compel.

Dated: New York, New York
       May 2, 2014

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

Jonathan D. Schiller
Joshua I. Schiller
575 Lexington Avenue, 7th Floor
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Hamish P.M. Hume
5301 Wisconsin Ave., NW, Suite 800
Washington, DC 20015
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

25

*Attorneys for CBS Corporation, CBS Broadcasting Inc., CBS Studios Inc. and Survivor Productions, LLC*