```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                                      :
IN RE: AUTOHOP LITIGATION                             :    MEMORANDUM AND ORDER[1]

                                                      :    12-CV-4155 (LTS)(KNF)
------------------------------------------------------X
```
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

This is an action by DISH Network L.L.C., a satellite television provider, seeking a declaratory judgment that it is in compliance with its retransmission agreements with CBS Corporation, CBS Broadcasting Inc., CBS Studios Inc. and Survivor Productions, LLC (collectively "CBS"). CBS brought counterclaims against DISH Network, L.L.C. and EchoStar Technologies LLC (collectively "DISH") for copyright violations, breach of contract and fraud. Before the Court is CBS's motion to compel DISH to produce certain documents. DISH opposes the motion.

## CBS'S CONTENTIONS

CBS seeks to compel DISH to produce: (1) internal, non-privileged DISH communications relating to negotiations with three local network affiliates, Gannett Broadcasting, Inc., Sinclair Broadcast Group. Inc. and Hoak Media Corp., referencing Prime Time Any Time ("PTAT") and AutoHop features allowing subscribers to skip television commercials when playing back certain recorded programs, and portions of any draft or final agreements between DISH and any of the three local affiliates relating to PTAT, AutoHop or commercial skipping. (Ex. 1, CBS Corporation's Fourth Set of Requests for the Production of

---

[1] This is a redacted version of the September 24, 2014 Memorandum and Order, Docket Entry No. 309, that was sealed to protect certain commercially sensitive information.

Documents, document request Nos. 15-18, Ex. 2 CBS Parties' Fifth Set of Requests for the Production of Documents, document request Nos. 1 and 2)[2]; (2) viewership tracking data showing usage of PTAT and AutoHop (Ex. 6, CBS Parties' First Request for Production of Documents, document request No. 12)[3]; (3) DISH documents concerning the value of distributing CBS programming (Ex. 1, CBS Corporation's Fourth Set of Requests for the Production of Documents, document request Nos. 19-22)[4]; (4) directives and instructions

---

[2] CBS Corporation's Fourth Set of Requests for the Production of Documents, document request Nos. 15, 17 and CBS Parties' Fifth Set of Requests for the Production of Documents, document request No. 1 state: "All documents concerning any communications discussing or referencing PTAT or AutoHop that You have had with Gannett[, Sinclair and Hoak Media]." CBS Corporation's Fourth Set of Requests for the Production of Documents, document request Nos. 16, 18 and CBS Parties' Fifth Set of Requests for the Production of Documents, document request No. 2 state:

> With respect to all draft and final agreements between You and Gannett[, Sinclair and Hoak Media] where PTAT or AutoHop was discussed or referenced during negotiations relating to that draft or final agreement, produce the portions of such documents that relate directly or indirectly to PTAT, AutoHop, or commercial skipping, including but not limited to provisions sufficient to show any consideration provided in connection with those services.

[3] CBS Parties' First Request for Production of Documents, document request No. 12 states:

> All documents Concerning DISH's [**REDACTED**], and all Documents Concerning [**REDACTED**] as well as all reports, studies, analyses, or data, including from periods of time after the [**REDACTED**], projecting or reporting the quantity or percentage of DISH subscribers' enabling or disabling PTAT and/or AutoHop, the quantity or percentage of the use of PTAT and/or AutoHop; or the use of AutoHop with regard to specific programs.

[4] CBS Corporation's Fourth Set of Requests for the Production of Documents, document request No. 19 states: "All documents relating to any analysis, study, survey, research, or business plan regarding the losses or other business harm DISH would incur if it lost the right to retransmit the CBS Broadcast Signal to some or all of its subscribers." CBS Corporation's Fourth Set of Requests for the Production of Documents, document request No. 20 states: "All documents relating to any analysis, study, survey, research, or business plan regarding the losses or other business harm DISH would incur if it lost the right to retransmit the broadcast signal of ABC, Fox, or NBC to some or all of its subscribers." CBS Corporation's Fourth Set of Requests

(continued...)

relating to the operation of PTAT and AutoHop ( Ex. 11, ABC Parties' Fifth Request for Production of Documents, document request No. 5,[5] Ex. 12, ABC Parties' Sixth Request for Production of Documents, document request Nos. 2 and 4,[6] Ex. 13, CBS Parties' Sixth Set of Requests for the Production of Documents, document request Nos. 2 and 3,[7]); and (5) documents referring to any harm allegedly caused to DISH by any networks' refusal to carry television advertising promoting the Hopper, DISH's high definition digital video recorder (Ex. 12, ABC

---

[4](...continued)
for the Production of Documents, document request No. 21 states: "All documents relating to any analysis, study, survey, research, or business plan regarding the amount DISH would be willing to pay to retransmit the CBS Broadcast Signal to its subscribers." CBS Corporation's Fourth Set of Requests for the Production of Documents, document request No. 22 states: "All documents relating to any analysis, study, survey, or research regarding the amount DISH would be willing to pay to provide CBS content to its subscribers through any alternative distribution channel, including without limitation any form of video-on-demand, internet streaming, over the top, or digital distribution."

[5] ABC Parties' Fifth Request for Production of Documents, document request No. 5 states: "All Documents, including guides and instruction manuals, providing employees or contractors with directives or instructions on changing PTAT settings after a local station has stopped or started an affiliation with ABC, CBS, NBC, or Fox."

[6] ABC Parties' Sixth Request for Production of Documents, document request No. 2 states: "All Documents, including guides and instruction manuals, providing employees or contractors with directives or instructions on changing PTAT settings when DISH switches from offering standard-definition PTAT recording to offering high-definition PTAT recording in a DMA"[designated market area]. ABC Parties' Sixth Request for Production of Documents, document request No. 4 states: "All Documents, including guides and instruction manuals, providing employees or contractors with directives or instructions on changing PTAT settings for Subscribers who live in zip codes associated with more than one DMA."

[7] CBS Parties' Sixth Set of Requests for the Production of Documents, document request No. 2 states: "All documents, including guides and instruction manuals, providing employees or contractors with directives or instructions on changing PTAT settings when DISH switches from offering standard-definition PTAT recording to offering high-definition PTAT recording in a DMA." CBS Parties' Sixth Set of Requests for the Production of Documents, document request No. 3 states: "All documents, including guides and instruction manuals, providing employees or contractors with directives or instructions on changing PTAT settings for Subscribers who live in zip codes with more than one DMA."

Parties' Sixth Request for Production of Documents, document request No. 8,[8] Ex. 13, CBS Parties' Sixth Set of Requests for the Production of Documents, document request No. 8[9]).  CBS also seeks to compel DISH to add Warren Schlichting as a custodian of electronically stored information.

 CBS contends that documents concerning negotiations and agreements with local affiliates are relevant [**REDACTED**] and, consequently, to CBS's fraud and copyright damages.

 CBS asserts that DISH's interrogatory responses state [**REDACTED**].  CBS seeks the data to analyze how often DISH subscribers watch network prime time programming without commercials.  According to CBS, DISH first refused to produce data claiming they were highly confidential, then took the position that it would not be feasible to produce data by the end of discovery in a format that CBS's outside expert could interpret or analyze, then stated it would be a prohibitively expensive and time-consuming production because the data were regularly archived in a format that is not readily accessible.  CBS contends the data are relevant, and DISH already submitted a declaration, in opposing ABC's motion for a preliminary injunction and ABC's appeal to the Second Circuit, in which these data were analyzed to support its assertion that [**REDACTED**].  Having relied on the data to support its defense, CBS asserts, DISH cannot now withhold the data on the ground that they are too confidential or too costly to produce, since any burden was created by DISH through its failure to preserve the data in an accessible format,

---

[8] ABC Parties' Sixth Request for Production of Documents, document request No. 8 states: "All documents referring to any harm to You allegedly caused by any networks' refusal to carry television commercials promoting the Hopper."

[9] CBS Parties' Sixth Set of Requests for the Production of Documents, document request No. 8 states: "All Documents requested by the ABC Parties in their Sixth Request For Production of Documents in *In re AutoHop Litigation*, No. 12 Civ. 4155 (S.D.N.Y.)."

upon having notice that it might be required to produce them. CBS asserts that, if DISH continues to refuse to produce the requested data on burden grounds, it should be precluded from using the data to support its defense.

CBS contends that documents concerning the value of distributing CBS programming are relevant to CBS's fraud claim and measure of damages, because the damages are based, in part, on the market value of distributing CBS programming by DISH on an on-demand, commercial-free basis as a result of the release of PTAT and AutoHop. CBS maintains that DISH's recent retransmission agreement with ABC confirms that PTAT and AutoHop are part of DISH's broader alternative distribution plan.

According to CBS, documents concerning the control DISH exercises over the operation of PTAT and AutoHop are relevant to whether DISH engages in sufficient volitional conduct related to the copying of CBS programming. Thus, DISH cannot limit its document response to "formalized" guides and instruction manuals but must produce all documents containing the relevant directives and instructions to its employees or contractors.

Moreover, documents referring to any networks' refusal to carry television advertising promoting the Hopper are relevant because they are "probative of the harm caused to advertisers when their advertisements are not seen by consumers," which is the "same harm CBS alleges occurs as a result of DISH's PTAT and AutoHop services being used to watch CBS programming commercial-free." CBS contends that "DISH cannot put this allegation at issue and then deny CBS the opportunity to seek discovery related to it."

## DISH'S CONTENTIONS

DISH contends that it produced to CBS the PTAT and AutoHop usage data upon which it relied when opposing both ABC and Fox's motions for a preliminary injunction and

supplemented those reports in discovery. It asserts that CBS now seeks all DISH's viewership data relating to the rate at which DISH subscribers use PTAT and AutoHop. However, DISH contends, this request is contrary to the parties' December 7, 2012 electronic discovery order and the May 13, 2013 amendment to that order excluding from production electronic information whose preservation requires extraordinary affirmative measures that are not utilized in the ordinary course of business. According to DISH, PTAT and AutoHop usage data represent a small part of an enormous data set generated by Hopper devices daily, which is extremely difficult to store, process and use. [**REDACTED**] Moreover, to extract the relevant meaning from the PTAT and AutoHop viewer measurement data requires associating it with other data, which is a time-consuming and difficult technical and analytical process. DISH contends that aggregate viewer measurement data are a valuable confidential asset of DISH and subject to strict privacy laws. As a consequence, only limited responsive data are accessible without resort to data archives that the parties already agreed shall not be used in this action. Although DISH makes viewer measurement data available to Rentrak [**REDACTED**]. CBS cannot establish the good cause necessary to require production of [**REDACTED**]. Thus, since DISH does not [**REDACTED**] no obligation exists on DISH to produce the data, and any further production would impose an undue burden and expense on DISH. Furthermore, less burdensome ways exist to obtain the information because this information was provided to Fox in another suit over PTAT and AutoHop by way of interrogatory responses, and CBS did not explain why it cannot proceed in that manner here, or why it needs the data to analyze how often DISH subscribers watch network programming without commercials. DISH contends that, if the Court grants CBS's request, any production of viewer measurement data should be subject to significant conditions, including that CBS will bear the expense of any such discovery, and only limited

6

access should be provided. Moreover, in light of the time needed to process and provide the data, the case schedule should be amended. According to DISH, cost-shifting is appropriate and the data should be placed in a clean room where only experts have access to the data and no one should be allowed to copy the data. DISH should also be afforded an opportunity to object to such experts before they receive access to the data to ensure that competitors do not receive access to it. DISH contends that no basis exists to preclude it from relying on previously created reports in support of its defense. DISH has not disobeyed any order or acted in bad faith.

      DISH asserts that the documents it agreed to produce [**REDACTED**] are "more than sufficient." CBS seeks production of internal discussions of DISH's negotiations with its affiliates, while refusing to produce any of its own communications with pay-television providers about PTAT or AutoHop in connection with retransmission consent negotiations. According to DISH, CBS cannot have it both ways, claim that a category of documents is not relevant in the context of its own discovery obligations, yet move to compel that same category of documents from DISH. Furthermore, CBS's request for internal communications is unduly burdensome, requiring careful analysis for work product and attorney-client privilege, making it time and labor-intensive. DISH's internal discussions of PTAT and AutoHop after the features were released have no bearing on whether DISH had a duty to disclose PTAT and AutoHop to CBS during negotiations of the retransmission agreement. Anything DISH considered paying internally [**REDACTED**], as opposed to what DISH paid is irrelevant to calculating damages. Similarly, requests for documents regarding the amount DISH would be willing to pay to retransmit CBS's broadcast signal or distribute CBS content through alternative distribution channels seem designed to obtain highly-confidential information [**REDACTED**], impose an undue burden on DISH and are irrelevant. CBS knows the market value of distributing its own

7

programming commercial-free and on-demand, and it has contracts with other entities evidencing that market value. CBS's request for all directives and instructions on changing PTAT settings, regardless of where they are located, is overly broad, unduly burdensome and cumulative, since DISH already produced guides and instruction manuals on the workings of PTAT.

DISH contends that any harm to DISH from the networks' refusal to air DISH advertisements promoting Hopper is irrelevant. That is so because the harm to DISH from the networks' refusal to air Hopper advertisements has no bearing on the alleged harm to the networks from consumers using AutoHop to skip commercials belonging to non-party advertisers that were aired. Moreover, DISH did not allege that it was harmed by the networks' refusal to air Hopper commercials.

## CBS'S REPLY

In its reply, CBS seeks to preclude DISH from relying on the PTAT and AutoHop usage data going forward in this action based on DISH's amended opposition to CBS's instant motion. Since DISH's amended opposition, filed without authorization, was stricken from the record, see Docket Entry No. 292, the Court will not consider CBS's arguments addressing DISH's amended opposition or any exhibits post-dating DISH's May 2, 2014 opposition to the motion. CBS also indicates that its request to compel DISH to add Warren Schlichting as a custodian of electronically stored information is moot.

## LEGAL STANDARD

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed.

R. Civ. P. 26(b)(1). The scope of discovery under Rule 26(b) is broad. See Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 98 S. Ct. 2380, 2389 (1978) (relevant for the purposes of Rule 26(b) means "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case").

> On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.
>
> Fed. R. Civ. P. 37(a)(1).
>
> Upon any motion or application involving discovery or disclosure requests or responses under Fed. R. Civ. P. 37, the moving party shall specify and quote or set forth verbatim in the motion papers each discovery request and response to which the motion or application is addressed. The motion or application shall also set forth the grounds upon which the moving party is entitled to prevail as to each request and response.
>
> Local Civil Rule 37.1.

"[M]otions to compel under Fed. R. Civ. P. 37 . . . are entrusted to the sound discretion of the district court." United States v. Sanders, 211 F.3d 711, 720 (2d Cir. 2000).

### APPLICATION OF LEGAL STANDARD

<u>Procedural Deficiencies</u>

CBS's motion is procedurally deficient because it does not contain a certification that it has in good faith conferred or attempted to confer with DISH in an effort to obtain discovery without court intervention, as required by Rule 37(a)(1) of the Federal Rules of Civil Procedure. Although CBS submitted exhibits demonstrating letters exchanged among counsel in connection with various discovery requests, such letters are not contemplated by Rule 37, and they place an unnecessary burden on the Court to ascertain what, if any, efforts have been made by CBS to confer or attempt to confer with DISH to resolve the discovery issues raised in this motion

9

without court intervention. Moreover, CBS failed to comply with Local Civil Rule 37.1, because it did not set forth verbatim DISH's initial responses to its document requests, including DISH's initial response to Document Request No. 12, contained in CBS's First Request for Production of Documents. However, the Court has reviewed the parties's submissions on the motion, including discovery-related communications among counsel. Notwithstanding the procedural deficiencies and to save time and resources in accordance with Rule 1 of the Federal Rule of Civil Procedure, the Court will analyze the motion on the merits.

<u>DISH's Internal Communications Related to Negotiations with Three Affiliates</u>

DISH's contention that it "has agreed to sufficient production on this subject matter, and should not be required to produce anything more" is baseless. DISH makes no citation to any authority for this proposition and does not explain what it means when it states that its production of external communications with the three affiliates is "more than sufficient." Nonprivileged relevant matter must be disclosed, <u>see</u> Fed. R. Civ. P. 26(b)(1), and Rule 26(b)(1) of the Federal Rules of Civil Procedure does not state or contemplate degrees of sufficiency in connection with disclosure obligations. Moreover, DISH's argument that producing internal communications related to negotiations with three affiliates will "require very careful analysis for work product and attorney-client privilege, making review and production extremely time-and-labor intensive" is unsupported. DISH does not explain how "very careful analysis for work product and attorney-client privilege" of its internal communications related to negotiations with three affiliates differs from any other analysis for work product and attorney-client privilege which must be performed before documents are disclosed, or why or how such an analysis is more time or labor intensive than any other analysis for work product and attorney-client privilege that must be performed before documents are disclosed. Thus, DISH failed to show

that CBS's request for DISH's internal communications on its negotiations with three affiliates concerning PTAT and AutoHop is unduly burdensome.

DISH is correct that CBS failed to show that its request for internal communications is relevant to calculating the amount of CBS's fraud damages. In fact, CBS's quotation: "'[Fraud damages are] computed by ascertaining the 'difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain,'" taken from Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80 (1996) (quoting Sager v. Friedman, 270 N.Y. 472, 481 (1936)), contradicts directly its argument that the amount DISH was willing to pay, or considered paying to its affiliates, relates to the amount of CBS's fraud damages. The measure of damages for fraudulent inducement to make a contract that otherwise would not have been made "is indemnity for loss suffered through that inducement. From such damages 'all elements of profit are excluded. The true measure of damage is indemnity for the actual pecuniary loss sustained as a direct result of the wrong.'" Sager, 270 N.Y. at 481. Thus, what DISH was willing to pay or consider paying to its affiliates is irrelevant to CBS's fraud damages.

However, DISH's internal communications concerning negotiations with its three affiliates are relevant to the determination of copyright statutory damages that CBS seeks in its counterclaims. See 17 U.S.C. § 504(c). In determining the amount of statutory damages for copyright infringement, courts consider various factors, including: (1) "the infringer's state of mind"; (2) "the expenses saved, and profits earned, by the infringer"; (3) "the revenue lost by the copyright holder"; (4) "the deterrent effect on the infringer and third parties"; (5) "the infringer's cooperation in providing evidence concerning the value of the infringing material"; and (6) the conduct and attitude of the parties." Bryant v. Media Right Prods., Inc, 603 F.3d 135, 144

(2d Cir. 2010). DISH's internal communications concerning negotiations with its affiliates are relevant to the enumerated factors that courts consider when determining copyright statutory damages, in particular to the alleged infringer's state of mind, since, in establishing the appropriate amount of statutory damages to be awarded, CBS has the burden of proving "that infringement was committed willfully." 17 U.S.C. § 504(c)(2). Accordingly, DISH's objections to CBS's request for internal communications concerning DISH's three affiliates, Ganett Broadcasting, Inc., Sinclair Broadcast Group, Inc. and Hoak Media Corp., are overruled. DISH must produce those documents to CBS, in response to CBS Corporation's Fourth Set of Requests for the Production of Documents, document request Nos. 15, 16, 17 and 18, and CBS Parties' Fifth Set of Requests for the Production of Documents, document request Nos. 1 and 2.

<u>DISH's Viewership Tracking Data Showing Usage of PTAT and AutoHop</u>

CBS failed to comply with Local Civil Rule 37.1, because it did not set forth verbatim DISH's initial response to document request No. 12 from CBS Parties' First Request for Production of Documents. In its memorandum of law, under the subheading "Viewership Tracking Data Showing Usage of PTAT and AutoHop," CBS referenced "Req. No. 12 (Second)" as the document request at issue. However, CBS failed to point to any document request "No. 12 (Second)" in its papers or explain the meaning of "(Second)" appended to "Req. No. 12" in its motion papers, notwithstanding that the parties use the words "Request No. 12 (Second)" in their letters to one another. Try as it may, the Court was unable to discern the meaning of "Request No. 12 (Second)." The Court will assume that "Request No. 12 (Second)" refers to document request No. 12 from CBS Parties' First Request for Production of Documents.

Although CBS in its memorandum of law contends that DISH's objections to CBS's document request No. 12 changed over time, CBS did not provide DISH's initial response to it,

only subsequent letters, which show certain discovery-related communications among counsel. In one of those letters, dated November 18, 2013, DISH stated it stands by its objection to CBS's request, without identifying that objection, and it contended that CBS's request lacks foundation and seeks work product, inappropriately. In a letter, dated February 4, 2014, DISH contended, inter alia, that document "Request No. 12 (Second)" is "overly broad and unduly burdensome, as well as incomprehensibly vague." DISH asserted that it is impracticable and not feasible to produce raw data because they are not in a format that CBS's experts could interpret or analyze. Moreover, DISH expressed concern that CBS failed to provide sufficient assurance that it would respect confidentiality with respect to any raw data that may be produced. In a letter, dated March 25, 2014, DISH contends that it did not need to maintain raw data flowing in from Hopper set-top boxes reflecting subscriber usage of PTAT and AutoHop in an accessible format for the ordinary course of its business, because the cost associated with such storage in an accessible format would be prohibitive.

According to CBS, "[i]n opposing both ABC's motions for preliminary injunction and ABC's subsequent appeal to the Second Circuit, DISH submitted declarations analyzing this viewership data to support its assertion [**REDACTED**]. DISH already produced PTAT and AutoHop usage data it relied upon in support of its opposition to the motions for preliminary injunction. CBS contends that DISH "already submitted declarations to the Court analyzing this data," and no reason exists "why the data that was [sic] used to prepare these analyses is distinct from, and more confidential than, the remaining raw data sought by CBS." CBS does not dispute that producing the requested viewership data would be unduly burdensome, only that "the asserted burden was created by DISH," and that the value of the required information outweighs the burden to DISH. CBS did not address DISH's objection that document request

13

No. 12 is "incomprehensibly vague."

The Court sustains DISH's objections that CBS's document request No. 12 is "overly broad and unduly burdensome, as well as incomprehensibly vague." CBS's document request No. 12 consists of a seemingly single sentence that is nine lines long and extremely difficult, if not impossible, to understand. CBS appears to request three categories of items: (1) "All documents Concerning [**REDACTED**]; (2) "All Documents Concerning [**REDACTED**]; and (3) "all reports, studies, analyses, or data, including from periods of time after the [**REDACTED**], projecting or reporting the quantity or percentage of DISH subscribers' enabling or disabling PTAT and/or AutoHop, the quantity or percentage of the use of PTAT and/or AutoHop; or the use of AutoHop with regard to specific programs."

The first two categories appear to seek all documents concerning all DISH's decisions on the [**REDACTED**]. The first two categories appear to be overly broad in scope, as they do not contain any time or other limitation, and the content of Vivek Khemka's deposition transcript remains unknown to the Court, as it was not submitted by any party on this motion, notwithstanding the reference to it in describing CBS's document request No. 12. The third category is vague, because it is hardly comprehensible, if at all, and what can be discerned to be requested is overly broad. The third category appears to seek all documents and data, without any time period or other limitation, "projecting or reporting" certain information about PTAT and AutoHop users and usage. Although the third category seems to include "periods of time after [**REDACTED**], no definite time period is indicated in the request. The convoluted syntax of CBS's document request No. 12 makes it difficult, if not impossible, to understand what exactly is being sought in the third category.

Moreover, the enormous burden and expense that would be imposed on DISH to access

14

and process the requested data outweighs any benefit CBS might have from using that data to refute DISH's assertion [**REDACTED**]. Although in its reply CBS focuses on DISH's changes in position, with respect to the production in response to document request No. 12 and its amended opposition to the motion not considered here, CBS does not challenge DISH's assertions that: (a) the parties agreed, on May 9, 2013, that they will not be required to search for "other forms of ESI whose preservation requires extraordinary affirmative measures that are not utilized in the ordinary course of business,"

see Docket Entry No. 214; and (b) producing the data requested does require extraordinary affirmative measures that are not utilized in the ordinary course of business. The Court notes that the parties' agreement occurred after document request No. 12 had been made by CBS. However, the portion of the parties' May 9, 2013 agreement exempting certain electronically stored information from production was based specifically on Section (6)(a) of the parties' Joint Electronic Discovery Submission No. 1, see Docket Entry No. 160, notwithstanding the fact that the agreed exemption in Docket Entry No. 214 expanded the initial exemption in Docket Entry No. 160. Given that electronically stored information whose preservation requires extraordinary affirmative measures that are not utilized in the ordinary course or business is not required to be produced as per the parties' May 9, 2013 agreement, document request No. 12 appears to fall squarely within that category. The Court finds that CBS failed to show that overruling DISH's objections, that document request No. 12 from the CBS Parties' First Request for Production of Documents is "overly broad and unduly burdensome, as well as incomprehensibly vague," is warranted.

<u>DISH Documents Concerning the Value of Distributing CBS Programming</u>

Although CBS contends that the documents requested are relevant to its "fraud

15

damages," that is not the case: what losses or business harm DISH "would incur if it lost the right to retransmit the CBS broadcast Signal" or what DISH was willing to pay to retransmit the CBS signal to its subscribers or to provide CBS content to its subscribers through any alternative distribution channel, is irrelevant to the issue of fraud damages. That is so because "[t]he true measure of damage is indemnity for the actual pecuniary loss sustained as a direct result of the wrong." Sager, 270 N.Y. at 481. CBS's request to compel DISH to respond to document request Nos. 19-22, from its Fourth Set of Requests For the Production of Documents is denied.

<u>Directives and Instructions Relating to the Operation of PTAT and AutoHop</u>

CBS contends that DISH produced only "formalized" guides and instruction manuals, without providing an explanation of what that term means or submitting a sample to facilitate the Court's understanding of what was produced. Notwithstanding, CBS's document requests do not include any limitation on the documents to "formalized." DISH's assertions of the determinative issue concerning "direct infringement" and whether documents it produced are "sufficient to show how PTAT operates" are of no consequence to its obligation to respond to CBS's document requests. DISH's conclusory objections that, "[i]n light of the vast amount of discovery produced by DISH on the workings of PTAT," CBS's requests for additional documents are "cumulative and unduly burdensome," are unsupported. DISH failed to explain why CBS's requests are unduly burdensome or to describe how they are cumulative. Therefore, DISH must produce documents in response to: (a) document request No. 5, in ABC's Fifth Request for Production of Documents; (b) document request Nos. 2 and 4, in ABC's Sixth Request for Production of Documents; and (c) document request Nos. 2 and 3, in CBS's Sixth Set of Requests for the Production of Documents.

Network Refusal to Carry DISH Advertisements

The Court finds that document request No. 8, from ABC Parties' Sixth Request for Production of Documents, and document request No. 8, from CBS Parties' Sixth Set of Requests for the Production of Documents, are irrelevant and no documents need to be produced. DISH is correct that the harm to DISH from the networks' refusal to air Hopper advertisements has no bearing on the harm to CBS from consumers using AutoHop to skip any non-parties' commercials that were aired.

## CONCLUSION

For the foregoing reasons, CBS's motion to compel, Docket Entry No. 250, is granted, in part, and denied, in part. On or before October 1, 2014, DISH must produce to CBS the following documents in response to:

(1) document request Nos. 15, 16, 17 and 18, in CBS Corporation's Fourth Set of Requests for the Production of Documents, and document request Nos. 1 and 2, in CBS Parties' Fifth Set of Requests for the Production of Documents; and

(2) document request No. 5, in ABC's Fifth Request for Production of Documents, document request Nos. 2 and 4, in ABC's Sixth Request for Production of Documents, and document request Nos. 2 and 3, in CBS's Sixth Set of Requests for the Production of Documents.

Dated: New York, New York  
November 3, 2014

SO ORDERED:

*Kevin Nathaniel Fox*  
KEVIN NATHANIEL FOX  
UNITED STATES MAGISTRATE JUDGE